UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
KEVIN POLLACK,

Plaintiff,

23 Civ.

Complaint
(Jury trial demanded)

-against-

JODIE LOUISE GORDON (also known as JODY GORDON), and FUSION MODELS BK LLC,

Defendants.
------------------------------------------------------------------------X

Plaintiff Kevin Pollack (referred to as "Pollack" herein), by and through his attorneys, Kasell Law Firm, brings this Complaint against Defendant Jodie Gordon (also known as Jody Gordon and referred to as "Gordon" herein) and Defendant Fusion Models BK LLC ("Fusion BK") and alleges as follows:

**SUMMARY OF ACTION**

1. Pollack was a member and 35.222% owner of Fusion Modeling Agency LLC ("Fusion") and now brings this Complaint against Gordon, who was acting as the primary operator and Managing Member of Fusion, after Gordon (1) breached the Operating Agreement of Fusion (the "Operating Agreement"), as amended, (2) breached Gordon's fiduciary duties, (3) refused to provide financial records to Pollack, (4) dissolved Fusion without notice to Pollack before dissolution, (5) formed a new limited liability company, Fusion BK, and (6) transferred all of Fusion's assets to Fusion BK without any remuneration to Pollack.

**PARTIES**

2. Pollack is an individual who was a Member of Fusion before the limited liability company was dissolved on May 3, 2021, by judicial decree issued by the Supreme Court in the County of Kings, New York, pursuant to Section 702 of New York's Limited Liability Company Law, in Index Number 500709/2021, and without any notice being provided to Pollack until almost one year after dissolution.

3. Pollack is a citizen of Florida.

4. Gordon is an individual who was also a Member of Fusion before it was dissolved by judicial decree. Gordon was the primary operator and Managing Member of Fusion.

5. Gordon is a citizen of New York who resides in Brooklyn, New York.

6. Fusion BK is a limited liability company formed under the laws of the State of New York on November 5, 2021, with Jodie Gordon as the company's registered agent at 101 N. 10th Street, Suite 301, Brooklyn, NY 11249.

7. Prior to its dissolution, Fusion's principal place of business was at 101 N. 10th Street, Brooklyn, NY 11249.

8. Upon information and belief, Fusion BK only has one member, Jodie Gordon.

9. Upon information and belief, Fusion BK is a citizen of New York.

10. Upon information and belief, Gordon is Fusion BK's managing member.

11. Upon information and belief, Fusion BK's principal place of business is 101 N. 10th Street, Brooklyn, NY 11249.

## JURISDICTION AND VENUE

12. Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over this action because Plaintiff is a citizen of Florida and Defendants are citizens of New York and the amount in controversy exceeds $75,000.

13. Pursuant to 28 U.S.C. § 1391, this action may be brought in this District because it is a judicial district in which Defendants reside and, in the alternative, it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred and, in addition, a substantial part of property that is the subject of the action is situated.

## FORMATION OF FUSION

14. On December 7, 2006, Gordon, Pollack and others (*i.e.*, Charles Hall, Benjamin Chui, Nathan Ankney, and Paragon Strategic Group, Inc., a Nevada corporation) entered into the Operating Agreement of Fusion, a limited liability company to be formed under the laws of New York.

15. Pursuant to Article 1.6 of the Operating Agreement:

> "1.6 Business of the Company. The Company has been organized to engage in the following business:
>
> 1.6.1 Operating a modeling agency;
>
> 1.6.2 Engaging in such other activities directly or indirectly related to the foregoing as may be necessary or advisable in the opinion of the Managing Members to further any aspect of the Company's business; and
>
> 1.6.3 Engaging in any lawful business for which limited liability companies may be organized under the Law."

16. On December 11, 2006, Gordon filed the Articles of Organization for Fusion with the New York Secretary of State, and the limited liability company was formed.

17. On February 9, 2011, the Members of Fusion amended the Operating Agreement (the "Amendment").

18. Among other things, the amendment to the Operating Agreement stated: "Jody's salary shall not increase above $110,000 unless both a) Members have received profit sharing, and b) all Members agree to a raise."

19. The Operating Agreement and Amendment are attached to this Complaint as Exhibit A.

**DISSOLUTION OF FUSION AND**
**UNLAWFUL TRANSFER OF ASSETS TO FUSION BK**

20. On January 11, 2021, Gordon filed a petition in the Supreme Court, Kings County, seeking judicial dissolution of Fusion pursuant to Section 702 of New York's Limited Liability Law.

21. On May 3, 2021, the Supreme Court issued an order dissolving Fusion.

22. Pollack was not given notice by Gordon or anyone else that Gordon had filed the petition for dissolution or that a Court had dissolved Fusion until April 28, 2022, when Gordon's counsel from Strazzullo Law Firm, P.C. informed Pollack's counsel that Fusion had been dissolved by judicial decree.

23. Article 8.1 of the Operating Agreement states in relevant part that "[t]he Company will be dissolved and its affairs will be wound up upon the earliest to occur of the following . . . [including] the entry of a decree of judicial dissolution pursuant to the Law."

24. Articles 8.2 and Article 8.3 of the Operating Agreement states in full:

> "8.2 *Winding Up.* Upon the occurrence of any event specified in Section 8.1, the Managing Members will take full account of the Company's liabilities and assets, and the Company's assets will be liquidated as promptly as is consistent with obtaining the fair value thereof. The proceeds

from the liquidation of the Company's assets will be applied and distributed in the following order:

8.2.1 First, to the payment and discharge of all of the Company's debts and liabilities (including debts and liabilities to the Members, to the extent permitted by law), and the establishment of any necessary reserves;

8.2.2 The balance, to the Members in accordance with the percentage of Units owned by each Member.

8.3 *Timing of Liquidating Distributions.* Liquidating distributions will be made by the end of the taxable year in which the liquidation occurs or, if later, within ninety (90) days of the liquidating event and will otherwise comply with Regulations Section 1.704-1(b)."

25. After the judicial decree was issued, Gordon did not "liquidate the Company's assets . . . as is consistent with obtaining the fair value" or otherwise comply with Articles 8.1, 8.2, and 8.3 of the Operating Agreement.

26. Rather, Gordon transferred all the assets to Fusion BK, a limited liability company formed under the laws of the State of New York on November 5, 2021.

27. The assets that Gordon transferred to Fusion BK include, but are not limited to, contracts with fashion models; contracts with companies; photos, videos and other copyrighted material; trademarks and trade dress associated with Fusion; Fusion's website domain and emails associated with https://www.fusionmodelsnyc.com; Fusion's phone number; Fusion's office lease; Fusion's office equipment and furniture; Fusion's Instagram account; and Fusion's goodwill (*e.g.*, the company's reputation, brand recognition, customer loyalty, and contacts).

28. Upon information and belief, Fusion BK's only member is Jodie Gordon.

29. Fusion BK currently has a value of an amount to be determined by a jury at trial and is at least $3,078,483.

30. At the time of the unlawful transfer of assets, Pollack owned 35.222% of the membership shares in Fusion and is owed an amount to be determined by a jury at trial.

**JODIE GORDON'S MALFEASANCE**
**PRIOR TO THE UNLAWFUL TRANSFER**

31. The unlawful transfer of Fusion's assets to Fusion BK was the final act of a series of malfeasance and other unlawful activity committed by Gordon.

32. Section 3.3.2 of the Operating Agreement states that "[t]he Managing Members, in consultation with the Company's accountant, will determine the source of each item of income, gain, loss, deduction, or credit, and will separately compute Net Income and Net Loss directly or indirectly attributable to each Member's Units."

33. Section 6.1 of the Operating Agreement provides that "[b]ooks and records of the Company will be maintained at the principal office of the Company. The Company will maintain the following books and records" which include: "A copy of the Company's federal, state and local income tax or information returns and reports, if any, for each year;" and "Financial statements of the Company for the six most recent fiscal years."

34. Section 6.2 of the Operating Agreement provides that "[e]ach Member has the right, on reasonable request . . . to . . . [o]btain from the Company, promptly after they are available, a copy of the Company's federal, state, and local income tax or information returns for each year."

35. Section 7 of the Amendment provides that "All Members shall have reasonable access to Fusion's books and records."

36. Despite reasonable demands by Pollack to Gordon on numerous occasions prior to dissolution of Fusion, Gordon has refused to provide details related to her compensation and complete and accurate financial records of Fusion, or to permit an independent forensic accounting of Fusion, in violation of Section 6.1 of the Operating Agreement and Section 7 of the Amendment.

37. Gordon's refusal to provide details related to Gordon's compensation is particularly egregious given that when the Operating Agreement was amended in 2011, Gordon's "salary shall

not increase above $110,000 unless both a) Members have received profit sharing, and b) all Members agree to a raise."

38. Pollack has made numerous email requests for financial information from Fusion's primary accounting personnel, Bret Randle ("Randle"), who was hired by Gordon to work for Fusion. Randle often disregarded Pollack's requests or, if answered, did not answer promptly or in full.

39. Further, emails from June and July 2020 show Gordon's refusal to provide certain basic yet critical financial information requested by Pollack, including monthly financial information. These emails also demonstrate Gordon's egregious and unreasonable attitude as well as her intent not to provide information to Pollack.

40. For example, in response to a Pollack email request on July 5, 2020, for financial information, including, but not limited to, monthly financial statements, monthly bank statements, and a schedule of any loans taken with relevant information such as parties and terms, on July 13, 2020, Gordon wrote: "Bret did send you a five-year detailed, financial report. It clearly shows you everything about the company's financials."

41. However, the report only had annual numbers for a five-year period and did not show Pollack "everything about the company's financials" nor did it provide the basic information requested by Pollack.

42. Moreover, the meager documentation provided to Pollack did not meet the requirements of the Operating Agreement, the Amendment, and Section 1102(B) of the New York Limited Liability Company Law. Indeed, Section of 1102 of the New York LLC law states that:

> "Any member may, subject to reasonable standards as may be set forth in, or pursuant to, the operating agreement, inspect and copy at his or her own expense, for any purpose reasonably related to the member's interest as a member, the records referred to in subdivision (a) of this section, ***any***

> ***financial statements maintained by the limited liability company for the three most recent fiscal years and other information regarding the affairs of the limited liability company as is just and reasonable*** (emphasis added)."

43. The information requested by Pollack was "information regarding the affairs of the limited liability company [that was] just and reasonable" and, thus, Pollack had the right to inspect and copy it under Section 1102 of New York LLC law.

44. The information requested by Pollack was particularly "just and reasonable" because the information provided by Randle, the company's accounting personnel hired by Gordon to work for Fusion, was inconsistent with other financial information provided, as is addressed below.

45. On July 7, 2020, Gordon wrote in response to Pollack's request for "reasonable access to Fusion's books and records" the following:

> "Yes, I'm aware of this. And I feel what Bret sent you is reasonable for you to have. Since you are not involved in daily operations or a guarantor in any of the day to day operations, then I feel as a silent investor what you are receiving is substantial. You are not responsible or involved with the lease, credit cards, loans, payroll, accounts payable, etc. If there's a reason for some specific things, then we can communicate, and potentially discuss, however, I need reasons why you would like specific financials."

46. Gordon's unilateral decision requiring Pollack to supply reasons for requesting specific financials is contrary to the Operating Agreement and the Amendment, and specifically to Section 6.2.1 of the Operating Agreement permitting Members to "[i]nspect during normal business hours, for any purpose reasonably associated with such Member's Units, any of the Company records required to be maintained by Section 6.1 and such other information regarding the affairs of the Company as is just and reasonable."

47. Finally, on July 28, 2020, Pollack's counsel wrote to Gordon demanding to inspect Fusion's books and records or that Gordon should provide a variety of financial records to which Pollack was entitled, but Pollack's counsel was ignored.

48. Gordon also has maintained certain bank accounts for Fusion, but Gordon has not provided Pollack with access to such bank accounts and has failed to provide bank statements when requested.

49. Section 5.1.4 of the Operating Agreement provides that Managing Members of Fusion have the right to "[u]pon ***unanimous approval*** of the Members borrow funds and issue evidences of indebtedness on behalf of the Company on either a recourse or nonrecourse basis and to pledge and hypothecate assets of the Company for such loans; and to prepay in whole or in part, refinance, revise, increase, modify, or extend any liabilities affecting the Company assets and in connection therewith execute any extensions or renewals thereof . . . . (emphasis added)."

50. Upon information and belief, Gordon arranged for Fusion to borrow money without authorization from Pollack in violation of the Operating Agreement because unanimous approval was not given by the Members.

51. Fusion's K-1s and financial statements along with emails show the existence of debt.

52. Despite repeated requests from Pollack, Gordon has refused to provide any lists of any indebtedness incurred or specific information related thereto such as parties and terms.

53. Evidence of such a loan is in an email dated June 1, 2018, from Randle that states, on one of the rare instances in which information was provided: "This was a high interest 15 month loan which paid for the new office build out. The interest paid is fully deductible, and the

investment is being depreciated. The loan was secured via Jody Gordon, because both owners are required to sign loan documents for anything involving Fusion."

54. Gordon's encumbering of Fusion caused significant interest expense that deprived Fusion of profits and potential distributions to Pollack. For instance, in the email dated June 1, 2019, Randle wrote: "Fusion was very profitable in 2017. It generated almost $80,000 in free cash flow. Unfortunately it had to pay a $53K in interest."

55. Similarly, in an email dated January 9, 2018, Randle wrote: "Cash Flow was extremely strong this year, but went to paying down the high-interest short-term loans", "The largest of the loans will be fully paid off in March, and the other/s will be fully paid by the end of 2018," and "We've had to delay payments to the Models in order to maintain operating cash flow and on-time loan payments, so 2018 cash will go to lowering all liabilities (loans and back payments to Models)."

56. Section 6 of the Amendment provides that: "[a]ll future K-1s shall be delivered to Members no later than April 1 of each year. Any subsequent tax penalties or accountant costs suffered by any Member shall be reimbursed by Fusion."

57. Pollack has been provided late K-1s in many years, in breach of Section 6 of the Amendment.

58. For example, K-1s for 2011, 2014, 2015, 2016, 2019, and 2021 were late, in violation of Section 6 of the Amendment.

59. The multiple late K-1s raise questions as to the procedures and accounting systems used by Fusion and the accuracy of the K-1s.

60. Crucially, Gordon has provided inconsistent and unreliable financial information to Pollack and, thus, the information requested by Pollack from Gordon for Pollack to inspect and copy was just and reasonable. For instance:

> the Profit & Loss statement for January 2015 through October 2018 (time stamped at 10:35 AM on November 14, 2018) shows a net loss for 2015 of $41,408.53;
>
> the Profit & Loss statement for January 2013 through December 2017 (time stamped at 10:23 AM on January 9, 2018) shows a net loss for 2015 of $44,484.53;
>
> the Profit & Loss statement for 2015 through Q1 2020 (time stamped at "Thursday, May 28. 2020 08:44:19 AM GMT-7") shows a net loss for 2015 of $84,000, and
>
> an email from Randle on April 1, 2016 states that "For 2015 Fusion is showing a $50K loss."

61. Pollack has found other discrepancies between the disclosed financials and past financial-related materials.

62. Based upon information and belief, Gordon was (a) engaged in comingling her personal funds and Fusion's funds, (b) having Fusion pay for her personal expenses, (c) providing unreliable and fraudulent financial information to avoid making profit distributions to Pollack as required by the 2011 Amendment, and (d) directly and indirectly compensating herself in excess of her $110,000 salary to avoid profits being shared with the Members and to reduce the value of Fusion so that the Members were unable to sell their ownership amount in Fusion to Gordon or to outside parties at a reasonable or acceptable price.

63. Gordon has used Pollack's personal information without Pollack's consent; for instance, Gordon did so in attempting to secure debt without Pollack's approval. On June 21, 2020, Gordon, apparently by accident, shared an email to Randle. Such email related to Pollack receiving an email from Stacey-Ann M. Miller, a Loan Specialist for the U.S. Small Business

Administration ("SBA"), which had attempted to access Pollack's credit information at the request of Gordon and without Pollack's consent. Gordon wrote in that email: "You had to put Pollack's email? Arghhhh" indicating that she was upset that the SBA had Pollack's email address, as she was hiding from Pollack her attempt to secure debt and never wanted Pollack to learn about her attempt to secure debt."

**FIRST CLAIM:**
**BREACH OF CONTRACT**
(*Against Gordon*)

64. Pollack repeats the allegations set forth in the paragraphs above as if fully set forth at length herein.

65. Pollack and Gordon entered into a contract in the form of the Operating Agreement and the Amendment.

66. Article 8.1 of the Operating Agreement states in relevant part that "[t]he Company will be dissolved and its affairs will be wound up upon the earliest to occur of the following . . . [including] the entry of a decree of judicial dissolution pursuant to the Law."

67. Article 8.2 and Article 8.3 of the Operating Agreement states in full:

> "8.2 *Winding Up.* Upon the occurrence of any event specified in Section 8.1, the Managing Members will take full account of the Company's liabilities and assets, and the Company's assets will be liquidated as promptly as is consistent with obtaining the fair value thereof. The proceeds from the liquidation of the Company's assets will be applied and distributed in the following order:
>
> > 8.2.1 First, to the payment and discharge of all of the Company's debts and liabilities (including debts and liabilities to the Members, to the extent permitted by law), and the establishment of any necessary reserves;
> >
> > 8.2.2 The balance, to the Members in accordance with the percentage of Units owned by each Member.

> 8.3 *Timing of Liquidating Distributions.* Liquidating distributions will be made by the end of the taxable year in which the liquidation occurs or, if later, within ninety (90) days of the liquidating event and will otherwise comply with Regulations Section 1.704-1(b)."

68. After the judicial decree was issued, Jodie Gordon did not "liquidate the Company's assets . . . as is consistent with obtaining the fair value" or otherwise comply with Article 8 of the Operating Agreement.

69. Rather, Gordon transferred all assets to a Fusion BK that currently has a value of an amount to be determined by a jury at trial and is at least $3,078,483.

70. At the time of the unlawful transfer of assets, Pollack owned 35.222% of the membership shares in Fusion and is owned an amount to be determined by a jury at trial.

**SECOND CLAIM:**
**TORTIOUS INTERFERENCE WITH CONTRACT**
(*Against Fusion BK*)

71. Pollack repeats the allegations set forth in the paragraphs above as if fully set forth at length herein.

72. Pollack and Gordon entered into a contract in the form of the Operating Agreement, including Articles 8.1, 8.2 and 8.3 of the Operating Agreement, and the 2011 Amendment.

73. Fusion BK, acting through Gordon as its Managing Member, knew of the Operating Agreement and Amendment.

74. Fusion BK, acting through Gordon as its Managing Member, took actions that were purposefully aimed at causing a breach or termination of the contractual relationship including the transfer of all assets that belonged to Fusion to Fusion BK that were required to be liquidated.

75. As a result of Fusion BK's interference, the Operating Agreement was breached and Gordon failed to fulfill Gordon's obligations under the Operating Agreement due to Fusion BK's actions.

76. Pollack was damaged by Fusion BK that currently has a value of an amount to be determined by a jury at trial and is at least $3,078,483.

77. At the time of the unlawful transfer of assets, Pollack owned 35.222% of the membership shares in Fusion and is owned an amount to be determined by a jury at trial.

**THIRD CLAIM:**
**BREACH OF FIDUCIARY DUTY**
(*Against Gordon*)

78. Pollack repeats the allegations set forth in the paragraphs above as if fully set forth at length herein.

79. As the Managing Member, and primary operator, of Fusion, Gordon owed Pollack a duty of care, a duty of loyalty, and a duty of good faith.

80. By transferring Fusion's assets to Fusion BK, Gordon committed theft and self-dealing.

81. Pollack suffered actual damages as a result of Gordon's breach of fiduciary duty, including economic and non-economic damages in an amount to be determined by a jury at trial.

82. As a result, Pollack is entitled to compensatory damages, punitive damages, restitution, injunctive relief, and an accounting.

**FOURTH CLAIM:**
**INDUCEMENT OF BREACH OF FIDUCIARY DUTY**
(*Against Fusion BK*)

83. Pollack repeats the allegations set forth in the paragraphs above as if fully set forth at length herein.

84. A fiduciary relationship existed between Gordon and Pollack.

85. Fusion BK, acting through Gordon, had actual or constructive knowledge of the fiduciary relationship between Gordon and Pollack, as, upon information and belief, Gordon is the sole member of and controls Fusion BK

86. Fusion BK, acting through Gordon, intentionally interfered with Gordon's fiduciary duty to Pollack and caused Gordon to breach Gordon's fiduciary duty by inducing or encouraging the breach, providing assistance or support to facilitate the breach, or otherwise engaging in conduct that interfered with Gordon's ability to fulfill Gordon's fiduciary obligations.

87. Gordon breached Gordon's fiduciary duty with acts of disloyalty, self-dealing, misappropriation of assets, or other conduct that violates Gordon's duties of loyalty, care, and good faith.

88. Fusion BK's intentional interference was a substantial factor in causing Gordon's breach of fiduciary duty.

89. Pollack suffered actual damages as a result of Gordon's breach of fiduciary duty, including economic and non-economic damages in an amount to be determined by a jury at trial.

90. As a result, Pollack is entitled to compensatory damages, punitive damages, restitution, injunctive relief, and an accounting.

**FIFTH CLAIM:**
**VIOLATION OF NEW YORK LLC**
**COMPLANY LAW SECTION 1102(B) AND OPERATING AGREEMENT**
(*Against Gordon*)

91. Pollack repeats the allegations set forth in the paragraphs above as if fully set forth at length herein.

92. Pursuant to New York Limited Liability Company Law Section 1102(B), "Any member may, subject to reasonable standards as may be set forth in or pursuant to, the operating agreement, inspect and copy at his or her own expense copy for any purpose reasonably related to

the member's interest as a member, the records referred to in subdivision (a) of this section any financial statements maintained by the limited liability company for the three most recent fiscal years and other information regarding the affairs of the limited liability company as is just and reasonable."

93. Pollack made numerous requests to Gordon to inspect Fusion's books and records, but Gordon failed to respond to any of Pollack's requests.

94. Accordingly, Pollack demands the right to inspect and copy the books and records of Fusion.

95. Section 6.2 of the Operating Agreement provides that "[e]ach Member has the right, on reasonable request...to...[o]btain from the Company, promptly after they are available, a copy of the Company's federal, state, and local income tax or information returns for each year.", and Section 7 of the Amendment provides that: "All Members shall have access to Fusion's books and records."

96. Pollack made requests to inspect certain books and records.

97. Gordon failed to and refused to comply with the requests.

98. Consequently, Gordon breached the Operating Agreement, the Amendment, and New York Limited Liability Company Law Section 1102(B).

99. Due to Fusion's and Gordon's failure to provide the requested records, Pollack has been damaged in an amount to be determined by a jury at trial.

**SIXTH CLAIM:**
**DEMAND FOR EQUITABLE ACCOUNTING**
(*Against Gordon*)

100. Pollack repeats the allegations set forth in the paragraphs above as if fully set forth at length herein.

101. Pollack was a Member of Fusion and may request an equitable accounting under common law.

102. Gordon was a fiduciary of Pollack, had money entrusted to Gordon that imposes the burden of an accounting, there is no adequate legal remedy, and an accounting has been demanded and refused.

103. Gordon, the person in possession of Fusion's financial records, should be ordered to produce the Company's financial records and demonstrate in detail how money for Fusion was expended and also return any pilfered funds that ended up in Gordon's possession.

**SEVENTH CLAIM:**
**FOR AN AWARD OF ATTORNEYS' FEES**
(*Against Gordon*)

104. Pollack repeats the allegations set forth in the paragraphs above as if fully set forth at length herein.

105. Section 9.11 of the Operating Agreement provides that "[i]n the event that any dispute between the Managing Members, or between the Managing Member and the Members, or between the Company and the Members, or among the Members should result in litigation or arbitration, the prevailing party in such dispute will be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses."

106. Accordingly, Pollack demands that the costs and attorneys' fees be borne by Gordon.

107. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Pollack demands a jury trial on all issues so triable.

**WHEREFORE**, Pollack is entitled to:

a. An accounting;

b. Full and complete access to Fusion's books and records, including bank statements and records of Gordon's compensation;

c. Damages for Gordon's breaches of the Operating Agreement, the Amendment, and the law;

d. Disgorgement of profits improperly retained and/or as converted by Gordon;

e. Full and complete access to Gordon's bank statements and other financial accounts;

f. Punitive damages;

g. Prejudgment interest at the prime rate as of the date of this action;

h. All reasonable attorneys' fees, all witness fees and costs, all court and arbitration costs and all other fees incurred by Pollack;

i. Piercing of the corporate veil of Fusion BK to impose liability on Gordon; and

j. such other and further relief that the Court deems just and appropriate.

DATED: Long Island City, New York
March 28, 2023

/s/_*David Kasell*__________

David M. Kasell, Esq.
Kasell Law Firm
Attorneys for Pollack
1038 Jackson Avenue, #4
Long Island City, NY 11101
(718) 404-6668