Exhibit "A"

Exhibit "A"

**OPERATING AGREEMENT**
**OF**
**FUSION MODELING AGENCY LLC**

*THESE UNITS HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER ANY FEDERAL OR STATE SECURITIES LAWS. THESE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFER AND MAY NOT BE TRANSFERRED EXCEPT AS PERMITTED UNDER FEDERAL AND STATE SECURITIES LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.*

# TABLE OF CONTENTS

ARTICLE I GENERAL PROVISIONS.................................................................................. 1

    1.1      *Formation* ...................................................................................... 1
    1.2      *Name*............................................................................................ 1
    1.3      *Principal Office.* .......................................................................... 1
    1.4      *Term*............................................................................................ 1
    1.5      *Registered Office and Registered Agent.* ..................................... 1
    1.6      *Business of the Company.* ............................................................. 1
    1.7      *Partnership Classification.* ......................................................... 2

ARTICLE II CAPITAL CONTRIBUTIONS; UNITS; LOANS ................................... 2

    2.1      *Initial Contributions; Units.* ....................................................... 2
    2.2      *Capital Contributions* ................................................................. 2
    2.3      *Loans by Members.* ...................................................................... 3

ARTICLE III CAPITAL ACCOUNTS, DISTRIBUTIONS AND ALLOCATIONS ................. 3

    3.1      *Capital Accounts*......................................................................... 3
    3.2      *Distributions* .............................................................................. 4
    3.3      *Allocations* ................................................................................. 4
    3.4      *Book-Up of Company Assets*......................................................... 5

ARTICLE IV MEMBERS ............................................................................................ 5

    4.1      *Limited Liability and Indemnification.* ....................................... 5
    4.2      *Admission of Additional Members*................................................ 6
    4.3      *Voluntary Partial Withdrawals*................................................... 6
    4.4      *Removal and Buyout* .................................................................... 6
    4.5      *Competing Activities* ................................................................... 6
    4.6      *Confidentiality* ........................................................................... 6

ARTICLE V MANAGEMENT AND CONTROL OF THE COMPANY ........................... 7

    5.1      *General Authority and Power of Managing Members* ................... 7
    5.2      *Limitations on Power of Managing Members* .............................. 8
    5.3      *Time and Services; Fees; Reimbursements*.................................. 9
    5.4      *Appointment of Managing Members*............................................ 9
    5.5      *Officers* ....................................................................................... 9
    5.6      *Investment Committee*................................................................ 10
    5.7      *Meetings of Members; Approvals* ............................................... 10
    5.8      *Members Have No Managerial Authority* .................................... 10
    5.9      *Liability and Indemnification of Managing Members* ................ 10

ARTICLE VI BOOKS AND RECORDS; ACCOUNTING; TAX ELECTIONS ................................... 11

    6.1      *Books and Records* .......................................................................... 11
    6.2      *Inspection of Records* ..................................................................... 11
    6.3      *Reports* ............................................................................................ 11
    6.4      *Tax Returns and Elections* ............................................................. 12
    6.5      *Tax Matters Partner* ....................................................................... 12
    6.6      *Withholding and Tax Advances* ..................................................... 12
    6.7      *Bank Accounts* ................................................................................ 12

ARTICLE VII TRANSFERS OF INTERESTS; REPURCHASE OPTIONS ................................ 13

    7.1      *Conditions to Transfer* ................................................................... 13
    7.2      *Rights of Transferee* ....................................................................... 13
    7.3      *Substitute Member* .......................................................................... 13
    7.4      *Effective Date of Transfer* .............................................................. 13
    7.5      *Effect of Violation* ........................................................................... 14
    7.6      *Redemptions* .................................................................................... 14
    7.7      *Divorce* ............................................................................................ 14

ARTICLE VIII DISSOLUTION ............................................................................................... 14

    8.1      *Dissolution* ...................................................................................... 14
    8.2      *Winding Up* ..................................................................................... 14
    8.3      *Timing of Liquidating Distributions* .............................................. 15
    8.4      *Continuation of Company* ............................................................... 15
    8.5      *Return of Contribution Nonrecourse to Other Members* ............... 15

ARTICLE IX MISCELLANEOUS PROVISIONS ................................................................... 15

    9.1      *Representations* ............................................................................... 15
    9.2      *Arbitration* ...................................................................................... 16
    9.3      *Counterparts* ................................................................................... 16
    9.4      *Successors and Assigns* .................................................................. 16
    9.5      *Notices* ............................................................................................. 16
    9.6      *Amendments* .................................................................................... 16
    9.7      *No Third Party Beneficiaries* ........................................................ 16
    9.8      *Severability* ..................................................................................... 16
    9.9      *Complete Agreement* ...................................................................... 17
    9.10     *Governing Law* ............................................................................... 17
    9.11     *Legal Fees* ....................................................................................... 17
    9.12     *Gender, Number and Headings* ...................................................... 17
    9.13     *Cross-References* ............................................................................ 17
    9.14     *Covenant to Sign Documents* .......................................................... 17
    9.15     *Cumulative Remedies* ..................................................................... 17

ARTICLE X DEFINITIONS ..................................................................................................... 18

KI

DEC 08, 2006 02:54P                                                                    000-000-00000

page 4

# OPERATING AGREEMENT

## OF

## FUSION MODELING AGENCY LLC

This Operating Agreement (this "*Agreement*") of Fusion Modeling Agency LLC, a New York limited liability company (the "*Company*"), is entered into by and among Jodie Gordon, Kevin Pollack, Charles Hall, Benjamin P. Chui, Nathan Ankney, and Paragon Strategic Group, Inc. ("*Paragon*"), a Nevada corporation, (the "*Initial Members*") effective as of this seventh day of December 2006.

### BACKGROUND

A.  The Company was formed by filing Articles of Organization (the "*Articles*") with the New York Secretary of State in December 2006.

B.  The Managing Members (as defined below) are authorized to make such other filings, applications and certifications, and to take such other actions, as they deem necessary or appropriate for the Company to conduct business.

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I
### GENERAL PROVISIONS

1.1  *Formation.*  Pursuant to the New York Limited Liability Company Law (the "*Law*"), the Company has been formed as a limited liability company under the laws of the State of New York.

1.2  *Name.*  The name of the Company will be "Fusion Modeling Agency LLC," or such other name as the Managing Members may from time to time determine. Prompt Notice of any change in the name of the Company will be given to all Members.

1.3  *Principal Office.*  The Company's principal office will be located at 601 West 26 Street, Suite 1737 New York, New York 10001, or such other place as the Managing Members may determine. Prompt Notice of any change in the location of the principal office will be given to all Members.

1.4  *Term.*  The term of the Company will begin on the date the Articles are filed with the New York Secretary of State, and will be perpetual until the Company is dissolved and its affairs wound up in accordance with the Law or this Agreement.

1.5  *Registered Office and Registered Agent.*  The Company will continuously maintain within the State of New York (i) a registered agent for service of process on the Company, which initially will be the person designated in the Articles, and (ii) a registered office which need not be a place of business, which initially will be at the location stated in the Articles.

1.6  *Business of the Company.*  The Company has been organized to engage in the following business:



1.6.1    Operating a modeling agency;

1.6.2    Engaging in such other activities directly or indirectly related to the foregoing as may be necessary or advisable in the opinion of the Managing Members to further any aspect of the Company's business; and

1.6.3    Engaging in any lawful business for which limited liability companies may be organized under the Law.

1.7    *Partnership Classification.* It is the intention of the parties hereto that the Company be treated as a partnership for federal and state income tax purposes. The Company will not elect to be treated as a corporation under section 301.7701-3(c) (or any corresponding applicable provisions of foreign, state or local law).

## ARTICLE II
## CAPITAL CONTRIBUTIONS; UNITS; LOANS

2.1    *Initial Contributions: Units.*

2.1.1    *Units.* The Company will initially have 99 Units with ownership rights and economic rights as set forth herein.

2.1.2    *Additional Members.* Additional members may be admitted to the Company upon unanimous action by the Members.

2.1.3    *Additional Units.* The Managing Members may issue additional Units as determined by unanimous consent by the Members.

2.2    *Capital Contributions.* The Initial Members have contributed the amounts set forth on **Schedule A,** to the Company's capital upon its formation ("*Initial Capital Contributions*") as they deem necessary to carry out the Company's business. Such Initial Capital Contributions will be used to fund working capital needs. No Initial Member will be required to make any additional contribution to the Company. If the Company needs additional funds for any reason, the Members may, but will not be required to, make additional Capital Contributions to the Company in such amounts and on such terms as may be deemed appropriate by the Members. Capital Contributions from Members shall be recorded in the Company's books and records. Capital Contributions will be made as follows:

2.2.1    Fusion Model Management, Inc. ("*Fusion Inc.*") will contribute its assets to Fusion LLC and receive 99 ownership units. Fusion Inc. will sell 33 of its ownership units ("Units") to Hall, Chui, Ankney and Paragon ("*Investors*") for $130,000 such that Investors own one-third of the total outstanding Units of Fusion LLC and the remaining 66 Units will be evenly distributed by Fusion Inc., to Jodie Gordon and Kevin Pollack. Following the payments as set forth in Section 2.2.6, the business of Fusion Inc. will be wound up, and Fusion Inc. will be dissolved and terminated.

2.2.2    Fusion Inc. will distribute a liquidating dividend of $130,000 to Kevin Pollack ("Pollack") and Jodie Gordon ("Gordon") as follows: $50,000 to Gordon and $80,000 to Pollack and such liquidating dividend will be paid out pursuant to Section 7 below.

2.2.3    Gordon will receive the first $5,000 of profit of Fusion LLC for fiscal year 2006, such fiscal year ending on December 31, 2006, before any profit sharing takes place. Gordon will

receive the first $55,000 of profit for fiscal year 2007, ending on December 31, 2007, before any profit sharing takes place. Should Fusion LLC not have $5,000 of profit for fiscal year 2006 or $55,000 for fiscal year 2007, Investors will contribute an amount equivalent to the difference between the profit actually achieved and the caps of $5,000 and $55,000 for each respective year. One-half of the $55,000 for year 2007 will be paid semi-annually on June 30 and December 31 of each such fiscal year as set forth above. Should Gordon be entitled receive an amount from profit-sharing in excess of the $5,000 cap for 2006 or the $55,000 cap for 2007 due to the semi-annual payments, such amounts equivalent to Gordon's profit-sharing, up to a maximum of the cap, must be repaid to the Investors at the end of the applicable fiscal year. After fiscal year 2007, Gordon's salary will be determined by the Board of Managing Members.

2.2.4    Pollack agrees to retire and terminate any and all debt owed to him by Fusion Inc. or its successor Fusion LLC, or anyone for whom he has invested in Fusion Inc., or represents with respect to debt owed by Fusion Inc., in return for the $80,000 liquidating dividend and the distribution of 33 Units of Fusion LLC.

2.2.5    Investors will contribute $150,000 to Fusion LLC as working capital. The total dollar amount to be invested by Investors is $280,000 (the "Investment"). This amount of $280,000 includes the amount set forth in this **Section 2.2.5** and the amount set forth in **Section 2.2.2** above.

2.2.6    Investors will make the Investment in four (4) quarterly installments. The first installment shall be paid in the amount of $77,500 of which $37,500 will be held by Fusion LLC as working capital and $40,000 will be paid to Fusion Inc., in partial satisfaction of **Sections 2.2.2, 2.2.3, and 2.2.4** and which will be paid out by Fusion Inc., as a liquidating dividend. The last three (3) of the four (4) quarterly installments shall be paid in the amount of $67,500 of which $37,500 will be held by Fusion LLC as working capital and $30,000 will be paid to Fusion Inc., in full satisfaction of **Sections 2.2.2, 2.2.3, and 2.2.4** and which will be paid out by Fusion Inc., as a liquidating dividend. Payments made by Investors shall be allocated as follows: $20,000 of the first installment to Gordon and $20,000 to Pollack, and thereafter, the next three (3) installments shall be paid as follows: $10,000 each quarter to Gordon and $20,000 each quarter to Pollack. The Investment's quarterly payments will be made at such times as follows: the first quarterly payment upon formation of Fusion LLC and the signing of the Operating Agreement for the LLC, January 1, 2007, April 1, 2007, and July 1, 2007. Upon the receipt of the final payment of the Investment on July 1, 2007, Fusion Inc.'s affairs will be wound up and Fusion Inc., will be dissolved.

2.3    *Loans by Members.* No Member will be required to lend funds to the Company. However, upon the unanimous approval of the Members, Members may make such loans. Any such loan will not be considered a Capital Contribution but will be a debt due from the Company to the lending Member(s) and will be made upon such terms and conditions and bearing interest at such rates as may be approved by the Members.

# ARTICLE III
## CAPITAL ACCOUNTS, DISTRIBUTIONS AND ALLOCATIONS

3.1    *Capital Accounts.*

3.1.1    *General.* A Capital Account will be maintained for each Member in accordance with Treasury Regulations Sections 1.704-1(b) and 1.704-2. Each Member's Capital Account generally will equal that Member's Capital Contributions (net of any liabilities assumed by the Company or taken

subject to). increased by allocations of Net Income, and reduced by distributions and by allocations of Net Loss.

3.1.2 *Transfers*. If any Units in the Company are transferred in accordance with the terms of **Article VII** of this Agreement, the transferee will succeed to the Capital Account of the transferor to the extent it relates to the transferred Units.

3.2 *Distributions*.

3.2.1 *General*. Distributions require the unanimous approval of the Members. Except as provided in this **Section 3.2** or **Section 8.2** (upon liquidation). the Company will make distributions only at such times and in such amounts as the Members may unanimously determine from time to time.

3.2.2 *Distributions In Kind*. If any assets of the Company arc distributed in kind, such assets will be distributed on the basis of the fair market value thereof, as reasonably determined by the Company's auditors. All such distributions will be in the same proportion as if such distribution had been made in cash.

3.2.3 *No Violations*. Notwithstanding anything in this Agreement to the contrary, the Company will not be obligated to, and will not, make any distribution that would (i) result in a violation of any law, rule, or regulation of any regulatory authority that has jurisdiction over the Company or its activities or (ii) render the Company insolvent.

3.3 *Allocations*.

3.3.1 *Allocation of Net Income and Loss*. After giving effect to the special allocations set forth in **Section 3.3.3**, Net Income or Net Loss for any period will be allocated among the Members in accordance with the percentage of Units owned by the respective Members as of the beginning of such period as set forth on **Schedule A** or as agreed to, in writing, by all of the Members.

3.3.2 *Source*. The Managing Members, in consultation with the Company's accountant, will determine the source of each item of income, gain, loss, deduction, or credit, and will separately compute Net Income and Net Loss directly or indirectly attributable to each Member's Units. The Managing Members' determination of the source of any items of income, gain, loss, deduction, or credit, will be final and binding on all Members.

3.3.3 *Special Allocations*.

(a) Notwithstanding the foregoing, no allocation of Net Income or Net Loss under **Section 3.3.1** will be made unless it would be considered, under the Regulations promulgated under Code Section 704(b) (the "*704(b) Regulations*"), either to have substantial economic effect, or to be in accordance with the percentage of Units owned by each Member in the Company. To the extent necessary to comply with the foregoing, in lieu of the allocations set forth in **Section 3.3.1**, the Managing Members may cause the Company's Net Income or Net Loss, or any items thereof, to be reallocated among the Members in such manner as the Managing Members may determine to be fair, appropriate and consistent with the provisions of the 704(b) Regulations, including without limitation the provisions of Regulations Section 1.704-2(f) (minimum gain chargeback), Section 1.704-2(i)(4) (member nonrecourse debt minimum gain chargeback), and Section 1.704-1(b)(2)(ii)(d) (qualified income offset), each of which is incorporated herein by reference.

(b)     Special allocations of Net Income (or items thereof) will be made to any Member if the Managing Members determine that such Member's Capital Account would otherwise have a deficit capital account balance that (in absolute value) exceeds the maximum deficit balance that would be permitted under the 704(b) Regulations.

(c)     If any allocations of Net Loss (or items thereof) would result in a deficit balance in a Member's Capital Account that would (in absolute value) exceed the maximum deficit balance that would be permitted under the 704(b) Regulations, some or all of such Net Loss (or items thereof) may be reallocated to any other Members whose Capital Accounts would not have such excess deficit balances (in proportion to their respective Units).

(d)     If any special allocations are made under **Sections 3.3.3(a)** or **(b)** (the "*Regulatory Allocations*"), the Managing Members may take such Regulatory Allocations into account in making subsequent allocations of Net Income or Net Loss, and may make such further special allocations as may be necessary or appropriate so as to prevent the Regulatory Allocations from distorting the manner in which Company distributions will be divided among the Members pursuant to this Agreement.

3.3.4     *Tax Allocations*.  For purposes of reporting each Member's share of federal, state and any applicable local income taxes, items of income, gain, loss, deduction and credit will be allocated in accordance with the provisions of Code Section 704(c) and the Regulations promulgated thereunder, so as to properly take into account any variation between the adjusted tax basis and the book value of Company assets, using any method that complies with Section 1.704-3 of the Regulations, as the Managing Members deem appropriate.

3.4     *Book-Up of Company Assets*.  The book value of all Company assets will be adjusted to equal their respective gross fair market values, as determined by the Managing Members, in consultation with the Company's accountant immediately preceding the occurrence of any of the following events: (i) the acquisition of additional Units in the Company by any new or existing member if the Managing Members determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members of the Company; (ii) the distribution by the Company of more than a *de minimus* amount of property as consideration for Units in the Company if the Managing Members determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members of the Company; and (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g) (which for this purpose will include the termination of the Company for federal income tax purposes pursuant to Code Section 708(b)(1)(B)).  In addition, the book value of any asset distributed by the Company to any Member will be adjusted to equal its gross fair market value immediately prior to such distribution.

## ARTICLE IV
## MEMBERS

4.1     *Limited Liability and Indemnification*.

4.1.1     Except as required under the Law, or as expressly set forth in this Agreement, or as agreed in writing by and between the Company and a Member, no Member will be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise.

4.1.2     To the maximum extent permitted by law, each Member will be indemnified and held harmless by the Company, to the extent of the Company's assets, from and against any and all

losses, claims, damages, liabilities (joint and/or several), expenses, judgments, fines, settlements, and other amounts arising from any and all claims (including reasonable legal fees and expenses, as those fees and expenses are incurred), demands, actions, suits, or proceedings (civil, criminal, administrative, or investigative), in which such person may be involved, as a party or otherwise, by reason of his or its membership in the Company.

4.2    *Admission of Additional Members.* Additional Members may be admitted to the Company from time to time in accordance with **Section 2.1.2**, with participation in the Company on such terms as may be unanimously approved by the Members.

4.3    *Voluntary Partial Withdrawals.* No Member may make a partial withdrawal from his Capital Account without the unanimous approval of the Members.

4.4    *Removal and Buyout.* Members may not be removed by Members at any time. No Member will be permitted to sell or transfer his or her Units until **three (3) years after this Agreement has been executed.** Units may then be sold only upon the consent of a unanimous vote of Units and each Member shall have the first right of refusal to purchase such Units on a pro rata basis and each Member has the right to participate in any arranged sale of Units on a pro rata basis.

4.5    *Competing Activities.* Except as otherwise provided in this **Section 4.5, Section 5.3.1** or elsewhere in this Agreement (or in any written agreement that may be entered into by the Company with any Member), the Members and their Affiliates may engage or invest in any other business activity, except those that might be in direct or indirect competition with the Company. Neither the Company nor any Member will have any right in such other activities or to the income or proceeds derived from such other business activities. No Member will be obligated to present any investment or business opportunity to the Company, if the opportunity is of the character that, if presented to the Company, could not be taken by the Company. Each Member will have the right to hold any other investment or business opportunity for his own account or to recommend such opportunity to persons other than the Company. *Except that,* Gordon agrees that she cannot compete with, solicit employees or clients of, or leave Fusion LLC for 5 years from the date of the signing of this Agreement and agrees to allow Fusion LLC to obtain a life insurance policy and a disability insurance policy in an amount of at least $500,000, to be paid to Fusion LLC.

4.6    *Confidentiality.*

4.6.1    *Confidential Information.* In the course of each Member's activities on behalf of the Company, he or she will come into possession of and/or become aware of certain proprietary matters and affairs of the Company. Each Member will be in a position of trust and confidence as to all trade secret information and other proprietary information relating to the Company's business that is not generally known to, or readily available to, the public and that is of a confidential, proprietary or secret nature and is or may be either applicable to, or related in any way to, the present or future business of the Company, or the business of any client of the Company (collectively, "*Confidential Information*"). Such Confidential Information includes, but is not limited to: investment decisions, investment opportunities, techniques and strategies; various financial and operating data consisting of, among other things, marketing data, documents, files, electronically recordable data or concepts, computer software and hardware, books, papers, compilations of information, records and specifications; names, of existing and potential clients; names, marketing methods, operating practices and related information regarding the Company's existing and potential clients, joint venture partners, licensees, licensors, and vendors; prices and fee structures the Company obtains or has obtained or at which it sells, has sold or intends to sell its services; information regarding the Company's financial condition; and fee structures applied to and compensation paid to the Company's consultants and employees. Each Member agrees not to disclose

any Confidential Information, directly or indirectly, or use Confidential Information in any way, either during such Member's membership in the Company or at any time thereafter, except as required in the course of such Member's pursuit of the Company's business on behalf of the Company.   Upon termination of a Member's status as a Member, such Member will return all originals and copies of the Company's property in such Member's possession, including materials, memoranda, records, reports, client lists or other documents, and specifically including any documents containing Confidential Information.

      4.6.2    *Remedies Upon Breach.*  The Members acknowledge that the goodwill, continued patronage and identity of the Company's clients and other confidential information constitute significant assets of the Company.  The parties recognize that irreparable injury will result to the Company, its business, and property, in the event of a breach by any Member of the covenants contained under the heading "Confidential Information" in this Agreement. The parties further recognize that such injury could not be fully compensated by monetary damages and thus would render any award ineffectual without provisional relief. Accordingly, it is agreed that, as a provisional remedy prior to arbitration for a breach of those provisions by a Member, the Company will be entitled to temporary and preliminary injunctive relief to restrain each Member and all other persons, firms or entities acting for or with such Member from any violations of **Section 4.6.1**. If the Company is required by applicable law to furnish a bond or other surety as a condition to the entry of such an injunction or restraining order, the Member against whom such injunction is sought hereby agrees that such bond or other surety may be in the minimum amount allowable by law. The Members acknowledge and agree that if any Member were to breach any of his or its obligations under the heading "Confidential Information" in this Agreement, it would be difficult to ascertain the precise damages arising from or as a consequence of the breach. Accordingly, each Member agrees that the Company will be entitled to recover, as liquidated damages, an amount equal to either the gross profit or 50% of the revenues, whichever is greater, resulting from business generated by such Member, either directly or indirectly. The agreements in this paragraph and under the heading "Confidential Information" will survive any termination of this Agreement.

## ARTICLE V
### MANAGEMENT AND CONTROL OF THE COMPANY

      5.1    *General Authority and Power of Managing Members.*  Except as otherwise provided in this Agreement, and subject to any written agreements entered into by and between the Managing Members and the Members, and subject to **Sections 5.2** and **5.3**, the Managing Members will have exclusive management and control of the day-to-day operations of the Company, will make all decisions affecting the Company and the Company's assets, and will have the rights, power and authority granted hereunder and by law, directly and through their duly appointed agents, to obligate and bind the Company and, on behalf of and in the name of the Company, to take any action of any kind and to do anything they deem necessary or advisable, including, without limitation, to:

      5.1.1    Enter into such other organizational documents or other agreements that the Managing Members may, from time to time, deem appropriate; and take all actions required or permitted thereunder as the Managing Members deem necessary or appropriate;

      5.1.2    Enter into agreements with clients of the Company and to take all actions required or permitted under such agreements as the Managing Members deem necessary or appropriate;

      5.1.3    Purchase, hold, sell or otherwise deal in property for the Company's account, and to exercise all rights, powers, privileges and other incidents of ownership;

5.1.4    Upon unanimous approval of the Members borrow funds and issue evidences of indebtedness on behalf of the Company on either a recourse or nonrecourse basis and to pledge and hypothecate assets of the Company for such loans; and to prepay in whole or in part, refinance, revise, increase, modify, or extend any liabilities affecting the Company assets and in connection therewith execute any extensions or renewals thereof;

5.1.5    Open, maintain, conduct, and close accounts with banks or other custodians for Company assets, each as selected by the Managing Members in their sole discretion, and to draw checks or other orders for the payment of money by the Company;

5.1.6    From time to time engage, at the expense of the Company, persons required for the Company's business, including accountants, attorneys, and others; to enter into and exercise on behalf of the Company, agreements and contracts with such persons on such terms and for such compensation as the Managing Members determine to be reasonable; and to give receipts, releases, indemnities, and discharges as to all of the foregoing and any matter incident thereto as the Managing Members may deem advisable or appropriate;

5.1.7    Act as an authorized agent of the Company for purposes of compliance with the rules and regulations of any regulatory agency or self-regulatory organization with jurisdiction over the Company or its activities, to the extent required by such rules or regulations;

5.1.8    Purchase, from or through others, contracts of liability, casualty and other insurance that the Managing Members deem advisable, appropriate or convenient for the protection of the assets or affairs of the Company or for any purpose convenient or beneficial to the Company, including policies of insurance insuring the Managing Members and/or the Company against liabilities that may arise out of the Managing Members' management of the Company;

5.1.9    Engage in any transaction with the Managing Members or any of their Affiliates, *provided that* in causing the Company to engage in such transactions, the Managing Members act in good faith and in the best interests of the Company;

5.1.10    Make all tax elections required or permitted to be made by the Company (including elections under Section 754 of the Code to the extent deemed appropriate by the Managing Members);

5.1.11    Make such applications for, and to obtain, such licenses, registrations, permits, and other authorizations from such governmental agencies, and associations, all in the name of and on behalf of the Company, as the Managing Members may from time to time determine;

5.1.12    File, conduct and defend legal proceedings of any type and to compromise and settle any such proceedings, or any claims against the Company on whatever terms deemed appropriate by the Managing Members after consultation with the Members; and

5.1.13    Engage in any kind of activity, and to perform and carry out contracts of any kind, necessary to, or in connection with, or incidental to the accomplishment of, the purposes of the Company.

5.2    *Limitations on Power of Managing Members.* Notwithstanding any other provision of this Agreement, the Managing Members will have no authority to cause the Company to engage in any transactions specified in this Agreement as requiring the approval, consent or vote of the Members without first obtaining the approval, consent or vote of the Members as set forth in this Agreement.

5.3     *Time and Services; Fees; Reimbursements.*

5.3.1    *Devotion of Time.* Except as to Gordon, or as may be provided in a separate writing by and between the Managing Members, the Managing Members will devote such time and services to the Company as they deem necessary for the efficient conduct of the Company's activities, but they will not be required to devote their full time to the performance of such duties. Gordon will be a full-time employee of the Company. Except as provided herein, nothing will prevent the Managing Members from engaging in other investment and/or activities for profit. Each Member acknowledges that such other activities on the part of the Managing Members gives rise to no obligation on the part of the Managing Members to account to any other Member or to the Company for any profits or other benefits derived therefrom, and that neither any Member nor the Company will have or will be entitled to any interest in any such activity.

5.3.2    *Compensation.* The Managing Members will not be entitled to any compensation for serving as such, although they may be compensated for services as employees or officers of the Company, on terms determined in good faith by the Managing Members to be reasonable. *Provided that,* as to Gordon, compensation for her services for years 2006 and 2007 will be as set forth in Section 2.2.3.

5.3.3    *Expenses and Reimbursements.* Except as may be provided in a separate writing by and between the Managing Members, all Company expenses will be borne by the Company or, if advanced by a Member, reimbursed to him (if prior approval by the Managing Members is obtained), including but not limited to: all costs and expenses (including legal fees) of forming and organizing the Company and offering Interests; legal and accounting fees incurred by or on behalf of the Company; rent for the Company's offices and salaries and benefits for its employees; expenses of Member meetings; and telephone and postage expense.

5.3.4    *Employees of the Company.* The Members acknowledge and agree that the Company may pay substantial amounts as salaries and bonuses to officers and employees of the Company who may also be Managing Members and/or Members of the Company, and that the amounts of such compensation will be within the sole discretion of the unanimous vote of the Members. The Members further acknowledge and agree that nothing in this Agreement will be construed as providing any Member who is also an employee of the Company any right to continued employment by the Company, nor will it be construed as limiting or otherwise affecting any of the Member's obligations or duties owed to the Company in his or her capacity as an employee of the Company, except as otherwise provided herein. The Members acknowledge that the Company has the right to terminate any Member's employment at any time for any reason, with or without cause, subject only to such Member's written employment contract, if any.

5.4     *Appointment of Managing Members.*

5.4.1    *Number; Designation.* Initially, Gordon, Pollack, and Hall will be the Managing Members. Hall, Chui, Ankney, and Paragon may elect another Member to serve as a Managing Member if Hall should resign or cease to be a managing member.

5.4.2    *No Removal; Cessation of Status.* The Members will have no right to remove the Managing Members for any reason.

5.5     *Officers.* The Managing Members may at any time appoint officers to whom they may delegate some or all of their duties, powers and responsibilities. The officers of the Company may include, without limitation, a chairperson, a president, a chief executive officer, one or more vice

presidents, a secretary (and one or more assistant secretaries), and a chief financial officer or treasurer (and one or more assistant treasurers). The officers will serve at the pleasure of the Managing Members. Any individual may hold any number of offices. The general areas of responsibility and specific powers and duties of each officer may be set forth in written delegations executed by the Managing Members, which may be revised from time to time.

5.6     *Investment Committee.* The Managing Members may, in their discretion, establish one or more investment committees, comprised of Members and/or employees of the Company chosen by the Managing Members, in order to make business decisions. The terms under which such committees will function will be at the discretion of the Managing Members.

5.7     *Meetings of Members; Approvals.* No annual or regular meetings of the Members are required to be held. However, if such meetings are held, such meetings will be noticed, held and conducted pursuant to the Law. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Law.

5.8     *Members Have No Managerial Authority.* The Members, in their capacities as such, will have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Law. Unless expressly and duly authorized in writing to do so by the Managing Members, no Member will have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

5.9     *Liability and Indemnification of Managing Members.*

5.9.1     *Limitation on Liability.* The Managing Members will not be liable to the Company or to any Member for any act or omission based upon errors of judgment or other fault in connection with the business or affairs of the Company, except for any such liability for losses, claims, damages, liabilities or expenses that a court of competent jurisdiction determines resulted from gross negligence or a willful violation of law.

5.9.2     *Indemnity.* The Company will indemnify and hold the Managing Members (the "*Indemnitees*") harmless, to the maximum extent permitted by law, from and against any and all losses, claims, damages, liabilities (joint or several), expenses, judgments, fines, settlements, and other amounts (including reasonable legal fees and expenses, as such fees and expenses are incurred) arising from any and all claims, demands, actions, suits, or proceedings (civil, criminal, administrative, or investigative) (i) in which the Indemnitees may be involved, as a party, a threatened party, or otherwise, by reason of their participation in the management of the Company's affairs or rendering of advice or consultation thereto, or being or having been, at the request of the Company, a general partner, member, director, officer, employee, or agent of any partnership, joint venture, limited liability company, corporation, trust, or other entity, or (ii) that relate to the Company, its business, or its affairs. Indemnification under this subsection will be permitted whether or not the Indemnitees continue to hold any of the aforementioned positions or continues to act in any of the aforementioned capacities at the time any such liability or expense is paid or incurred. Notwithstanding the foregoing, the Company will not be obligated to indemnify or hold harmless the Indemnitees to the extent the Indemnitees' liability for losses, claims, damages, liabilities or expenses is determined by a court of competent jurisdiction to have resulted from gross negligence or a willful violation of law by such Indemnitees.

5.9.3     *Reliance on Agents.* The Managing Members may execute any power granted, or perform any duty imposed by this Agreement either directly or through agents, including any of their Affiliates. The Managing Members may consult with legal counsel, accountants, appraisers, management

DEC 08, 2006 03:20P                                                    000-000-00000                                          page 2

consultants, investment bankers, and other consultants. An opinion by any such person on a matter that the Managing Member believes to be within such person's professional or expert competence will be full and complete protection for any action taken or omitted by the Managing Members in good faith based on the opinion. The Managing Members will not be responsible for the misconduct, negligence, acts, or omissions of any such person or of any agent or employee of the Company, except that they must use due care in selecting such persons.

## ARTICLE VI
## BOOKS AND RECORDS; ACCOUNTING; TAX ELECTIONS

6.1    *Books and Records.* Books and records of the Company will be maintained at the principal office of the Company. The Company will maintain the following books and records:

6.1.1    A current list of the name and last known business, residence or mailing address of each Member, together with the Capital Contributions and number of Units held by each Member;

6.1.2    A copy of the Articles and all amendments thereto, together with executed copies of any power of attorney pursuant to which the Articles or any amendments thereto have been executed;

6.1.3    A copy of this Agreement and all amendments hereto, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments hereto have been executed;

6.1.4    A copy of any agreements entered into by and between the Managing Members that modify the terms of this Agreement;

6.1.5    A copy of the Company's federal, state and local income tax or information returns and reports, if any, for each year;

6.1.6    Financial statements of the Company for the six most recent fiscal years; and

6.1.7    True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date each became a Member.

6.2    *Inspection of Records.* Each Member has the right, on reasonable request, subject to such Member's agreement to maintain the confidentiality thereof, to:

6.2.1    Inspect during normal business hours, for any purpose reasonably associated with such Member's Units, any of the Company records required to be maintained by **Section 6.1** and such other information regarding the affairs of the Company as is just and reasonable; and

6.2.2    Obtain from the Company, promptly after they are available, a copy of the Company's federal, state, and local income tax or information returns for each year.

6.3    *Reports.* The Managing Members will cause the following to be prepared and provided to each Member:

DEC 08,2006 03:21P

000-000-00000

page 3

**6.3.1**   As soon as possible after the end of each fiscal year, the information necessary for each Member to complete such Member's federal and state income tax or information returns; and

**6.3.2**   As soon as possible after the end of each fiscal year, an annual financial report.

**6.4**   *Tax Returns and Elections.*   The Company's tax or fiscal year will end on December 31 of each year. The Company's accountants will be instructed to prepare and file all required income tax returns for the Company. The Managing Members will make any tax election necessary for completion of the Company tax return. If a distribution of property is made in the manner provided in Code Section 734, or if a transfer of any Units are permitted by, this Agreement are made in the manner provided in Code Section 743, the Company may file an election under Code Section 754 in accordance with the procedures set forth in the applicable Regulations promulgated thereunder.

**6.5**   *Tax Matters Partner.*   Charles Hall is hereby appointed the initial "Tax Matters Partner" for purposes of Code Sections 6221 et seq., and will have all the authority granted by the Code to the Tax Matters Partner. The Managing Members may from time to time appoint any other Member to be the Tax Matters Partner on behalf of the Company.

**6.6**   *Withholding and Tax Advances.*

**6.6.1**   *Authority To Withhold.*   To the extent the Company is required by law to withhold or to make tax payments on behalf of, or as to, any Member (e.g., (i) backup withholding, (ii) withholding as to Members that are neither citizens nor residents of the United States, or (iii) withholding under any applicable state income tax laws as to Members that are not residents of the state (to the extent the Company has income that is sourced from such state) ("*Tax Advances*"), the Company may withhold such amounts and make such tax payments as may be required.

**6.6.2**   *Repayment of Tax Advances.*   All Tax Advances made on behalf of a Member will, at the option of the Company, either be (i) promptly paid to the Company by the Member on whose behalf such Tax Advances were made, or (ii) repaid by reducing the amount of the current or next succeeding distribution or distributions which would otherwise have been made to such Member (or, if such distributions are not sufficient for that purpose, by so reducing the proceeds of any liquidation otherwise payable to such Member). Whenever the Company selects option (ii) pursuant to the preceding sentence for repayment of a Tax Advance by a Member, for all other purposes of this Agreement such Member will be treated as having received such distributions (whether before or upon liquidation) unreduced by the amount of such Tax Advance.

**6.6.3**   *Indemnification.*   Each Member hereby agrees to indemnify and hold harmless the Company from and against any liability as to Tax Advances made on behalf of or as to a Member.

**6.6.4**   *Certification.*   Each Member will promptly give the Company any certification or affidavit that the Company may request in connection with this **Section 6.6**.

**6.7**   *Bank Accounts.*   The Managing Members will maintain the funds of the Company in one or more separate accounts in the name of the Company with such financial institutions as the Managing Members may determine, and the Managing Members will not permit the funds of the Company to be commingled in any fashion with the funds of any other person. Withdrawals will be made only in the regular course of the Company's business on such signature or signatures as the Managing Members may from time to time determine.

## ARTICLE VII
## TRANSFERS OF INTERESTS; REPURCHASE OPTIONS

7.1     *Conditions to Transfer.*   Except for involuntary transfers that are caused by Member Termination Events, no Member will be entitled to transfer, assign, convey, sell, pledge or encumber (collectively, "Transfer") all or any of his Units unless the following conditions are satisfied:

   7.1.1     The Members unanimously approve the transfer subject to **Section 4.4** of this Agreement;

   7.1.2     The transferor and the transferee submit a duly executed and acknowledged written assignment to the Company in a form approved by the Managing Members specifying the Units being transferred, setting forth the transferor's intention that the transferee succeed to the transferor's standing as a Member, and stating that the transferee accepts and agrees to be bound by the provisions of this Agreement;

   7.1.3     The transferor or transferee furnishes an opinion of counsel, satisfactory to the Managing Members that the transfer will not violate any federal or state securities laws, adversely affect either the tax status of the Company or the limited liability of any Member, or cause a termination of the Company under Code Section 708(b); and

   7.1.4     The transferor or transferee pays a transfer fee to the Company sufficient to cover all reasonable expenses connected with the assignment, including legal fees.

   7.1.5     Any of the foregoing conditions (other than in **Section 7.1.1** above) may be waived by the Managing Members, in their discretion.

7.2     *Rights of Transferee.*   If a transfer complies with the provisions of **Section 7.1**, the transferee will be entitled to receive the assigning Member's share of distributions, Net Income, and Net Loss, but will not be a Member and will not be entitled to voting or other rights of a Member (other than the right to receive distributions and allocations), unless the transferee is admitted as a substitute Member in accordance with the provisions of **Section 7.3**.

7.3     *Substitute Member.*   A transferee as to some or all of a Member's Units may become a Member if, in addition to satisfying the conditions in **Section 7.1**, the transferee signs and agrees to the terms of this Agreement, the Members unanimously Consent to such transferee being admitted as a substitute Member, which Consent may be given or withheld, conditioned or delayed, as the Members may determine in their absolute discretion. Furthermore, no transferee will be considered admitted as a substitute Member unless and until such transferee executes and delivers to the Company such number of counterpart signature pages to this Agreement as the Managing Members may require. A transferee of some or all of a Member's Units who has not been so admitted will be entitled only to the transferring Member's share of all allocations of Net Income and Net Loss (and any items in the nature thereof) pursuant to **Article III** and all distributions pursuant to **Article III** and **Article VIII**. The admission of a transferee as a substitute Member will not result in the release of the Member who assigned the Units from any liability that such Member may have to the Company, except as otherwise expressly provided in a writing executed by the Company.

7.4     *Effective Date of Transfer.*   Unless otherwise provided in this Agreement or in the documentation delivered in connection with the transfer of a Member's Units, any transfer of a Member's Units made in compliance with this **Article VII** will be effective as of the close of business on the day on which all documentation required by this **Article VII** has been received and accepted by the Company.

DEC 08, 2006 03:21P                    000-000-00000

7.5   *Effect of Violation.*  Any purported transfer other than as provided pursuant to this **Article VII** will be null and void and will not bind or be recognized by the Company.

7.6   *Valuation of Assets.*

7.6.1   *Purchase Price.*  The amount paid to be paid for Units (the *"Purchase Price"*) will equal the net present value of the Company's projected cash flows or a multiple of book value, whichever is greater.

7.6.2   *Valuation of Assets.*  For purposes of this **Section 7.6**, the net present value of the Company's Units as of a particular date (the *"Valuation Date"*) will be calculated as set forth above in **Section 7.6.1**;

7.6.3   *Terms.*  The Purchase Price to be paid upon the purchase of Units may be paid in such combination of cash and promissory notes (*"Purchase Notes"*) as the Members may decide, provided that any Purchase Notes will bear interest from the effective date of the purchase at the Company's borrowing rate as it may be from time to time, and such Purchase Price will provide for the payment of interest at least quarterly and the repayment of principal no later than the fifth anniversary of the effective date of the purchase, and will be prepayable in whole or in part, without penalty.

7.6.4   *Closing.*  The closing of any purchase will be held at the offices of the Company at a time specified by the Managing Members.

7.7   *Divorce.*  As to any Member who is also an employee of the Company, if such Member's spouse obtains or becomes entitled to an ownership interest in such Member's Units (or any portion thereof) as a result of or in connection with any decree, judgment, award, or settlement arising out of a divorce, separation, or decree of separate maintenance, the spouse's share of such Member's Units will become subject to the purchase and/or redemption options described in **Section 7.6**, except that such Member will have the first option to purchase the Units.

## ARTICLE VIII
## DISSOLUTION

8.1   *Dissolution.*  The Company will be dissolved and its affairs will be wound up upon the earliest to occur of the following:

8.1.1   The sale or other disposition of all or substantially all of the Company's assets and distribution of the proceeds of such sale or disposition;

8.1.2   Unanimous election of the Members to dissolve the Company;

8.1.3   The resignation of a Managing Member where either no other Managing Member exists or the remaining Members do not elect to continue the business of the Company as provided in **Section 8.4**; or

8.1.4   Any other event which is specified in this Agreement or the entry of a decree of judicial dissolution pursuant to the Law.

8.2   *Winding Up.*  Upon the occurrence of any event specified in **Section 8.1**, the Managing Members will take full account of the Company's liabilities and assets, and the Company's assets will be

liquidated as promptly as is consistent with obtaining the fair value thereof. The proceeds from the liquidation of the Company's assets will be applied and distributed in the following order:

      8.2.1    First, to the payment and discharge of all of the Company's debts and liabilities (including debts and liabilities to the Members, to the extent permitted by law), and the establishment of any necessary reserves;

      8.2.2    The balance, to the Members in accordance with the percentage of Units owned by each Member.

    8.3    *Timing of Liquidating Distributions.* Liquidating distributions will be made by the end of the taxable year in which the liquidation occurs or, if later, within **ninety (90) days** of the liquidating event and will otherwise comply with Regulations Section 1.704-1(b).

    8.4    *Continuation of Company.* Upon the resignation of a Managing Member, the Company will dissolve unless there is at least one remaining Managing Member who elects to continue the business of the Company within **thirty (30) days** of the Managing Members' resignation.

    8.5    *Return of Contribution Nonrecourse to Other Members.* Except as provided by law, upon dissolution, each Member will look solely to the assets of the Company for the return of the Member's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the contribution of any Members, such Member will have no recourse against any other Member.

### ARTICLE IX
### MISCELLANEOUS PROVISIONS

    9.1    *Representations.* Each Member represents and warrants to each other Member and the Company that such Member:

      9.1.1    Has a pre-existing personal or business relationship with the Company or one or more of its Members, or by reason of his or its business or financial experience, or by reason of the business or financial experience of his or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any Affiliate of the Company, he or it is capable of evaluating the risks and merits of an investment in the Company and of protecting his or its own interests in connection with this investment;

      9.1.2    Has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, article or any other form of advertising or general solicitation as to the sale of Units in the Company;

      9.1.3    Has acquired his Units in the Company for his own account, for investment, and not with a view to or for the resale, distribution, subdivision or fractionalization thereof and no other person will have any direct or indirect beneficial interest in or right to the Units;

      9.1.4    Has no contract, undertaking, understanding, agreement, or arrangement, formal or informal, with any person to sell, transfer, or pledge all or any portion of his or its Units in the Company; and has no current plans to enter into any such contract, undertaking, understanding, agreement, or arrangement;

9.1.5       Has sufficient financial strength to hold Units in the Company as an investment and bear the economic risks of that investment (including possible complete loss of such investment) for an indefinite period of time; and

9.1.6       Has been afforded full and complete access to the books, financial statements, records, contracts, documents and other information concerning the Company and its proposed activities, and has been afforded an opportunity to ask such questions of the Company's agents, accountants and other representatives concerning the Company's proposed business, operations, financial condition, assets, liabilities and other relevant matters as he has deemed necessary or desirable, and has been given all such information as has been requested, in order to evaluate the merits and risks of the investment contemplated herein.

9.2       *Arbitration.* Any controversy between the Members, or between the Managing Members and the Members, involving this Agreement will be submitted to arbitration on the request of any party to such controversy in the county and state in which the Company maintains its principal office at the time the request for such arbitration is made. The arbitration will comply with and be governed by the provisions of the commercial arbitration rules of the American Arbitration Association and no party to any such controversy will be entitled to any punitive damages. Judgment may be entered upon any award granted in any such arbitration in any court of competent jurisdiction in the county and state in which the Company maintains its principal office at the time the award is rendered. By signing this Agreement, each Member agrees to waive his or her or its right to seek remedies in court, including any right to a jury trial; *provided, however*, that nothing in this paragraph will constitute a waiver of any right a party to this Agreement may have to choose a judicial forum to the extent such a waiver would violate applicable law.

9.3       *Counterparts.* This Agreement may be executed in several counterparts, and as executed will constitute one agreement, binding on all of the parties hereto.

9.4       *Successors and Assigns.* Except as otherwise provided herein, the terms and provisions of this Agreement will be binding upon and will inure to the benefit of the successors, personal representatives and assigns of the parties hereto.

9.5       *Notices.* All Notices required or permitted under this Agreement will be given to the person entitled thereto by personal service, mail, overnight courier or telecopy to the address or telecopy number maintained by the Company for such person. All Notices will be effective upon actual receipt; provided, however, that any Notice sent by certified or registered mail to the address so maintained will be deemed received on the earlier of actual receipt or three days after mailing.

9.6       *Amendments.* This Agreement may be amended only upon the unanimous Consent of the Members.

9.7       *No Third Party Beneficiaries.* Except as expressly provided herein, this Agreement is entered into for the sole and exclusive benefit of the parties hereto and will not be interpreted in such a manner as to give rise to or create any rights or benefits of or for any person not a party hereto.

9.8       *Severability.* If any covenant, condition, term or provision of this Agreement or if the application of such provision to any person or circumstance is judicially determined to be invalid or unenforceable, then the remainder of this Agreement, or the application of such covenants, condition, term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, will not be affected thereby, and each covenant, term, condition and provision of this Agreement will be valid and enforceable to the fullest extent permitted by law.

9.9    *Complete Agreement.* This Agreement and the Articles constitute the complete agreement between the parties.

9.10    *Governing Law.* This Agreement will be governed by and interpreted under the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York.

9.11    *Legal Fees.* In the event that any dispute between the Managing Members, or between the Managing Member and the Members, or between the Company and the Members, or among the Members should result in litigation or arbitration, the prevailing party in such dispute will be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

9.12    *Gender, Number and Headings.* As used in this Agreement, the masculine gender will include the feminine and neuter, and vice versa, as the context so requires; and the singular number will include the plural, and vice versa, as the context so requires. As used in this Agreement, section headings are for the convenience of reference only and will not be used to modify, interpret, limit, expand or construe the terms of this Agreement.

9.13    *Cross-References.* All cross-references in this Agreement, unless specifically directed to another agreement or document or statute, refer to provisions within this Agreement.

9.14    *Covenant to Sign Documents.* Each Member will execute, with acknowledgement or affidavit if required, all documents and writings reasonably necessary or appropriate in the creation of the Company and the achievement of its purpose, including any certification required.

9.15    *Cumulative Remedies.* The remedies of the Members under this Agreement are cumulative and will not exclude any other remedies to which any Member may be lawfully entitled.

DEC 08,2006 03:23P                                                                                              000-000-00000

# ARTICLE X
## DEFINITIONS

The following terms used in this Agreement will have the meanings set forth below:

*"Affiliate"* as to a specified person, any other person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the person in question.

*"Agreement"* this Operating Agreement, as it may be amended from time to time.

*"Articles of Organization"* the Company's Articles of Organization as filed with the New York Secretary of State, as it may be amended from time to time.

*"Capital Account"* an account maintained for each Member as provided in **Section 3.1.**

*"Capital Contribution"* as to any Member the amount of money and the gross fair market value of any other property contributed by the Member to the Company.

*"Code"* the Internal Revenue Code of 1986, as amended (or any corresponding provision of succeeding law), and, to the extent applicable, the Regulations.

*"Company"* Fusion Modeling Agency LLC.

*"Consent"* Either (a) the consent given by vote at a meeting called and held in accordance with **Section 5.7**; (b) a written consent required or permitted to be given pursuant to this Agreement or applicable law; or (c) the act of voting or granting any such written consent, as the context may require. As used in this Agreement, except where otherwise expressly provided, the *"Consent of the Managing Members"* and the *"Consent of the Members"* mean the Consent of a Majority in Interest of the Managing Members, and the Consent of a Majority in Interest of the Members, respectively.

*"Event of Bankruptcy"* as to any person, (a) the entry of a decree or order for relief by a court having jurisdiction in respect of such person in an involuntary case under federal or state bankruptcy or insolvency law, or the appointment of a receiver, assignee, or trustee for such person or for any substantial part of his property, or the issuance of an order for the winding-up or liquidation of his affairs and the continuance of any such decree or order unstayed and in effect for a period of ninety (90) consecutive days, or (b) the commencement by such person of a voluntary proceeding seeking any decree, order or appointment referred to in clause (a) or the consent by such person to any such decree, order or appointment.

*"Majority in Interest"* of the Members means Members collectively holding more than one-half of the Units entitled to consent on an issue.

*"Member"* each person listed on **Schedule A** as a member, and any additional or

substitute Member admitted to the Company in accordance with the terms of this Agreement.

"*Managing*        Jodie Gordon, Kevin Pollack, Charles Hall and any additional or substitute
*Members*"         Managing Member admitted to the Company in accordance with the terms of
                   this Agreement.

"*Net Income*"     the taxable income or taxable loss of the Company for each period determined
*and "Net Loss*"   in accordance with Code Section 703(a) (for this purpose, all items of income,
                   gain, loss or deduction required to be separately stated pursuant to Code
                   Section 703(a)(1) will be included in taxable income or loss), with the
                   following adjustments:

(a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss will be added to such taxable income or will reduce such loss;

(b) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Loss, will be subtracted from such taxable income or will increase such loss;

(c) in lieu of any depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, the Company will compute such deductions based on the book value of the Company property, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3);

(d) gain or loss resulting from a taxable disposition of Company property will be computed by reference to the book value of the property disposed of (as adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3)), notwithstanding that the adjusted tax basis of such property differs from its book value; and

(e) if the book value of Company assets is adjusted to equal fair market value as provided in Section 3.5, then Net Income or Net Loss will include the amount of any increase or decrease in such book values attributable to such adjustment.

(f) any item which is specially allocated pursuant to **Sections 3.3.3** or **3.3.4** will not be taken into account in computing Net Income or Net Loss.

"*Notification*"   a writing containing the information required by this Agreement to be
*or "Notice*"      communicated to any person, sent or delivered in accordance with
                   **Section 9.5**; provided, however, that any written communication containing
                   such information sent to such person and actually received by such person
                   will constitute Notification or Notice for all purposes of this Agreement.

"*Regulations*"    the income tax regulations promulgated under the Code, as such regulations
                   may be amended from time to time (including corresponding provisions of

## SCHEDULE A
## CAPITAL CONTRIBUTIONS
## AND
## NUMBER OF UNITS

|  | Capital Contribution | Number of Units |
|---|---|---|
| Jodie Gordon | $0 | 33 |
| Kevin Pollack | $0 | 33 |
| Charles Hall | $37,500 | 8.25 |
| Benjamin Chui | $37,500 | 8.25 |
| Nathan Ankney | $10,000 | 2.20 |
| Paragon Strategic Group, Inc. | $65,000 | 14.30 |
| Total | $150,000 | 99 Units |

### CONSENT OF SPOUSE AND AGREEMENT
### REGARDING MEMBERSHIP INTERESTS IN
### FUSION MODELING MANAGEMENT LLC

I am the spouse of a Member in Fusion Modeling Agency LLC (the "*Company*"). I understand that, in connection with my spouse's participation in the business of the Company and his acquisition of his Membership Interest in the Company, my spouse has entered into a Limited Liability Company Operating Agreement (the "*Agreement*") with all of the other Members in the Company.

I have read the Agreement and have discussed it with my spouse. I understand that in the Agreement my spouse has given certain other Members and/or the Company the right to buy all of his Units in the Company that he owns or may in the future own (the "*Units*") in certain events. I understand that the Agreement restricts my spouse's ability to sell or otherwise transfer all or any portion of the Units to anyone, including me.

I also understand that one of the main purposes of the restrictions in the Agreement is to ensure that equity ownership of the Units remains with my spouse and, to the extent described in the Agreement, other Members who are active in the Company's business. I understand that it is important to the Members of the Company that, if my spouse were to die or become incapacitated, I would not be able to exert any control over the operation of the Company and that, if my spouse and I were to become separated or divorced, I would not be the owner of any Units in the Company. I understand that these things are important to the value and viability of the Company's business. I understand that the other Members would not be willing to enter into the Agreement or to purchase Units if I did not consent to and approve the terms of the Agreement and if I did not make the other promises in this document.

Because of these factors, I consent to and approve of all of the terms of the Agreement. I also agree with my spouse, the Company, and the other Members of the Company that if my spouse and I ever get divorced or try to enter into any marital property settlement agreement, or if my spouse or I ever seek a decree of separate maintenance, I will not have an interest in or try to obtain any part of the Units; instead, to the extent my spouse has or can obtain assets other than the Units in amounts and of value sufficient to settle or satisfy any marital property claims I may have in the value of the Units, I will accept such other assets in settlement of those claims. If my spouse does not have sufficient other assets with which to satisfy any claims I may have as to the Units, or if for any other reason I obtain an interest in the Units in connection with any such divorce, separation, settlement, or decree, I agree to sell the Units to the Company and/or other Members at the price and in accordance with the applicable terms of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units. I agree that I will not do anything to try to prevent the operation of any part of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units.

Dated: _____          _____
                                              (Signature)

                                   _____
                                              (Print Name)

                                   _____
                                   Spouse of [name of member]

-1-

succeeding regulations).

"Units"     the number of Units held by a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement.

**IN WITNESS WHEREOF,** Jodie Gordon, Kevin Pollack and Charles Hall, Benjamin P. Chui, Nathan Ankney, and Paragon Strategic Group, Inc., a Nevada corporation have executed this Agreement as of the date first above written.

By: _____
    Jodie Gordon

By: _____
    Kevin Pollack

By: _____
    Charles Hall

By: _____
    Benjamin P. Chui

By: _____
    Nathan Ankney

For: Paragon Strategic Group, Inc., a Nevada corporation

By: _____
    Nathan Ankney
Its:    Chief Executive Officer

20

CONSENT OF SPOUSE AND AGREEMENT
REGARDING MEMBERSHIP INTERESTS IN
FUSION MODELING MANAGEMENT LLC

I am the spouse of a Member in Fusion Modeling Agency LLC (the "*Company*"). I understand that, in connection with my spouse's participation in the business of the Company and his acquisition of his Membership Interest in the Company, my spouse has entered into a Limited Liability Company Operating Agreement (the "*Agreement*") with all of the other Members in the Company.

I have read the Agreement and have discussed it with my spouse. I understand that in the Agreement my spouse has given certain other Members and/or the Company the right to buy all of his Units in the Company that he owns or may in the future own (the "*Units*") in certain events. I understand that the Agreement restricts my spouse's ability to sell or otherwise transfer all or any portion of the Units to anyone, including me.

I also understand that one of the main purposes of the restrictions in the Agreement is to ensure that equity ownership of the Units remains with my spouse and, to the extent described in the Agreement, other Members who are active in the Company's business. I understand that it is important to the Members of the Company that, if my spouse were to die or become incapacitated, I would not be able to exert any control over the operation of the Company and that, if my spouse and I were to become separated or divorced, I would not be the owner of any Units in the Company. I understand that these things are important to the value and viability of the Company's business. I understand that the other Members would not be willing to enter into the Agreement or to purchase Units if I did not consent to and approve the terms of the Agreement and if I did not make the other promises in this document.

Because of these factors, I consent to and approve of all of the terms of the Agreement. I also agree with my spouse, the Company, and the other Members of the Company that if my spouse and I ever get divorced or try to enter into any marital property settlement agreement, or if my spouse or I ever seek a decree of separate maintenance, I will not have an interest in or try to obtain any part of the Units; instead, to the extent my spouse has or can obtain assets other than the Units in amounts and of value sufficient to settle or satisfy any marital property claims I may have in the value of the Units, I will accept such other assets in settlement of those claims. If my spouse does not have sufficient other assets with which to satisfy any claims I may have as to the Units, or if for any other reason I obtain an interest in the Units in connection with any such divorce, separation, settlement, or decree, I agree to sell the Units to the Company and/or other Members at the price and in accordance with the applicable terms of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units. I agree that I will not do anything to try to prevent the operation of any part of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units.

Dated: __12-18-06__

_Amee Ankney_
(Signature)

_Amee Ankney_
(Print Name)

Spouse of (name of member)

_Nathan Ankney_

-1-

succeeding regulations).

"Units"        the number of Units held by a Member in the Company at any particular time,
               including the right of such Member to any and all benefits to which a Member
               may be entitled as provided in this Agreement.


IN WITNESS WHEREOF, Jodie Gordon, Kevin Pollack and Charles Hall, Benjamin P.
Chui, Nathan Ankney, and Paragon Strategic Group, Inc., a Nevada corporation have executed this
Agreement as of the date first above written.

By: _____          By: _____
       Jodie Gordon                            Kevin Pollack

By: _____          By: _____
       Charles Hall                            Benjamin P. Chui


By: _____          For: Paragon Strategic Group, Inc., a Nevada
       Nathan Ankney                         corporation


                                       By: _____
                                              Nathan Ankney
                                       Its:   Chief Executive Officer

succeeding regulations).

"Units"   the number of Units held by a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement.

**IN WITNESS WHEREOF,** Jodie Gordon, Kevin Pollack and Charles Hall, Benjamin P. Chui, Nathan Ankney, and Paragon Strategic Group, Inc., a Nevada corporation have executed this Agreement as of the date first above written.

By: _____
    Jodie Gordon

By: _____
    Kevin Pollack

By: _____
    Charles Hall

By: _____
    Benjamin P. Chui

By: _____
    Nathan Ankney

For:  Paragon Strategic Group, Inc., a Nevada corporation

By: _____
    Nathan Ankney
Its:  Chief Executive Officer

### CONSENT OF SPOUSE AND AGREEMENT
### REGARDING MEMBERSHIP INTERESTS IN
### FUSION MODELING MANAGEMENT LLC

I am the spouse of a Member in Fusion Modeling Agency LLC (the "*Company*"). I understand that, in connection with my spouse's participation in the business of the Company and his acquisition of his Membership Interest in the Company, my spouse has entered into a Limited Liability Company Operating Agreement (the "*Agreement*") with all of the other Members in the Company.

I have read the Agreement and have discussed it with my spouse. I understand that in the Agreement my spouse has given certain other Members and/or the Company the right to buy all of his Units in the Company that he owns or may in the future own (the "*Units*") in certain events. I understand that the Agreement restricts my spouse's ability to sell or otherwise transfer all or any portion of the Units to anyone, including me.

I also understand that one of the main purposes of the restrictions in the Agreement is to ensure that equity ownership of the Units remains with my spouse and, to the extent described in the Agreement, other Members who are active in the Company's business. I understand that it is important to the Members of the Company that, if my spouse were to die or become incapacitated, I would not be able to exert any control over the operation of the Company and that, if my spouse and I were to become separated or divorced, I would not be the owner of any Units in the Company. I understand that these things are important to the value and viability of the Company's business. I understand that the other Members would not be willing to enter into the Agreement or to purchase Units if I did not consent to and approve the terms of the Agreement and if I did not make the other promises in this document.

Because of these factors, I consent to and approve of all of the terms of the Agreement. I also agree with my spouse, the Company, and the other Members of the Company that if my spouse and I ever get divorced or try to enter into any marital property settlement agreement, or if my spouse or I ever seek a decree of separate maintenance, I will not have an interest in or try to obtain any part of the Units; instead, to the extent my spouse has or can obtain assets other than the Units in amounts and of value sufficient to settle or satisfy any marital property claims I may have in the value of the Units, I will accept such other assets in settlement of those claims. If my spouse does not have sufficient other assets with which to satisfy any claims I may have as to the Units, or if for any other reason I obtain an interest in the Units in connection with any such divorce, separation, settlement, or decree, I agree to sell the Units to the Company and/or other Members at the price and in accordance with the applicable terms of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units. I agree that I will not do anything to try to prevent the operation of any part of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units.

Dated: _Aug 13th, 2006_      _____
(Signature)

Jenny Lui
_____
(Print Name)

_____
Spouse of Benjamin Chui

-1-

Exhibit "B"

**From:** pollackka@aol.com,

**To:** Pollackka@aol.com, jody@fusionmodelsnyc.com, Thomas@aperfectcalendar.com, ben@Chui.us.com,

**Subject:** Re: Timing of proposed $225K capital raise - Please confirm

**Date:** Tue, 8 Feb 2011 1:57

---

Below are the relevant terms that appear to have been agreed upon with respect to the proposed capital raise. I have culled through past emails where agreement was noted. If you believe there is a mistake, please point it out.

We agree and consent to a proposed capital raise with the following terms as follows:

1) $225,000 is amount of the proposed capital raise.

2) Investment in the proposed capital raise can be made on or before 8pm EST on Friday, February 11, 2011.

3) The pre-money valuation for this capital raise is $214,500.

4) The $25,000 money owed to Jody shall be paid out to her by Fusion up to $1,100 per month, until she is paid exactly a total of $27,500.

5) A maximum of $3,000 shall be paid towards the credit card debt upon completion of the proposed capital raise. Thereafter up to $1,000 may be paid per month towards any remaining balances due.

6) All future K-1s shall be delivered to Members no later than April 1 of each year. Any subsequent tax penalties or accountant costs suffered by any Member shall be reimbursed by Fusion.

7) All Members shall have reasonable access to Fusion's books and records.

8) Once Fusion shows any profit then Jody shall pay out profit sharing to all Members in pro rata fashion in an amount that will at least cover any tax liability of the Members for their share of profits.

9) Jody shall, within 30 days of the Friday, February 11, 2011, have completed and submitted a life insurance policy for at least $500K of coverage, with "Fusion Modeling Agency LLC" as the beneficiary. Every 30 days this is late, a fair and appropriate penalty shall be applied against Jody. Such penalty shall be determined by a vote, based on ownership percentage, of all of the Members other than Jody.

10) Jody's salary shall not increase above $110,000 unless both: a) Members have received profit sharing, and b) all Members agree to a raise.

11) Should Fusion need another capital raise beyond this raise process, it is Jody's responsibility to find a financing method that does not dilute other Members or require other Members to contribute capital.

12) Email confirmation of these terms by all Members (or failure to disagree with these terms via email by 9PM EST on Wednesday, February 9, 2011) shall make these terms binding going forward.

13) If there are changes to these terms in the future, they will require agreement among all of the Members.

-----Original Message-----
From: Pollackka@aol.com
To: pollackka@aol.com; jody@fusionmodelsnyc.com; Thomas@aperfectcalendar.com; ben@Chui.us.com
Sent: Mon, Feb 7, 2011 2:21 pm
Subject: Timing of proposed $225K capital raise - Please confirm

Jody wants to wrap up this proposed $225K capital raise this week as per the prior email.

Accordingly, she has proposed that: **investors may participate in this proposed $225K capital raise on or before Friday, February 11, 2011, by 8pm EST**. Note that any wires or checks must be received by Jody at her offices no later than Friday, February 11, 2011, at 8pm EST to participate in this proposed $225K capital raise.

I will plan to put together a summary of all the terms/conditions (i.e. #4 below, etc.) and distribute later this week.

Please confirm your assent to the timing of this proposed $225K capital raise. I hereby confirm my assent. Failure to affirmatively confirm your assent by Wednesday, February 9, 2011, at 9pm EST shall be interpreted to mean that you assent to the timing of this proposed $225K capital raise.

Regards,
Kevin


In a message dated 2/4/2011 8:33:22 P.M. Eastern Standard Time, pollackka@aol.com writes:

Thomas,

Ben, Jody and I were on the conference call. We were hoping you would be on so we could finalize everything.

We agree and consent to a proposed capital raise as follows:

1) $225,000 is the total capital raise
2) The pre-money valuation for this capital raise is $214,500
3) The $25K money owed to Jody shall be paid out to her by Fusion up to $1.1K per month, until she is paid exactly a total of $27.5K
4) There are other agreed upon conditions (the ones that I proposed that Jody already agreed to in an email previously - I don't have them in front of me and they can be delineated later, but for example, Jody agreed to the life insurance getting done in X time, K-1s in timely manner, etc.)

Although I think $225K is more than required (and Lyme Regis determined this, too) and although I have set certain conditions in the past and I think it is not good business sense to not incorporate some of my conditions, I also believe that it would be unwise to hold up the process and drive the company to close for lack of capital in a timely manner. Accordingly, I have been willing to consent to a full capital raise without those prior conditions.

What remains is receiving your consent to a proposed capital raise. Do you consent to 1), 2), 3) and 4) above? If so, we can set a date.

Thanks,
Kevin


-----Original Message-----
From: Jody Gordon <jody@fusionmodelsnyc.com>
To: 'Thomas Quinlin' <Thomas@aperfectcalendar.com>; pollackka@aol.com; ben@Chui.us.com