UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

KEVIN POLLACK,                                          23 Civ. 02376 (SJB)

        *Plaintiff*,

   -against-

JODIE LOUISE GORDON (also known as JODY
GORDON) and FUSION MODELS BK LLC,

       *Defendants*.

--------------------------------------------------------------X

## <u>DECLARATION OF BRIAN LEHMAN, ESQ.</u>
### (28 U.S.C. § 1746)

I, Brian Lehman, Esq., pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am counsel of record for Plaintiff Kevin Pollack in the above-captioned action. I am admitted to practice in this matter (*pro hac vice*) and submit this declaration in support of Plaintiff's opposition to Defendants' motion for summary judgment and to authenticate the accompanying materials under Federal Rule of Civil Procedure 56(c)(4) and Local Civil Rule 56.1(d).

2.     The documents identified below were produced or obtained in discovery in this case, have been maintained by me in the ordinary course of my practice, and are true and correct copies of the documents they purport to be. To the best of my knowledge, information, and belief, they are authentic and unaltered in any material respect. This declaration is made to satisfy the evidentiary foundation required by the Federal Rules of Evidence, including Rules 901 and 1002.

3.      Attached hereto are the following exhibits:

**Exhibit 1** — Plaintiff's Production Pages P_2300, P_2301, and P_2698.

**Exhibit 2** — Declaration of Kevin Pollack, dated October 25, 2025 ("Pollack Decl.");

**Exhibit 3** — Excerpts from the Deposition of Kevin Pollack, dated April 23, 2025 ("Pollack Dep. Tr.");

**Exhibit 4** — Excerpts from the Deposition of Defendant Jodie Gordon, dated October 8, 2024 ("Gordon Dep.");

**Exhibit 5** — Expert Report on Valuation of Fusion Modeling Agency LLC as of Judicial Dissolution (April 30, 2021) dated November 4, 2024, and submitted as "Exhibit 2" during Defense Counsel's Deposition of Mr. Quan Vu on June 4, 2025 ("Vu Report");

**Exhibit 6** — Excerpts from the Deposition of Plaintiff's Expert Quan Vu, dated June 4, 2025 ("Vu Dep.x");

**Exhibit 7** — Operating Agreement of Fusion Modeling Agency LLC ("Fusion") (referred to as "Fusion" throughout this Memorandum).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 27, 2025,
Brooklyn, New York.

/s/ *Brian Lehman*
Brian Lehman, Esq.
*Counsel for Plaintiff Kevin Pollack*

# EXHIBIT 1

---

Excerpts of Plaintiff's Production Pages P_2300, P_2301, and P_2698.

**From:** jody@fusionmodelsnyc.com,
**To:** pollackka@aol.com,
**Subject:** FW: confidential and to discuss
**Date:** Fri, Dec 5, 2014 4:47 pm
**Attachments:** Fusion Model JV Financing Proposal.docx (16K)

---

See attached! Even better!


Jody Gordon

Director

Fusion Models

601 West 26th St

Suite 1737

New York, Ny, 10001

Ph: 212 675 1300

M: 917 304 7935

www.fusionmodelsnyc.com

Like us on Facebook

https://www.facebook.com/FusionModels

http://fusionmodelsnyc.blogspot.com/

www.instagram.com/FusionModelsNYC


This message is intended for the addressee only and may contain confidential or proprietary information.

Any use or copying of this message or the information it contains other than by an intended recipient and for the purposes for which it was sent is prohibited.

Fusion Models and its affiliates reserves the right to monitor and archive all e-mail communications as legally allowed.


**From:** JING TIAN [mailto:jt159@optonline.net]
**Sent:** Friday, December 05, 2014 4:34 PM
**To:** Jody Gordon
**Subject:** RE: confidential and to discuss


Hi, Jody, I have rewritten the proposal for you and see the attached! Jing


On Fri, Dec 05, 2014 at 01:19 PM, Jody Gordon wrote:


**Investment of no less than $2M in Fusion NYC for** 20% of Fusion NYC

$1M of investment goes into Fusion - explain this would be to expand fusion so it grow and become much more profitable, Fusion has never had any big investment for grown, it would be for  new staff to further grow and $Y for promotion and $Z for as to create a scouting venture around America in RV van and we would have FUSION logo all over it, it would be combined with a reality TV show on looking for the next top faces for FUSION and we would then be able to collaborate on finding sponsors for the competition.


$1M of investment is to effectively buy shares from JG and KP, pro rata


**POINTS:**

P_2300

Top 10 agency on Models.com

Repuation as high end player that clients and models want to work with

Strong platform in place (took 10+ years to build) from which can rapidly grow to next level (i.e. increase growth rate of revenues/profits)

Would be very difficult to build comparable platform and reputation from scratch in the current competitive environment; better return from investing in strong, e

Led by highly respected industry leader who built reputation from scratch with very limited resources

Well operated and has survived and thrived during recessions that other agencies failed to get through

Managed to grow with limited resources and used resources very efficiently; can only imagine potential results if have more capital to put to work to grow busine

Huge potential to produce strong profit sharing and financial returns, especially with capital investment

Synergistic opportunities to leverage off of models, clients, image, and brand name/reputation - can be good for the investor's other business to be a stakeholder

Worldwide presence, including China

Capability and strategically advantageous to open offices in L.A., Paris and elsewhere

*We also have models we can place in China with your agency. None of our models are currently placed*

Jody Gordon

Director

Fusion Models

601 West 26th St

Suite 1737

New York, Ny, 10001

Ph: 212 675 1300

M: 917 304 7935

www.fusionmodelsnyc.com

Like us on Facebook

https://www.facebook.com/FusionModels

http://fusionmodelsnyc.blogspot.com/

www.instagram.com/FusionModelsNYC

This message is intended for the addressee only and may contain confidential or proprietary information.

Any use or copying of this message or the information it contains other than by an intended recipient and for the purposes for which it was sent is prohibited.

Fusion Models and its affiliates reserves the right to monitor and archive all e-mail communications as legally allowed.

P_2301

Case 1:23-cv-02376-SJB-LKE  Document 73-2  Filed 11/12/25  Page 6 of 211 PageID #: 743

**From:** Jody@fusionmodelsnyc.com,
**To:** pollackka@aol.com,
**Subject:** Business opportunity
**Date:** Fri, Jun 26, 2020 2:51 pm

---

Hi Kevin,

I sent this to you beginning of May. I sent thought my personal account not fusion email, I saw a typo in the email address that I sent to youl. Here you go.

Respected high fashion business which is renowned worldwide. Our company has forged a path as a leading Boutique Modeling Agency. We would like to formally invite you to a business opportunity. We are seeking you as an investor with our amazing company.

 Several factors make us a great investment. We have immense growth potential. We have consistent relationships with top tier clients and models who continually seek out and work with us. We have an amazing board of models and great staff. In eight years, the woman's board continues to develop as a force. The numbers continue to grow at a pleasing rate. We are based in NYC but cover the globe. We are looking to grow with you, and now is the perfect time to be part of our brand and watch your investment grow.

-Top 10 agency -Models.com

-Contract Models with major luxury brands such as Victoria Secrets, Tommy Hilfiger, Miu Miu , Zara, Channel, Mac Jacobs, Michael Khors, etc

-Well operated for 15 years through diverse economic times

-Driven, experienced, invested Owner operated

-Prime office location and layout (newly renovated)

We have been entrenched in this industry for over 20 years, we are respected by our colleagues for our resiliency, excellence, passion for the industry, and devotion to develop models.

 With you as an  investor we can take on several challenges of being the unique boutique agency among monster agencies. This company looks forward to growing and becoming even greater, together we can take advantage of this opportunity. We will have the means secure the top talent , acquire the best agents, increase our model portfolio and create the hottest company.


The company isn't looking for any investment under $500,000.00, ideally to take things to a much greater level to help increase revenue tenfold, we are looking for a million dollar investment or more. This company has grown on very little investment, which has made it difficult to reach it's maximum capacity, it's been building on very little funding. Which has not been an easy feat. However, too much capital early would not have been as beneficial as it would be now, the company is established and set up for growth.

Jody Gordon

DIRECTOR

**FUSION MODELS NYC**

101 N. 10th street, #301

Brooklyn, NY 11249

WWW.FUSIONMODELSNYC.COM

@fusionmodelsnyc

T 212 675 1300

M 917 304 7935

@jodielouisegordon
jody@fusionmodelsnyc.com

P_2698

# EXHIBIT 2

---

Excerpts of Declaration of Kevin Pollack, dated October 25, 2025 ("Pollack Decl.").

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

KEVIN POLLACK,                                              23 Civ. 02376 (SJB)

        Plaintiff,

    -against-

JODIE LOUISE GORDON (also known as JODY
GORDON) and FUSION MODELS BK LLC,

        Defendants.

-------------------------------------------------------------X

## DECLARATION OF KEVIN POLLACK
### *(Pursuant to 28 U.S.C. § 1746)*

I, Kevin Pollack, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge, information, and belief:

### Background and Foundation

1.    I make this declaration based on my own personal knowledge obtained through my direct participation as a 35.222% member (*i.e.*, owner) and advisor to Fusion Modeling Agency LLC ("Fusion"), my continuous involvement as an advisor, and my review of Fusion's business records, digital accounts, and financial filings that were maintained in the ordinary course of business and produced during discovery.

2.    I have over twenty-five years of professional experience as an attorney, investment banker, and corporate director, including service as Chief Financial Officer and Audit Committee member of publicly traded NASDAQ companies. I hold a J.D. and M.B.A. from Vanderbilt University and the Wharton School of the University of Pennsylvania (*magna cum laude*), with concentrations in finance and entrepreneurial management.

3.    Through this experience I am familiar with the structure, valuation, and management of private companies, brand assets, and intellectual-property portfolios. My knowledge of Fusion's operations, finances, and digital assets is derived from personal involvement and business records.

## Fusion

4.      Fusion Modeling Agency LLC was duly organized on December 7, 2006. I personally participated in its formation and executed its Operating Agreement on or about that date.  *See* Pollack Dep. Tr. at 59 ("I did review [the Operating Agreement] before I signed it.").

5.      At formation, the members were Jodie Gordon, myself, Charles Hall, Benjamin Chui, Nathan Ankey, and Paragon Strategies Group, Inc. I know this from signing the Operating Agreement and reviewing Fusion's initial records.  Prior to the formation, the assets of new company had belonged to Fusion Model Management Inc.  *See* Pollack Dep. Tr. at 65 ("Fusion LLC is a LLC that took on the assets of Fusion Corporation and was in the model-agency business primarily.").  The primary assets of the corporation that were transferred primarily included the intangible assets such as the word mark "Fusion," goodwill and reputation associated with that mark, client lists, model contracts and phone number by which models and high-end fashion clients contacted the agency.  *See* Pollack Dep. Tr. at 66 ("Essentially, the assets of Fusion Inc. were transferred over here including the brand name and recognition and all of the goodwill and recognition built up.").

6.      Ms. Gordon was designated as a managing member responsible for day-to-day operations, subject to the Operating Agreement's terms. I participated in meetings confirming this arrangement.

7.      By the end of 2013, Defendant Gordan and I were the only remaining members of Fusion.  I owned 35.222% of membership units in Fusion, and Defendant Gordon owned 64.778% of membership units.  *See* P_1213 (K-1 for 2013).

8.      On January 11, 2021, Ms. Gordon filed a petition for judicial dissolution of Fusion in the Supreme Court of the State of New York, Kings County. I obtained and reviewed the publicly filed petition after the dissolution took effect and prior to this lawsuit.

9.      On May 3, 2021, the Kings County Supreme Court issued an order judicially dissolving Fusion. I reviewed that order from the publicly available docket after the dissolution took effect and prior to this lawsuit.

10.      On or about April 15, 2022, I commenced an arbitration before the American Arbitration Association captioned *Pollack v. Gordon*, Case No. 01-22-0001-5367. I personally filed that arbitration through my attorney, David Kasell.

11.      The dissolution order did not specify any liquidation procedure. I reviewed the order in its entirety and confirm that omission.

12.      Article VIII of the Operating Agreement does specify a liquidation procedure after judicial dissolution.

13.      I received K-1 tax documents from Fusion and its accountants each year through March 12, 2024, including the 2023 K-1 transmitted by accountant Brett Randle with Ms. Gordon

copied at jody@fusionmodelsnyc.com. These documents were transmitted in the ordinary course of business and indicate that Fusion continued to exist for tax purposes through 2023.

14.     Certain federal, state, and city tax filings were not provided to me despite requests.

**Fusion's Intangible Assets and Operations**

15.     From my direct participation in Fusion as a member and advisor, I know that Fusion's principal intangible assets consisted of its trade name, trademarks, and digital properties, including the domain www.FusionModelsNYC.com, branded email addresses, the Instagram account @FusionModelsNYC, the telephone number (212-675-1300), and related branding.  *See* Pollack Dep. Tr. at 121 ("Fusion has significant assets and these include the name Fusion, the logo, the phone number (212) 675-1300, the domain name FusionModelsNYC.com, the e-mails associated with that domain name and social media, such as Instagram, where the tag is @FusionModelsNYC.").

16.     Fusion used these assets continuously in interstate and international commerce as its primary channels of client communication and brand recognition.  *See* Pollack Dep. Tr. at 121 ("It is viewed as a reputable and leading model agency … ranked as a Top 10 agency on Models.com … and also on Model Scouts.com.").

17.     Since 2006, Fusion continuously used the word "Fusion," its LLC name, and telephone number (212-675-1300) on commercial documents and communications. I personally received and sent such materials during operations.

18.     On or about October 11, 2007, Fusion registered and began using the domain www.FusionModelsNYC.com as its official website for client communications, portfolio display, and booking inquiries.  I refreshed my memory of the date of this registration by entering the website into https://www.godaddy.com/offers/whois-b on October 25, 2025.

19.     By 2010, I personally observed Fusion's name appearing in trade publications and on social-media platforms promoting its models and clients.

20.     In or around May 2017, Fusion relocated its offices to 101 North 10th Street, Suite 301, Brooklyn, New York 11249, as part of a rebranding initiative. I visited the premises and participated in the relocation.

21.     In June 2017, Fusion introduced a stylized logo displaying the word "FUSION" in a tall, high-contrast sans-serif typeface with closely spaced letters that are "fused" together.

22.     The stylized Fusion logo served as a distinct visual identifier for the agency in interstate and international commerce. I personally observed its use by Fusion and its employees and agents.

23.     A true and accurate copy of that logo appeared on Fusion's official website as publicly accessible through the Internet Archive in July 2017. I compared the archived page to Fusion's live site as of October 24, 2025, and confirmed its accuracy.

### Fusion's Valuation in 2020 and Afterwards

24.     On June 26, 2020, I received an email from Ms. Gordon at jody@fusionmodelsnyc.com titled "Business Opportunity – Investment with Fusion." I recognize it as genuine because I received it directly in the ordinary course of our business correspondence.

25.     That email described Fusion as a respected high-fashion business, a Top 10 agency on Models.com, and listed luxury-brand clients such as Victoria's Secret, Tommy Hilfiger, Miu Miu, Zara, Chanel, Marc Jacobs, and Michael Kors, seeking investments of $500,000 to $1 million. I read those representations in the email at the time.

26.     This communication demonstrated that Fusion remained active and well regarded in the fashion industry as of June 2020.

27.     Ms. Gordon noted she had sent the solicitation from her personal account rather than a Fusion email, which confirmed that Fusion business was conducted through multiple addresses. I read this statement in the same email.

28.     After the May 3, 2021 dissolution order, Fusion's trade name, domain, telephone number, and digital accounts remained undivided pending lawful liquidation. I know this from my observation of continued use which has continued up until the date of this declaration.

29.     I continued receiving K-1 forms through March 12, 2024, evidencing that Fusion remained active for tax purposes through 2023. I personally received those forms.

### Formation and Use of Fusion BK and Ongoing Use of Assets

30.     Ms. Gordon stated in her summary-judgment memorandum that she is the sole member of Fusion Models BK LLC. I read that representation in her filing wherein it states: "Plaintiff does not realize that Jody Gordon is the sole member of Fusion Models BK."

31.     Fusion Models BK LLC ("Fusion BK") is a limited liability company formed under the laws of the State of New York on November 5, 2021, with Defendant Gordon as the company's registered agent at 101 N. 10th Street, Suite 301, Brooklyn, NY 11249. I have confirmed this by reviewing New York Department of State public records.

32.     Since dissolution of Fusion, Ms. Gordon and Fusion BK have continued using Fusion's web domain, email, mark, logo, telephone number, digital branding and former address. I have observed that use personally and through online searches.

33.    As of October 24, 2025, the Instagram account @FusionModelsNYC remained active with approximately 122,000 followers and 5,111 posts, listing the Brooklyn address and telephone number. I observed this directly on that date.

34.    The account cross-links to @FusionTalentBK, which describes itself as "a globally connected agency … Established 2023, Brooklyn NY" and displays the same logo introduced in 2017. I personally viewed this in October 1, 2024, October 24, 2025 and multiple times in between those dates in which I always observed the same or similar information.

35.    As of October 24, 2025, @FusionTalentBK had approximately 1,311 followers—about 1.07 percent of @FusionModelsNYC's following—illustrating the relative market recognition of the original Fusion brand and mark. I verified those follower counts online.

36.    Defendant Gordon's personal Instagram account @JodieLouiseGordon lists jody@fusionmodelsnyc.com and links to both @FusionModelsNYC and FusionModelsNYC.com. I viewed this page personally on October 24, 2025, and multiple times since May 2021 (*e.g.*, November 6, 2024) and the information has always been the same.

37.    On October 24, 2025, www.FusionModelsBK.com automatically redirected to www.FusionModelsNYC.com. I observed the redirection on October 1, 2025.

38.    The domain www.FusionModelsNYC.com remains active and lists Fusion's Brooklyn address and telephone number. I reviewed the live site on October 25, 2025.

39.    The website's design, layout, and trade dress are substantially the same as those used before Fusion's dissolution. I compared archival copies with the current site to refresh my memory.

40.    FusionModelsNYC.com links directly to @FusionModelsNYC, which continues to display Fusion's model roster and contact number. I verified this link.

41.    The active hyperlink for Instagram from the site https://www.fusionmodelsnyc.com goes to @FusionModelsNYC rather than @FusionTalentBK shows that the original Instagram account remains the primary digital channel. I confirmed the link.

42.    Defendants continue to operate through Fusion's domain, social-media accounts, telephone number and address. I have observed ongoing postings and communications under those identifiers.

43.    Defendants did not create a new brand identity but continued operations under Fusion's established assets. I know this from direct observation and comparison.

44.    The continued ability to operate through these assets demonstrates their commercial utility and market value. This conclusion is based on my experience valuing intangible property and my observation that it continues to be used.

**Financial and Valuation Evidence**

45.     On April 18, 2020, I had a phone call with Ms. Gordon in which she stated that Fusion's gross revenue was $4 million. I personally participated in that call.  I have refreshed my memory by listening to an audio recording to call that I produced to Defendants during discovery.

46.     In the same call, Ms. Gordon stated that accountant Bret Randle valued Fusion at "four-to-five times" gross revenue. I personally heard this statement.  I have refreshed my memory by listening to an audio recording to call that I produced to Defendants during discovery.

47.     Mr. Randle's valuation aligned with my professional belief that Fusion's intangible assets could have been sold for approximately $16 million within 90 days of dissolution. This belief is based on my experience in valuation of businesses.

48.     On June 26, 2020, I received an email as the financial advisor to Fusion from Jody Gordon sent from her business address, jody@fusionmodelsnyc.com, with the subject line "Business opportunity." In that message, Ms. Gordon described Fusion Models NYC as a "respected high fashion business … a leading Boutique Modeling Agency," "Prime office location and layout (newly renovated)" with an invitation she intended to send to potential investors to invest between $500,000 and $1 million in the company. She represented that Fusion was "a Top 10 agency – Models.com," had "contract models with major luxury brands such as Victoria's Secret, Tommy Hilfiger, Miu Miu, Zara, Chanel, Marc Jacobs, [and] Michael Kors," and was "well operated for 15 years through diverse economic times." The email concluded with Fusion's Brooklyn address, website (www.fusionmodelsnyc.com), phone number (212-675-1300), and social-media handle (@FusionModelsNYC), reflecting that Fusion was conducting ongoing business and actively seeking capital for expansion as of mid-2020.  *See* P_2698.

49.     In my professional judgment, multiple buyers would have been interested in acquiring Fusion for $16 million within 90 days of judicial dissolution if the financial statements supported a $20 million valuation.

50.     That $20 million valuation is consistent with Fusion's 2014 valuation, when Ms. Gordon told me she was attempting to sell 20 percent of the company to Chinese investors for no less than $2 million, implying a $10 million valuation then. Given Fusion's growth, that value would approximately double to $20 million by 2021 at a 9.9% continuous annual growth rate. I performed that calculation myself.  I refreshed my recollection of this conversation by reviewing the email sent to me contemporaneously with the conversation.  *See* P_2300.

51.     I am a 35.222% member (*i.e.*, owner) of Fusion and served continuously as an advisor on financial matters from 2006 to 2021, giving me firsthand knowledge of its valuation and operations.  *See* Pollack Dep. Tr. at 120–30; 172-184.

52.     My professional background includes raising $10 million about a month in 2012 for uBid based on factor including revenue, brand and goodwill, and conducting over 50 valuations of public and private companies through my work at Banc of America Securities and Paragon Capital LP. This extensive experience informs my valuation opinions herein. *See* Pollack Dep. Tr.

at 183-84 ("I am going to answer because I have been an investment banker. I am a finance professional. I have been on a lot of committees. I have financial expertise, I have gotten deals done. I once raised $10 million for a company, I recall in about a month. I think I could have sold these assets possibly within a couple of weeks, maybe faster. Worse case, maybe it takes a month or two, but certainly not six months, or a year, or never.")

53.    I have personally reviewed all Fusion financial records produced in this case. They confirm that Fusion's primary economic value was concentrated in its intangible property—its name recognition, marks, website, email domain, phone number, and social-media accounts.

54.    Those digital assets generated Fusion's business by connecting models worldwide with high-end fashion clients, thereby allowing Fusion to receive a premium as a market maker. I observed this dynamic firsthand during operations.

55.    Based on my experience, the company's intangible assets could have been marketed and sold to established agencies, private-equity groups, brand acquirers or other potential buyers active in the modeling sector or seeking to enter the market.

56.    My belief that Fusion's intangible assets could have sold for around $16 million within 90 days of its judicial dissolution is based on economics and market-dynamics in which buyers are interested in buying assets for a lower price than their valuation. *See* Pollack Dep. Tr. at 120–30; 172-184.

57.    Larger acquirers could eliminate duplicative costs such as accounting, legal, and professional fees as well as other "bloat" that I have observed in the financial records produced in discovery that I reviewed (*e.g.*, personal expenses unique to Defendant Gordon that were charged to Fusion). *See* Pollack Dep. Tr. at 126–27 ("If there was a 25 percent reduction in these expenses, that can lead to a valuation of about $3.5 to $5.5 million; an 85 percent reduction … around $11 to $18 million; a 95 percent reduction … $13 to $20 million and above.").

58.    Larger acquirers could improve cash collection and reduce charge-backs, increasing valuation through enhanced cash conversion. These statements are consistent with my business experience and knowledge.

59.    Under assumptions of increased efficiency (i.e., removing duplicative costs, increasing collection, more marketing, better management), the expert report by Quan Vu valued Fusion at the time of judicial dissolution at approximately $20.5 million, which is consistent with my own professional judgment and observation of Fusion's business value. *See* Pollack Dep. Tr. at 126–127 ("I noticed that there was a document provided in discovery that showed numbers from 2015 to 2022 … close to $35 million of gross income … around $10 million of gross margin, but almost no profit. To me, it looks like money is going out the door … Fusion could have gone to other model agencies and sold the assets for a lot of value."); *see also* Pollack Dep. Tr. at 120–30; 172-184.

**Certification**

Declaration Under Penalty of Perjury (Executed Outside the United States)
(28 U.S.C. § 1746(1))

I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 25, 2025, at Lisbon, Portugal.

*Kevin Pollack*
ID XhX5ymcj8n1d2nDvR31rusRP
_____
Kevin Pollack

8

# EXHIBIT 3

---

Excerpts of Deposition of Kevin Pollack, dated April 23, 2025 ("Pollack Dep. Tr.").

April 23, 2025

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

Case No.:  23-CV-02376

------------------------------------------------ x

KEVIN POLLACK,

                              Plaintiff,


              -against-


JODIE LOUISE GORDON (also
known as JODY GORDON) and
FUSION MODELS BK LLC,


                              Defendants.


------------------------------------------------ x


          DEPOSITION of the PLAINTIFF, KEVIN
POLLACK, taken by the Defendants, pursuant to
Court Order, held via (Legalview/Zoom)
Videoconference, on April 23, 2025 at 10:08 a.m.,
before Lori Carr, a Notary Public and Certified
Court Reporter of the State of New York.


          **************************************************

(1)

(2)

A P P E A R A N C E S:

(3)

(4)        KASELL LAW FIRM

(5)          Attorneys for Plaintiff

(6)              1038 Jackson Avenue

(7)              Suite 4

(8)              Long Island City, New York 11101

(9)        BY:   BRIAN LEHMAN, ESQ.

(10)              (Via Videoconference)

(11)              Kaselllawfirm.com.

(12)

(13)

(14)        MARIA PATELIS & ASSOCIATES, PLLC

(15)              7024 18th Avenue.

(16)              Brooklyn, New York 11204-5201

(17)        BY:   MARIA PATELIS ESQ.

(18)              (Via Videoconference)

(19)              m.patelis@aol.com

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)

(3)                    S T I P U L A T I O N S

(4)

(5)        IT IS HEREBY STIPULATED AND AGREED by and

(6)    between the attorneys for the respective parties

(7)    herein, that filing, sealing and certification, and

(8)    the same are, hereby waived.

(9)

(10)        IT IS FURTHER STIPULATED AND AGREED that all

(11)   objections except as to the form of the question,

(12)   shall be reserved to the time of the trial.

(13)

(14)        IT IS FURTHER STIPULATED AND AGREED that the

(15)   within deposition may be signed and sworn to by an

(16)   officer authorized to administer an oath, with the

(17)   same force and effect as if signed and sworn to

(18)   before the Court.

(19)

(20)                        ~ oOo ~

(21)

(22)

(23)

(24)

(25)

(1)

(2)                    V I D E O   S T I P U L A T I O N S

(3)

(4)          IT IS HEREBY STIPULATED AND AGREED by and

(5)     between counsel for all parties present that this

(6)     deposition is being conducted by Videoconference,

(7)     that the Court Reporter, all counsel, and the

(8)     witness are all in separate remote locations and

(9)     participating via Videoconference

(10)    (LegalView/Zoom/WebEx) meeting under the control of

(11)    Lexitas Court Reporting Service, that the officer

(12)    administering the oath to the witness need witness

(13)    shall be sworn in remotely by the Court Reporter

(14)    after confirming the witness's identity, that this

(15)    Videoconference will not be recorded in any manner,

(16)    and that any recording without the express written

(17)    consent of all parties shall be considered

(18)    unauthorized, in violation of law, and shall not be

(19)    used for any purpose in this litigation or

(20)    otherwise.

(21)

(22)          IT IS FURTHER STIPULATED that exhibits may be

(23)    marked by the attorney presenting the exhibit to

(24)    the witness, and that a copy of any exhibit

(25)    presented to a witness shall be emailed to or

(1)

(2) otherwise in possession of all counsel prior to any

(3) questioning of a witness regarding the exhibit in

(4) question.

(5)

(6)      All parties shall bear their own costs in the

(7) conduct of this deposition by Videoconference.

(8)

(9)

(10)                    Xxxxx

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)                    KEVIN POLLACK

(2)    K E V I N   P O L L A C K,

(3)              having been first duly sworn/affirmed

(4)              before a Notary Public of the State of

(5)              New York, was examined and testified as

(6)              follows:

(7)    **BY THE REPORTER:**

(8)         Q.   Please state your name for the

(9)    record.

(10)        **A.   Kevin Pollack.**

(11)        Q.   Please state your address for the

(12)   record.

(13)        **A.   10216 Orchard Reserve Drive, West**

(14)   **Palm Beach, Florida 33412.**

(15)   **EXAMINATION**

(16)   **BY MS. PATELIS:**

(17)        Q.   Good morning, Kevin, or good

(18)   afternoon.  My name is Maria Patelis, I am

(19)   the attorney for Jody Gordon and Fusions

(20)   Models BK, defendants in a Federal case that

(21)   you filed under case number 23 CV 02376.

(22)             I'm going to be asking you a

(23)   series of questions today.  If you don't

(24)   understand my question, you can always ask me

(25)   to rephrase it so that you understand it.

KEVIN POLLACK

(2)        **A.    I was an investor.**

(3)        Q.    Who were the other investors of

(4)    that entity?

(5)        **A.    I don't know who else invested**

(6)    **capital into the company.    I do know the**

(7)    **names of the other owners.**

(8)        Q.    Who are they?

(9)        **A.    Jill Oshin, Ron Sklar and Jody**

(10)    **Gordon.**

(11)        Q.    What business was Fusion Modeling

(12)    Agency, Inc. involved in?

(13)        **A.    The model agency business, and**

(14)    **Fusion acted as a marketplace between models**

(15)    **and clients.**

(16)        Q.    Acts as a market -- what, I am

(17)    sorry, I didn't hear you?

(18)        **A.    Marketplace.**

(19)        Q.    Can you define what a marketplace

(20)    is, in terms of a modeling agency?

(21)        **A.    Okay, I will put it a different**

(22)    **way.**

(23)        Q.    Yes, so I could understand it.

(24)        **A.    It was a model agency, clients**

(25)    **wanted models and models wanted to work with**

(1)                    **KEVIN POLLACK**

(2)    **clients.**

(3)         Q.   Now, did there come a time that

(4)    Fusion Modeling, Inc. had to shut down, the

(5)    corporation?

(6)         **A.   It did ultimately shut down.**

(7)         Q.   Why did it shut down?

(8)         **A.   My recollection is that when**

(9)    **Fusion Modeling Agency LLC was created,**

(10)   **Fusion Modeling -- Fusion Models, Inc. was**

(11)   **supposed to be shut down.**

(12)              **And if your question is why did**

(13)   **Fusion Modeling, Inc. -- sorry, why did**

(14)   **Fusion models, Inc. --**

(15)              **MR. LEHMAN:  Kevin, please let**

(16)         **her ask the questions.**

(17)              **MS. PATELIS:  He is asking for**

(18)         **clarification.**

(19)              **MR. LEHMAN:  He didn't ask for**

(20)         **clarification.  Kevin, just let her**

(21)         **ask the questions.**

(22)         Q.   Why would Fusion Modeling Inc.

(23)   shut down?

(24)         **A.   Because new investors -- let me**

(25)   **explain that differently and better and more**

KEVIN POLLACK

(2)    **A.    I don't know the exact number.**

(3) **Approximately $50,000, maybe a bit more.**

(4)    Q.    So other than the loans, did

(5) Fusion Modeling Inc. have any other assets,

(6) or was it of any other value?

(7)    **A.    Of course, besides having models**

(8) **and clients, it had built a brand name and**

(9) **had its mark.   It had its website, e-mail**

(10) **addresses, its phone number.   It had a lot of**

(11) **reputation in the industry build up in that**

(12) **time period using my investment capital.**

(13)    Q.    How much was your investment

(14) capital at the time?

(15)    **A.    I don't know what it was at the**

(16) **time, but I do know that in total I invested**

(17) **more than $200,000 in Fusion-related**

(18) **entities.**

(19)    Q.    No, I am just asking about the

(20) corporation, I am not --

(21)    **A.    I don't know the exact number.**

(22) **But approximately, approximately $200,000 and**

(23) **that is not inflation adjusted.**

(24)    Q.    Were you ever involved in the

(25) modeling agency prior to meeting Jody Gordon?

(1)                    KEVIN POLLACK

(2)        solution to this.  Sorry about it,

(3)        Maria.

(4)            MS. PATELIS:  Can you just repeat

(5)        the last question I asked?

(6)            (Whereupon, the requested portion

(7)        of the transcript was read back by the

(8)        reporter.)

(9)        A.    I was introduced to this

(10)    opportunity by Jill Oshin and Jody Gordon and

(11)    Ron Sklar.

(12)        Q.    Prior to meeting the three of

(13)    them, you were never involved in modeling

(14)    agencies, correct?

(15)        A.    Correct.

(16)        Q.    Can you tell us now, we are

(17)    referencing Fusion Modeling Agency LLC, what

(18)    was the purpose of forming this LLC?

(19)        A.    The purpose was to have a new

(20)    legal entity that the new investors wanted to

(21)    hold the Fusions assets.

(22)        Q.    Who are the new investors, can

(23)    you name them?

(24)        A.    The new investors are the names

(25)    that are on the operating agreement.

```
(1)                    KEVIN POLLACK

(2)           MS. PATELIS:  Ms. Carr, can you

(3)       pull up the document that says Exhibit

(4)       A?  Can you scroll to the first page

(5)       which is referenced as page 3 of 334,

(6)       it would be page 27 of 34?

(7)       I would have your Federal complaint,

(8)       the civil cover sheet and the initial

(9)       documents that commenced this case as

(10)      Defendants' 1.

(11)           (Defendants' Exhibit 1, Federal

(12)       complaint, the civil cover sheet and

(13)       the initial documents that commenced

(14)       this case, was so marked for

(15)       identification, as of this date.)

(16)      Q.   On this page, do you see the

(17)   names of the people you are claiming are

(18)   investors, is it Jody Gordon, Charles Hall,

(19)   Nathan Ankney and I, yourself, Benjamin Chui

(20)   and Nathan on behalf of Paragon; are these

(21)   the initial investors?

(22)      A.   There was another person

(23)   involved, but I don't recall his connection

(24)   to the entities here.

(25)      Q.   Did he sign the operating
```

(1)                       KEVIN POLLACK

(2)    for you to pay this loan off, correct?

(3)         **A.    For the company to pay the loan**

(4)    **off.**

(5)         Q.    Yes?

(6)         **A.    Additional money, whether through**

(7)    **revenues, or investments, or otherwise, would**

(8)    **be required.**

(9)         Q.    Okay.  But it was paid, as far as

(10)   you know?

(11)        **A.    As far as I know, it was paid,**

(12)   **but --**

(13)        Q.    Thank you.  Who collected the

(14)   initial monies for the initial investments

(15)   for Fusion LLC?

(16)        **A.    I don't recall.**

(17)        Q.    In your own words, can you

(18)   describe Fusion LLC to me?

(19)        **A.    Fusion LLC is a LLC that took on**

(20)   **the assets of Fusion Corporation and was in**

(21)   **the model agency business primarily.**

(22)        Q.    What were the assets of Fusion,

(23)   Inc.?

(24)        **A.    I can't name all the assets that**

(25)   **transferred because some of this was in Jody**

(1)                    **KEVIN POLLACK**

(2)  **Gordon's control, but --**

(3)         Q.    What assets did you transfer?

(4)         **A.    The company transferred the**

(5)  **assets, not me.**

(6)         Q.    What were the assets?

(7)         **A.    There was clients, models, the**

(8)  **name, the mark.**

(9)         Q.    Were you the owner of the

(10)  website?

(11)        **A.    The website was for the benefit**

(12)  **of the company.**

(13)        Q.    I know, but who was the host and

(14)  who owned the rights to it?

(15)        **A.    In my view, the company did.**

(16)        Q.    I know, but someone had to

(17)  personally put in their information, was it

(18)  your information?

(19)        **A.    I don't believe so.**

(20)        Q.    What mark are you referencing?

(21)        **A.    The logo.**

(22)        Q.    Was there a copyright or a

(23)  trademark done with respect to the logo?

(24)        **A.    I don't recall.**

(25)        Q.    Did the same models from Fusion

(1)                          KEVIN POLLACK

(2)     Inc. transition to Fusion LLC?

(3)              **A.    To my knowledge, the models that**

(4)     **were kept, because models often come and go.**

(5)     **Models, yes, models from Fusion Inc., Fusion**

(6)     **the corporation went to Fusion LLC.**

(7)              Q.    Do you recall how many models

(8)     there were?

(9)              **A.    No.**

(10)             Q.    Do you know the names of them?

(11)             **A.    I don't recall this information**

(12)    **from about 20 years ago.**

(13)             Q.    Okay.

(14)             **A.    But, essentially, the assets of**

(15)    **Fusion Inc. were transferred over here**

(16)    **including the brand name and recognition and**

(17)    **all of the goodwill and recognition billed**

(18)    **up.**

(19)             Q.    How do you describe goodwill to

(20)    me, can you describe goodwill to me?

(21)             **A.    Sure.**

(22)             Q.    I mean, let me rephrase this

(23)    question.

(24)                  You said Jody mismanaged Fusion,

(25)    Inc., so given that premise, what was the

(1)                KEVIN POLLACK

(2)    goodwill that went from Fusion, Inc. to

(3)    Fusion LLC?

(4)        **A.    A company can be mismanaged yet**

(5)    **still have valuable assets, this is a common**

(6)    **occurrence in the world.  There were plenty**

(7)    **of assets that went over from the Inc. to the**

(8)    **LLC.**

(9)        Q.    You don't have a breakdown of

(10)   what they are or what they exactly are, what

(11)   their value was?

(12)       **A.    The value was significant**

(13)   **because -- I don't have the breakdown, no.**

(14)       Q.    Is it more than 10,000?

(15)       **A.    Is what more than 10,000?**

(16)       Q.    The value of the assets.

(17)       **A.    In my view, the assets were worth**

(18)   **significantly more because over time, a model**

(19)   **agency that stays in business for a while**

(20)   **typically gains a bigger reputation and**

(21)   **becomes a more established player.**

(22)       Q.    That didn't happen when you

(23)   formed the LLC, you just transferred whatever

(24)   you had from the corporation to the LLC,

(25)   correct?

(1)                    KEVIN POLLACK

(2)          MR. LEHMAN:  There is a lag,

(3)      Maria, there is a lag and you are

(4)      jumping in when he is not done.  There

(5)      is a lag on the zoom.

(6)      A.    There are --

(7)          MS. PATELIS:  Ms. Carr, can you

(8)      just repeat the last of his response,

(9)      please, and we will see if he answered

(10)     the question?

(11)         (Whereupon, the record was read

(12)     back by the reporter.)

(13)     Q.    Continue.

(14)     A.    The phone number, any rankings on

(15) industry authorities.  Fusion at a point was

(16) ranked as a top 10 agency on Models.Com which

(17) is an authority.

(18)     Q.    When, what year?

(19)     A.    Let me finish.

(20)     Q.    What year?

(21)     A.    The top 10 agency -- I am going

(22) to finish.

(23)         MR. LEHMAN:  He is in the middle

(24)     of answering your question.  Maria, do

(25)     you want --  Kevin, do you want to

(1)                    KEVIN POLLACK

(2)    shall resign or cease to be a managing

(3)    member.

(4)            At any point from the execution

(5)    of this document until the entity was

(6)    dissolved in 2021, were you always a managing

(7)    member as stated in this agreement, operating

(8)    agreement?

(9)        **A.    Yes.**

(10)       Q.    Also, if you look to page 34 of

(11)   the agreement which is Article 6, books,

(12)   records accounting, tax elections.

(13)           At any time, did you make any

(14)   written request for books and records from

(15)   2006 through 2021?

(16)       **A.    Yes, I made a request for records**

(17)   **and financial information and other**

(18)   **information.**

(19)       Q.    Right.  And you said for that

(20)   time period, you didn't receive any records,

(21)   correct?

(22)       **A.    I did not -- I received**

(23)   **something, but it was very sparse or**

(24)   **inaccurate.**

(25)       Q.    Right.  And did there come a time

(1)                    **KEVIN POLLACK**

(2)              (Attorneys talking at the same

(3)          time.)

(4)              MS. PATELIS:  The court reporter

(5)          is the one who is going to dictate if

(6)          he didn't finish or if I am going too

(7)          fast or she didn't hear anything.

(8)              MR. LEHMAN:  See how his mouth is

(9)          moving, but you are not --

(10)             MS. PATELIS:  I am not wasting my

(11)         client's money on your babbling right

(12)         now.  I am asking a question if he

(13)         availed himself in accordance with the

(14)         operating agreement to his entitlement

(15)         to the books and records from 2006 to

(16)         2021.  That's all I am asking.

(17)         A.    Is that your question?

(18)         Q.    Yes.

(19)         A.    I saw books and records, and Jody

(20)    refused to provide them.  And when she did

(21)    provide something, it was very sparse,

(22)    inaccurate, misleading.  The details are in

(23)    the complaint of examples.  So I am not going

(24)    to rehash it.

(25)             Q.    No, I am not asking.  I am asking

(1)                    KEVIN POLLACK

(2)   in your own words, I am not asking you to

(3)   provide me what was in the complaint.

(4)        **A.    She provided -- not only did she**

(5)   **provide extremely sparse information, she**

(6)   **refused to provide critical information.**

(7)        Q.   But you continued to do business

(8)   with her --

(9)             **MS. PATELIS:  And don't make any**

(10)            **movements to your client.**

(11)            **MR. LEHMAN:  Whenever she**

(12)            **interrupts you again, Kevin, whenever**

(13)            **she interrupts you, you say I was**

(14)            **interrupted moving forward, from now**

(15)            **on, whenever she interrupts you.**

(16)            **THE WITNESS:   I was interrupted.**

(17)        **A.    She refused to share basic**

(18)   **details about her salary, and the evidence**

(19)   **showed she breached the agreement and**

(20)   **overpaid herself.  And to this day, I still**

(21)   **don't know what she paid herself.  Lots of**

(22)   **wires came out, and that seems like**

(23)   **information you shouldn't be hiding from**

(24)   **other investors.  Yes, there was lots of**

(25)   **information.**

(1)                    KEVIN POLLACK

(2)              She took on debt she was not

(3)     allowed to take.  She refused to provide

(4)     information about that debt she took on in

(5)     breach of the agreement.  Many things she did

(6)     were in breach of the agreement, and she

(7)     refused to provide basic information.

(8)              She used my personal information

(9)     without my consent to try to secure funds.

(10)    The bottom line is, she refused to provide

(11)    access and when she provided information it

(12)    was sparse.

(13)             She and her accountant controlled

(14)    the flow of information and refused to

(15)    provide it in a manner that was appropriate

(16)    for the circumstances.

(17)             MS. PATELIS:  Move to strike as

(18)         not responsive.

(19)             THE WITNESS:  Brian, are you

(20)         there?  She made some move to strike.

(21)             MS. PATELIS:  No --

(22)             MR. LEHMAN:  There is no judge

(23)         here.  Stop, Kevin, you are not the

(24)         lawyer.  Just let her do that.  If

(25)         there is something, just answer her

(1)                    KEVIN POLLACK

(2)        scrolling ability.

(3)              MR. LEHMAN:  Everyone sees there

(4)        is no PACER number on this, right?

(5)              THE WITNESS:  I see there is no

(6)        PACER number, correct.

(7)              MS. PATELIS:  Is this not the

(8)        complaint?

(9)              MR. LEHMAN:  It is not what you

(10)       e-mailed me.

(11)             MS. PATELIS:  Court Reporter, if

(12)       you can put up the complaint that I

(13)       e-mailed you?  Can you go to paragraph

(14)       29?

(15)       Q.    It references Fusion BK currently

(16)   has a value of an amount to be determined by

(17)   a jury at trial and is at least $3,078,483.

(18)   How did you come up with that number?

(19)       A.    So, the way I view valuation is

(20)   going to take a bit of time, please don't

(21)   interrupt me and I will answer in full right

(22)   now.

(23)             Fusion has, Fusion BK has

(24)   significant assets and these include the name

(25)   Fusion, the logo, the phone number, (212)

(1)                    **KEVIN POLLACK**

(2)    675-1300, the domain name Fusion Models

(3)    NYC.com, the e-mails associated with that

(4)    domain name and social media, such as

(5)    Instagram, where the tag is @FusionModelsNYC.

(6)            Fusion has these assets and there

(7)    are other assets, but one thing is clear is

(8)    that it is viewed as a reputable and leading

(9)    model agency, and it serves to connect models

(10)   and clients.  It has been ranked as a top 10

(11)   agency on Models.Com which is an authority in

(12)   the space.

(13)           It has also been ranked as a top

(14)   10 agency on Model Scouts.com which is viewed

(15)   as a reputable player in the space.  It has

(16)   had a track record of around 20 years of

(17)   building its name and reputation and client

(18)   base and clients, using my investment

(19)   capital.

(20)           So along the way, Fusion has also

(21)   picked up some really good clients like Dior,

(22)   Chanel, Gucci, Vogue, Diane Von Furstenberg.

(23)   So models want to go work with a company

(24)   that's well known, like Fusion, instead of

(25)   some fly-by-night scam operation or something

(1)                    **KEVIN POLLACK**

(2)    that might be newer.

(3)                    Fusion already has a track record

(4)    in the space and so models from around the

(5)    country and around the world seek out to work

(6)    with Fusion.  And when they do so, they reach

(7)    out to that website I mentioned,

(8)    WWW.Fusionmodelsnyc.com.

(9)                    They reach out through Instagram

(10)   @Fusion ModelsNYC.  They use that phone

(11)   number (212) 675-1300.  They show up at the

(12)   office address, the same one that the company

(13)   has been at before this.  Other model

(14)   agencies also want to work with Fusion

(15)   because of that reputation and want their

(16)   models to work with Fusion.

(17)                   Clients of Fusion and prospective

(18)   clients want to work with Fusion because they

(19)   have a great base of models.  When I last

(20)   looked at the website, there were over a

(21)   hundred models showing up on the website.

(22)   And one thing that Fusion has in particular,

(23)   that is very valuable, it has diverse models.

(24)                   In recent times, diversity is a

(25)   very valued aspect in advertising the media

(1)                    KEVIN POLLACK

(2)    in trends.  So Fusion has a nice stable of

(3)    diverse models, that's not what a lot of

(4)    people think that it is blond hair blue-eyed

(5)    models.

(6)              No.  Diversity is a key part, and

(7)    Fusion has a competitive advantage there.

(8)    When I looked at the models on Fusion's

(9)    website, I saw there was a significant number

(10)   of models with very diverse backgrounds.

(11)              And when I last looked at

(12)   Models.Com, it showed models from Fusion

(13)   listed there ranked in different ways because

(14)   the site Models.Com does different types of

(15)   rankings of models.  I noticed that when I

(16)   looked, the majority, overwhelming majority

(17)   were diverse background models.

(18)              For example, there is Goy Michael

(19)   of south Sudanese descent who was ranked as a

(20)   top 50 model on Models.Com.  There is also

(21)   Momo Ndiaye of Senegalese descent ranked as a

(22)   top 50 model, Models.Com.

(23)              Leomie Anderson, a former

(24)   Victoria Secret Angel has worked with Fusion

(25)   who has a black heritage, she was listed as a

KEVIN POLLACK

(1)

(2)     money girl.

(3)            Lina Zhang from China was listed

(4)     on that website as an industry icon and they

(5)     don't have a lot of those on the website.

(6)     Another example of a model of a diverse

(7)     background that showed up or that Fusion

(8)     actually worked with is Adekunle Gold is a

(9)     musician as well, he has collaborated with

(10)    Pharrell and Khalid and he has got a record

(11)    deal with Def Jam to release multiple albums.

(12)           These are all diverse models and

(13)    because Fusion has models like these that are

(14)    ranked and respected, when I last looked at

(15)    the site, but this was a historical trend for

(16)    Fusion that gives it an advantage.

(17)           That's allowed Fusion to have

(18)    high margins, margins -- gross margins of

(19)    around 30 percent and above.  In Q1 of 2020,

(20)    the gross margin for Fusion was about

(21)    35 percent and then Q2 of 2020, the gross

(22)    margin was around 38 percent.

(23)           If I look at 2021, the gross

(24)    income, the total income coming into Fusion

(25)    was about $3.9 million.  The cost of goods

(1)                    KEVIN POLLACK

(2)    sold was about $2.8 million and that left

(3)    $1.1 million of gross margin.

(4)                    I should note that that

(5)    3.9 million gross income number from 2021 was

(6)    much higher in 2018.  In 2019, it was over $5

(7)    and-a-half million in each of those years and

(8)    the gross margin in each of those years I

(9)    recall was around $1.7 million.

(10)                    So one might think that given the

(11)   amount of gross margin, there would be

(12)   significant profits that comes out of Fusion,

(13)   that the net income and the bottom line would

(14)   be large.

(15)                    However, what has happened in

(16)   actuality is that money has been funneled

(17)   away out of the company to expenses that

(18)   don't make a lot of sense, that are bloated,

(19)   there is potential theft, money is going out

(20)   the door and it is not hitting the bottom

(21)   line.

(22)                    I noticed that there was a

(23)   document provided in discovery that showed

(24)   numbers from 2015 to 2022, I believe.  It

(25)   showed close to $35 million of gross income,

(1)                    **KEVIN POLLACK**

(2)    around $10 million of gross margin, but

(3)    almost zero, no profit.  Nominal, maybe

(4)    $50,000 one way or the other.

(5)            It is hard to believe that for me

(6)    less than 1/10th of 1 percent or so or

(7)    2/10ths of 1 percent of the total money

(8)    coming into the door is the profit or loss.

(9)            To me, it looks like money is

(10)   going out the door, but this could be solved

(11)   easily.  Fusion can easily get rid of a lot

(12)   of expenses.  What they could have done, back

(13)   when they dissolved, was gone to other model

(14)   agencies and sold the assets for a lot of

(15)   value.

(16)            If there was only a 25 percent

(17)   reduction in these expenses, that can lead to

(18)   a valuation of anyone from about $3

(19)   and-a-half million to $5 and-a-half million.

(20)   If there was an 85 percent reduction in those

(21)   expenses, that can lead to a valuation of

(22)   around $11 million to $18 million.

(23)            If it was a 95 percent reduction

(24)   in these expenses, that could lead to a

(25)   valuation of $13 million to $20 million and

```
(1)                    KEVIN POLLACK

(2)     above.

(3)              When I speak of these expenses,

(4)     another firm might not need Fusion's

(5)     accountant, they might not need these

(6)     employees.  They could just take the models,

(7)     the name, the website, the clients, the value

(8)     of the assets, the value in the form of the

(9)     assets I mentioned above.

(10)             And agencies that Fusion could

(11)    have approached upon dissolution include

(12)    Elite, IMG, Wilhelmina, Ford, Next, DNA,

(13)    Vision, Focus, Bella, Muse, Red, Lions.

(14)             MS. PATELIS:  Tigers -- move to

(15)        strike as not responsive.

(16)        A.   I am not done yet.  Please let me

(17)    finish.  You interrupted me.

(18)        Q.   I asked you where the $3 million

(19)    --

(20)             THE COURT REPORTER:  I cannot get

(21)        you --

(22)             (Attorney and witness

(23)        interrupting each other.)

(24)        A.   I will explain where that

(25)    valuation was coming from.  I am not done.
```

(1)                    **KEVIN POLLACK**

(2)              **MS. PATELIS:  I move to strike as**

(3)         **not responsive.**

(4)              Q.    Let's move on.

(5)              **A.    I haven't finished.  I have been**

(6)    **interrupted, and it will be noted on the**

(7)    **record.**

(8)              Q.    You are speaking for 15 minutes.

(9)    I asked you how you came up with 3 million

(10)   and it is your personal knowledge from what

(11)   you are stating and now then you are getting

(12)   into this whole story that is not relevant.

(13)             **A.    I am explaining the value at a**

(14)   **minimum.  Also, of course, we have a**

(15)   **valuation expert, but I didn't finish.**

(16)             Q.    Right, okay.

(17)             **A.    I have other modeling agencies,**

(18)   **but the point is, there is a loaded expense**

(19)   **structure, and there are some valuable**

(20)   **assets, like the name, which is still being**

(21)   **used, the Instagram which is still being**

(22)   **used.**

(23)             **MS. PATELIS:  Can I stop you for**

(24)         **one second?  I move to strike as not**

(25)         **responsive.**

(1)                    **KEVIN POLLACK**

(2)            **MR. LEHMAN:  I will note it was**

(3)       **very responsive.  It was very**

(4)       **responsive.**

(5)            **MS. PATELIS:  But it wasn't.**

(6)            **THE WITNESS:  I didn't get to**

(7)       **finish.  I will let Brian speak.**

(8)            **MR. LEHMAN:  No, I think you**

(9)       **should finish.**

(10)           Q.   Brian, no. When Brian asks you

(11)      questions, which as an attorney you should be

(12)      able to do, and he knows how to do his job,

(13)      hopefully, then you can say whatever you want

(14)      to talk about.

(15)           **A.   I didn't finish.  I will say that**

(16)      **the value, there is very valuable assets and**

(17)      **I listed those assets.**

(18)           Q.   You didn't answer any questions,

(19)      so you are just talking right now.

(20)           **A.   I am answering the question of**

(21)      **how I came to this valuation of at least that**

(22)      **amount.**

(23)           Q.   It is your personal feeling.

(24)           **A.   I know a lot more about finance**

(25)      **and valuation than many, many people and --**

(1)                    **KEVIN POLLACK**

(2)          Q.   I am sure you do.

(3)          A.   So yeah, that's the basis of why

(4)   it should be valued so highly.  I didn't get

(5)   to finish going through my analysis.

(6)               MS. PATELIS:  When your attorney

(7)               asks you questions, you can go over

(8)               this again.  He will be responsible

(9)               for that portion of the transcript.

(10)              MR. LEHMAN:  Finish whenever you

(11)              can.

(12)              MS. PATELIS:  I move to strike as

(13)              nonresponsive.  The question is over.

(14)              I am going to move on with my

(15)              question.

(16)              MR. LEHMAN:  He was answering

(17)              your question exactly the way you

(18)              asked it.

(19)              THE WITNESS:  I was answering the

(20)              question.

(21)              MS. PATELIS:  I moved to strike

(22)              it, so it is over.  I am moving on to

(23)              my next question.

(24)              THE WITNESS:  I didn't get to

(25)              finish it.  So Brian, do I finish it,

```
(1)                    KEVIN POLLACK
(2)   she make?
(3)          A.    I don't recall.
(4)          Q.    Was it less than --
(5)          A.    I recall her saying she wouldn't
(6)   sell the company for anything less than
(7)   $5 million.  At one point, I believe she said
(8)   for not less than $10 million.
(9)          Q.    Sure, okay.  When was that?
(10)         A.    I don't recall, but I believe
(11)  even during COVID she said that.
(12)         Q.    She said it to you?
(13)         A.    Yes.
(14)         Q.    Was there a third-party present?
(15)         A.    I believe so.
(16)         Q.    Who?
(17)         A.    Nelson Ferrara.
(18)         Q.    Was that the conversation that
(19)  you recorded that your attorney provided to
(20)  me?
(21)         A.    I believe that was where it was.
(22)  If I am incorrect, she said it at a different
(23)  point.
(24)         Q.    Who is Nelson -- I am sorry, what
(25)  was his last name again?
```

(1)                    KEVIN POLLACK

(2)    Fusion LLC?

(3)         **A.    He was providing advice that was**

(4)    **helpful for the company.**

(5)         Q.    During what time frame?

(6)         **A.    Whenever he provided advice.  He**

(7)    **helped draft my initial investments in the**

(8)    **Fusion corporation.  So he is familiar with**

(9)    **much of Fusion's history because he helped**

(10)   **prepare the original investment documents**

(11)   **back in 2002 or so.**

(12)        Q.    What are you referring to 2002,

(13)   we are talking about Fusion LLC that was

(14)   formed in 2006?

(15)        **A.    Yeah, because Fusion LLC took the**

(16)   **assets of Fusion Corporation, just how Jody**

(17)   **Gordon's new entity took the assets of Fusion**

(18)   **LLC, just took them.**

(19)             **MS. PATELIS:  Move to strike as**

(20)        **not responsive.**

(21)        Q.    Has Nelson Ferrara ever received

(22)   a salary or monetary benefits from Fusion

(23)   LLC?

(24)        **A.    I don't believe so.**

(25)        Q.    Did there come a time that Jody

                        KEVIN POLLACK

(1)

(2)            MR. LEHMAN:  I am allowed to ask

(3)      questions now.

(4)            MS. PATELIS:  Not really.

(5)            MR. LEHMAN:  I am allowed to ask

(6)      questions now.  Of course I am.

(7)            MS. PATELIS:  Go ahead.

(8)            MR. LEHMAN:  Note that

(9)      Miss Patelis does not have her video

(10)     on right now, so I don't know if she

(11)     is here.

(12)           MS. PATELIS:  Obviously I am

(13)     here.  Go on.

(14)  EXAMINATION

(15)  BY MR. LEHMAN:

(16)     Q.    Kevin, is it possible to deposit

(17)  money into an account without being on that

(18)  account or do you not know?

(19)     A.    I think you can deposit money

(20)  into an account without being on that

(21)  account.

(22)     Q.    Look at paragraph 29, and this

(23)  was the complaint filed on your behalf in

(24)  Federal court.  It says "Fusion BK currently

(25)  has a value of an amount to be determined by

(1)                    KEVIN POLLACK

(2)   a jury at trial and is at least $3,078,483."

(3)             Can you explain to me how you

(4)   came up with that number?

(5)             MS. PATELIS:  Objection.  Asked

(6)         and answered.

(7)        Q.   You may continue.

(8)        A.   Yes, I am going to answer the

(9)   question.  So, Fusion has many valuable

(10)  assets and in particular, its name and mark

(11)  and logo.  Its phone number (212) 675-1300,

(12)  its website WWW.FusionModelsNYC.com, and the

(13)  e-mails associated with that domain name.

(14)  Its social media, such as its Instagram which

(15)  the tag is @FusionModelsNYC.

(16)             So Fusion is a model agency that

(17)  acts as a marketplace between clients and

(18)  models and it has a reputation as a leading

(19)  agency.  It has been ranked as a top 10

(20)  agency on Models.Com and as a top 10 agency

(21)  by ModelScouts.com, both are viewed as

(22)  authorities in the space.

(23)             The thing is that Fusion built

(24)  this reputation over its 20 or so years using

(25)  my investment capital.  And along the way, it

(1)                    **KEVIN POLLACK**

(2)    was able to secure clients like Dior, Chanel,

(3)    Vogue, Diane Von Furstenberg and other

(4)    high-end brands.

(5)              So, Fusion was not viewed as some

(6)    scam fly-by-night agency.  There are a lot of

(7)    scams out there, but this is rather an agency

(8)    that has been there for a very long time

(9)    that's been able to build a lot of brand

(10)   value.  Those assets I mentioned have a lot

(11)   of value besides the models and the clients.

(12)              So, models want to work with

(13)   Fusion.  Models from around the country and

(14)   around the world seek out Fusion, so they can

(15)   work with high-end clients like that.  When

(16)   they do so, often they will go to that

(17)   website WWW.FusionModelsNYC.com or at

(18)   Instagram @Fusion ModelsNYC, other social

(19)   media, that phone number (212) 675-1300, or

(20)   they might show up at the office.

(21)              The models approaching Fusion

(22)   often use these key assets of Fusion.  That

(23)   is a lot of the value because that's how the

(24)   models reach Fusion, through social media,

(25)   through its contacts, through its office.

(1)                     KEVIN POLLACK

(2)              So other agencies also want to

(3)      work with Fusion because it has an

(4)      established client base.  So many models from

(5)      other agencies have worked with Fusion as

(6)      well.  Clients want to work with Fusion

(7)      because they have a stable of a large number

(8)      of models.

(9)              When I last looked on Fusion's

(10)     website, there were over a hundred models on

(11)     the website.  In one area where Fusion has a

(12)     lot of expertise, this is important for its

(13)     value, is its diversity.  The diversity is a

(14)     big thing in recent years, in terms of

(15)     advertising and trends.

(16)              A lot of people think that models

(17)     is all about blond hair and blue eyes, but

(18)     that's not the case.  Diversity is a big

(19)     area, and Fusion has a very diverse model

(20)     base.  When I look on their website, a lot of

(21)     models were diverse.

(22)              When I went to Models.Com, the

(23)     last time I did so, I noticed and when I

(24)     looked at the models there, I noticed that

(25)     the majority of Fusion Models mentioned on

(1)                    KEVIN POLLACK

(2)    that site, I recall the overwhelming majority

(3)    were models of diverse backgrounds.

(4)               For example, Goy Michael of South

(5)    Sudanese descent was ranked on Models.Com as

(6)    a top 50 male model.  Momo Adacumay -- excuse

(7)    me Momo Ndiaye --

(8)               MS. PATELIS:  Are you reading off

(9)          something?

(10)              THE WITNESS:  I am not reading

(11)         off anything.

(12)              MR. LEHMAN:  Please don't

(13)         interrupt him.

(14)    A.    I am not reading off anything.

(15)    Momo Ndiaye of Sudanese descent is also

(16)    ranked as a top 50 male model on Models.Com.

(17)    Leomie Anderson, a British model who has been

(18)    a Victoria's Secret angel has worked with

(19)    Fusion.  She has a black background and she

(20)    is ranked on Models.Com, when I looked, as a

(21)    money girl.

(22)               Lina Zhange from China who worked

(23)    with Fusion and showed up when I looked was

(24)    listed in Models.Com as a money girl.  Then

(25)    there is Adekunle Gold who is of Nigerian

(1)                    KEVIN POLLACK

(2)    background who is a musician.  He has

(3)    released multiple albums and has signed with

(4)    Def Jam, the last time I checked and he has

(5)    collaborated with Pharrell and Khaled.  He

(6)    worked with Fusion.

(7)              So Fusion has a very valuable

(8)    stable of diverse clients.  That helps create

(9)    a competitive advantage for Fusion.  And as a

(10)   result, Fusion is able to have higher

(11)   margins, margins around 30 percent.

(12)             In Q1 2020, the gross margin was

(13)   around 35 percent.  In Q2 2020, that gross

(14)   margin was around 38 percent.  If we look at

(15)   2021, the total income coming into Fusion was

(16)   $3.9 million approximately.  And the cost of

(17)   goods sold was approximately $2.8 million

(18)   leaving a 1.1 million gross margin.

(19)             Now that 3.9 million gross income

(20)   number, the income coming in, that number was

(21)   about $5 and-a-half million, significantly

(22)   higher in 2018 and also in 2019.  In 2018 --

(23)   in 2019 that gross margin was approximately

(24)   $1.7 million in each year.

(25)             So one might think that with such

(1)                    KEVIN POLLACK

(2)    a nice gross margin number, there would be

(3)    plenty of profits.

(4)              I unfortunately have seen that's

(5)    not been the case because money has been

(6)    funneled out of Fusion.  Money has gone out

(7)    the door, whether for unnecessary expenses,

(8)    bloated expenses, potential theft,

(9)    overpayment of Jody Gordon for a variety of

(10)   reasons, money has been out the door.  The

(11)   net profit mass usually ended up being almost

(12)   nothing.

(13)              I was provided with a document in

(14)   discovery that showed, I recall, 2015 to

(15)   2022, about eight years, and it showed around

(16)   34 million or $35 million in gross income in

(17)   total.  The gross margin was around

(18)   $10 million, but the net profit or loss was

(19)   something around $50,000, which is I believe

(20)   under 2/10ths of 1 percent of that total 34,

(21)   $35 million which seems very unlikely that

(22)   you end up with almost exactly zero.

(23)              I believe that document showed

(24)   profits in years that other documents did

(25)   not show profits.  The bottom line is that

(1)                    KEVIN POLLACK

(2)   money was going out the door, it looks like

(3)   they were cooking the books.  But more

(4)   importantly with the reduction of expenses.

(5)   This company is valuable even more than it is

(6)   with those expenses.

(7)            Fusion could have taken those key

(8)   assets I described and the models and the

(9)   clients as well and brought them to another

(10)  agency upon dissolution.  Jody did not do

(11)  that.

(12)           Had she done so, she could have

(13)  considered going to agencies such as Elite,

(14)  IMG, Wilhelmina, Next, Vision, Focus, DNA,

(15)  Ford APM, EMG, JAG, State, Heroes, Bella,

(16)  Muse, Red, Lions, Major, Women, Women 360, LA

(17)  Model Management, Marilyn, Stets, Fenton,

(18)  Bicoastal or other agencies, but it appears

(19)  she never did that.

(20)           Some of those agencies or other

(21)  buyers don't need Fusion's expense structure.

(22)  If one of these agencies has a legal

(23)  department, they don't need the legal cost

(24)  for Fusion.  If they have an accounting

(25)  department, they don't need the accounting

(1)                    KEVIN POLLACK

(2)    cost of Fusion.  They might not need any of

(3)    those employees.

(4)                    There is a whole way, many

(5)    reasons why these agencies could reduce the

(6)    expense structure.  With a 25 percent

(7)    reduction in expenses, that supports a

(8)    valuation of about 3 and a half million to $5

(9)    and-a-half million.  With an 85 percent

(10)   reduction, it is about an 11 million to

(11)   $18 million valuation.  And with a 95 percent

(12)   reduction of expenses, it is about 13 million

(13)   to run a $20 million or a bit more valuation.

(14)                   There was definitely an

(15)   opportunity to capitalize on that, but

(16)   instead, it appears that Mitch Gordon just

(17)   took the assets instead.  The assets were

(18)   supposed to be promptly liquidated and this

(19)   was the way to do it and she didn't do it?

(20)                   Again, she just took the assets

(21)   and she is using the same exact assets I

(22)   mentioned above.  So those assets clearly

(23)   have value.

(24)                   Now, if Jody had switched

(25)   careers, wasn't involved in modeling and went

(1)                          **KEVIN POLLACK**

(2)    off and did something totally unrelated, it

(3)    doesn't change the fact that she didn't

(4)    follow the agreement in terms of liquidation,

(5)    and what you are supposed to do.

(6)              The fact that she is running the

(7)    modeling agency using the same exact assets

(8)    as Fusion LLC is alarming and obviously

(9)    inappropriate.

(10)             So when we look at the valuation

(11)   here, we have to also take into consideration

(12)   that the numbers that I have been provided by

(13)   Jody Gordon likely are not accurate.  You

(14)   have been given examples of that in the

(15)   complaint, so you have to adjust for that.  I

(16)   believe there has been theft or fraud.  I

(17)   still don't know what she has been paid to

(18)   this date and what money has gone out the

(19)   door in wires and otherwise to her?

(20)             She refused to provide any of

(21)   that information to me before dissolution.

(22)   There is evidence that she breached the

(23)   agreement and overpaid herself as well.  So

(24)   to me when I look at valuation, given those

(25)   key assets, that name, the social media which

(1)                   KEVIN POLLACK

(2)     when I last looked was actually on Jody's own

(3)     personal Instagram?

(4)              The same social media that she is

(5)     using now and that was in Fusion LLC.  The

(6)     website, Fusion Models NYC, the name, the

(7)     logo, the office, the phone number, people

(8)     are using this over and over.  These are

(9)     extremely valuable assets, that's how Fusion

(10)    is in business because people know about

(11)    Fusion, as opposed to being a startup from

(12)    yesterday, where people are not going to

(13)    reach out to them.

(14)             Clients reach out to them,

(15)    models, so those assets are extremely

(16)    valuable and so based on my analysis of the

(17)    situation, I find that the valuation at an

(18)    absolute minimum should be what is stated in

(19)    the complaint.

(20)             But on further review, that

(21)    valuation should be much higher and Jody

(22)    Gordon herself tried to raise money to 20 to

(23)    $25 million valuation back in the 2010s.  I

(24)    don't recall exactly what year.

(25)             She thought there was a lot of

(1)                          **KEVIN POLLACK**

(2)      value there.  She herself also multiple times

(3)      said I am not going to sell this agency for

(4)      less than $5 million or $10 million.

(5)                     Clearly, she thought there was

(6)      value there and is running it today.  Clearly

(7)      there is benefit.

(8)                     To wrap-up on that, I also had a

(9)      valuation expert do an analysis.  The bottom

(10)     line is there is a lot of waste, potential

(11)     fraud, potential theft, numbers going out the

(12)     door, money going out the door.  Numbers that

(13)     might be fake, manipulated.  I haven't seen

(14)     accurate records.  I have seen a lot of

(15)     inconsistencies, but there is a lot of value

(16)     there and Jody did not go to another modeling

(17)     agency, which I would have done, if I had

(18)     known.

(19)                    I probably would have got a deal

(20)     done, that would have made a lot of sense.

(21)     Instead she just took the assets.

(22)          Q.   How quickly would you have gotten

(23)     a deal done?

(24)          **A.   I believe --**

(25)                **MS. PATELIS:  Objection.  What**

(1)                    **KEVIN POLLACK**

(2)        **deal are you referring to?**

(3)               **MR. LEHMAN:  The deal he just**

(4)        **referred to.**

(5)        Q.   If you can answer, you can

(6)    answer.

(7)               **MS. PATELIS:  What deal, what**

(8)        **time frame?**

(9)        Q.   How quickly -- okay, I will ask

(10)   this question.  When the company was

(11)   judicially dissolved, how quickly do you,

(12)   Kevin, think that you could have sold the

(13)   mark, the name, the phone number, the website

(14)   to one of those agencies that you mentioned?

(15)               **MS. PATELIS:  Objection.  You are**

(16)        **speculating on something there has**

(17)        **been no evidence of.**

(18)        Q.   You can answer when she is done.

(19)        **A.   I am going to answer because I**

(20)   **have been an investment banker.  I am a**

(21)   **finance professional.  I have been on a lot**

(22)   **of committees.  I have financial expertise, I**

(23)   **have gotten deals done.  I once raised**

(24)   **$10 million for a company, I recall in about**

(25)   **a month.**

(1)                    **KEVIN POLLACK**

(2)            I think I could have sold these

(3)    assets possibly within a couple of weeks,

(4)    maybe faster.  Worse case, maybe it takes a

(5)    month or two, but certainly not six months,

(6)    or a year, or never.

(7)            Which apparently is the case with

(8)    Jody, who just took all of the assets that

(9)    were built using my investment capital, not

(10)   paying me any distributions along the way,

(11)   paying herself, who knows what amount of

(12)   money because she refused to share it,

(13)   providing terrible financials to hide the

(14)   truth.

(15)           So yes, the answer is, those

(16)   assets, despite all of the numbers, those

(17)   assets, I think I could have done it in a

(18)   couple of weeks, maybe a month or two, worst

(19)   case.

(20)           MS. PATELIS:  Let me ask you a

(21)       cross question.

(22)           MR. LEHMAN:  You don't get to go

(23)       when I am not done yet.

(24)           MS. PATELIS:  First of all, you

(25)       are going off my -- you are trying

(1)                    **KEVIN POLLACK**

(2)        **to -- you are not redirecting on my --**

(3)            **MR. LEHMAN:  At this point --  at**

(4)        **this point --  you have your**

(5)        **objection.**

(6)            **MS. PATELIS:  I have my objection**

(7)        **on the record.  You are not just going**

(8)        **to start, you know, asking him**

(9)        **questions --**

(10)           **MR. LEHMAN:  I asked him about**

(11)       **paragraph 29 of the complaint.**

(12)       **Kevin, I don't have anymore -- Kevin,**

(13)       **I don't have anymore --**

(14)       Q.    Kevin, is there anything you

(15)   would like to add, that's my last question,

(16)   is there anything you would like to add about

(17)   this case?

(18)           **MS. PATELIS:  Objection.  Broad.**

(19)       **This is not your time --**

(20)       A.    No, I do not have anything to

(21)   add.

(22)           **MR. LEHMAN:  Would you stop,**

(23)       **Maria?**

(24)           **MS. PATELIS:  Why don't you**

(25)       **become a lawyer and do things the**

(1)                    KEVIN POLLACK

(2)        right way?

(3)            MR. LEHMAN:  Wow. I am just

(4)        noting on the record, I will repeat

(5)        this so it is on the record.  She just

(6)        said, my opposing counsel just said,

(7)        "why don't you become a lawyer?"  I hope

(8)        that we have --

(9)            (Attorneys talking on top of each

(10)        other.)

(11)            MR. LEHMAN:  You made a mistake,

(12)        I made a mistake.  We are all

(13)        forgiven.

(14)            MS. PATELIS:  I want to ask a

(15)        question.

(16)    EXAMINATION

(17)    BY MS. PATELIS:

(18)        Q.  Everything you just testified to,

(19)    was it based on your personal knowledge, yes

(20)    or no, of why Fusion could have been or the

(21)    value of it in accordance with paragraph 29,

(22)    is that all in your personal knowledge based

(23)    upon --

(24)        A.  I am a financial expert and based

(25)    on my opinion, yes.

```
(1)                    KEVIN POLLACK
(2)           MR. LEHMAN:  I am done here.
(3)       Kevin, are you done?
(4)              THE WITNESS:  Yes.
(5)              MS. PATELIS:  I am done asking
(6)       questions.  Thank you, Lori.  It has
(7)       been a pleasure.
(8)              (Time noted:  2:48 p.m.)
(9)                  _____
(10)                 KEVIN POLLACK
(11)
          Sworn and Subscribed
(12)
          This_____day of _____, 2025.
(13)
          _____
(14)          Notary Public
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

(1)

(2)                    C E R T I F I C A T E

(3)

STATE OF NEW YORK     )

(4)                           : ss.

(5)  COUNTY OF NEW YORK    )

(6)

(7)           I, LORI CARR, a Shorthand Reporter and

(8)  Notary Public within and for the State of New

(9)  York, do hereby certify:

(10)           That  KEVIN POLLACK, the witness whose

(11)  deposition is hereinbefore set forth, was sworn

(12)  and that such deposition is a true record of the

(13)  testimony given by such witness.

(14)           I further certify that I am not related

(15)  to any of the parties to this action by blood or

(16)  marriage; and that I am in no way interested in

(17)  the outcome of this matter.

(18)           IN WITNESS WHEREOF, I have hereunto set

(19)  my hand this 3rd day of May, 2025.

(20)

(21)              _Lori Carr_

(22)              LORI CARR, RPR, CRR

(23)

(24)

(25)

# EXHIBIT 4

---

Excerpts of Deposition of Defendant Jodie Gordon, dated
October 8, 2024 ("Gordon Dep.").

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
KEVIN POLLACK,

                        PLAINTIFF,


      -against-      Case No.:
              23 CIV.2376(KAM)(SJB)


JODIE LOUISE GORDON (also known as JODY
GORDON) and FUSION MODELS BK LLC,

                     DEFENDANTS.
----------------------------------------X


             DATE:  October 8, 2024

             TIME:  10:40 A.M.



         DEPOSITION of the Defendant,

JODIE LOUISE GORDON, taken by the

respective parties, pursuant to a Court

Order and to the Federal Rules of Civil

Procedure, held at the offices of 1038

Jackson Avenue, Suite 4, Long Island City,

New York 11101, before Ranae Porter, a

Notary Public of the State of New York.

1

2    A P P E A R A N C E S:

3

4    KASELL LAW FIRM
        Attorneys for the Plaintiff
5       KEVIN POLLACK
        1038 Jackson Avenue, Suite 4
6       Long Island City, New York 11101
        BY: DAVID KASELL, ESQ.

7

8    MARIA PATELIS LAW FIRM PLLC
        Attorneys for the Defendants
9       JODIE LOUISE GORDON (also known as JODY
        GORDON) and FUSION MODELS BK LLC
10      7024 18th Avenue
        Brooklyn, New York 11204
11      BY: MARIA PATELIS, ESQ.
        Dkasellesq@gmail.com

12

13              *         *         *

14

15

16

17

18

19

20

21

22

23

24

25

1

2    J O D I E   L O U I S E   G O R D O N,

3    called as a witness, having been first duly

4    sworn by a Notary Public of the State of

5    New York, was examined and testified as

6    follows:

7    EXAMINATION BY

8    MR. KASELL:

9        Q.    Please state your name for the

10   record.

11       A.    Jodie Louise Gordon.

12       Q.    What is your address?

13       A.    101 North 10th Street, Suite

14   301, Brooklyn, New York 11249.

15       Q.    Good morning, Ms. Gordon.  How

16   are you today?

17       A.    Good.  Thank you.

18       Q.    My name's David Kasell.  I

19   represent Kevin Pollack in this action.

20   I'm going to be asking you some questions

21   today.

22       A.    Okay.

23       Q.    Have you ever been deposed

24   before?

25       A.    Have I had a deposition before?

1

2          A.    Fusion Model Management and

3     Fusion Modeling Agent LLC.

4          Q.    Was there a Fusion Modeling

5     Inc.?

6          A.    Fusion Model Management, Inc.

7     That was previous.  That's the one I

8     mentioned.

9          Q.    So there's still only two of

10    them?

11         A.    No.  You're aware of my Fusion

12    Models BK.  You're aware of that.

13         Q.    Okay.  Are there any other

14    Fusion entities?

15         A.    No.

16              MS. PATELIS:  I just want to

17         put on the record that Fusion

18         Modeling Agency LLC was judicially

19         dissolved.

20              THE WITNESS:  Correct.

21         Q.    Do you have any idea how big

22    the modeling business is?

23              MS. PATELIS:  Objection.  Time

24         frame.

25         Q.    Well, okay.  If you understand

1

2          A.    Yes.

3          Q.    Do you know what the web

4    address was?

5          A.    I believe it's Fusionmodels.com

6    or Fusion -- I think's Fusion Models or

7    Fusion NYC.  I don't know.  I never look at

8    the website to be honest with you.

9          Q.    That's okay.  Do you remember

10   what the Fusion -- what Fusion's phone

11   number was at that point at the end of the

12   2019?

13         A.    I mean Fusion's always had the

14   same phone number.  It's 212-675-1300.

15         Q.    And so it still has that phone

16   number?

17         A.    Mm-hmm.

18         Q.    Okay.  So like throughout its

19   -- even when it was at a different

20   location, Fusion had that phone number?

21         A.    Yup.

22         Q.    What about -- and its e-mail

23   address, I guess Fusion had -- well

24   actually, let me ask the question.

25               What's the e-mail address for

# EXHIBIT 5

Excerpts of Expert Report on Valuation of Fusion Modeling Agency LLC as of Judicial Dissolution (April 30, 2021), dated November 4, 2024, and submitted as "Exhibit 2" during Defense Counsel's Deposition of Mr. Quan Vu on June 4, 2025 ("Vu Report").

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------X

 KEVIN POLLACK,

                       Plaintiff,

                                                 23 Civ. 2376 (KAM) (SJB)

        -against-

JODIE LOUISE GORDON (also known as
JODY GORDON) and FUSION MODELS
BK LLC,

                       Defendants.

--------------------------------------------------------------------------X

**Expert Report on
Valoration of Fusion Modeling Agency LLC as
<ins>of Judicial Dissolution (April 30, 2021)</ins>**

This report summarizes my expert testimony in valuing Fusion Modeling Agency LLC ("Fusion" or "the Company"), a limited liability company formed under the laws of New York that was judicially dissolved on April 30, 2021, in *Jodie Gordon v. Fusion Modeling Agency, LLC*, Index No. 500709/2021 (Kings County Supreme Court) (Martin, J.).

Utilizing the Discounted Cash Flow ("DCF") methodology, I estimate Fusion's value to be between $3.4 million and $5.4 million. The DCF methodology is a financial valuation method used to estimate the value of a company based on its expected future cash flows. The DCF approach projects the future cash flows the entity is expected to generate and then discounts them back to their present value using a discount rate, typically the weighted average cost of capital (WACC).

The main idea behind the DCF method is that the value of an investment today is equal to the sum of all its future cash flows, adjusted for cash flow risks and the time value of money, which reflects the idea that money available today is worth more than the same amount in the future due to its potential earning capacity. The DCF methodology is widely used to assess the intrinsic value of a business or investment by considering both future earnings potential and risk factors.

This valuation is based on several sources of information including Profit & Loss ("P&L") statements from for 2013 through Q2 2020 provided by Fusion; Fusion's tax filings, balance sheets, bank statements and credit card statements turned over in discovery in this litigation (D0001-02139); and publicly available data for a publicly traded comparable company, Wilhelmina International, Inc. ("Wilhelmina"; Nasdaq-CM ticker: WHLM) including the information and financial data available in Wilhelmina's Annual Reports (Form 10-K) and Quarterly Reports (Form 10-Q).

## **Background on Valuation**

There are three widely accepted valuation methodologies for businesses:

**(1) Discounted Cash Flow (DCF)**: The DCF method estimates a company's intrinsic value based on its expected future cash flows. The process starts by forecasting the company's free cash flows over a set period, typically five to ten years. This forecast uses assumptions about revenue growth, operating margins, capital expenditures, and working capital needs. The projected cash flows are then discounted to their present value using a discount rate, usually the company's Weighted Average Cost of Capital (WACC), which reflects the time value of money and the risks associated with future cash flows.

After the forecast period, a terminal value is calculated to estimate the company's worth beyond that horizon. Terminal value represents the estimated value of a business or asset at the end of a specific forecast period when future cash flows can be projected more reliably. It accounts

for all future cash flows beyond the forecast period, essentially capturing the company's value into perpetuity.

Two primary methods exist for calculating the terminal value: (1) Multiples Method: This involves applying a valuation multiple, such as EBITDA, revenue, or net income, to the company's financials at the end of the forecast period. This method is based on comparable companies within the same industry and provides a market-based valuation, and (2) Perpetuity Growth Method: This assumes the company will continue to generate cash flows at a constant growth rate indefinitely. It is ideal for mature, stable companies expected to grow steadily over time. Both methods are often used as checks against each other to ensure consistency in the valuation results.

**(2) Comparable Companies Analysis (Comps)**: Comps estimates a company's value by comparing it to similar companies within the same industry or sector. This approach is based on the idea that similar companies should have similar market valuation metrics. The process starts by selecting a group of peer companies that match the target company in industry, size, growth potential, and financial characteristics.

Once the peer group is chosen, key financial metrics, such as Enterprise Value to EBITDA (EV/EBITDA) and Price-to-Earnings (P/E) ratios, are calculated for each comparable company. These multiples are obtained by dividing each company's market or enterprise value by its respective financial metric. This standardizes comparisons across companies. The mean and median of these multiples are often used as they provide a reliable benchmark, mitigating the impact of outliers and presenting a balanced view of market valuations.

These multiples are then applied to the target company's financial metrics to estimate its value. Adjustments may be needed to account for differences in growth rates, profitability, or capital structure to improve accuracy. The outcome is a valuation range that reflects how the market values similar companies.

**(3) Precedent Transaction Analysis (Transaction Comps)**: Transaction Comps estimates a company's value by examining prices paid in past transactions involving similar companies. The idea is that comparable companies in similar situations are valued similarly in mergers, acquisitions, or buyouts. The process starts by identifying relevant past transactions in the same industry or involving similar companies.

Key valuation multiples, such as EV/EBITDA and P/E ratios, are derived based on the transaction price and the financial metrics of the acquired company at the time of the deal. The mean and median of these multiples create a benchmark that is applied to the target company's financial metrics. Adjustments may be made for differences such as size, market conditions, or growth potential.

Transaction Comps is valuable because it reflects the premiums paid in acquisitions, including synergies, strategic value, or control premiums. However, this method relies on the availability of recent and relevant transaction data, and unique deal circumstances can sometimes make direct comparisons challenging.

## Valuation of Fusion

The Discounted Cash Flow or DCF method is the most suitable and reliable valuation methodology because there are no publicly available precedent transactions and limited public traded comps (*i.e.*, Wilhelmina). As explained above, the DCF method emphasizes Fusion's ability to generate future cash flows, providing an intrinsic valuation based on the company's specific financial performance and growth prospects.

To forecast Fusion's P&L statements for the DCF valuation, historical data from Exhibits O, P, Q, and R, covering the period from 2013 through the second quarter of 2020, was used. The first step involved constructing historical P&Ls from all four exhibits, despite discrepancies in overlapping figures. To address these inconsistencies and assess their magnitude, the mean, maximum, and minimum values were calculated for overlapping data points. The mean historical annual revenue growth rate (6.73%) was then applied to project Fusion's revenues for the 2022-2026 period (a five-year forecast). For the other P&L line items, the mean of the historical margins was calculated and applied to derive the forecasted values (8.29% for EBITDA and 8.05% for EBIT), ensuring consistency and accuracy in the projections. This structured approach enabled a robust, data-driven forecast for Fusion's P&L statements, forming the basis for the DCF valuation.

With the forecasted P&L complete, the valuation process moved to calculating free cash flows for the five-year forecast period based on revenue projections, incorporating a 25% reduction in operating expenses to reflect reasonable, expected efficiency improvements. It bears emphasizing that may be viewed as a very conservative reduction given that Fusion's primary asset is its service mark, which is associated with Fusion Models being a pioneer in promoting diversity and inclusion in the modeling industry particularly for high-end fashion.

From an economic perspective, Fusion Models operates as a market maker within the modeling industry by facilitating transactions between diverse models and clients seeking inclusive representation for high-end projects, thereby ensuring liquidity in a niche market segment. Fusion has positioned itself itself as an intermediary that provides reliable access to a diverse talent pool, Fusion enhances market efficiency, and it is able to capture the surplus. Fusion has a gross profit margin of approximately 30% ((gross profits – costs of good and services)/(gross profits)).

Fusion's established, strategic positioning allows the company to capture value through a robust network effect, driving demand from both sides of the market. Fusion's commitment to diversity serves as a differentiator that attracts premium models and clientele, thereby augmenting its pricing power and reinforcing its status as an industry leader.

3

The primary asset of Fusion Models is its service mark, which functions as intellectual property embodying significant goodwill and brand equity that was established over 15 years. The service mark "Fusion" is a powerful intangible asset. This brand equity provides a competitive advantage, creating barriers to entry for potential competitors and commanding a premium in contractual negotiations. The service mark acts as an economic moat, protecting the firm's market share and ensuring long-term profitability.

From an economic perspective, Fusion is a "bolt-on" company -- that is, Fusion is a smaller business that could be acquired by a larger company, typically a strategic acquirer or a private equity firm, to complement and enhance the operations of an existing platform company. The bolt-on is integrated into the parent company's existing business structure to create value through synergies, such as expanding market share, enhancing product offerings, or increasing operational efficiencies.

The goal of acquiring a bolt-on company is to achieve strategic growth by leveraging the existing infrastructure, distribution channels, or expertise of the larger company, thereby maximizing economies of scale and reducing costs. This type of acquisition strategy allows the larger entity to quickly diversify its portfolio, enter new markets, or strengthen its competitive position without having to develop those capabilities organically.

A larger company that acquires Fusion could reasonably expect to achieve an 85-95% reduction in operating expenses, which is significantly higher than the 25% reduction I have included in this valuation. An 85% reduction in expenses produces a valuation range of $11.4 million to $18.4 million and a 95% reduction in expenses produces a valuation range of $12.7 million to $20.5 million. For example, a larger company would benefit from economies of scale on expenses such as accounting, legal, and professional services, and meals, which total $178,283 according to Fusion's 2021 Federal Partnership Tax Return (D0495).

In simple terms, a larger company would already have in-house counsel and accounting, allowing it to eliminate these expenses immediately. That is, redundancies would be eliminated. Similarly, a modeling agent's budget for meals would already be accounted for and could be eliminated. Finally, a review of the bank and credit card statements for Fusion shows that many of the expenses are of a more personal benefit to one of the managing members (such as SoulCyle memberships, frequent Uber rides, and spa treatments) that a larger company would expect to eliminate.

The efficiency of collections and returns would also improve, as larger companies are more effective in these areas; clients who fail to pay would not receive repeated services. This enhanced efficiency not only streamlines cash flow but also reduces the administrative burden associated

4

with follow-up on outstanding payments. Additionally, the established reputation and resources of a larger company can lead to higher client compliance and quicker resolution of payment issues.

After calculating free cash flows for the five-year forecast period based on revenue projections, Fusion's free cash flows were discounted to their present value using a WACC (Weighted Average Cost of Capital) range of 13-17%, accounting for the risk and time value of Fusion's future cash flows. To estimate the terminal value, two methods were employed. The first was the multiples method, which applied an exit multiple of 3-5x EBITDA, referencing Wilhelmina's EBITDA multiple of 3.75x as of December 12, 2022, to provide a market-based estimate for Fusion's value beyond the forecast period. The second method, the perpetuity growth approach, assumed a perpetual growth rate of 6-8% to estimate the ongoing value of Fusion's cash flows. Terminal values from both methods were discounted to their present value using the same WACC range. The multiples method produced a valuation range of $2.8-$3.4 million at a 15% WACC with a 3-5x EBITDA exit multiple, while the perpetuity method yielded a valuation range of $5.4-$6.5 million with a 6-8% annual growth rate. The combined present value of the forecasted cash flows and terminal value provided a comprehensive valuation of Fusion, covering both near-term projections and long-term growth potential. This approach offered a balanced valuation, even with limited comparable market and transaction data.

DCF is a robust valuation method with several advantages in valuing Fusion. Primarily, it provides an intrinsic valuation by focusing on the company's ability to generate future cash flows, making it less influenced by short-term market fluctuations and investor sentiment. As a result, the DCF often leads to more conservative valuations compared to market-based methods like Comps and Transaction Comps. This conservatism makes it ideal for producing a cautious and fundamental estimate of a company's value. Additionally, the DCF's forward-looking nature allows for consideration of potential growth and strategic initiatives, making it especially useful for companies with strong future prospects. Its flexibility enables practitioners to adapt it to different industries, business models, and economic conditions, incorporating various scenarios and assumptions. This adaptability, combined with its comprehensive focus on cash generation, ensures a thorough and detailed assessment of a company's intrinsic value.

The DCF method's ability to change assumptions serves as a strength, requiring rigorous evaluation and justification of each projection. This ensures that every assumption is grounded in careful analysis and realistic expectations. This sensitivity highlights the importance of thorough research, enabling more accurate and nuanced valuations. DCF's complexity is also beneficial because it ensures that all aspects of a company's operations, from revenue to capital expenditures, are examined. This level of detail provides a more comprehensive and accurate reflection of the company's value than simpler models can. Although estimating the terminal value involves judgment, using both the multiples method and the perpetuity growth method can yield a range of outcomes for a balanced valuation. By applying sensitivity analysis to different scenarios, one can

test the strength of their valuations, making the DCF not only reliable but also adaptable to changing conditions. Thus, DCF remains one of the most insightful tools for assessing a company's intrinsic value, far outweighing its potential challenges.

In this case, DCF is the most appropriate methodology for valuation, offering a conservative, intrinsic valuation grounded in projected future cash flows. Fusion's enterprise value is estimated to range between $3.4 million and $5.4 million.

Quan A Vu
November 4, 2024

**Fusion Modeling Agency LLC: Raw Income Statements**

**Profit & Loss**
**Jan 2015 - Jun 2020 (Exhibit R)**
Date: 7/24/20

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1Q 2020 | 2Q 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income** | | | | | | | | | |
| Advance Fees | | | | | | | | | |
| Agency Fee | | | | | | | | | |
| Agency Fee (Models) | | | | | | | | | |
| CC Fees | | | | | | | | | |
| Expenses Recovered | | | | | | | | | |
| MA Fee's | | | | | | | | | |
| Model Fees | | | | | | | | | |
| Uncategorized Income | | | | | | | | | |
| Usage | | | | | | | | | |
| Write-Offs Collected | | | | | | | | | |
| Other (Consolidated) | | | 3,774,700.00 | 4,563,064.00 | 4,893,369.33 | 5,751,701.67 | 5,619,379.64 | 1,280,860.93 | 305,344.01 |
| **Total Income** | | | **3,774,700.00** | **4,563,064.00** | **4,893,369.33** | **5,751,701.67** | **5,619,379.64** | **1,280,860.93** | **305,344.01** |
| | | | | | | | | | |
| **COGS** | | | | | | | | | |
| Model Expenses | | | 2,515,876.00 | 3,157,295.00 | 3,286,615.67 | 4,060,624.33 | 3,927,157.78 | 836,215.49 | 190,704.67 |
| Model Payments | | | | | | | | | |
| **Total COGS** | | | **2,515,876.00** | **3,157,295.00** | **3,286,615.67** | **4,060,624.33** | **3,927,157.78** | **836,215.49** | **190,704.67** |
| | | | | | | | | | |
| **Gross Profit** | | | **1,258,824.00** | **1,405,769.00** | **1,606,753.66** | **1,691,077.34** | **1,692,221.86** | **444,645.44** | **114,639.34** |
| | | | | | | | | | |
| **Expense** | | | | | | | | | |
| Advertising | | | | | | 598.00 | 225.00 | | |
| Depreciation | | | | | 30,538.56 | 30,538.56 | 30,538.56 | 7,634.64 | 7,634.64 |
| Insurance | | | 29,189.04 | 53,206.40 | 47,339.90 | 64,659.90 | 43,878.09 | 11,539.38 | 11,725.28 |
| Interest | | | 1,433.17 | 25,417.67 | 53,906.18 | 36,042.21 | 31,996.53 | 80.72 | |
| Licenses and Permits | | | 3,578.00 | 150.00 | 150.00 | 1,630.00 | | | |
| Marketing | | | 102,500.00 | 248,500.00 | 107,000.00 | 620.59 | 3,200.00 | | |
| Meals & Entertainment | | | 61,991.23 | 66,145.82 | 66,532.20 | 45,596.37 | 32,117.63 | 18,419.54 | |
| Merchant Deposit Fees | | | | | | | | | |
| Mother Agency | | | 72,903.13 | 97,870.64 | 173,777.18 | 172,793.93 | 177,084.66 | 39,331.67 | 830.00 |
| Office Expenses | | | 81,595.22 | 125,047.28 | 103,357.42 | 111,164.63 | 125,613.66 | 16,133.09 | 4,249.16 |
| Payroll | | | 504,866.91 | 616,906.22 | 669,639.52 | 661,067.83 | 723,463.68 | 182,016.56 | 143,635.64 |
| Professional Fees | | | 57,043.95 | 38,992.47 | 31,943.93 | 67,749.87 | 80,629.03 | 16,613.46 | 19,630.32 |
| Reconciliation Discrepancies | | | | | | | | | |

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1Q 2020 | 2Q 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Reimbursement | | | | | | | | | |
| Rent | | | 83,976.52 | 64,024.31 | 72,278.28 | 168,204.28 | 189,920.26 | 21,403.23 | 27,717.00 |
| Taxes | | | 7,327.81 | 5,580.45 | 1,500.00 | | 8,268.34 | 1,500.00 | |
| Telephone | | | | | | | | | |
| Travel | | | 225,118.06 | 264,723.24 | 196,908.64 | 298,009.44 | 228,707.67 | 65,534.76 | 6,477.90 |
| Utilities | | | 27,384.96 | 32,742.58 | 24,305.46 | 37,629.33 | 42,211.79 | 14,265.98 | 5,286.59 |
| Other (QuickBooks) | | | | 1,040.92 | 1,115.73 | 2,117.06 | 2,335.10 | 4,489.35 | 943.93 |
| **Total Expense** | | | **1,258,908.00** | **1,640,348.00** | **1,580,293.00** | **1,698,422.00** | **1,720,190.00** | **398,962.38** | **228,130.46** |
| | | | | | | | | | |
| **Net Ordinary Income** | | | **(84.00)** | **(234,579.00)** | **26,460.66** | **(7,344.66)** | **(27,968.14)** | **45,683.06** | **(113,491.12)** |
| Other Income | | | | | | | | | |
| Other Expense | | | | | | | | | |
| **Net Other Income** | | | **--** | **--** | **--** | **--** | **--** | **--** | **--** |
| **Net Income** | | | **(84.00)** | **(234,579.00)** | **26,460.66** | **(7,344.66)** | **(27,968.14)** | **45,683.06** | **(113,491.12)** |

**Profit & Loss**
**Jan 2015 - 1Q 2020 (Exhibit Q)**
**Date: 5/28/20**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1Q 2020 | 2Q 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income** | | | | | | | | | |
| Advance Fees | | | | | | | | | |
| Agency Fee | | | 527,808.78 | 626,949.19 | 668,595.71 | 798,266.78 | 757,928.76 | 173,403.96 | |
| Agency Fee (Models) | | | 534,735.54 | 686,833.02 | 661,515.16 | 794,283.11 | 742,512.78 | 162,741.19 | |
| CC Fees | | | | | | | | | |
| Expenses Recovered | | | 181,346.76 | 86,264.81 | 72,149.02 | 144,252.13 | 88,880.08 | 2,564.71 | |
| MA Fee's | | | | | | | | | |
| Model Fees | | | 2,472,233.36 | 3,024,436.19 | 3,357,213.51 | 3,990,966.78 | 3,984,898.37 | 922,924.03 | |
| Uncategorized Income | | | | | | | | | |
| Usage | | | | | | | | | |
| Write-Offs Collected | | | | | | | | | |
| Other | | | 58,575.56 | 138,580.79 | 134,312.60 | 23,516.20 | 40,625.01 | 19,312.98 | |
| **Total Income** | | | **3,774,700.00** | **4,563,064.00** | **4,893,786.00** | **5,751,285.00** | **5,614,845.00** | **1,280,946.87** | |
| | | | | | | | | | |
| **COGS** | | | | | | | | | |
| Model Expenses | | | 39,924.12 | 37,578.05 | 409,287.34 | 179,814.75 | 554,620.22 | (22,166.85) | |
| Model Payments | | | 2,475,951.88 | 3,119,716.95 | 2,879,411.66 | 3,878,226.25 | 3,352,113.78 | 857,639.20 | |
| **Total COGS** | | | **2,515,876.00** | **3,157,295.00** | **3,288,699.00** | **4,058,041.00** | **3,906,734.00** | **835,472.35** | |
| | | | | | | | | | |
| **Gross Profit** | | | **1,258,824.00** | **1,405,769.00** | **1,605,087.00** | **1,693,244.00** | **1,708,111.00** | **445,474.52** | |

**Expense**

| | | | | | | |
|---|---|---|---|---|---|---|
| Advertising | | | | | | |
| Depreciation | | | | | | |
| Insurance | | | | | | |
| Interest | | | | | | |
| Licenses and Permits | | | | | | |
| Marketing | | | | | | |
| Meals & Entertainment | | | | | | |
| Merchant Deposit Fees | | | | | | |
| Mother Agency | | | | | | |
| Office Expenses | | | | | | |
| Payroll | 504,866.91 | 616,906.22 | 669,639.52 | 661,067.83 | 723,463.68 | 182,016.56 |
| Professional Fees | | | | | | |
| Reconciliation Discrepancies | | | | | | |
| Reimbursement | | | | | | |
| Rent | 83,976.52 | 64,024.31 | 72,278.28 | 168,204.28 | 189,920.26 | 7,000.00 |
| Taxes | 7,327.81 | 5,580.45 | 1,500.00 | -- | 8,268.34 | 1,500.00 |
| Telephone | | | | | | |
| Travel | 225,118.06 | 264,723.24 | 196,908.64 | 298,009.44 | 228,128.67 | 72,269.51 |
| Utilities | 27,384.96 | 32,742.58 | 24,305.46 | 37,629.33 | 42,211.79 | 14,265.98 |
| Other | 410,233.74 | 656,371.20 | 615,661.10 | 533,511.12 | 527,682.26 | 210,796.74 |
| **Total Expense** | **1,258,908.00** | **1,640,348.00** | **1,580,293.00** | **1,698,422.00** | **1,719,675.00** | **487,848.79** |
| | | | | | | |
| **Net Ordinary Income** | **(84.00)** | **(234,579.00)** | **24,794.00** | **(5,178.00)** | **(11,564.00)** | **(42,374.27)** |
| Other Income | | | | | | |
| Other Expense | | | | | | |
| **Net Other Income** | **--** | **--** | **--** | **--** | **--** | **--** |
| **Net Income** | **(84.00)** | **(234,579.00)** | **24,794.00** | **(5,178.00)** | **(11,564.00)** | **(42,374.27)** |

**Profit & Loss**
**Jan 2013 - Dec 2017 (Exhibit P)**
**Date: 1/9/18**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1Q 2020 | 2Q 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income** | | | | | | | | | |
| Advance Fees | 1,390.00 | 4,420.00 | 2,080.00 | 800.00 | 690.00 | | | | |
| Agency Fee | 535,847.33 | 560,916.43 | 528,405.45 | 628,370.85 | 668,870.91 | | | | |
| Agency Fee (Models) | 523,174.72 | 558,687.84 | 536,055.54 | 687,366.35 | 655,387.03 | | | | |
| CC Fees | -- | 15.00 | 525.60 | 741.42 | 847.20 | | | | |
| Expenses Recovered | 43,541.05 | 64,358.25 | 167,249.40 | 87,077.22 | 66,757.04 | | | | |

| | | | | | |
|---|---|---|---|---|---|
| MA Fee's | 17,551.61 | 74,798.54 | 47,818.71 | 91,976.56 | 70,127.51 |
| Model Fees | 2,563,744.05 | 2,562,928.13 | 2,475,216.69 | 3,031,844.53 | 3,356,269.58 |
| Uncategorized Income | -- | -- | -- | -- | -- |
| Usage | -- | 17,500.00 | -- | 17,530.47 | 50,896.04 |
| Write-Offs Collected | 204,523.81 | -- | -- | 20,670.43 | 8,331.90 |
| Other | -- | -- | -- | -- | -- |
| **Total Income** | **3,889,772.57** | **3,843,624.19** | **3,757,351.39** | **4,566,377.83** | **4,878,177.21** |
| | | | | | |
| **COGS** | | | | | |
| Model Expenses | 161,018.48 | 74,471.68 | 10,451.42 | 58,113.73 | (68,662.37) |
| Model Payments | 2,547,089.19 | 2,547,214.85 | 2,482,551.88 | 3,114,783.62 | 3,277,997.76 |
| **Total COGS** | **2,708,107.67** | **2,621,686.53** | **2,493,003.30** | **3,172,897.35** | **3,209,335.39** |
| | | | | | |
| **Gross Profit** | **1,181,664.90** | **1,221,937.66** | **1,264,348.09** | **1,393,480.48** | **1,668,841.82** |
| | | | | | |
| **Expense** | | | | | |
| Advertising | -- | -- | -- | -- | 10,000.00 |
| Depreciation | -- | -- | -- | -- | 30,538.56 |
| Insurance | 26,423.30 | 36,063.53 | 32,386.23 | 56,904.77 | 50,827.89 |
| Interest | 5,153.41 | 1,519.67 | 1,433.17 | 994.94 | 53,906.18 |
| Licenses and Permits | -- | -- | 3,578.00 | 150.00 | 150.00 |
| Marketing | 73,607.92 | 129,677.50 | 102,500.00 | 248,500.00 | 97,000.00 |
| Meals & Entertainment | 71,751.60 | 67,248.59 | 61,991.23 | 66,145.82 | 66,532.20 |
| Merchant Deposit Fees | -- | -- | -- | 1,040.92 | 1,115.73 |
| Mother Agency | 87,815.72 | 81,614.58 | 72,903.13 | 101,200.28 | 214,016.70 |
| Office Expenses | 63,613.46 | 63,622.56 | 93,746.08 | 85,373.55 | 111,531.99 |
| Payroll | 445,917.78 | 474,704.05 | 504,866.91 | 616,906.22 | 669,639.52 |
| Professional Fees | 33,925.36 | 49,540.20 | 57,043.95 | 38,992.47 | 31,943.93 |
| Reconciliation Discrep | 0.26 | -- | -- | (794.88) | -- |
| Reimbursement | 140.00 | -- | 1,050.00 | 95.41 | -- |
| Rent | 103,905.43 | 88,667.46 | 102,442.66 | 80,994.68 | 86,326.75 |
| Taxes | 23.26 | 4,214.31 | 7,327.81 | 5,580.45 | 1,500.00 |
| Telephone | 9,444.55 | 7,099.71 | 6,655.96 | 14,154.42 | 13,468.76 |
| Travel | 145,135.68 | 189,849.62 | 232,911.90 | 244,054.50 | 179,275.72 |
| Utilities | 18,112.08 | 21,034.96 | 20,729.00 | 18,588.16 | 10,836.70 |
| Other | -- | -- | -- | -- | -- |
| **Total Expense** | **1,084,969.81** | **1,214,856.74** | **1,301,566.03** | **1,578,881.71** | **1,628,610.63** |
| | | | | | |
| **Net Ordinary Income** | **96,695.09** | **7,080.92** | **(37,217.94)** | **(185,401.23)** | **40,231.19** |
| Other Income | 6.20 | 12.06 | 0.10 | -- | -- |
| Other Expense | 29,215.11 | 19,424.17 | 7,266.69 | 74,572.83 | 52,324.75 |
| **Net Other Income** | **(29,208.91)** | **(19,412.11)** | **(7,266.59)** | **(74,572.83)** | **(52,324.75)** |

**Net Income**  67,486.18  (12,331.19)  (44,484.53)  (259,974.06)  (12,093.56)

**Profit & Loss**
**Jan 2015 - Oct 2017 (Exhibit O)**
**Date: 11/14/18**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1Q 2020 | 2Q 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income** | | | | | | | | | |
| Advance Fees | | | 2,080.00 | 800.00 | 690.00 | | | | |
| Agency Fee | | | 528,355.45 | 628,237.52 | 671,629.04 | | | | |
| Agency Fee (Models) | | | 534,735.54 | 687,233.02 | 664,238.49 | | | | |
| CC Fees | | | 525.60 | 741.42 | 847.20 | | | | |
| Expenses Recovered | | | 167,249.40 | 87,077.22 | 72,149.02 | | | | |
| MA Fee's | | | 45,914.71 | 88,694.56 | 70,276.34 | | | | |
| Model Fees | | | 2,474,966.69 | 3,031,177.86 | 3,372,380.18 | | | | |
| Uncategorized Income | | | -- | -- | -- | | | | |
| Usage | | | -- | 17,530.47 | 50,896.04 | | | | |
| Write-Offs Collected | | | -- | 20,670.43 | 8,331.90 | | | | |
| Other | | | -- | -- | -- | | | | |
| **Total Income** | | | 3,753,827.39 | 4,562,162.50 | 4,911,438.21 | | | | |
| | | | | | | | | | |
| **COGS** | | | | | | | | | |
| Model Expenses | | | (9,669.81) | 18,821.03 | (57,125.80) | | | | |
| Model Payments | | | 2,496,073.11 | 3,153,409.65 | 3,316,792.57 | | | | |
| **Total COGS** | | | 2,486,403.30 | 3,172,230.68 | 3,259,666.77 | | | | |
| | | | | | | | | | |
| **Gross Profit** | | | 1,267,424.09 | 1,389,931.82 | 1,651,771.44 | | | | |
| | | | | | | | | | |
| **Expense** | | | | | | | | | |
| Advertising | | | | | | | | | |
| Depreciation | | | -- | -- | 30,538.56 | | | | |
| Insurance | | | 32,386.23 | 56,904.77 | 50,827.89 | | | | |
| Interest | | | 1,433.17 | 994.94 | 53,906.18 | | | | |
| Licenses and Permits | | | 3,578.00 | 150.00 | 150.00 | | | | |
| Marketing | | | 102,500.00 | 248,500.00 | 107,000.00 | | | | |
| Meals & Entertainment | | | 61,991.23 | 66,145.82 | 66,532.20 | | | | |
| Merchant Deposit Fees | | | -- | 1,040.92 | 1,115.73 | | | | |
| Mother Agency | | | 72,903.13 | 101,200.28 | 214,016.70 | | | | |
| Office Expenses | | | 93,746.08 | 85,373.55 | 111,576.99 | | | | |
| Payroll | | | 504,866.91 | 616,906.22 | 669,639.52 | | | | |

| | | | |
|---|---:|---:|---:|
| Professional Fees | 57,043.95 | 38,992.47 | 31,943.93 |
| Reconciliation Discrepancies | -- | (794.88) | 183.37 |
| Reimbursement | 1,050.00 | 95.41 | -- |
| Rent | 102,442.66 | 80,994.68 | 86,326.75 |
| Taxes | 7,327.81 | 5,580.45 | 1,500.00 |
| Telephone | 6,655.96 | 14,154.42 | 13,468.76 |
| Travel | 232,911.90 | 244,054.50 | 179,372.18 |
| Utilities | 20,729.00 | 18,588.16 | 10,836.70 |
| Other (Admin, Ins & Other Expenses) | -- | -- | -- |
| **Total Expense** | **1,301,566.03** | **1,578,881.71** | **1,628,935.46** |
| | | | |
| **Net Ordinary Income** | **(34,141.94)** | **(188,949.89)** | **22,835.98** |
| Other Income | 0.10 | -- | -- |
| Other Expense | 7,266.69 | 74,572.83 | 51,274.75 |
| **Net Other Income** | **(7,266.59)** | **(74,572.83)** | **(51,274.75)** |
| **Net Income** | **(41,408.53)** | **(263,522.72)** | **(28,438.77)** |

# Fusion Modeling Agency LLC: Raw Balance Sheet Statements

**Balance Sheet**
**2015 - 2019 (Exhibit Q); 2020 - 2021 (Exhibits from Defendant's Objections)**
**Date: 7/24/20**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | |
| **Current Assets** | | | | | | | | | |
| **Bank Accounts** | | | | | | | | | |
| Payroll Account | | | 291.34 | 1,454.85 | 768.62 | (4,833.86) | (18.00) | 106,948.80 | 5,918.76 |
| Money Market Account | | | 195.47 | (69,413.56) | 0.65 | 26.01 | 500.94 | 760.63 | 58,406.27 |
| Chase Checking | | | 145.19 | 351.12 | 211.23 | -- | -- | 1,000.00 | 1,000.00 |
| Chase Checking (Main) | | | 30,782.00 | 135,374.59 | (4,951.63) | (24,093.96) | (20,592.70) | 53,954.23 | (4,070.00) |
| **Total Bank Accounts** | | | 31,414.00 | 67,767.00 | (3,971.13) | (28,901.81) | (20,109.76) | 162,663.66 | 61,255.03 |
| **Accounts Receivable** | | | 841,904.89 | 718,365.35 | 754,422.11 | 973,992.96 | 1,305,797.34 | 666,124.16 | 813,511.68 |
| **Other Current Assets** | | | | | | | | | |
| Model Advances Receivable | | | 128,662.86 | 178,851.07 | 212,246.68 | 264,818.68 | 305,149.15 | 170,239.60 | 169,223.82 |
| Pre-Paid Commissions (deleted) | | | 120,000.00 | 111,500.00 | | -- | -- | | |
| For Deposit | | | | | | | | 19,200.00 | 19,200.00 |
| Security Deposits | | | | 37,950.00 | 34,813.00 | 34,813.00 | 34,813.00 | 34,813.00 | 40,663.00 |
| **Total Other Current Assets** | | | 248,662.86 | 328,301.07 | 247,059.68 | 299,631.68 | 339,962.15 | 224,252.60 | 229,086.82 |
| **Total Current Assets** | | | 1,121,981.75 | 1,114,433.42 | 997,510.66 | 1,244,722.83 | 1,625,649.73 | ########### | 1,103,853.53 |
| **Fixed Assets** | | | | | | | | | |
| **Net - Brooklyn Office Build Out** | | | | | | | | | |
| Accum Dep - Brooklyn Office | | | | | (12,440.16) | (24,880.32) | (37,320.48) | (49,760.64) | (66,593.64) |
| Cost - Brooklyn Office | | | | 181,817.25 | 250,060.93 | 250,060.93 | 250,060.93 | 250,060.93 | 250,060.93 |
| **Total Net - Brooklyn Office Build Out** | | | -- | 181,817.25 | 237,620.77 | 225,180.61 | 212,740.45 | 200,300.29 | 183,467.29 |
| **Net - Computers** | | | | | | | | | |
| Accum Dep - Computers | | (17,205.42) | (17,205.42) | (18,074.34) | (18,943.26) | (19,812.18) | (20,681.10) | (21,443.10) |
| Cost - Brooklyn Computers | | | | 2,902.59 | 6,082.36 | 6,082.36 | 6,082.36 | 6,082.36 | 6,082.36 |
| Cost - Computers | | | 17,205.42 | 17,205.42 | 17,205.42 | 17,205.42 | 17,205.42 | 17,205.42 | 18,433.53 |
| **Total Net - Computers** | | | -- | 2,902.59 | 5,213.44 | 4,344.52 | 3,475.60 | 2,606.68 | 3,072.79 |
| **Net - Office Furniture** | | | | | | | | | |
| Accum Dep - Office Furniture | | (6,130.48) | (6,130.48) | (23,359.96) | (40,589.44) | (57,818.92) | (75,048.40) | (85,642.40) |
| Cost - Brooklyn Office | | | | 67,773.30 | 120,606.46 | 120,606.46 | 120,606.46 | 120,606.46 | 120,606.46 |
| Cost - Office Furniture | | | 6,130.48 | 6,130.48 | 6,654.05 | 6,654.05 | 6,654.05 | 6,654.05 | 6,654.05 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Total Net - Office Furniture** | -- | 67,773.30 | 103,900.55 | 86,671.07 | 69,441.59 | 52,212.11 | 41,618.11 |
| **Total Fixed Assets** | -- | 252,493.14 | 346,734.76 | 316,196.20 | 285,657.64 | 255,119.08 | 228,158.19 |
| **TOTAL ASSETS** | **1,121,981.75** | **1,366,926.56** | **1,344,245.42** | **1,560,919.03** | **1,911,307.37** | ########### | **1,332,011.72** |
| | | | | | | | |
| **LIABILITIES AND EQUITY** | | | | | | | |
| **Liabilities** | | | | | | | |
| **Current Liabilities** | | | | | | | |
| Accounts Payable | 1,087,620.77 | 1,363,253.23 | 1,489,022.15 | 1,774,447.97 | 2,036,270.49 | ########### | 1,572,215.89 |
| Credit Cards | 47,066.84 | 56,285.94 | 31,584.87 | 38,879.73 | 54,217.74 | 27,876.28 | 49,234.28 |
| Other Current Liabilities | 1,402.58 | 17,557.57 | 2,100.00 | -- | 435.00 | 25,900.00 | 30,376.00 |
| **Total Current Liabilities** | **1,136,090.19** | **1,437,096.74** | **1,522,707.02** | **1,813,327.70** | **2,090,923.23** | ########### | **1,651,826.17** |
| **Long-Term Liabilities** | | | | | | | |
| Business Loan | 96,877.56 | 555,478.82 | 184,786.40 | 171,743.33 | 282,143.14 | 353,597.76 | 318,463.49 |
| **Total Long-Term Liabilities** | **96,877.56** | **555,478.82** | **184,786.40** | **171,743.33** | **282,143.14** | **353,597.76** | **318,463.49** |
| **Total Liabilities** | **1,232,967.75** | **1,992,575.56** | **1,707,493.42** | **1,985,071.03** | **2,373,066.37** | ########### | **1,970,289.66** |
| **Equity** | | | | | | | |
| **Managing Members Equity** | | | | | | | |
| **Gordon Equity - Net** | | | | | | | |
| Contributions - Gordon | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 |
| Current Yr R/E Added - Gordon | (194,051.52) | (374,219.52) | (372,258.52) | (392,295.52) | (412,521.52) | (412,521.52) | (412,521.52) |
| Distributions - Gordon | 62,266.57 | 60,229.57 | 60,229.57 | 60,229.57 | 60,229.57 | 60,229.57 | 60,229.57 |
| **Total Gordon Equity - Net** | **22,199.00** | **(160,006.00)** | **(158,045.00)** | **(178,082.00)** | **(198,308.00)** | **(198,308.00)** | **(198,308.00)** |
| **Pollack Equity - Net** | | | | | | | |
| Contributions - Pollack | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 |
| Current Yr R/E Added - Pollack | (207,898.89) | (305,861.89) | (304,794.89) | (315,689.89) | (326,686.89) | (326,686.89) | (326,686.89) |
| Distributions - Pollack | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 |
| **Total Gordon Equity - Net** | **(133,101.00)** | **(231,064.00)** | **(229,997.00)** | **(240,892.00)** | **(251,889.00)** | **(251,889.00)** | **(251,889.00)** |
| **Total Managing Members Equity** | **(110,902.00)** | **(391,070.00)** | **(388,042.00)** | **(418,974.00)** | **(450,197.00)** | **(450,197.00)** | **(450,197.00)** |
| **Retained Earnings** | -- | -- | -- | -- | -- | (34,489.94) | (271,444.55) |
| **Net Income** | (84.00) | (234,579.00) | 24,794.00 | (5,178.00) | (11,564.00) | (236,954.61) | 83,363.61 |
| **Total Equity** | **(110,986.00)** | **(625,649.00)** | **(363,248.00)** | **(424,152.00)** | **(461,761.00)** | **(721,641.55)** | **(638,277.94)** |
| **TOTAL LIABILITIES AND EQUITY** | **1,121,981.75** | **1,366,926.56** | **1,344,245.42** | **1,560,919.03** | **1,911,305.37** | ########### | **1,332,011.72** |

**Fusion Modeling Agency LLC: Summary Income Statements**

**Profit & Loss**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1Q 2020 | 2Q 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 3,774,700 | 4,563,064 | 4,893,369 | 5,751,702 | 5,619,380 | 1,280,861 | 305,344 |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 3,774,700 | 4,563,064 | 4,893,786 | 5,751,285 | 5,614,845 | 1,280,947 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 3,753,827 | 4,562,163 | 4,911,438 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 3,889,773 | 3,843,624 | 3,757,351 | 4,566,378 | 4,878,177 | | | | |
| Ordinary Income | | | | | | | | | |
| Mean | 3,889,773 | 3,843,624 | 3,765,145 | 4,563,667 | 4,894,193 | 5,751,493 | 5,617,112 | 1,280,904 | 305,344 |
| Max | 3,889,773 | 3,843,624 | 3,774,700 | 4,566,378 | 4,911,438 | 5,751,702 | 5,619,380 | 1,280,947 | 305,344 |
| Min | 3,889,773 | 3,843,624 | 3,753,827 | 4,562,163 | 4,878,177 | 5,751,285 | 5,614,845 | 1,280,861 | 305,344 |
| *Max-Min Variance* | *--* | *--* | *20,873* | *4,215* | *33,261* | *417* | *4,535* | *86* | *--* |
| *% Variance from Mean* | *--* | *--* | *0.55%* | *0.09%* | *0.68%* | *0.01%* | *0.08%* | *0.01%* | *--* |
| | | | | | | | | | |
| **COGS** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 2,515,876 | 3,157,295 | 3,286,616 | 4,060,624 | 3,927,158 | 836,215 | 190,705 |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 2,515,876 | 3,157,295 | 3,288,699 | 4,058,041 | 3,906,734 | 835,472 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 2,486,403 | 3,172,231 | 3,259,667 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 2,708,108 | 2,621,687 | 2,493,003 | 3,172,897 | 3,209,335 | | | | |
| COGS | | | | | | | | | |
| Mean | 2,708,108 | 2,621,687 | 2,502,790 | 3,164,930 | 3,261,079 | 4,059,333 | 3,916,946 | 835,844 | 190,705 |
| Max | 2,708,108 | 2,621,687 | 2,515,876 | 3,172,897 | 3,288,699 | 4,060,624 | 3,927,158 | 836,215 | 190,705 |
| Min | 2,708,108 | 2,621,687 | 2,486,403 | 3,157,295 | 3,209,335 | 4,058,041 | 3,906,734 | 835,472 | 190,705 |
| *Max-Min Variance* | *--* | *--* | *29,473* | *15,602* | *79,364* | *2,583* | *20,424* | *743* | *--* |
| *% Variance from Mean* | *--* | *--* | *1.18%* | *0.49%* | *2.43%* | *0.06%* | *0.52%* | *0.09%* | *--* |
| | | | | | | | | | |
| **Gross Profit** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 1,258,824 | 1,405,769 | 1,606,754 | 1,691,077 | 1,692,222 | 444,645 | 114,639 |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 1,258,824 | 1,405,769 | 1,605,087 | 1,693,244 | 1,708,111 | 445,475 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 1,267,424 | 1,389,932 | 1,651,771 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 1,181,665 | 1,221,938 | 1,264,348 | 1,393,480 | 1,668,842 | | | | |
| Gross Profit | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Mean | 1,181,665 | 1,221,938 | 1,262,355 | 1,398,738 | 1,633,113 | 1,692,161 | 1,700,166 | 445,060 | 114,639 |
| Max | 1,181,665 | 1,221,938 | 1,267,424 | 1,405,769 | 1,668,842 | 1,693,244 | 1,708,111 | 445,475 | 114,639 |
| Min | 1,181,665 | 1,221,938 | 1,258,824 | 1,389,932 | 1,605,087 | 1,691,077 | 1,692,222 | 444,645 | 114,639 |
| *Max-Min Variance* | -- | -- | *8,600* | *15,837* | *63,755* | *2,167* | *15,889* | *829* | -- |
| *% Variance from Mean* | -- | -- | *0.68%* | *1.13%* | *3.90%* | *0.13%* | *0.93%* | *0.19%* | -- |

**Expenses**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jan 2015 - Jun 2020 (Exhibit R) | | | 944,181 | 1,230,261 | 1,185,220 | 1,273,817 | 1,290,143 | 299,222 | 171,098 |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 944,181 | 1,230,261 | 1,185,220 | 1,273,817 | 1,289,756 | 365,887 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 976,175 | 1,184,161 | 1,221,702 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 813,727 | 911,143 | 976,175 | 1,184,161 | 1,221,458 | | | | |
| Expenses | | | | | | | | | |
| Mean | 813,727 | 911,143 | 960,178 | 1,207,211 | 1,203,400 | 1,273,817 | 1,289,949 | 332,554 | 171,098 |
| Max | 813,727 | 911,143 | 976,175 | 1,230,261 | 1,221,702 | 1,273,817 | 1,290,143 | 365,887 | 171,098 |
| Min | 813,727 | 911,143 | 944,181 | 1,184,161 | 1,185,220 | 1,273,817 | 1,289,756 | 299,222 | 171,098 |
| *Max-Min Variance* | -- | -- | *31,994* | *46,100* | *36,482* | -- | *386* | *66,665* | -- |
| *% Variance from Mean* | -- | -- | *3.33%* | *3.82%* | *3.03%* | -- | *0.03%* | *20.05%* | -- |

**Net Ordinary Income**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jan 2015 - Jun 2020 (Exhibit R) | | | 314,643 | 175,508 | 421,534 | 417,261 | 402,079 | 145,424 | (56,459) |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 314,643 | 175,508 | 419,867 | 419,428 | 418,355 | 79,588 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 291,250 | 205,771 | 430,070 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 367,938 | 310,795 | 288,174 | 209,319 | 447,384 | | | | |
| Net Ordinary Income | | | | | | | | | |
| Mean | 367,938 | 310,795 | 302,177 | 191,526 | 429,714 | 418,344 | 410,217 | 112,506 | (56,459) |
| Max | 367,938 | 310,795 | 314,643 | 209,319 | 447,384 | 419,428 | 418,355 | 145,424 | (56,459) |
| Min | 367,938 | 310,795 | 288,174 | 175,508 | 419,867 | 417,261 | 402,079 | 79,588 | (56,459) |
| *Max-Min Variance* | -- | -- | *26,469* | *33,811* | *27,517* | *2,167* | *16,275* | *65,836* | -- |
| *% Variance from Mean* | -- | -- | *8.76%* | *17.65%* | *6.40%* | *0.52%* | *3.97%* | *58.52%* | -- |

**Net Other Income**

| | | | | | | |
|---|---|---|---|---|---|---|
| Jan 2015 - Jun 2020 (Exhibit R) | | | | | | |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | | | | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | (7,267) | (74,573) | (51,275) | |
| Jan 2013 - Dec 2017 (Exhibit P) | (29,209) | (19,412) | (7,267) | (74,573) | (52,325) | |
| Net Other Income | | | | | | |
| Mean | (29,209) | (19,412) | (7,267) | (74,573) | (51,800) | |
| Max | (29,209) | (19,412) | (7,267) | (74,573) | (51,275) | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Min | (29,209) | (19,412) | (7,267) | (74,573) | (52,325) | | | | |
| *Max-Min Variance* | -- | -- | -- | -- | *1,050* | | | | |
| *% Variance from Mean* | -- | -- | -- | -- | *(2.03%)* | | | | |
| **Net Income** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 314,643 | 175,508 | 421,534 | 417,261 | 402,079 | 145,424 | (56,459) |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 314,643 | 175,508 | 419,867 | 419,428 | 418,355 | 79,588 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 283,983 | 131,198 | 378,795 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 338,729 | 291,383 | 280,907 | 134,746 | 395,059 | | | | |
| Net Income | | | | | | | | | |
| Mean | 338,729 | 291,383 | 298,544 | 154,240 | 403,814 | 418,344 | 410,217 | 112,506 | (56,459) |
| Max | 338,729 | 291,383 | 314,643 | 175,508 | 421,534 | 419,428 | 418,355 | 145,424 | (56,459) |
| Min | 338,729 | 291,383 | 280,907 | 131,198 | 378,795 | 417,261 | 402,079 | 79,588 | (56,459) |
| *Max-Min Variance* | -- | -- | *33,736* | *44,310* | *42,739* | *2,167* | *16,275* | *65,836* | -- |
| *% Variance from Mean* | -- | -- | *11.30%* | *28.73%* | *10.58%* | *0.52%* | *3.97%* | *58.52%* | -- |
| **Checks** | | | | | | | | | |
| **Net Ordinary Income** | | | | | | | | | |
| *Jan 2015 - Jun 2020 (Exhibit R)* | -- | -- | *314,727* | *410,087* | *395,073* | *424,606* | *430,048* | *99,741* | *57,033* |
| *Jan 2015 - 1Q 2020 (Exhibit Q)* | -- | -- | *314,727* | *410,087* | *395,073* | *424,606* | *429,919* | *121,962* | -- |
| *Jan 2015 - Oct 2017 (Exhibit O)* | -- | -- | *325,392* | *394,720* | *407,234* | -- | -- | -- | -- |
| *Jan 2013 - Dec 2017 (Exhibit P)* | *271,242* | *303,714* | *325,392* | *394,720* | *407,153* | -- | -- | -- | -- |
| **Net Income** | | | | | | | | | |
| *Jan 2015 - Jun 2020 (Exhibit R)* | -- | -- | *314,727* | *410,087* | *395,073* | *424,606* | *430,048* | *99,741* | *57,033* |
| *Jan 2015 - 1Q 2020 (Exhibit Q)* | -- | -- | *314,727* | *410,087* | *395,073* | *424,606* | *429,919* | *121,962* | -- |
| *Jan 2015 - Oct 2017 (Exhibit O)* | -- | -- | *325,392* | *394,720* | *407,234* | -- | -- | -- | -- |
| *Jan 2013 - Dec 2017 (Exhibit P)* | *271,242* | *303,714* | *325,392* | *394,720* | *407,153* | -- | -- | -- | -- |
| **Depreciation** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | | | 30,539 | 30,539 | 30,539 | 7,635 | 7,635 |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | | | | | | | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | | | 30,539 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | | | | | 30,539 | | | | |
| Depreciation | | | | | | | | | |
| Mean | | | | | 30,539 | 30,539 | 30,539 | 7,635 | 7,635 |
| Max | -- | -- | -- | -- | 30,539 | 30,539 | 30,539 | 7,635 | 7,635 |
| Min | -- | -- | -- | -- | 30,539 | 30,539 | 30,539 | 7,635 | 7,635 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *Max-Min Variance* | | | | | -- | -- | -- | -- | -- |
| *% Variance from Mean* | | | | | -- | -- | -- | -- | -- |
| **Interest** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 1,433 | 25,418 | 53,906 | 36,042 | 31,997 | 81 | |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | | | | | | | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 1,433 | 995 | 53,906 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 5,153 | 1,520 | 1,433 | 995 | 53,906 | | | | |
| Interest | | | | | | | | | |
| Mean | 5,153 | 1,520 | 1,433 | 9,136 | 53,906 | 36,042 | 31,997 | 81 | |
| Max | 5,153 | 1,520 | 1,433 | 25,418 | 53,906 | 36,042 | 31,997 | 81 | -- |
| Min | 5,153 | 1,520 | 1,433 | 995 | 53,906 | 36,042 | 31,997 | 81 | -- |
| *Max-Min Variance* | -- | -- | -- | *24,423* | -- | -- | -- | -- | |
| *% Variance from Mean* | -- | -- | -- | *267.33%* | -- | -- | -- | -- | |
| **Taxes** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 7,328 | 5,580 | 1,500 | -- | 8,268 | 1,500 | |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 7,328 | 5,580 | 1,500 | | 8,268 | 1,500 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 7,328 | 5,580 | 1,500 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 23 | 4,214 | 7,328 | 5,580 | 1,500 | | | | |
| Taxes | | | | | | | | | |
| Mean | 23 | 4,214 | 7,328 | 5,580 | 1,500 | | 8,268 | 1,500 | |
| Max | 23 | 4,214 | 7,328 | 5,580 | 1,500 | | 8,268 | 1,500 | -- |
| Min | 23 | 4,214 | 7,328 | 5,580 | 1,500 | | 8,268 | 1,500 | -- |
| *Min* | -- | -- | -- | -- | | | -- | -- | |
| *Max-Min Variance* | -- | -- | -- | -- | | | -- | -- | |
| **EBITDA** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 323,404 | 206,506 | 507,479 | 483,842 | 472,883 | 154,639 | (48,824) |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 321,971 | 181,088 | 421,367 | 419,428 | 426,623 | 81,088 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 300,011 | 212,346 | 516,015 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 373,114 | 316,529 | 296,935 | 215,895 | 533,329 | | | | |
| EBITDA | | | | | | | | | |
| Mean | 373,114 | 316,529 | 306,783 | 211,582 | 518,941 | 483,842 | 472,883 | 154,639 | (48,824) |
| Max | 373,114 | 316,529 | 323,404 | 215,895 | 533,329 | 483,842 | 472,883 | 154,639 | (48,824) |
| Min | 373,114 | 316,529 | 296,935 | 206,506 | 507,479 | 483,842 | 472,883 | 154,639 | (48,824) |
| *Max-Min Variance* | -- | -- | *26,469* | *9,388* | *25,850* | -- | -- | -- | -- |
| *% Variance from Mean* | -- | -- | *8.63%* | *4.44%* | *4.98%* | -- | -- | -- | -- |

**EBIT**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Jan 2015 - Jun 2020 (Exhibit R) | | | 323,404 | 206,506 | 476,940 | 453,303 | 442,344 | 147,004 | (56,459) |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 321,971 | 181,088 | 421,367 | 419,428 | 426,623 | 81,088 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 300,011 | 212,346 | 485,476 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 373,114 | 316,529 | 296,935 | 215,895 | 502,790 | | | | |

EBIT

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mean | 373,114 | 316,529 | 306,783 | 211,582 | 488,402 | 453,303 | 442,344 | 147,004 | (56,459) |
| Max | 373,114 | 316,529 | 323,404 | 215,895 | 502,790 | 453,303 | 442,344 | 147,004 | (56,459) |
| Min | 373,114 | 316,529 | 296,935 | 206,506 | 476,940 | 453,303 | 442,344 | 147,004 | (56,459) |
| *Max-Min Variance* | -- | -- | *26,469* | *9,388* | *25,850* | -- | -- | -- | -- |
| *% Variance from Mean* | -- | -- | *8.63%* | *4.44%* | *5.29%* | -- | -- | -- | -- |

# Fusion Modeling Agency LLC: Forecasted Income Statement

**Profit & Loss**

| | | | Actuals | | | |
|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** |
| **Ordinary Income** | | | | | | |
| Mean | 3,889,773 | 3,843,624 | 3,765,145 | 4,563,667 | 4,894,193 | 5,751,493 |
| Max | 3,889,773 | 3,843,624 | 3,774,700 | 4,566,378 | 4,911,438 | 5,751,702 |
| Min | 3,889,773 | 3,843,624 | 3,753,827 | 4,562,163 | 4,878,177 | 5,751,285 |
| *Ordinary Income Y-o-Y Growth* | | | | | | |
| *Mean* | | *(1.19%)* | *(2.04%)* | *21.21%* | *7.24%* | *17.52%* |
| *Max* | | *(1.19%)* | *(1.79%)* | *20.97%* | *7.56%* | *17.11%* |
| *Min* | | *(1.19%)* | *(2.34%)* | *21.53%* | *6.93%* | *17.90%* |
| **EBITDA** | | | | | | |
| Mean | 373,114 | 316,529 | 306,783 | 211,582 | 518,941 | 483,842 |
| Max | 373,114 | 316,529 | 323,404 | 215,895 | 533,329 | 483,842 |
| Min | 373,114 | 316,529 | 296,935 | 206,506 | 507,479 | 483,842 |
| *EBITDA Margins* | | | | | | |
| *Mean* | *9.59%* | *8.24%* | *8.15%* | *4.64%* | *10.60%* | *8.41%* |
| *Max* | *9.59%* | *8.24%* | *8.57%* | *4.73%* | *10.86%* | *8.41%* |
| *Min* | *9.59%* | *8.24%* | *7.91%* | *4.53%* | *10.40%* | *8.41%* |
| **EBIT** | | | | | | |
| Mean | 373,114 | 316,529 | 306,783 | 211,582 | 488,402 | 453,303 |
| Max | 373,114 | 316,529 | 323,404 | 215,895 | 502,790 | 453,303 |
| Min | 373,114 | 316,529 | 296,935 | 206,506 | 476,940 | 453,303 |
| *EBIT Margins* | | | | | | |
| *Mean* | *9.59%* | *8.24%* | *8.15%* | *4.64%* | *9.98%* | *7.88%* |
| *Max* | *9.59%* | *8.24%* | *8.57%* | *4.73%* | *10.24%* | *7.88%* |
| *Min* | *9.59%* | *8.24%* | *7.91%* | *4.53%* | *9.78%* | *7.88%* |
| **Taxes** | | | | | | |
| Mean | 23 | 4,214 | 7,328 | 5,580 | 1,500 | -- |
| Max | 23 | 4,214 | 7,328 | 5,580 | 1,500 | -- |
| Min | 23 | 4,214 | 7,328 | 5,580 | 1,500 | -- |
| *Taxes as % of EBIT* | | | | | | |
| *Mean* | *0.01%* | *1.33%* | *2.39%* | *2.64%* | *0.31%* | *--* |
| *Max* | *0.01%* | *1.33%* | *2.27%* | *2.58%* | *0.30%* | *--* |
| *Min* | *0.01%* | *1.33%* | *2.47%* | *2.70%* | *0.31%* | *--* |

**S**

| 2019 | Mean | | Forecasts | | | | |
|---|---|---|---|---|---|---|---|
| | | | 2022 | 2023 | 2024 | 2025 | 2026 |
| 5,617,112 | | | 5,995,358 | 6,399,074 | 6,829,975 | 7,289,893 | 7,780,780 |
| 5,619,380 | | | 5,997,778 | 6,401,657 | 6,832,732 | 7,292,835 | 7,783,921 |
| 5,614,845 | | | 5,992,938 | 6,396,491 | 6,827,218 | 7,286,950 | 7,777,639 |
| | | | | | | | |
| (2.34%) | 6.73% | | 6.73% | 6.73% | 6.73% | 6.73% | 6.73% |
| (2.30%) | 6.73% | | 6.73% | 6.73% | 6.73% | 6.73% | 6.73% |
| (2.37%) | 6.74% | | 6.73% | 6.73% | 6.73% | 6.73% | 6.73% |
| | | | | | | | |
| 472,883 | | | 497,151 | 530,628 | 566,359 | 604,497 | 645,202 |
| 472,883 | | | 497,351 | 530,842 | 566,588 | 604,741 | 645,463 |
| 472,883 | | | 496,950 | 530,414 | 566,131 | 604,253 | 644,942 |
| | | | | | | | |
| 8.42% | 8.29% | | 8.29% | 8.29% | 8.29% | 8.29% | 8.29% |
| 8.42% | 8.40% | | 8.29% | 8.29% | 8.29% | 8.29% | 8.29% |
| 8.42% | 8.21% | | 8.29% | 8.29% | 8.29% | 8.29% | 8.29% |
| | | | | | | | |
| 442,344 | | | 482,602 | 515,100 | 549,786 | 586,807 | 626,322 |
| 442,344 | | | 482,797 | 515,308 | 550,008 | 587,044 | 626,575 |
| 442,344 | | | 482,408 | 514,892 | 549,564 | 586,570 | 626,069 |
| | | | | | | | |
| 7.87% | 8.05% | | 8.05% | 8.05% | 8.05% | 8.05% | 8.05% |
| 7.87% | 8.16% | | 8.05% | 8.05% | 8.05% | 8.05% | 8.05% |
| 7.88% | 7.97% | | 8.05% | 8.05% | 8.05% | 8.05% | 8.05% |
| | | | | | | | |
| 8,268 | | | 5,888 | 6,284 | 6,707 | 7,159 | 7,641 |
| 8,268 | | | 5,890 | 6,287 | 6,710 | 7,162 | 7,644 |
| 8,268 | | | 5,885 | 6,282 | 6,705 | 7,156 | 7,638 |
| | | | | | | | |
| 1.87% | 1.22% | | 1.22% | 1.22% | 1.22% | 1.22% | 1.22% |
| 1.87% | 1.19% | | 1.22% | 1.22% | 1.22% | 1.22% | 1.22% |
| 1.87% | 1.24% | | 1.22% | 1.22% | 1.22% | 1.22% | 1.22% |

# Discounted Cash Flow Analysis - EBITDA Methodology

|  | | Fiscal Year Ending December 31, | | | |
|---|---|---|---|---|---|
|  | 2022E | 2023E | 2024E | 2025E | 2026E |
| Revenues | $5,995,358 | $6,399,074 | $6,829,975 | $7,289,893 | $7,780,780 |
| EBITDA | 497,151 | 530,628 | 566,359 | 604,497 | 645,202 |
| EBIT | 482,602 | 515,100 | 549,786 | 586,807 | 626,322 |
| Tax Provision | (5,888) | (6,284) | (6,707) | (7,159) | (7,641) |
| **Unlevered Net Income** | **$476,715** | **$508,816** | **$543,078** | **$579,648** | **$618,681** |
| | | | | | |
| Plus: Depreciation and Amortization | $14,548 | $15,528 | $16,574 | $17,690 | $18,881 |
| Less: Capital Expenditures | (14,548) | (15,528) | (16,574) | (17,690) | (18,881) |
| Change in Working Capital (high variability --> not reliable) | | | | | |
| **Unlevered Free Cash Flow** | **$476,715** | **$508,816** | **$543,078** | **$579,648** | **$618,681** |
| | | | | | |
| Revenue % Growth Rate | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% |
| % EBIT Margin | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% |
| Depreciation (% of Revenues) | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Capital Expenditures (% of Revenues) | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Tax Rate | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% |

### Present Value Calculation Based on Terminal EBITDA Multiple

| | A | B | | | A + B | | |
|---|---|---|---|---|---|---|---|
| Discount Rate | Discounted Unlevered FCF | Present Value of Terminal Value Based on a Multiple of LTM EBITDA | | | Present Value of Enterprise Value | | |
| | | 3.0x | 4.0x | 5.0x | 3.0x | 4.0x | 5.0x |
| **13.0%** | $1,888,033 | $1,050,570 | $1,400,760 | $1,750,950 | $2,938,603 | $3,288,793 | $3,638,983 |
| 14.0% | 1,840,772 | 1,005,294 | 1,340,392 | 1,675,490 | 2,846,066 | 3,181,163 | 3,516,261 |
| 15.0% | 1,795,364 | 962,339 | 1,283,119 | 1,603,898 | 2,757,703 | 3,078,483 | 3,399,263 |
| 16.0% | 1,751,717 | 921,568 | 1,228,757 | 1,535,946 | 2,673,285 | 2,980,475 | 3,287,664 |
| 17.0% | 1,709,744 | 882,852 | 1,177,136 | 1,471,420 | 2,592,596 | 2,886,880 | 3,181,164 |

# Discounted Cash Flow Analysis - Perpetuity Methodology

|  | | Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|---|
|  | | **2022E** | **2023E** | **2024E** | **2025E** | **2026E** |
| Revenues | | $5,995,358 | $6,399,074 | $6,829,975 | $7,289,893 | $7,780,780 |
| EBITDA | | 497,151 | 530,628 | 566,359 | 604,497 | 645,202 |
| EBIT | | 482,602 | 515,100 | 549,786 | 586,807 | 626,322 |
| Tax Provision | | (5,888) | (6,284) | (6,707) | (7,159) | (7,641) |
| **Unlevered Net Income** | | **$476,715** | **$508,816** | **$543,078** | **$579,648** | **$618,681** |
| | | | | | | |
| Plus: | Depreciation and Amortization | $14,548 | $15,528 | $16,574 | $17,690 | $18,881 |
| Less: | Capital Expenditures | (14,548) | (15,528) | (16,574) | (17,690) | (18,881) |
| | Change in Working Capital | -- | -- | -- | -- | -- |
| **Unlevered Free Cash Flow** | | **$476,715** | **$508,816** | **$543,078** | **$579,648** | **$618,681** |
| | | | | | | |
| Revenue % Growth Rate | | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% |
| % EBIT Margin | | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% |
| Depreciation (% of Revenues) | | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Capital Expenditures (% of Revenues) | | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |

---

### Present Value Calculation Based on Unlevered Free Cash Flow in Perpetuity

| | | A | | B | | | A + B | | |
|---|---|---|---|---|---|---|---|---|---|
| **Discount Rate** | | **Discounted Unlevered FCF** | | **Present Value of Terminal Unlevered Free Cash Flow in Perpetuity Growing at** | | | **Present Value of Enterprise Value** | | |
| | | | | **6.0%** | **7.0%** | **8.0%** | **6.0%** | **7.0%** | **8.0%** |
| 13.0% | | $1,888,033 | | $5,084,896 | $5,988,344 | $7,253,172 | $6,972,929 | $7,876,377 | $9,141,205 |
| 14.0% | | 1,840,772 | | 4,257,533 | 4,911,656 | 5,783,819 | 6,098,305 | 6,752,428 | 7,624,591 |
| 15.0% | | 1,795,364 | | 3,622,769 | 4,114,064 | 4,745,729 | 5,418,133 | 5,909,428 | 6,541,094 |
| 16.0% | | 1,751,717 | | 3,122,356 | 3,502,013 | 3,976,585 | 4,874,073 | 5,253,731 | 5,728,302 |
| 17.0% | | 1,709,744 | | 2,719,257 | 3,019,402 | 3,386,245 | 4,429,001 | 4,729,145 | 5,095,989 |

Exhibit "O"

**Fusion Modeling Agency LLC**
**Profit & Loss**
**January 2015 through October 2018**

| | 2015 | 2016 | 2017 | 2018 to Oct |
|---|---:|---:|---:|---:|
| **Ordinary Income/Expense** | | | | |
| **Income** | | | | |
| Advance Fees | 2,080.00 | 800.00 | 690.00 | 1,465.00 |
| Agency Fee | 528,355.45 | 628,237.52 | 671,629.04 | 668,421.62 |
| Agency Fee (Models) | 534,735.54 | 687,233.02 | 664,238.49 | 667,006.68 |
| CC Fees | 525.60 | 741.42 | 847.20 | 307.80 |
| Expenses Recovered | 167,249.40 | 87,077.22 | 72,149.02 | 111,036.42 |
| MA Fee's | 45,914.71 | 88,694.56 | 70,276.34 | 20,292.25 |
| Model Fees | 2,474,966.69 | 3,031,177.86 | 3,372,380.18 | 3,349,990.94 |
| Uncategorized Income | 0.00 | 0.00 | 0.00 | 0.00 |
| Usage | 0.00 | 17,530.47 | 50,896.04 | 7,820.00 |
| Write-Offs Collected | 0.00 | 20,670.43 | 8,331.90 | 68,724.00 |
| **Total Income** | 3,753,827.39 | 4,562,162.50 | 4,911,438.21 | 4,895,064.71 |
| **Cost of Goods Sold** | | | | |
| Model Expenses | (9,669.81) | 18,821.03 | (57,125.80) | (84,445.97) |
| Model Payments | 2,496,073.11 | 3,153,409.65 | 3,316,792.57 | 3,350,157.59 |
| **Total COGS** | 2,486,403.30 | 3,172,230.68 | 3,259,666.77 | 3,265,711.62 |
| **Gross Profit** | 1,267,424.09 | 1,389,931.82 | 1,651,771.44 | 1,629,353.09 |
| **Expense** | | | | |
| Depreciation | 0.00 | 0.00 | 30,538.56 | 25,448.80 |
| Insurance | 32,386.23 | 56,904.77 | 50,827.89 | 53,665.25 |
| Interest | 1,433.17 | 994.94 | 53,906.18 | 64,448.30 |
| Licenses and Permits | 3,578.00 | 150.00 | 150.00 | 1,500.00 |
| Marketing | 102,500.00 | 248,500.00 | 107,000.00 | (5,499.41) |
| Meals & Entertainment | 61,991.23 | 66,145.82 | 66,532.20 | 41,005.35 |
| Merchant deposit fees | 0.00 | 1,040.92 | 1,115.73 | 1,856.06 |
| Mother Agency | 72,903.13 | 101,200.28 | 214,016.70 | 141,253.84 |
| Office Expenses | 93,746.08 | 85,373.55 | 111,576.99 | 84,308.43 |
| Payroll | 504,866.91 | 616,906.22 | 669,639.52 | 538,052.24 |
| Professional Fees | 57,043.95 | 38,992.47 | 31,943.93 | 54,482.95 |
| Reconciliation Discrepancies | 0.00 | (794.88) | 183.37 | (200.00) |
| Reimbursement | 1,050.00 | 95.41 | 0.00 | 0.00 |
| Rent | 102,442.66 | 80,994.68 | 86,326.75 | 147,957.84 |
| Taxes | 7,327.81 | 5,580.45 | 1,500.00 | 0.00 |
| Telephone | 6,655.96 | 14,154.42 | 13,468.76 | 8,796.06 |
| Travel | 232,911.90 | 244,054.50 | 179,372.18 | 224,434.03 |
| Utilities | 20,729.00 | 18,588.16 | 10,836.70 | 22,507.03 |
| **Total Expense** | 1,301,566.03 | 1,578,881.71 | 1,628,935.46 | 1,404,016.77 |
| **Net Ordinary Income** | (34,141.94) | (188,949.89) | 22,835.98 | 225,336.32 |
| **Other Income/Expense** | | | | |
| **Other Income** | | | | |
| Interest Income | 0.10 | 0.00 | 0.00 | 0.24 |
| **Total Other Income** | 0.10 | 0.00 | 0.00 | 0.24 |
| **Other Expense** | | | | |
| Exchange Gain or Loss | 62.70 | (281.78) | (2,940.63) | (2,015.22) |
| Write Off Model Account | 7,203.99 | 74,854.61 | 54,215.38 | (4,665.49) |
| **Total Other Expense** | 7,266.69 | 74,572.83 | 51,274.75 | (6,680.71) |

# Fusion Modeling Agency LLC
## Profit & Loss
### January 2015 through October 2018

Case 1:23-cv-02376-SJB-LKE     Document 73-2     Filed 11/12/25     Page 101 of 211
PageID #: 693

|  | 2015 | 2016 | 2017 | 2018 to Oct |
|---|---|---|---|---|
| Net Other Income | (7,266.59) | (74,572.83) | (51,274.75) | 6,680.95 |
| Net Income | (41,408.53) | (263,522.72) | (28,438.77) | 232,017.27 |

# Fusion Modeling Agency LLC
## Profit & Loss
### January 2015 through October 2018

|  | TOTAL |
|---|---|
| **Ordinary Income/Expense** | |
| Income | |
| Advance Fees | 5,035.00 |
| Agency Fee | 2,496,643.63 |
| Agency Fee (Models) | 2,553,213.73 |
| CC Fees | 2,422.02 |
| Expenses Recovered | 437,512.06 |
| MA Fee's | 225,177.86 |
| Model Fees | 12,228,515.67 |
| Uncategorized Income | 0.00 |
| Usage | 76,246.51 |
| Write-Offs Collected | 97,726.33 |
| **Total Income** | 18,122,492.81 |
| Cost of Goods Sold | |
| Model Expenses | (132,420.55) |
| Model Payments | 12,316,432.92 |
| **Total COGS** | 12,184,012.37 |
| **Gross Profit** | 5,938,480.44 |
| Expense | |
| Depreciation | 55,987.36 |
| Insurance | 193,784.14 |
| Interest | 120,782.59 |
| Licenses and Permits | 5,378.00 |
| Marketing | 452,500.59 |
| Meals & Entertainment | 235,674.60 |
| Merchant deposit fees | 4,012.71 |
| Mother Agency | 529,373.95 |
| Office Expenses | 375,005.05 |
| Payroll | 2,329,464.89 |
| Professional Fees | 182,463.30 |
| Reconciliation Discrepancies | (811.51) |
| Reimbursement | 1,145.41 |
| Rent | 417,721.93 |
| Taxes | 14,408.26 |
| Telephone | 43,075.20 |
| Travel | 880,772.61 |
| Utilities | 72,660.89 |
| **Total Expense** | 5,913,399.97 |
| **Net Ordinary Income** | 25,080.47 |
| Other Income/Expense | |
| Other Income | |
| Interest Income | 0.34 |
| **Total Other Income** | 0.34 |
| Other Expense | |
| Exchange Gain or Loss | (5,174.93) |
| Write Off Model Account | 131,608.49 |
| **Total Other Expense** | 126,433.56 |

10:35 AM

11/14/18

Accrual Basis

# Fusion Modeling Agency LLC
## Profit & Loss
### January 2015 through October 2018

|  | TOTAL |
|---|---|
| **Net Other Income** | (126,433.22) |
| **Net Income** | (101,352.75) |

Exhibit "P"

10:23 AM

01/09/18

Accrual Basis

# Fusion Modeling Agency LLC
## Profit & Loss
### January 2013 through December 2017

| | Jan - Dec 13 | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | TOTAL |
|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | |
| **Income** | | | | | | |
| Advance Fees | 1,390.00 | 4,420.00 | 2,080.00 | 800.00 | 690.00 | 9,380.00 |
| Agency Fee | 535,847.33 | 560,916.43 | 528,405.45 | 628,370.85 | 668,870.91 | 2,922,410.97 |
| Agency Fee (Models) | 523,174.72 | 558,687.84 | 536,055.54 | 687,366.35 | 655,387.03 | 2,960,671.48 |
| CC Fees | 0.00 | 15.00 | 525.60 | 741.42 | 847.20 | 2,129.22 |
| Expenses Recovered | 43,541.05 | 64,358.25 | 167,249.40 | 87,077.22 | 66,757.04 | 428,982.96 |
| MA Fee's | 17,551.61 | 74,798.54 | 47,818.71 | 91,976.56 | 70,127.51 | 302,272.93 |
| Model Fees | 2,563,744.05 | 2,562,928.13 | 2,475,216.69 | 3,031,844.53 | 3,356,269.58 | 13,990,002.98 |
| Uncategorized Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Usage | 0.00 | 17,500.00 | 0.00 | 17,530.47 | 50,896.04 | 85,926.51 |
| Write-Offs Collected | 204,523.81 | 0.00 | 0.00 | 20,670.43 | 8,331.90 | 233,526.14 |
| **Total Income** | 3,889,772.57 | 3,843,624.19 | 3,757,351.39 | 4,566,377.83 | 4,878,177.21 | 20,935,303.19 |
| **Cost of Goods Sold** | | | | | | |
| Model Expenses | 161,018.48 | 74,471.68 | 10,451.42 | 58,113.73 | -68,662.37 | 235,392.94 |
| Model Payments | 2,547,089.19 | 2,547,214.85 | 2,482,551.88 | 3,114,783.62 | 3,277,997.76 | 13,969,637.30 |
| **Total COGS** | 2,708,107.67 | 2,621,686.53 | 2,493,003.30 | 3,172,897.35 | 3,209,335.39 | 14,205,030.24 |
| **Gross Profit** | 1,181,664.90 | 1,221,937.66 | 1,264,348.09 | 1,393,480.48 | 1,668,841.82 | 6,730,272.95 |
| **Expense** | | | | | | |
| Advertising | 0.00 | 0.00 | 0.00 | 0.00 | 10,000.00 | 10,000.00 |
| Depreciation | 0.00 | 0.00 | 0.00 | 0.00 | 30,538.56 | 30,538.56 |
| Insurance | 26,423.30 | 36,063.53 | 32,386.23 | 56,904.77 | 50,827.89 | 202,605.72 |
| Interest | 5,153.41 | 1,519.67 | 1,433.17 | 994.94 | 53,906.18 | 63,007.37 |
| Licenses and Permits | 0.00 | 0.00 | 3,578.00 | 150.00 | 150.00 | 3,878.00 |
| Marketing | 73,607.92 | 129,677.50 | 102,500.00 | 248,500.00 | 97,000.00 | 651,285.42 |
| Meals & Entertainment | 71,751.60 | 67,248.59 | 61,991.23 | 66,145.82 | 66,532.20 | 333,669.44 |
| Merchant deposit fees | 0.00 | 0.00 | 0.00 | 1,040.92 | 1,115.73 | 2,156.65 |
| Mother Agency | 87,815.72 | 81,614.58 | 72,903.13 | 101,200.28 | 214,016.70 | 557,550.41 |
| Office Expenses | 63,613.46 | 63,622.56 | 93,746.08 | 85,373.55 | 111,531.99 | 417,887.64 |
| Payroll | 445,917.78 | 474,704.05 | 504,866.91 | 616,906.22 | 669,639.52 | 2,712,034.48 |
| Professional Fees | 33,925.36 | 49,540.20 | 57,043.95 | 38,992.47 | 31,943.93 | 211,445.91 |
| Reconciliation Discrepancies | 0.26 | 0.00 | 0.00 | -794.88 | 0.00 | -794.62 |
| Reimbursement | 140.00 | 0.00 | 1,050.00 | 95.41 | 0.00 | 1,285.41 |
| Rent | 103,905.43 | 88,667.46 | 102,442.66 | 80,994.68 | 86,326.75 | 462,336.98 |
| Taxes | 23.26 | 4,214.31 | 7,327.81 | 5,580.45 | 1,500.00 | 18,645.83 |
| Telephone | 9,444.55 | 7,099.71 | 6,655.96 | 14,154.42 | 13,468.76 | 50,823.40 |
| Travel | 145,135.68 | 189,849.62 | 232,911.90 | 244,054.50 | 179,275.72 | 991,227.42 |
| Utilities | 18,112.08 | 21,034.96 | 20,729.00 | 18,588.16 | 10,836.70 | 89,300.90 |
| **Total Expense** | 1,084,969.81 | 1,214,856.74 | 1,301,566.03 | 1,578,881.71 | 1,628,610.63 | 6,808,884.92 |
| **Net Ordinary Income** | 96,695.09 | 7,080.92 | -37,217.94 | -185,401.23 | 40,231.19 | -78,611.97 |
| **Other Income/Expense** | | | | | | |
| Other Income | 6.20 | 12.06 | 0.10 | 0.00 | 0.00 | 18.36 |
| Other Expense | 29,215.11 | 19,424.17 | 7,266.69 | 74,572.83 | 52,324.75 | 182,803.55 |
| **Net Other Income** | -29,208.91 | -19,412.11 | -7,266.59 | -74,572.83 | -52,324.75 | -182,785.19 |
| **Net Income** | 67,486.18 | -12,331.19 | -44,484.53 | -259,974.06 | -12,093.56 | -261,397.16 |

Exhibit "Q"



# Fusion Modeling Agency, LLC
## Profit and Loss
### 2015 through Q1 2020

| | 2015 | 2016 | 2017 | 2018 | 2019 | Q1 2020 | Total |
|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | |
| Agency Fee | 527,808.78 | 626,949.19 | 668,595.71 | 798,266.78 | 757,928.76 | 173,403.96 | 3,552,953.18 |
| Agency Fee (Models) | 534,735.54 | 686,833.02 | 661,515.16 | 794,283.11 | 742,512.78 | 162,741.19 | 3,582,620.80 |
| Model Fees | 2,472,233.36 | 3,024,436.19 | 3,357,213.51 | 3,990,966.78 | 3,984,898.37 | 922,924.03 | 17,752,672.24 |
| Expenses Recovered | 181,346.76 | 86,264.81 | 72,149.02 | 144,252.13 | 88,880.08 | 2,564.71 | 575,457.51 |
| All Other Income | 58,575.56 | 138,580.79 | 134,312.60 | 23,516.20 | 40,625.01 | 19,312.98 | 414,923.14 |
| **Total Income** | **$ 3,774,700.00** | **$ 4,563,064.00** | **$ 4,893,786.00** | **$ 5,751,285.00** | **$ 5,614,845.00** | **$ 1,280,946.87** | **$ 25,878,626.87** |
| **Cost of Goods Sold** | | | | | | | |
| Model Payments | 2,475,951.88 | 3,119,716.95 | 2,879,411.66 | 3,878,226.25 | 3,352,113.78 | 857,639.20 | 16,563,059.72 |
| Model Expenses | 39,924.12 | 37,578.05 | 409,287.34 | 179,814.75 | 554,620.22 | (22,166.85) | 1,199,057.63 |
| **Total Cost of Goods Sold** | **$ 2,515,876.00** | **$ 3,157,295.00** | **$ 3,288,699.00** | **$ 4,058,041.00** | **$ 3,906,734.00** | **$ 835,472.35** | **$ 17,762,117.35** |
| **Gross Profit** | **$ 1,258,824.00** | **$ 1,405,769.00** | **$ 1,605,087.00** | **$ 1,693,244.00** | **$ 1,708,111.00** | **$ 445,474.52** | **$ 8,116,509.52** |
| **Expenses** | | | | | | | |
| Admin, Ins & Office Expenses | 410,233.74 | 656,371.20 | 615,661.10 | 533,511.12 | 527,682.26 | 210,796.74 | 2,954,256.16 |
| Payroll | 504,866.91 | 616,906.22 | 669,639.52 | 661,067.83 | 723,463.68 | 182,016.56 | 3,357,960.72 |
| Rent | 83,976.52 | 64,024.31 | 72,278.28 | 168,204.28 | 189,920.26 | 7,000.00 | 585,403.65 |
| Taxes | 7,327.81 | 5,580.45 | 1,500.00 | 0.00 | 8,268.34 | 1,500.00 | 24,176.60 |
| Travel | 225,118.06 | 264,723.24 | 196,908.64 | 298,009.44 | 228,128.67 | 72,269.51 | 1,285,157.56 |
| Utilities | 27,384.96 | 32,742.58 | 24,305.46 | 37,629.33 | 42,211.79 | 14,265.98 | 178,540.10 |
| **Total Expenses** | **$ 1,258,908.00** | **$ 1,640,348.00** | **$ 1,580,293.00** | **$ 1,698,422.00** | **$ 1,719,675.00** | **$ 487,848.79** | **$ 8,385,494.79** |
| **Net Income** | **$ (84.00)** | **$ (234,579.00)** | **$ 24,794.00** | **$ (5,178.00)** | **$ (11,564.00)** | **$ (42,374.27)** | **$ (268,985.27)** |

Thursday, May 28, 2020 08:44:19 AM GMT-7 - Accrual Basis



# Fusion Modeling Agency, LLC
## Balance Sheet
### 2015 through 2019

|  | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| **Bank Accounts** | | | | | |
| 0736 - Payroll Account | 291.34 | 1,454.85 | 768.62 | (4,833.86) | (18.00) |
| 3457 - Money Market Account | 195.47 | (69,413.56) | 0.65 | 26.01 | 500.94 |
| 6565 - Chase Chcking | 145.19 | 351.12 | 211.23 | 0.00 | 0.00 |
| 9646 - Chase Chcking (Main) | 30,782.00 | 135,374.59 | (4,951.63) | (24,093.96) | (20,592.70) |
| **Total Bank Accounts** | $ 31,414.00 | $ 67,767.00 | $ (3,971.13) | $ (28,901.81) | $ (20,109.76) |
| **Accounts Receivable** | $ 841,904.89 | $ 718,365.35 | $ 754,422.11 | $ 973,992.96 | $ 1,305,795.34 |
| **Other Current Assets** | | | | | |
| Model Advances Receivable | 128,662.86 | 178,851.07 | 212,246.68 | 264,818.68 | 305,149.15 |
| Pre-Paid Commissions (deleted) | 120,000.00 | 111,500.00 | 0.00 | 0.00 | 0.00 |
| Security Deposits | | 37,950.00 | 34,813.00 | 34,813.00 | 34,813.00 |
| **Total Other Current Assets** | $ 248,662.86 | $ 328,301.07 | $ 247,059.68 | $ 299,631.68 | $ 339,962.15 |
| **Total Current Assets** | $ 1,121,981.75 | $ 1,114,433.42 | $ 997,510.66 | $ 1,244,722.83 | $ 1,625,647.73 |
| **Fixed Assets** | | | | | |
| **Net - Brooklyn Office Build Out** | | | | | |
| Accum Dep - Brooklyn Office | | | (12,440.16) | (24,880.32) | (37,320.48) |
| Cost - Brooklyn Office | | 181,817.25 | 250,060.93 | 250,060.93 | 250,060.93 |
| **Total Net - Brooklyn Office Build Out** | $ - | $ 181,817.25 | $ 237,620.77 | $ 225,180.61 | $ 212,740.45 |
| **Net - Computers** | | | | | |
| Accum Dep - Computers | (17,205.42) | (17,205.42) | (18,074.34) | (18,943.26) | (19,812.18) |
| Cost - Brooklyn Computers | | 2,902.59 | 6,082.36 | 6,082.36 | 6,082.36 |
| Cost - Computers | 17,205.42 | 17,205.42 | 17,205.42 | 17,205.42 | 17,205.42 |
| **Total Net - Computers** | $ - | $ 2,902.59 | $ 5,213.44 | $ 4,344.52 | $ 3,475.60 |
| **Net - Office Furniture** | | | | | |
| Accu Dep - Office Furniture | (6,130.48) | (6,130.48) | (23,359.96) | (40,589.44) | (57,818.92) |
| Cost - Brooklyn Office | | 67,773.30 | 120,606.46 | 120,606.46 | 120,606.46 |
| Cost - Office Furniture | 6,130.48 | 6,130.48 | 6,654.05 | 6,654.05 | 6,654.05 |
| **Total Net - Office Furniture** | $ - | $ 67,773.30 | $ 103,900.55 | $ 86,671.07 | $ 69,441.59 |
| **Total Fixed Assets** | $ - | $ 252,493.14 | $ 346,734.76 | $ 316,196.20 | $ 285,657.64 |
| **TOTAL ASSETS** | $ 1,121,981.75 | $ 1,366,926.56 | $ 1,344,245.42 | $ 1,560,919.03 | $ 1,911,305.37 |
| **LIABILITIES AND EQUITY** | | | | | |
| **Liabilities** | | | | | |
| **Current Liabilities** | | | | | |
| **Accounts Payable** | 1,087,620.77 | 1,363,253.23 | 1,489,022.15 | 1,774,447.97 | 2,036,270.49 |
| **Credit Cards** | 47,066.84 | 56,285.94 | 31,584.87 | 38,879.73 | 54,217.74 |
| **Other Current Liabilities** | 1,402.58 | 17,557.57 | 2,100.00 | 0.00 | 435.00 |
| **Total Current Liabilities** | $ 1,136,090.19 | $ 1,437,096.74 | $ 1,522,707.02 | $ 1,813,327.70 | $ 2,090,923.23 |
| **Long-Term Liabilities** | | | | | |
| **Business Loan** | 96,877.56 | 555,478.82 | 184,786.40 | 171,743.33 | 282,143.14 |
| **Total Long-Term Liabilities** | $ 96,877.56 | $ 555,478.82 | $ 184,786.40 | $ 171,743.33 | $ 282,143.14 |
| **Total Liabilities** | $ 1,232,967.75 | $ 1,992,575.56 | $ 1,707,493.42 | $ 1,985,071.03 | $ 2,373,066.37 |



# Fusion Modeling Agency, LLC
## Balance Sheet
### 2015 through 2019

|  | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **Equity** |  |  |  |  |  |
| **Managing Members Equity** |  |  |  |  |  |
| Gordon Equity - Net |  |  |  |  |  |
| Contribtuions - Gordon | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 |
| Current yr R/E Added - Gordon | (194,051.52) | (374,219.52) | (372,258.52) | (392,295.52) | (412,521.52) |
| Distributions - Gordon | 62,266.57 | 60,229.57 | 60,229.57 | 60,229.57 | 60,229.57 |
| **Total Gordon Equity - Net** | $ 22,199.00 $ | (160,006.00) $ | (158,045.00) $ | (178,082.00) $ | (198,308.00) |
| Pollack Equity - Net |  |  |  |  |  |
| Contributions - Pollack | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 |
| Current Yr R/E Added - Pollack | (207,898.89) | (305,861.89) | (304,794.89) | (315,689.89) | (326,686.89) |
| Distributions - Pollack | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 |
| **Total Pollack Equity - Net** | $ (133,101.00) $ | (231,064.00) $ | (229,997.00) $ | (240,892.00) $ | (251,889.00) |
| **Total Managing Members Equity** | $ (110,902.00) $ | (391,070.00) $ | (388,042.00) $ | (418,974.00) $ | (450,197.00) |
| **Retained Earnings** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Net Income** | (84.00) | (234,579.00) | 24,794.00 | (5,178.00) | (11,564.00) |
| **Total Equity** | $ (110,986.00) $ | (625,649.00) $ | (363,248.00) $ | (424,152.00) $ | (461,761.00) |
| **TOTAL LIABILITIES AND EQUITY** | $ 1,121,981.75 | $ 1,366,926.56 | $ 1,344,245.42 | $ 1,560,919.03 | $ 1,911,305.37 |

Thursday, May 28, 2020 09:04:22 AM GMT-7 - Accrual Basis

Exhibit "R"

# Fusion Modeling Agency, LLC

## PROFIT AND LOSS
### January 2015 - December 2019

|  | JAN - DEC 2015 | JAN - DEC 2016 | JAN - DEC 2017 | JAN - DEC 2018 | JAN - DEC 2019 | TOTAL |
|---|---|---|---|---|---|---|
| **Income** | **$3,774,700.00** | **$4,563,064.00** | **$4,893,369.33** | **$5,751,701.67** | **$5,619,379.64** | **$24,602,214.64** |
| **Cost of Goods Sold** | | | | | | |
| Model Expenses | 2,515,876.00 | 3,157,295.00 | 3,286,615.67 | 4,060,624.33 | 3,927,157.78 | **16,947,568.78** |
| **Total Cost of Goods Sold** | **2,515,876.00** | **3,157,295.00** | **3,286,615.67** | **4,060,624.33** | **3,927,157.78** | **16,947,568.78** |
| **GROSS PROFIT** | **$1,258,824.00** | **$1,405,769.00** | **$1,606,753.66** | **$1,691,077.34** | **$1,692,221.86** | **$7,654,645.86** |
| **Expenses** | | | | | | |
| Advertising | | | | 598.00 | 225.00 | $823.00 |
| Depreciation | | | 30,538.56 | 30,538.56 | 30,538.56 | $91,615.68 |
| Insurance | 29,189.04 | 53,206.40 | 47,339.90 | 64,659.90 | 43,878.09 | **$238,273.33** |
| Interest Expense | 1,433.17 | 25,417.67 | 53,906.18 | 36,042.21 | 31,996.53 | **$148,795.76** |
| Licenses and Permits | 3,578.00 | 150.00 | 150.00 | 1,630.00 | | $5,508.00 |
| Marketing | 102,500.00 | 248,500.00 | 107,000.00 | 620.59 | 3,200.00 | $461,820.59 |
| Meals & Entertainment | 61,991.23 | 66,145.82 | 66,532.20 | 45,596.37 | 32,117.63 | $272,383.25 |
| Mother Agency | 72,903.13 | 97,870.64 | 173,777.18 | 172,793.93 | 177,084.66 | $694,429.54 |
| Office Expenses | 81,595.22 | 125,047.28 | 103,357.42 | 111,164.63 | 125,613.66 | **$546,778.21** |
| Payroll | 504,866.91 | 616,906.22 | 669,639.52 | 661,067.83 | 723,463.68 | **$3,175,944.16** |
| Professional Fees | 57,043.95 | 38,992.47 | 31,943.83 | 67,749.87 | 80,629.03 | **$276,359.25** |
| QuickBooks Payments Fees | | 1,040.92 | 1,115.73 | 2,117.06 | 2,335.10 | $6,608.81 |
| Rent | 83,976.52 | 64,024.31 | 72,278.28 | 168,204.28 | 189,920.26 | **$578,403.65** |
| Taxes | 7,327.81 | 5,580.45 | 1,500.00 | | 8,268.34 | **$22,676.60** |
| Travel | 225,118.06 | 264,723.24 | 196,908.64 | 298,009.44 | 228,707.67 | **$1,213,467.05** |
| Utilities | 27,384.96 | 32,742.58 | 24,305.46 | 37,629.33 | 42,211.79 | **$164,274.12** |
| **Total Expenses** | **$1,258,908.00** | **$1,640,348.00** | **$1,580,293.00** | **$1,698,422.00** | **$1,720,190.00** | **$7,898,161.00** |
| **NET OPERATING INCOME** | $ (84.00) | $ (234,579.00) | $28,460.66 | $ (7,344.66) | $ (27,968.14) | $ (243,515.14) |
| **NET INCOME** | $ (84.00) | $ (234,579.00) | $28,460.66 | $ (7,344.66) | $ (27,968.14) | $ (243,515.14) |



# Fusion Modeling Agency, LLC

## PROFIT AND LOSS

### January - June, 2020

| | JAN - MAR, 2020 | APR - JUN, 2020 | TOTAL |
|---|---|---|---|
| Income | $1,280,860.93 | $305,344.01 | $1,586,204.94 |
| Cost of Goods Sold | | | |
| Model Expenses | 836,215.49 | 190,704.67 | $1,026,920.16 |
| **Total Cost of Goods Sold** | **$836,215.49** | **$190,704.67** | **$1,026,920.16** |
| **GROSS PROFIT** | **$444,645.44** | **$114,639.34** | **$559,284.78** |
| Expenses | | | |
| Depreciation | 7,634.64 | 7,634.64 | $15,269.28 |
| Insurance | 11,539.38 | 11,725.28 | $23,264.66 |
| Interest Expense | 80.72 | | $80.72 |
| Meals & Entertainment | 18,419.54 | | $18,419.54 |
| Mother Agency | 39,331.67 | 830.00 | $40,161.67 |
| Office Expenses | 16,133.09 | 4,249.16 | $20,382.25 |
| Payroll | 182,016.56 | 143,635.64 | $325,652.20 |
| Professional Fees | 16,613.46 | 19,630.32 | $36,243.78 |
| QuickBooks Payments Fees | 4,489.35 | 943.93 | $5,433.28 |
| Rent | 21,403.23 | 27,717.00 | $49,120.23 |
| Taxes | 1,500.00 | | $1,500.00 |
| Travel | 65,534.76 | 6,477.90 | $72,012.66 |
| Utilities | 14,265.98 | 5,286.59 | $19,552.57 |
| **Total Expenses** | **$398,962.38** | **$228,130.46** | **$627,092.84** |
| NET OPERATING INCOME | $45,683.06 | $ (113,491.12) | $ (67,808.06) |
| NET INCOME | $45,683.06 | $ (113,491.12) | $ (67,808.06) |

# EXHIBIT 6

Excerpts of Deposition of Plaintiff's Expert Quan Vu,
dated June 4, 2025 ("Vu Dep.").

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
KEVIN POLLACK,

                              PLAINTIFF,

    -against-              Case No.:
                    23 Civ. 2376 (SJB) (LKE)


JODIE LOUISE GORDON (also known as JODY
GORDON) and FUSION MODELS BK LLC,

                              DEFENDANTS.
----------------------------------------X
                    DATE: June 4, 2025
                    TIME: 11:23 A.M.


              DEPOSITION of the Non-Party
Witness, QUAN VU, taken by the Defendants,
pursuant to a Notice and to the Federal
Rules of Civil Procedure, held VIA ZOOM
VIDEOCONFERENCE, before Jamie Newman, a
Notary Public of the State of New York.

**A P P E A R A N C E S:**

KASELL LAW FIRM
Attorneys for the Plaintiff
KEVIN POLLACK
1038 Jackson Avenue, Ste #4
Long Island City, New York 11101
BY: BRIAN LEHMAN, ESQ.
Brianlehman97@gmail.com

MARIA PATELIS & ASSOCIATES, PLLC
Attorneys for the Defendants
JODIE LOUISE GORDON (also known as JODY GORDON) and FUSION MODELS BK LLC
7024 18th Avenue
Brooklyn, New York 11204
BY: MARIA PATELIS, ESQ.
File #: 23CIV2376
m.patelis@aol.com

* * *

```
(1)                    QUAN VU

(2)        A.      No.

(3)        Q.      Are you accredited by any

(4)   professional valuation body such as NACVA,

(5)   ACA or AICPA?

(6)        A.      No.

(7)        Q.      Have you ever taken or passed

(8)   any valuation course work through these

(9)   organizations?

(10)       A.      No.

(11)       Q.      Would you agree, other than

(12)  your new profession, that most of your

(13)  background involves Biopharma operations

(14)  and strategic finance rather than valuation

(15)  consulting?

(16)       A.      No, the -- not necessarily.

(17)  The reason for that is our business is in

(18)  the business of valuation because in the

(19)  mergers and acquisition context, even

(20)  outside of Biopharma, for example, in which

(21)  I consulted for technology companies,

(22)  valuation is the fundamental core in any

(23)  kinds of mergers and acquisition context or

(24)  licensing context.

(25)       Q.      Right, but here is -- this case
```

(1)                    QUAN VU

(2)    is not a merger and acquisition case, it's

(3)    a --

(4)        **A.    Yeah, but the valuation is the**

(5)    **same irrespective.**

(6)        Q.    Okay.

(7)            How many shareholder dispute

(8)    valuation cases have you personally

(9)    performed a DCF for?

(10)       **A.    Shareholders disputes**

(11)   **specifically?**

(12)       Q.    Yes.

(13)       **A.    I don't think I have done any.**

(14)       Q.    Okay.

(15)           Have you ever prepared a

(16)   valuation report for modeling agency or any

(17)   similar service based business?

(18)       **A.    Service based business, yes.**

(19)   **So, if you look at, for example, healthcare**

(20)   **insurance companies those are service based**

(21)   **businesses.  You look at different types of**

(22)   **consulting firms that are service based**

(23)   **business.**

(24)           **If you look at technology**

(25)   **companies which I've done plenty of**

```
                         QUAN VU
(1)
(2)   valuation those are service based business
(3)   in terms of the software that they provide.
(4)        Q.     Were they publicly traded
(5)   companies?
(6)        A.     Yes.
(7)        Q.     Were any of them private
(8)   companies?
(9)        A.     Yes.
(10)       Q.     Is your firm registered as a
(11)  valuation service provider with any
(12)  professional body?
(13)       A.     My firm -- which one in
(14)  particular are we talking about?
(15)       Q.     The one you work for?
(16)       A.     The one right now?
(17)       Q.     Yes.
(18)       A.     No, the one right now is
(19)  Biopharma company.
(20)       Q.     How many times have you been
(21)  retained as an expert in litigation?
(22)       A.     How many times have I been
(23)  retained as an expert, probably be this is
(24)  the second.
(25)       Q.     This is the second?
```

```
(1)                    QUAN VU

(2)        A.      Uh-hmm.

(3)        Q.      And the first one?

(4)        A.      The one I've alluded to earlier

(5)   in the deposition context with respect to

(6)   potential financial improprieties.

(7)        Q.      But that was within your

(8)   business; correct?

(9)        A.      Within the business, correct.

(10)       Q.      So, it wasn't you were --

(11)       A.      No.  No.  Not contacted by

(12)  anyone, yes, that's correct.

(13)       Q.      So, you were never contracted

(14)  by anyone to perform an evaluation, other

(15)  than the one that was disputed in your

(16)  firm; correct?

(17)       A.      Correct.

(18)       Q.      And --

(19)       A.      You know, the -- it depends on

(20)  how you classify or define that, but, you

(21)  know, specifically with context the answer

(22)  is no.  With respect to doing valuation

(23)  work on behalf of companies who engage us,

(24)  that's quite a bit.

(25)       Q.      Right, but how many times have
```

(1)                    QUAN VU

(2)        bring that up to the Judge, but I'm

(3)        going to wait to see how many times

(4)        you interrupt me before I do so

(5)        because I'm not spending the next

(6)        hour arguing with you, Brian, as much

(7)        as I like you.

(8)        Q.    Can you, Mr. Vu, can you

(9)    identify any peer-reviewed valuation

(10)   publications that support your growth rates

(11)   and multiples without reconciliation?

(12)       A.    I'm sorry, can you rephrase

(13)   that?

(14)           MR. LEHMAN:  Are you saying can

(15)       he?

(16)       Q.    Yeah.  Can you identify any

(17)   peer-reviewed valuation publication that

(18)   support your growth rate and multiples

(19)   without reconciliation?

(20)       A.    Yeah, the premise of the growth

(21)   rates are pretty much based upon the

(22)   historical valuation of the P&L statements

(23)   that are provided to you us.  The -- when

(24)   you look at the multiples of how that

(25)   works, that's based on a peer comp that's

                          **QUAN VU**

(1)

(2)   **publicly traded.**

(3)            **I believe the company is called**

(4)   **the Wilhelmina and that's the emphasis of**

(5)   **how this actually grows.  The industry**

(6)   **growth in and of itself is never that**

(7)   **specific and so, you don't take an industry**

(8)   **growth and go, okay, I'm going to take that**

(9)   **and apply it to this company, no.**

(10)           **It's based on the individual**

(11)  **projection of the company which is the**

(12)  **imbedded assumption behind the -- the**

(13)  **assumptions are based upon DCF, discounted**

(14)  **cash flow analysis.**

(15)       Q.    But, are these -- but, did you

(16)  identify any peer-reviewed valuations

(17)  that's --

(18)       **A.    I'm not sure I understand what**

(19)  **you mean by peer-reviewed valuation.**

(20)       Q.    Well, these are your

(21)  assumptions, independent assumptions, is

(22)  that what you're saying?

(23)       **A.    No, these are not independent**

(24)  **assumptions.  The independent assumptions**

(25)  **in which the data has been provided to me,**

(1)                      **QUAN VU**

(2)    **yes.  Based upon the financial statements**

(3)    **that have been provided, you know, you look**

(4)    **at the historical trends, for example, see**

(5)    **where its grown hence, you know, the DCF is**

(6)    **an intrinsic value of the company so it's**

(7)    **based upon all the information, financial**

(8)    **information, as provided to me.**

(9)              **The one that is applied as one**

(10)   **of the exit multiple terminal value is**

(11)   **essentially a fair market of multiple and**

(12)   **the peer comp here which is basically the**

(13)   **only one that's publicly traded is**

(14)   **Wilhelmina.**

(15)        Q.     Right.

(16)             Do you have a written

(17)   methodology or check list that you follow

(18)   in preparing the DCF valuation?

(19)        **A.     Once again, I'm not entirely**

(20)   **sure I understand the question.**

(21)        Q.     Well, do you have a form, a

(22)   format if your -- have you done DCF

(23)   valuation before?

(24)        **A.     Yes, many times.**

(25)        Q.     And do you have a check list of

(1)                    QUAN VU

(2)    what you follow when you prepare one?

(3)         **A.    You don't need a check list to**

(4)    **follow because if you've done it that many**

(5)    **times it becomes kind of like imbedded**

(6)    **muscle memory.**

(7)         Q.    Right.

(8)              But, is your valuation of

(9)    fusion replicable by any other credential

(10)   valuation professional using standard

(11)   inputs?

(12)        **A.    Absolutely.**

(13)        Q.    And can you identify them?

(14)        **A.    Yeah, it's the DCF methodology.**

(15)   **You follow the standard procedures, you**

(16)   **look at the historical numbers.  You run**

(17)   **the averages and the means.  Then you**

(18)   **calculate the growth rates and you grow**

(19)   **that out five years and you take the**

(20)   **historical margins, you apply to everything**

(21)   **below, including cause, expenses and then**

(22)   **you derive at all the following multiples**

(23)   **in the valuation.**

(24)              **It's very standard.  Anyone can**

(25)   **do it with historical numbers.  The method**

(1)                    **QUAN VU**

(2)    **is pretty much consistent and standardized.**

(3)         Q.    Can you identify the objective

(4)    bench marks used in selecting your -- you

(5)    said five percent, but in your report you

(6)    did a six to eight perpetual growth rate?

(7)              **MR. LEHMAN:  Objection, I don't**

(8)         **think he said five percent.**

(9)              **MS. PATELIS:  He did say it.**

(10)      **A.    Yeah, so the growth rate takes**

(11)   **historical growth rates and you kind of**

(12)   **just look at a range of potential growth**

(13)   **rates that you can grow the company into**

(14)   **perpetuity and that's where I was using the**

(15)   **numbers.**

(16)              **There's no technical bench mark**

(17)   **per se because as I have alluded to before,**

(18)   **each company is unique in its own growth**

(19)   **rate and it just depends on where they are.**

(20)      Q.    So, is it fair to say that you

(21)   used the DCF standard in your valuation of

(22)   fusion modeling agency?

(23)      **A.    Yes.**

(24)      Q.    And I'm going to ask you, did

(25)   you cite any valuation authority or

```
(1)                  QUAN VU
(2)   standard that supports your choice?
(3)       A.     There is no standard per se.
(4)   You look at the various methodologies
(5)   available to you and you --
(6)       Q.    What are those?
(7)       A.     -- and you evaluate what is the
(8)   most appropriate.
(9)       Q.    So what are those that are
(10)  available to you?
(11)      A.     They are a number of
(12)  available --
(13)             MR. LEHMAN:  Quan, wait.
(14)        Ms. Patelis, please don't interrupt
(15)        him while he's in the middle of
(16)        answering you did it on the last
(17)        question.  Thank you.
(18)      A.     Yeah, so there are a number of
(19)  different methodologies.  Generally
(20)  speaking depending on the circumstances
(21)  it's hard to encompass all of them.  For
(22)  example, in the liquidation context it's
(23)  something else.  In a real estate context
(24)  it's something else, but at a high level
(25)  for general businesses, they're basically
```

(1)                    QUAN VU

(2)   -- they're variant thereof, but essentially

(3)   there is something called public comps

(4)   which are publicly traded companies that

(5)   are trading and then you look at the

(6)   different variables.

(7)              There are precedent

(8)   transactions, they call them traction comps

(9)   in which companies have already been

(10)  acquired and you look at what is the

(11)  premium above market they are being traded

(12)  for and the DCF.

(13)              Obviously as I have alluded to

(14)  before, sometimes they are different names,

(15)  sometimes they are variants thereof or

(16)  subcategories thereof, but at a high level

(17)  that's what it is.  I mean certain context

(18)  require certain things, for example, like a

(19)  leverage buyout is very different.

(20)              Real estate or let's say very

(21)  asset heavy companies, tangible asset

(22)  companies are also very different.  They

(23)  don't necessarily apply and so it requires

(24)  an evaluation of the factors intrinsic to

(25)  the company in terms of valuation being

(1)                           **QUAN VU**

(2)     **applied.**

(3)          Q.      But my question is, what

(4)     valuation did you apply?

(5)          **A.      The DCF.**

(6)          Q.      The DCF.

(7)                  And what is your authority that

(8)     supports your choice?

(9)                  **MR. LEHMAN:  Objection.**

(10)              **Assumes evidence that's not in the**

(11)              **record.  Assumes there's an**

(12)              **authority.**

(13)                  **MS. PATELIS:  I'm asking him a**

(14)              **question and it's a standard question**

(15)              **to an expert, so Brian, can you just**

(16)              **back off in interrupting.**

(17)          **A.      So, there's no authority per se**

(18)     **because the DCF is intrinsic and it's a**

(19)     **methodology used by people who do valuation**

(20)     **as part of their daily lives.  There's --**

(21)     **you don't need to cite anything per se**

(22)     **because it's all -- that's why it's called**

(23)     **an intrinsic valuation because it is**

(24)     **intrinsic in and of itself.  It doesn't**

(25)     **rely on many market factors.**

(1)                    QUAN VU

(2)   with the IRS?

(3)             MR. LEHMAN:  Maria, you just

(4)        interrupted him again, do not do

(5)        that.  He's in the middle of a

(6)        question.  He's trying to answer your

(7)        questions.

(8)             MS. PATELIS:  Okay, he's not.

(9)             MR. LEHMAN:  Stop interrupting.

(10)       Just give it a pause.  I understand

(11)       that Zoom's difficult, but give it a

(12)       pause.

(13)       A.    Yeah, no, so to answer your

(14)   question, Maria, it depends because you

(15)   don't just apply fair value according to

(16)   the IRS standards.

(17)             The key to valuation here is

(18)   what is the market willing to pay for.

(19)   It's not contingent upon what the IRS or

(20)   what anybody else talks about.  I mean, at

(21)   the end of the day when you look at

(22)   valuation between one business versus

(23)   another it's who is willing to buy what at

(24)   what price.

(25)             And so, the intrinsic valuation

```
(1)                 QUAN VU
(2)   is irrespective of, you know, anything else
(3)   that's transpiring around, it's just
(4)   looking at the methodology, how it's done
(5)   and you value the company intrinsically,
(6)   not market driven, not any rule related in
(7)   the sense, but accepted methodology that
(8)   everyone uses.
(9)        Q.    I understand that, but you know
(10)  that the company was dissolved; correct?
(11)       A.    Right, so that's in a
(12)  liquidation.  See, if you're assuming a
(13)  liquidation context, yes, but from my
(14)  understanding we are operating from a
(15)  context of a but-for analysis.
(16)            But-for the liquidation aspect
(17)  of it, we are looking at a company from a
(18)  potential efficiency before it even gets to
(19)  that liquidation.
(20)       Q.    But that was not the facts of
(21)  the case.  The facts were that the company
(22)  was dissolved judicially?
(23)       A.    Right.
(24)       Q.    So --
(25)            MR. LEHMAN:  Objection, is
```

```
(1)                    QUAN VU
(2)          MS. PATELIS:  He finished.
(3)          MR. LEHMAN:  -- you literally
(4)      just did that.
(5)          MS. PATELIS:  He finished.
(6)          MR. LEHMAN:  No, he didn't.
(7)      Can we please remove the resumé off
(8)      the screen, I don't think you could
(9)      see him.  There we go, thank you.
(10)     Q.    But Mr. Vu, you were aware that
(11) the company was dissolved?
(12)     A.    Yes, I am.
(13)     Q.    Do you agree that intrinsic
(14) value is not the same as fair market value
(15) used in litigation settings?
(16)     A.    The intrinsic value is not the
(17) same -- once again, it comes back to what
(18) do you mean by intrinsic and what do you
(19) mean by fair value?  We don't need -- you
(20) know, the definition of fair value in and
(21) of itself doesn't require anything market
(22) related sometimes.
(23)         If you take, for example, even
(24) the approaches of, like, an asset value
(25) model where you take the assets minus
```

```
(1)                    QUAN VU
(2)   liability that has nothing to do with
(3)   technically fair value.  I mean, fair value
(4)   by definition is what do you believe is the
(5)   value of the business, like, fairly and I
(6)   suppose but whatever that means --
(7)        Q.    I know, I'm --
(8)        A.    -- but that approach --
(9)             MR. LEHMAN:  Stop interrupting
(10)        him.
(11)       A.    -- accepted approach is
(12)  essentially assets minus liability and so,
(13)  but that's not how companies look at in
(14)  terms of the value of how they're being
(15)  sold, for example.  You know --
(16)       Q.    I --
(17)       A.    -- when you look at a company
(18)  it's not just what's going on out there.
(19)             THE COURT REPORTER:  I cannot
(20)        get everyone talking at the same
(21)        time.
(22)             MR. LEHMAN:  Ms. Patelis, you
(23)        have to stop interrupting him.  I
(24)        agree.  If you want to get the Judge
(25)        involved get the Judge involved, but
```

(1)                    QUAN VU

(2)        **A.    Yes.**

(3)            **(Whereupon, the aforementioned**

(4)        **38-page valuation expert report was**

(5)        **marked as Defendant(s)' Exhibit 2 for**

(6)        **identification as of this date by the**

(7)        **Reporter.)**

(8)        Q.    Showing you what's been marked

(9)    as Defendant's Exhibit 2, are you familiar

(10)   with this document, please review it?

(11)       **A.    I am.**

(12)       Q.    And is the same report that you

(13)   provided to your Counsel?

(14)       **A.    It is.**

(15)       Q.    Do you need time to answer the

(16)   question or?

(17)       **A.    Oh, are you still on that**

(18)   **question, okay?**

(19)       Q.    Yes.

(20)       **A.    Yeah, no, absolutely.  So what**

(21)   **I did was I look at the historical ordinary**

(22)   **income provided the various P&Ls and I ran**

(23)   **a mean, a max and minimum number on them**

(24)   **and then using the year to year growth of**

(25)   **the revenues from 2013 all the way to 2019,**

```
(1)                    QUAN VU
(2)    I get a mean growth of 6.73 percent.
(3)         Q.    So was that an industry data?
(4)         A.    No.  Once again, there's no
(5)    industry data here it's intrinsic to the
(6)    company itself.
(7)         Q.    So, you used fusion numbers?
(8)         A.    Correct.
(9)         Q.    Okay.
(10)              And you applied a 25 percent
(11)   reduction in operating expenses?
(12)        A.    Correct.
(13)        Q.    What documentation supports
(14)   that assumption?
(15)        A.    The ordinary business when run
(16)   with efficiency it's just that, I mean,
(17)   there is no technical documents per se --
(18)        Q.    Do you --
(19)        A.    -- if you look at any kind of
(20)   acquisition context those are usually the
(21)   synergies assumed, for example, in any kind
(22)   of acquisition context because the
(23)   potential efficiencies.  The argument here
(24)   is based on efficiency of the company, how
(25)   it's run before it goes down.
```

```
(1)                    QUAN VU

(2)            MR. LEHMAN:  Stop interrupting

(3)         the witness.  Stop interrupting the

(4)         witness.

(5)         Q.    So, this number, again, was

(6)    just derived from nowhere; correct?

(7)         A.    No.  No.  It's not --

(8)            MR. LEHMAN:  Objection.

(9)         Q.    Can you explain?

(10)           MR. LEHMAN:  Objection.  Can

(11)        you repeat the question, please?

(12)        Q.    Can you explain how you came up

(13)   with the 25 percent reduction?

(14)        A.    Absolutely.  The 25 percent

(15)   reduction assumes pretty much industry, you

(16)   know, general industry operational

(17)   efficiency -- inefficiency companies that

(18)   you can say.

(19)        Q.    And were the efficiency

(20)   assumption bench marked against comparable

(21)   modeling agencies?

(22)        A.    There are -- unfortunately,

(23)   there's only one out there that's publicly

(24)   traded which the data has revealed.

(25)        Q.    Okay, we'll get to that soon.
```

(1)                    QUAN VU

(2)    acquisition.  So when they have a bolt-on

(3)    acquisition the expenses almost become

(4)    irrelevant because there will be

(5)    redundancies.

(6)              So, a company would buy it for

(7)    -- just to achieve the top line sales that

(8)    they'll add to their on top line sales and

(9)    eliminate all the operating expenses

(10)   associated with the fusion.

(11)       Q.    Right, but this company was

(12)   being dissolved?

(13)       A.    I understand that.

(14)       Q.    So it doesn't align with your

(15)   valuation?

(16)       A.    The valuation is contingent

(17)   upon the assumption that it operates

(18)   efficiently before liquidation context.

(19)   That's like almost -- to argue from a

(20)   liquidation context and its value kind of

(21)   defeats the whole purpose.

(22)       Q.    Right, but this is a legal

(23)   matter so --

(24)       A.    I'm not here to evaluate legal

(25)   matters, I'm here to evaluate the company

(1)                    **QUAN VU**

(2)    **itself.**

(3)         Q.    And what financial documents

(4)    did you reply upon?

(5)         **A.    Once again, it's an intrinsic**

(6)    **value.  The documents I rely upon are given**

(7)    **to me by the company or by my -- our**

(8)    **Counsel that has received all these**

(9)    **documents from the company.**

(10)         Q.    So, can you specify what

(11)    documents you?

(12)         **A.    Yeah, Exhibits O, P, Q and R.**

(13)         Q.    That's it?

(14)         **A.    Those are specific to the**

(15)    **valuation model, yes.**

(16)         Q.    And did you accept managements

(17)    projections without independent

(18)    verification?

(19)         **A.    Management didn't give me any**

(20)    **rejections.**

(21)         Q.    Did you consider the industry

(22)    competitive landscape or macroeconomic

(23)    conditions?

(24)         **A.    Absolutely, that's why there's**

(25)    **only -- that's how I found Wilhelmina**

(1)                    **QUAN VU**

(2)     **International.  That's the only one that's**

(3)     **publicly traded.**

(4)          Q.    And what -- wait, the fusion is

(5)     not publicly traded --

(6)          **A.      I know.**

(7)          Q.    -- correct?

(8)          **A.      I know.**

(9)          Q.    Okay.

(10)           And what risk factors did you

(11)    account in your analysis, if any?

(12)         **A.      Hard to define what you mean by**

(13)    **risk factors.  What specific risk factors**

(14)    **are we talking about?**

(15)         Q.    So, the valuation methodology

(16)    you used, right?

(17)         **A.      Uh-hmm.**

(18)         Q.    Is that approach recognized by

(19)    professional valuation standards such as

(20)    ASA, NAC, VA, etc.?

(21)         **A.      Absolutely.**

(22)         Q.    And did you apply adjustments

(23)    that would not be made in a fair market

(24)    transition?

(25)         **A.      Absolutely.**

(1)                    **QUAN VU**

(2)        Q.    And have you testified in other

(3)   matters using a non-fair market value

(4)   standards?

(5)        **A.    No, I've not testified, this**

(6)   **goes back to the question you've asked**

(7)   **before.**

(8)        Q.    Right.

(9)              And is there any authoritative

(10)  source that supports your deviation from

(11)  fair market value?

(12)       **A.    No, not that I'm aware.**

(13)       Q.    You reference a bolt-on

(14)  acquisition scenario with up to 95 expense

(15)  reductions; correct?

(16)       **A.    Uh-hmm.**

(17)       Q.    Was this based on your offer or

(18)  actual acquire interest on any --

(19)            **MR. LEHMAN:  Maria, I have a**

(20)       **question.  You said 95 reductions, I**

(21)       **just don't know what that means.  95**

(22)       **-- maybe it's muffled because of**

(23)       **Zoom.  95 what?**

(24)       Q.    Mr. Vu understands my

(25)  questions?

(1)                    QUAN VU

(2)        **A.    It's on Page 4, fourth**

(3)    **paragraph.**

(4)            **MR. LEHMAN:  I -- okay.**

(5)        Q.    So, you reference on a bolt-on

(6)    requisition scenario with up to 95 percent

(7)    expense reduction?

(8)        **A.    Correct.**

(9)        Q.    Was this based on any offer or

(10)   actual acquire interest?

(11)       **A.    With respect to the company?**

(12)       Q.    Yes, of course.

(13)       **A.    Like, somebody -- no.  I mean,**

(14)   **I'm not aware that anybody came and offered**

(15)   **this company a price, no.**

(16)       Q.    Okay.

(17)           So, then how did you come up

(18)   with bolt-on acquisition scenario of up to

(19)   95 percent expense reduction?

(20)       **A.    It's the same answer in which**

(21)   **I've alluded to and specifically answered**

(22)   **before, is that in an acquisition context**

(23)   **there will be redundancies across the**

(24)   **board.**

(25)           **You can almost eliminate almost**

(1)                    **QUAN VU**

(2)   **specifically for a very small company being**

(3)   **acquired by a large company that almost all**

(4)   **the operating expenses can be eliminated.**

(5)        Q.    Right, but why would you apply

(6)   this analysis when the company is getting

(7)   dissolved and not acquired, that's what I'm

(8)   trying to understand?

(9)        **A.    Right, this is when we go back**

(10)  **to the but-for analysis.  The analysis is**

(11)  **based upon but before the liquidation**

(12)  **scenario as an operating entity operating**

(13)  **efficiently.  It should not happen, it**

(14)  **should not even go there, but --**

(15)       Q.    I understand, but --

(16)       **A.    Please let me finish.  If you**

(17)  **look at the operational listed you can**

(18)  **achieve up to 85 to 95 percent, but that's**

(19)  **why I'm only assuming 25 percent.**

(20)       Q.    But at the time the litigation

(21)  was filed, the company was dissolved?

(22)       **A.    I understand that which is what**

(23)  **you keep on going back to, but that's not**

(24)  **the argument I am making.  The argument and**

(25)  **the valuation I'm basing on is before the**

```
(1)                    QUAN VU

(2)    liquidation.  How should the company be run

(3)    and that's how the value is based off of.

(4)              It should be, like, you know,

(5)    assuming a 25 percent operational

(6)    efficiency you should have a really -- a

(7)    decent, you know, justifiable valuation of

(8)    the company.

(9)        Q.    Okay.  So, the facts of the

(10)   matter weren't really correctly applied in

(11)   your valuation?

(12)           MR. LEHMAN:  Objection, you're

(13)      testifying.

(14)       Q.    And were these bolt-on benefits

(15)   modeled in actual financial terms or left

(16)   conceptually?

(17)       A.    Once again, it depends on

(18)   context.

(19)       Q.    You used a 1317 percent

(20)   discount rate.  Can you walk me through how

(21)   you derived that WACC?

(22)           MR. LEHMAN:  Maria, you said

(23)      1317.  Are you saying 13 to 17?

(24)           MS. PATELIS:  13-17 percent

(25)      discount rate.
```

(1)                     **QUAN VU**

(2)              **MR. LEHMAN:  The dash means to,**

(3)          **right?  I think you're just reading**

(4)          **something, but it's coming across as**

(5)          **confusing.  Is it 13 to 17?**

(6)      Q.    Mr. Vu, are you looking at the

(7)  same thing that I'm looking at?

(8)      **A.    Yes.**

(9)              **MR. LEHMAN:  Where are you**

(10)          **looking?**

(11)      **A.    The 13 to 17 discount percent**

(12)  **rate, that is correct.**

(13)      Q.    Okay.  And can you walk me

(14)  through how you derived that WACC?

(15)      **A.    Yes.  If you look at -- if you**

(16)  **look at how companies, particularly**

(17)  **companies that are, you know, either**

(18)  **private or in the market and what's the**

(19)  **risk factor.**

(20)              **So, there are a number of**

(21)  **things that could go into there.  You can**

(22)  **look at the variety of different things;**

(23)  **what's the industry, what's the interest**

(24)  **rate because essentially what the discount**

(25)  **rate is, what do I expect to get in return**

(1)                    **QUAN VU**

(2)    **for the investment I'm making.**

(3)              **And so it takes into account**

(4)    **that very risk to be fair, you have to**

(5)    **always take a range and so I'm assuming a**

(6)    **discount rate of 15 percent because of the**

(7)    **risk factors associated with an investment**

(8)    **in a private company.  It's not -- you**

(9)    **know, it's not like you're putting money**

(10)   **into treasury notes or something where**

(11)   **you're guaranteed like four percent.**

(12)             **And so those risk factors are**

(13)   **accounted for as well as, you know, other**

(14)   **factors.  I gave it a range between 13 and**

(15)   **17 taking the midpoint of 15.**

(16)      Q.    And did you use CAPM or any

(17)   other model for that?

(18)      **A.    Yeah, the cap -- yeah, the**

(19)   **capital asset pricing model.  There are not**

(20)   **enough variables here to do that, but you**

(21)   **-- that's why there's a range provided.**

(22)      Q.    Did you consult Duff & Phelps

(23)   or any other standards for private company

(24)   discount rates?

(25)      **A.    Once again, it depends upon**

(1)                    **QUAN VU**

(2)     **industry.  They're not that reliable in the**

(3)     **sense that you only have one, for example,**

(4)     **publicly traded company.  I mean, it's not**

(5)     **possible.**

(6)          Q.    But I'm saying for a private

(7)     company discount rate?

(8)          **A.    Once again, it's very specific**

(9)     **to very different industries to different**

(10)    **companies and to different capital**

(11)    **structure and whatnot, it's not apples to**

(12)    **apples.**

(13)         Q.    Right.  Well, why did you use

(14)    six to eight percent perpetual growth rate?

(15)         **A.    Based upon the historical**

(16)    **numbers provided by the top line sales of**

(17)    **the company.**

(18)         Q.    Do you have data supporting the

(19)    level of sustained growth?

(20)         **A.    I'm looking at that asa**

(21)    **sustained growth.  Depends on the different**

(22)    **companies, different -- sustained industry.**

(23)    **If you look at, for example, let's say you**

(24)    **want to grow a company six percent into**

(25)    **perpetuity and the inflation rate is four**

(1)                        **QUAN VU**

(2)    **percent.  Then you have to make the**

(3)    **appropriate adjustments.**

(4)              **Normally speaking you're**

(5)    **looking anywhere between two to four**

(6)    **percent growth into perpetuity is the**

(7)    **standard.  That's an accepted standard.**

(8)              **But that assumes that you**

(9)    **adjust for potential inflationary**

(10)   **environments where the real growth rate is**

(11)   **actually only several percentages which is**

(12)   **the difference between the nominal versus**

(13)   **the inflation rate.**

(14)       Q.    Well, how about if I ask you is

(15)   a six to eight percent growth rate

(16)   reasonable for a company declining in a

(17)   niche industry?

(18)       **A.    That's one -- yeah, if you're**

(19)   **looking at the industry, right, it's one**

(20)   **thing.  Once again, this valuation is very**

(21)   **specific to the company and intrinsic to**

(22)   **the company's performance on the top line.**

(23)       Q.    Right, but -- okay.

(24)              But, you were aware that the

(25)   company was dissolved; correct?

[Page 53]
June 4, 2025

(1)                    QUAN VU

(2)        **A.    Yes, you've asked me that**

(3)    **several times.**

(4)        Q.    Okay, I just want to make sure

(5)    because I don't know why you would do it

(6)    this way.

(7)              Why did you choose 3-5 times

(8)    EBITDA multiples?

(9)        **A.    Yes.**

(10)        Q.    And how does that compare to

(11)    Wilhelmina or other industry comps?

(12)        **A.    So Wilhelmina International as**

(13)    **of 12 -- December 2nd, 2022 it's enterprise**

(14)    **value 3.75.  Using that as kind of like the**

(15)    **midpoint range.  I put between three and**

(16)    **five times EBITDA multiples taking the 4.**

(17)    **-- four times EBITDA multiples as kind of**

(18)    **like the midpoint.**

(19)        Q.    Well, you know, that Wilhelmina

(20)    offers more in different services than what

(21)    Fusion offers; correct?

(22)        **A.    I understand that, but that's**

(23)    **the closest publicly available comp, and**

(24)    **the only publicly available comp available.**

(25)        Q.    But how did they compare to

Lexitas Court Reporting
800-678-0166

(1)                     QUAN VU

(2)    Fusion?

(3)         A.     They are a model agency that

(4)    does similar things and that is the closest

(5)    thing that's available.

(6)         Q.     So, a company that has been in

(7)    business since 2007, correct, that's when

(8)    Fusion came into business, how did you

(9)    determine that it was still in the growth

(10)   stage and not a mature company?

(11)        A.     Because you look at the

(12)   historical numbers, again, the top line

(13)   sales will tell you that.  So, if you look

(14)   at the growth rate of Fusion, you know, if

(15)   you look at -- if you just look at in the

(16)   first couple of years from 2013 to 2014,

(17)   right, the mean growth rate is, you know,

(18)   1.9 percent -- 1.2 percent in the negative.

(19)            From 2014 to 2015 it's 2

(20)   percent in the negative and then in 2016 it

(21)   goes to 21 percent in the positive and then

(22)   to 7.24 in the positive in the following

(23)   year and then up again in 2018 to

(24)   17.52 percent and in 2019 to negative

(25)   2.34 percent.

(1)                          **QUAN VU**

(2)              **If you take the average of all**

(3)    **those growth rates you get 6.73 which is**

(4)    **the number that is provided in the analysis**

(5)    **document that is before you.**

(6)         Q.    And how sensitive is your

(7)    valuation to changes in the exit multiple

(8)    then?

(9)         **A.    How sensitive it is.  You have**

(10)   **one company so it can be potentially**

(11)   **sensitive, but there no other publicly**

(12)   **traded comps and so given the date of the**

(13)   **valuation and pretty much the date of when**

(14)   **this case was taking place as December 2nd,**

(15)   **the closet one that I got, December 2,**

(16)   **2022, I'm using that multiple.**

(17)             **But remember that there are two**

(18)   **multiples.  One multiple is being applied**

(19)   **for the terminal value.  The other is to**

(20)   **check it, right.  So, you have basically**

(21)   **two DCF valuation methodologies.  You have**

(22)   **the multiple exit method and you have the**

(23)   **the growth into perpetuity.**

(24)         Q.    You also determined that Fusion

(25)   was a pioneer in promoting diversity, can

(1)                     QUAN VU

(2)    you cite your sources?

(3)         **A.    That is from the information**

(4)    **provided from the company description.**

(5)         Q.    Where did you obtain that?

(6)         **A.    I think I read it on the -- in**

(7)    **one of the documents.  I can't remember.**

(8)         Q.    And how did you determine the

(9)    Fusion attracts premium models and

(10)   clientele?

(11)        **A.    Once again, I believe that is**

(12)   **also from one of the marketing documents.**

(13)        Q.    Okay, but how does that defer

(14)   then the public companies that you are

(15)   comparing Fusion to?

(16)        **MR. LEHMAN:  Defer?  Differ?**

(17)        Q.    Yeah, how does that differ from

(18)   the public companies you compared Fusion

(19)   to?

(20)        **A.    Yeah, so that is what**

(21)   **distinguishes in the sense of the**

(22)   **diversity.  The different types of clients,**

(23)   **the different models they attract.**

(24)        **But once again it goes back to**

(25)   **the models.  Fusion -- once Fusion becomes**

(1)                    **QUAN VU**

(2)     **somewhat of a, for lack of a better word, a**

(3)     **household name, right, similar to, you**

(4)     **know, kind of like the top modeling agency,**

(5)     **then that's where the value comes in.**

(6)          Q.    Did you present a waited

(7)     conclusion blending DCF and market based

(8)     results?

(9)          **A.    No, negative because of the**

(10)    **limited -- that's why I eliminated the**

(11)    **other two analysis based upon the public**

(12)    **comps because there's only one, right, and**

(13)    **so you want to try to eliminate as much as**

(14)    **the potential market distortion because**

(15)    **there's only one company.**

(16)              **So, the publicly traded comps**

(17)    **only one is available which is not very**

(18)    **good for valuation purposes.  The second is**

(19)    **the present transaction which, you know,**

(20)    **you simply don't have any because these are**

(21)    **private companies and even they acquire**

(22)    **other companies often times, you know, if**

(23)    **not most of the time they're not required**

(24)    **to publicly reveal what they are being**

(25)    **bought for.**

(1)                    QUAN VU

(2)             And so because of that you try

(3)     to eliminate all kinds of market influences

(4)     and hence the conclusion to do the

(5)     intrinsic value of the company, right.  And

(6)     so, the only variable that is affected

(7)     perhaps by the market is the discount rate

(8)     if you really want to take it, but to

(9)     minimize that variability you do the range.

(10)    You always do a range.

(11)        Q.    Right, but the problem is that

(12)    this company was dissolved?

(13)             MR. LEHMAN:  Objection, please

(14)         stop testifying.

(15)             MS. PATELIS:  I'm not, but

(16)         there's no objection based.  I'm just

(17)         trying to understand why he would do

(18)         a totally different approach on

(19)         something that is dissolved already.

(20)             MR. LEHMAN:  You've made this

(21)         point, like, six times already, can

(22)         we move on.  Just ask questions.  If

(23)         you have questions, ask them.  If not

(24)         can, can just end the deposition this

(25)         is tedious.

(1)                    QUAN VU

(2)    financials to correct any personal expenses

(3)    run through the business?

(4)        A.    **Negative.  I took a abroad**

(5)    **25 percent discount.**

(6)        Q.    Were your projections

(7)    independently verified or supported by

(8)    management's actual plans?

(9)        A.    **I only used what's available to**

(10)   **me.**

(11)       Q.    And what was available to you?

(12)       A.    **The P&Ls that I already cited**

(13)   **to you and in the report.**

(14)       Q.    And did you consider Covid-19's

(15)   impact on cash flow reliability post-2020?

(16)       A.    **I don't need to consider these**

(17)   **factors because when you look at it, once**

(18)   **again, it's an intrinsic valuation**

(19)   **irrespective of what the market and the**

(20)   **outside factors are.**

(21)           **Just looking at the intrinsic**

(22)   **value of the company based upon the**

(23)   **historical financials forecasted forward.**

(24)       Q.    Okay.  So would a hypothetical

(25)   buyer in a private market apply a discount

(1)                          **QUAN VU**

(2)    **you value the company.  If you're hired by**

(3)    **a valuation expert to look at your company**

(4)    **and what it can potentially sell for in the**

(5)    **market, that is a vary clear and objective**

(6)    **evaluation methodology that, oh, okay, this**

(7)    **is what a potential buyer could buy it for.**

(8)    **This is what you could sell it for.**

(9)        Q.    But would a willing buyer in an

(10)   arm's length transaction realistically pay

(11)   the value you concluded in the --

(12)       **A.    Absolutely.**

(13)       Q.    And what due diligence would a

(14)   hypothetical buyer need to believe this

(15)   valuation is fair?

(16)       **A.    Almost everything -- everything**

(17)   **that I've done provide in that report.**

(18)   **They would do exactly the same.**

(19)       Q.    So another valuation

(20)   professional would replicate your work

(21)   based solely on your report?

(22)       **A.    Yes, they could easily**

(23)   **replicate that and they would publicly come**

(24)   **to the same conclusion based upon the**

(25)   **information that was given to me.**

(1)                    **QUAN VU**

(2)        Q.    Do you have an understanding of

(3)    where Fusion gets its business from?

(4)        **A.    I do not know the business**

(5)    **model.**

(6)        Q.    And is there any concentration

(7)    of risk with most sales coming from one or

(8)    two clients?

(9)        **A.    That is a risk that any company**

(10)   **would face, yes.**

(11)       Q.    Why did you use past operations

(12)   of Fusion for the future?

(13)       **A.    That is a standard methodology**

(14)   **for the discounted cash flow.**

(15)       Q.    And Fusion has been around for

(16)   many years, what made you assume that those

(17)   years of operation were not suitable to be

(18)   used for value?

(19)       **A.    Those are the numbers that I**

(20)   **got from 2013 to 2019 and I believe a part**

(21)   **of 2020.  So I am using all the information**

(22)   **at my disposal.**

(23)       Q.    And how did you determine the

(24)   Fusion was running efficiently?

(25)       **A.    You look at some of these**

(1)                          QUAN VU

(2)    operating expenses and then you start to

(3)    question wait, these are not typical of

(4)    companies that are run efficiently.  Having

(5)    that many valuation exercises you can

(6)    pretty much assume that a lot of businesses

(7)    or all businesses are run around, roughly,

(8)    25 to 30 percent.

(9)                     If you look at all the

(10)   potential market data which I've done all

(11)   my life is that you can efficiently

(12)   eliminate in almost all acquisition there's

(13)   an acquisition context where inefficiencies

(14)   show a company can run in the same manner

(15)   with cost cutting of, roughly, around 30

(16)   percent every single time.

(17)        Q.    Yes, but unfortunately this is

(18)   not an acquisition matter.

(19)        A.    I know that.

(20)        Q.    And under case law the standard

(21)   value is fair market value.

(22)             MR. LEHMAN:  Maria, are you

(23)        really testifying now under case law.

(24)        What case law are you referring --

(25)             MS. PATELIS:  No, I'm asking

```
(1)                        QUAN VU

(2)           and just telling him as an expert --

(3)                MR. LEHMAN:  You're telling

(4)           him?  I asked you before, please do

(5)           not educate the expert.  That's not

(6)           what's supposed to happen here.

(7)           You're literally saying under case

(8)           law to a witness who is testifying.

(9)      Q.    Have you ever published a

(10)  peer-reviewed work on DCF analysis?

(11)      A.    No.

(12)      Q.    Is the method you ever

(13)  recognized by professional valuation

(14)  standards ACA, NA, CVA?

(15)      A.    Yes.

(16)      Q.    Did you test the sensitivity of

(17)  your DCF to key assumptions?

(18)      A.    Yes.

(19)      Q.    So, you tested growth rate and

(20)  discount rate?

(21)      A.    Yes, that's why you have two

(22)  methods of the DCF right there.  You have

(23)  the DCF using the terminal value of EBITDA

(24)  multiples.  You have the DCF running into

(25)  perpetuity with the terminal value and you
```

```
(1)                    QUAN VU
(2)   double checked against those two as long as
(3)   they're within range, they're reasonable
(4)   checks against one another.
(5)        Q.    Now, who directed you to use
(6)   the DCF model in this case?
(7)        A.    No one.
(8)        Q.    Did you assess what -- again,
(9)   I'm just asking a question that you already
(10)  answered that -- in your calculations, did
(11)  you include market based inputs?
(12)       A.    Only Wilhelmina.
(13)       Q.    That's it?
(14)       A.    That's it.
(15)       Q.    Did you apply marketability or
(16)  minority interest discounts?
(17)       A.    No.
(18)       Q.    Would a hypothetical buyer
(19)  consider the risk factors you omitted?
(20)       A.    Yes.
(21)       Q.    Were your cash flow projections
(22)  provided by the party that retains you?
(23)       A.    No.
(24)       Q.    Where did you -- how did you
(25)  receive them?
```

(1)                    QUAN VU

(2)      **A.    I don't have a cash flow**

(3) **projection.  I created the cash flow**

(4) **protection based upon the historical**

(5) **numbers that I got from the company.**

(6)      Q.    Did you conduct any independent

(7) verification on those projections?

(8)      **A.    I don't have access to the**

(9) **company's complete financials to do**

(10) **verification.  I just take what the P&Ls**

(11) **that were sent over and the other financial**

(12) **statements that companied that.**

(13)      Q.    If you did not speak to anyone

(14) managing Fusion's operations, how did you

(15) determine that the past income was

(16) unreliable?

(17)      **A.    You look at the discrepancies.**

(18) **Why are the numbers different from year to**

(19) **year, right, and then overlap.  So when you**

(20) **look at some of those things, you can see**

(21) **there are differences that's why there are**

(22) **discrepancies and there's no way for me**

(23) **personally to evaluate why there are**

(24) **discrepancies.**

(25)      Q.    And on what basis did you

[Page 68]
June 4, 2025

(1)                    QUAN VU

(2)     conclude the company was liquid?

(3)         **A.    Based upon the historic and its**

(4)     **growth rate, right, this is a but-for**

(5)     **analysis.  But-for the liquidation itself**

(6)     **if the company was run efficiently it would**

(7)     **be fine.**

(8)         Q.    And did you review Fusion's

(9)     2019 and 2020 balance sheets, before

(10)    reaching that conclusion?

(11)        **A.    Yes.**

(12)        Q.    And are you aware that Fusion

(13)    incurs high model related overhead

(14)    including rent, travel and meals?

(15)        **A.    Yes.**

(16)        Q.    Would you agree that gross

(17)    profit, not net, is the more useful metric

(18)    for service business like model agencies?

(19)        **A.    Depends on how you define**

(20)    **growth and net.**

(21)        Q.    Would you agree that the value

(22)    of the service mark depends on the success

(23)    of the associated business?

(24)        **A.    Yes.**

(25)        Q.    Isn't the value of the service

(1)                    QUAN VU

(2)  mark determined by income?

(3)       **A.    Yes and no, right.  Depending**

(4)  **on the circumstances.  Depending upon the**

(5)  **year.  Depending upon many different**

(6)  **factors, but generally speaking the market**

(7)  **in and of itself have value and how does it**

(8)  **have value it's obviously going to be very**

(9)  **tied to the contract of the models that**

(10) **come on, right.**

(11)           **And what attracts it, I mean,**

(12) **it's almost like Pepsi and Coke, so to**

(13) **speak.**

(14)      Q.    Right, but we're talking about

(15) Fusion, not Pepsi.

(16)      **A.    I'm just giving you an example.**

(17)      Q.    So, if there's -- if you don't

(18) know what contract they had, you wouldn't

(19) be able to determine the income of the

(20) service mark?

(21)      **A.    Well, I wouldn't be able to do**

(22) **that, so the only measure that I have is**

(23) **essentially, once again, just the P&Ls that**

(24) **Fusion has provided to me.**

(25)      Q.    And what evidence do you have

```
(1)                    QUAN VU
(2)   that a larger company would buy them?
(3)        A.    I don't have the evidence.  I
(4)   mean, that calls for speculation.
(5)        Q.    Well, it's in your report
(6)   that's why I'm referencing it.
(7)        A.    Yes, I mean, that is in the
(8)   potential of any smaller company being
(9)   acquired by a big one what is the value
(10)  going to be.
(11)       Q.    And what basis do you have that
(12)  a larger company that will acquire Fusion,
(13)  would expect to achieve in 85, 95 percent
(14)  reduction in operating expenses?
(15)       A.    Those are assumptions based
(16)  upon the size of a company.  So like I said
(17)  before, if a company is big enough and it
(18)  has redundancies that's what you could
(19)  eliminate, but that's not what I'm assuming
(20)  in my model and valuation.  My model and
(21)  valuation assumes 25 percent.
(22)       Q.    Right, but we're talking about
(23)  Fusion not in general, I just want to --
(24)       A.    Yes, 25 to 30 percent is in
(25)  general as well.  If you look at any kind
```

(1)                      **QUAN VU**

(2)    **of acquisition context by a strategic**

(3)    **buyer, not a finance buyer, if it's**

(4)    **acquired by a private equity or you know,**

(5)    **but they, too, can eliminate.**

(6)              **But most strategic buyers, not**

(7)    **all of them, find synergy associated with**

(8)    **operating expenses and eliminating**

(9)    **redundancies.  You don't need accounting,**

(10)   **you don't need HR.  You don't need a lot of**

(11)   **other functions because it's already**

(12)   **embedded within the acquiring entity.**

(13)       Q.    I mean, what qualifies you to

(14)   assume which cost should be reduced?

(15)       **A.    Because I've done this my**

(16)   **entire 25 years of valuation.**

(17)       Q.    I understand that, but what did

(18)   you do for Fusion though?

(19)       **A.    I'm applying the same**

(20)   **methodology.  I'm applying the same**

(21)   **assumptions that I've used in selling**

(22)   **multi-billion dollars business, right, at**

(23)   **the investment bank.  These are accepted**

(24)   **standards in all fair valuation investment**

(25)   **banks employ.**

(1)                    **QUAN VU**

(2)        Q.    Did you interview the owner or

(3)    gain an understanding of the operation to

(4)    assume what costs should -- you think

(5)    should be reduced?

(6)        **A.    I do not have access to such**

(7)    **individuals.**

(8)        Q.    Okay.

(9)            Under what assumption -- how do

(10)   you know what the larger company has in

(11)   terms of infrastructure or not as it is

(12)   again just based upon your expectations and

(13)   your assumptions?

(14)       **A.    Based upon --**

(15)           **MR. LEHMAN:  Objection, asked**

(16)       **-- Quan, wait a second.  It has been**

(17)       **asked and answered and we know this**

(18)       **because in your question you said**

(19)       **again.  So can we just please stop**

(20)       **berating this.**

(21)           **MS. PATELIS:  Can you just**

(22)       **repeat my last question, Jamie, and**

(23)       **have him answer it.**

(24)           **(Whereupon, the referred to**

(25)       **question was read back by the**

```
(1)                    QUAN VU

(2)        Reporter.)

(3)        A.    I do not know exactly what a

(4)   large company would have, but in general,

(5)   you know, if you assume a strategic acquire

(6)   that's usually the average of what they

(7)   will get in terms of synergy.

(8)              Obvious that's dependent.  You

(9)   can argue the bigger they are, the more

(10)  likely that's the case.  The smaller they

(11)  are, the less likely --

(12)       Q.    But we're focusing on a model

(13)  of Fusion, right?

(14)       A.    I know, I get it.

(15)       Q.    If the business is acquired by

(16)  a larger --

(17)            MR. LEHMAN:  Ms. Patelis, you

(18)       just interrupted him, so please let

(19)       him finish.

(20)       A.    So yeah, if you're in the

(21)  modeling agency.  If let's say, for

(22)  example, this is acquired by the elite

(23)  modeling agency or for modeling agency all

(24)  these things will be redundant and yes,

(25)  they could achieve significant, significant
```

```
(1)                    QUAN VU

(2)   operational expense savings.

(3)        Q.    I understand that, but again,

(4)   this company is dissolved so we're trying

(5)   --

(6)        A.    You're just kind of, again,

(7)   Maria, you're kind of beating a dead horse.

(8)        Q.    Right.

(9)        A.    You know, this is not an

(10)  analysis based upon liquidation, it's based

(11)  upon the but-for liquidation.

(12)       Q.    But if you did a liquidation

(13)  analysis, what would the valuation be?

(14)       A.    I don't know, I didn't do that

(15)  that's a hypothetical question.  I would

(16)  need to look at the capital structure, what

(17)  its debts are, what are the various things

(18)  and so on and so forth in order to

(19)  determine that and I don't have that.

(20)       Q.    And how did you determine a

(21)  Fusion pays expenses for the personal

(22)  benefit of the member if you didn't

(23)  interview her?

(24)       A.    I looked at what's in the the

(25)  financials.
```

(1)                    **QUAN VU**

(2)        Q.    And what did you determine the

(3)   expenses were for?

(4)        **A.    I do not recall from the top of**

(5)   **my head.**

(6)        Q.    Well, the report's right there.

(7)   I mean, it's listed --

(8)        **A.    Which section of the report are**

(9)   **we referring to?**

(10)       Q.    Well, with the section you said

(11)  the expenses that pay for the models that

(12)  they have, what were the expenses, what did

(13)  you ask?

(14)       **A.    I didn't ask anybody, right.    I**

(15)  **don't have access to any particular**

(16)  **individuals to ask which is what I said**

(17)  **before.**

(18)       Q.    Okay, moving on.

(19)            How did you know that a larger

(20)  company will lead to higher client

(21)  compliance and quicker payment resolution?

(22)       **A.    Because when you look at larger**

(23)  **companies they have various accounting**

(24)  **systems with respect to accounts**

(25)  **receivables, accounts payable and so they**

(1)                        **QUAN VU**

(2)    **can have -- they have the infrastructure in**

(3)    **place to pretty enforce all of that.  Much**

(4)    **easier and much faster than a typical**

(5)    **smaller company.**

(6)         Q.    But what are these assumptions

(7)    based upon?

(8)         **A.    They're based upon just any**

(9)    **established company.  I mean, that's what**

(10)   **-- an established company with a build up**

(11)   **of an infrastructure would have as the**

(12)   **company grows you have much more mature**

(13)   **departments with individuals that**

(14)   **specialize in these various areas.**

(15)        Q.    Right.  But I'm asking you to

(16)   testify with respect to a report that you

(17)   prepared.  So I'm just asking, like, are

(18)   you aware that the model agency doesn't

(19)   offer services to their models, that they

(20)   will sign --

(21)             **MR. LEHMAN:  Objection, you're**

(22)        **testifying now that makes you a**

(23)        **witness.  You're literally telling**

(24)        **the expert what other people will do**

(25)        **that makes you a witness.**

```
(1)                    QUAN VU
(2)        report though.
(3)              MS. PATELIS:  Brian --
(4)              MR. LEHMAN:  Please, as an
(5)        attorney -- no, I can't do what I'm
(6)        supposed to do if you're not showing
(7)        me in the report where you're
(8)        referring to.  Where are you
(9)        referring to?
(10)             MS. PATELIS:  He just testified
(11)       that Wilhelmina was the only comp
(12)       that he used or are you not
(13)       listening?
(14)             MR. LEHMAN:  Can you please
(15)       tell me where in the report?
(16)             MS. PATELIS:  No.
(17)       Q.    Mr. Vu, can you tell me how
(18)   Wilhelmina was comparable?
(19)       A.    Yes, I --
(20)             MR. LEHMAN:  Asked and
(21)        answered.
(22)       Q.    So, go on?
(23)       A.    As I said before they are in
(24)   the modeling business.  They have models,
(25)   they do very similar lines of business.
```

(1)                    QUAN VU

(2)      **A.     That is essentially what's**

(3)   **discounted anywhere between 13 and**

(4)   **17 percent taking the 15 percent discount,**

(5)   **yes.**

(6)      Q.     And what projection did you use

(7)   for future cash flows?

(8)      **A.     I don't have projections.  Once**

(9)   **again, this has already been answer.  It is**

(10)  **using the historical numbers to forecast**

(11)  **going forward.**

(12)             **I do not have access for**

(13)  **anything from the company with regard to --**

(14)  **with respect to any forecast, any kind of**

(15)  **assumptions that go into those forecasts so**

(16)  **on and so forth.**

(17)     Q.     And how did you calculate the

(18)  terminal value?

(19)     **A.     I covered it on two levels.**

(20)  **The terminal value is calculated on an**

(21)  **EBITDA multiple based upon the Wilhelmina**

(22)  **multiple.  The other one is based upon the**

(23)  **growth rate of the company and the mean**

(24)  **average -- the average which is the growth**

(25)  **into perpetuity of 6.73 percent.**

(1)                    **QUAN VU**

(2)      Q.    So it wasn't the Gordon growth

(3)  model then?

(4)      **A.    I don't know what the Gordon**

(5)  **growth model is.**

(6)      Q.    You don't know, okay.

(7)          MR. LEHMAN:  Maria, what is the

(8)      Gordon growth model?  Maria, what is

(9)      the Gordon growth model?

(10)          MS. PATELIS:  When you put me

(11)      on for a deposition and you pay for

(12)      it, you can ask me.

(13)      Q.    Did you reconcile your DCF

(14)  results with other valuation methods?

(15)      **A.    There's -- you cannot value.**

(16)  **This is the best method that's available to**

(17)  **me based upon the information I've got.  I**

(18)  **have assessed it against two other**

(19)  **multiples, right.**

(20)          **The publicly traded comps which**

(21)  **there is one and the present transaction**

(22)  **which there's no information available for**

(23)  **any kind of modeling, it's acquiring others**

(24)  **and they're usually private and so, of the**

(25)  **three methodologies, the DCF is the best**

[Page 86]
June 4, 2025

(1)                          **QUAN VU**

(2)    **one available.**

(3)          Q.    Right, but wouldn't you agree

(4)    that the DCF's model reliability depends

(5)    heavily on the validity of its input?

(6)          **A.    Of course, as with any model.**

(7)          Q.    Right.  So, if your cash flows

(8)    or discount rate are inconsistent, doesn't

(9)    that skew the result?

(10)          **A.    Of course, but my discount**

(11)    **rates a very justified based upon what the**

(12)    **market is, what the inflationary rate is**

(13)    **and what is generally speaking the risks**

(14)    **associates with small companies.**

(15)          Q.    Right, but I'm talking

(16)    specifically about this report, not in

(17)    general?

(18)          **A.    Right.  So you take it with**

(19)    **it's level of specificity, but no one knows**

(20)    **with any level of specificity exactly what**

(21)    **the discount rate will be.  Even if you ask**

(22)    **somebody sitting at the company, for**

(23)    **example, how would he or she know what is**

(24)    **the true absolute discount rate because**

(25)    **there's not enough publicly available**

<div align="center">QUAN VU</div>

(1)

(2) **information out there to come to that level**

(3) **of precision hence the range.**

(4)     Q.    Right, but do you agree that

(5) buyers in an open market will perform due

(6) diligence on these projections?

(7)     **A.    Of course they would, but I**

(8) **don't have access to do the due diligence**

(9) **beyond what is given to me.**

(10)     Q.    So, if this business was listed

(11) for sale would a buyer pay your value?

(12)     **A.    Absolutely.  If they run the**

(13) **analysis, if they run the discounted cash**

(14) **flow and they forecast appropriately, yes,**

(15) **they would come to the same conclusion.**

(16)     Q.    Did you consult with legal

(17) counsel before selecting your valuation

(18) standard?

(19)     **A.    Once again, you have asked me**

(20) **that before.  The answer is no.**

(21)     Q.    Would you agree that using a

(22) fair market value provides an objective

(23) arm's length basis for valuation?

(24)     **A.    Once again, you've asked me**

(25) **that before.**

(1)                    **QUAN VU**

(2)        Q.    It's a yes or no?

(3)        **A.    Yes, and the discounted cash**

(4)  **flow as well as all the other methodologies**

(5)  **here are assessments of fair market value.**

(6)              **The question is really upon at**

(7)  **what stage are we doing this kind of**

(8)  **analysis and what's appropriate for the**

(9)  **company and the type of company that's**

(10) **being run.**

(11)             **This particular instance with**

(12) **Fusion and given it's historical data the**

(13) **obvious method for valuation here is the**

(14) **discounted cash flow.**

(15)       Q.    Now, can you explain the legal

(16) authority that permits you to use intrinsic

(17) value --

(18)             **MR. LEHMAN:  No. No.**

(19)             **MS. PATELIS:  No?**

(20)             **MR. LEHMAN:  Yes, absolutely.**

(21)         **The expert witness is not going to**

(22)         **give the legal authority for**

(23)         **anything.**

(24)             **MS. PATELIS:  Well, if the**

(25)             **attorney doesn't, then the expert**

(1)                    **QUAN VU**

(2)    **only pretty much selected.  It is basically**

(3)    **party of my daily job for the last**

(4)    **25 years.**

(5)         Q.    So, just to clarify, doing

(6)    valuations is part of your daily job for

(7)    the last 25 years?

(8)         **A.    Yes, both from the service's**

(9)    **side of the business investment banking**

(10)   **providing advisory work and valuation for**

(11)   **various companies of the investment banking**

(12)   **and from a corporate side in-house**

(13)   **valuation of potential acquisitions,**

(14)   **licensing, collaborations, joint ventures,**

(15)   **you name it, all based upon the varies**

(16)   **methodologies that I have with a heavy**

(17)   **reliance upon the DCF because of its**

(18)   **intrinsic value and you know, how a company**

(19)   **would look at it for the most part, but one**

(20)   **of three methodologies.**

(21)        Q.    I'm going to skip around a

(22)   little bit.

(23)             I believe at one point you

(24)   testified you didn't know the business

(25)   models, does it matter from a valuation

(1)                    QUAN VU

(2)   perspective if you know the business model?

(3)        **A.    If you understand the business**

(4)   **model, yeah, it can provide some input, but**

(5)   **for the most part from this particular**

(6)   **context because there's no publicly --**

(7)   **let's say, for example I look at a business**

(8)   **model and I look at the performance of the**

(9)   **business model, well, to what extent and**

(10)  **how well I know it's being run is also the**

(11)  **way in which I would compare it against**

(12)  **peers.**

(13)         **But there are no peer's**

(14)  **information, there's only Wilhelmina so I**

(15)  **have to rely on the intrinsic information**

(16)  **that is given to me.**

(17)       Q.    Do you only value public

(18)  companies or do you valuate private

(19)  companies?

(20)       **A.    I valuated private companies**

(21)  **plenty.**

(22)       Q.    How do you valuate private

(23)  companies if they're --

(24)            (Cross-talk.)

(25)            **MR. LEHMAN:  I'm asking him --**

(1)                        QUAN VU

(2)        if you want to put down your

(3)        objection you can say outside the

(4)        scope and you can raise it with the

(5)        Judge, I'm going to ask the question.

(6)        You want to put down your objection

(7)        or are you done talking.

(8)            MS. PATELIS:  I finished my

(9)        deposition.  So I am instructing the

(10)       Reporter since it's my deposition --

(11)           MR. LEHMAN:  Maria, let me ask

(12)       the question.

(13)       Q.    Quan, how do you value private

(14)   companies if there's not publicly traded

(15)   companies available?

(16)           MS. PATELIS:  Objection.

(17)       A.    The intrinsic valuation of the

(18)   company based upon the DCF.

(19)       Q.    Why does that work?

(20)       A.    It works because it has numbers

(21)   and that's the only thing we can work from.

(22)   It has historical numbers and the

(23)   historical numbers allow the DCF to

(24)   actually because it's the cash flow forward

(25)   looking, it allows us to project forward,

(1)                    **QUAN VU**

(2)    **discount backward to get the value that the**

(3)    **company is worth.**

(4)            **Those are the only numbers and**

(5)    **the only information available to us to run**

(6)    **valuations.**

(7)        Q.    Would you agree that it's basic

(8)    economics that any company would buy

(9)    another company if they could get more

(10)   value for less money?

(11)           **MS. PATELIS:  Objection,**

(12)        **relevance.  Fusion was dissolved at**

(13)        **the time this lawsuit began.**

(14)       Q.    Quan, you can answer the

(15)   question?

(16)       **A.    Absolutely.**

(17)           **MR. LEHMAN:  I don't have any**

(18)        **other questions.  All right, Maria,**

(19)        **are you going to send me the**

(20)        **transcript from the other -- Jamie,**

(21)        **can you just note that she logged**

(22)        **off.  Counsel for Defendant's logged**

(23)        **off.**

(24)

(25)

(1)                 (Whereupon, at 12:58 P.M., the

(2)         Examination of this witness was concluded.)

(3)                     QUAN VU

(4)

(5)

(6)

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

# EXHIBIT 7

Excerpts of Operating Agreement of Fusion Modeling
Agency LLC ("Fusion").

Case 23-23-02376-ASBJKE Document 17 Filed 03/28/23/1725e 3 Page 180 of 211
PageID #09170-00000

**OPERATING AGREEMENT**
**OF**
**FUSION MODELING AGENCY LLC**

*THESE UNITS HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER ANY FEDERAL OR STATE SECURITIES LAWS. THESE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFER AND MAY NOT BE TRANSFERRED EXCEPT AS PERMITTED UNDER FEDERAL AND STATE SECURITIES LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.*

# TABLE OF CONTENTS

ARTICLE I GENERAL PROVISIONS ...................................................................... 1

    1.1    *Formation* ........................................................................................ 1
    1.2    *Name*............................................................................................... 1
    1.3    *Principal Office.* .......................................................................... 1
    1.4    *Term*................................................................................................ 1
    1.5    *Registered Office and Registered Agent.* ................................. 1
    1.6    *Business of the Company.* ........................................................... 1
    1.7    *Partnership Classification.* ........................................................ 2

ARTICLE II CAPITAL CONTRIBUTIONS; UNITS; LOANS ................................... 2

    2.1    *Initial Contributions; Units.* ...................................................... 2
    2.2    *Capital Contributions* ................................................................ 2
    2.3    *Loans by Members.* ...................................................................... 3

ARTICLE III CAPITAL ACCOUNTS, DISTRIBUTIONS AND ALLOCATIONS ................ 3

    3.1    *Capital Accounts.* ........................................................................ 3
    3.2    *Distributions* ............................................................................... 4
    3.3    *Allocations* ................................................................................... 4
    3.4    *Book-Up of Company Assets.* ..................................................... 5

ARTICLE IV MEMBERS .......................................................................................... 5

    4.1    *Limited Liability and Indemnification.* ..................................... 5
    4.2    *Admission of Additional Members.* ........................................... 6
    4.3    *Voluntary Partial Withdrawals.* ................................................ 6
    4.4    *Removal and Buyout* ................................................................... 6
    4.5    *Competing Activities* ................................................................... 6
    4.6    *Confidentiality* ............................................................................ 6

ARTICLE V MANAGEMENT AND CONTROL OF THE COMPANY ......................... 7

    5.1    *General Authority and Power of Managing Members* ............... 7
    5.2    *Limitations on Power of Managing Members* ........................... 8
    5.3    *Time and Services; Fees; Reimbursements.* ............................... 9
    5.4    *Appointment of Managing Members.* ........................................ 9
    5.5    *Officers* ......................................................................................... 9
    5.6    *Investment Committee* ................................................................ 10
    5.7    *Meetings of Members; Approvals* .............................................. 10
    5.8    *Members Have No Managerial Authority* .................................. 10
    5.9    *Liability and Indemnification of Managing Members* .............. 10

ARTICLE VI BOOKS AND RECORDS; ACCOUNTING; TAX ELECTIONS .................................... 11

| 6.1 | Books and Records ................................................................. 11 |
| 6.2 | Inspection of Records ............................................................. 11 |
| 6.3 | Reports ................................................................................ 11 |
| 6.4 | Tax Returns and Elections ....................................................... 12 |
| 6.5 | Tax Matters Partner .............................................................. 12 |
| 6.6 | Withholding and Tax Advances ................................................. 12 |
| 6.7 | Bank Accounts ...................................................................... 12 |

ARTICLE VII TRANSFERS OF INTERESTS; REPURCHASE OPTIONS .............................. 13

| 7.1 | Conditions to Transfer ........................................................... 13 |
| 7.2 | Rights of Transferee .............................................................. 13 |
| 7.3 | Substitute Member ................................................................ 13 |
| 7.4 | Effective Date of Transfer ....................................................... 13 |
| 7.5 | Effect of Violation ................................................................. 14 |
| 7.6 | Redemptions ......................................................................... 14 |
| 7.7 | Divorce ............................................................................... 14 |

ARTICLE VIII DISSOLUTION ..................................................................................... 14

| 8.1 | Dissolution ........................................................................... 14 |
| 8.2 | Winding Up .......................................................................... 14 |
| 8.3 | Timing of Liquidating Distributions .......................................... 15 |
| 8.4 | Continuation of Company ....................................................... 15 |
| 8.5 | Return of Contribution Nonrecourse to Other Members ................. 15 |

ARTICLE IX MISCELLANEOUS PROVISIONS ................................................................ 15

| 9.1 | Representations ..................................................................... 15 |
| 9.2 | Arbitration ........................................................................... 16 |
| 9.3 | Counterparts ........................................................................ 16 |
| 9.4 | Successors and Assigns ........................................................... 16 |
| 9.5 | Notices ................................................................................ 16 |
| 9.6 | Amendments ......................................................................... 16 |
| 9.7 | No Third Party Beneficiaries .................................................... 16 |
| 9.8 | Severability .......................................................................... 16 |
| 9.9 | Complete Agreement .............................................................. 17 |
| 9.10 | Governing Law ...................................................................... 17 |
| 9.11 | Legal Fees ............................................................................ 17 |
| 9.12 | Gender, Number and Headings .................................................. 17 |
| 9.13 | Cross-References ................................................................... 17 |
| 9.14 | Covenant to Sign Documents .................................................... 17 |
| 9.15 | Cumulative Remedies ............................................................. 17 |

ARTICLE X DEFINITIONS .......................................................................................... 18

PageID #00920-00000

## OPERATING AGREEMENT
## OF
## FUSION MODELING AGENCY LLC

This Operating Agreement (this "*Agreement*") of Fusion Modeling Agency LLC, a New York limited liability company (the "*Company*"), is entered into by and among Jodie Gordon, Kevin Pollack, Charles Hall, Benjamin P. Chui, Nathan Ankney, and Paragon Strategic Group, Inc. ("*Paragon*"), a Nevada corporation, (the "*Initial Members*") effective as of this seventh day of December 2006.

## BACKGROUND

A. The Company was formed by filing Articles of Organization (the "*Articles*") with the New York Secretary of State in December 2006.

B. The Managing Members (as defined below) are authorized to make such other filings, applications and certifications, and to take such other actions, as they deem necessary or appropriate for the Company to conduct business.

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I
## GENERAL PROVISIONS

1.1 *Formation*. Pursuant to the New York Limited Liability Company Law (the "*Law*"), the Company has been formed as a limited liability company under the laws of the State of New York.

1.2 *Name*. The name of the Company will be "Fusion Modeling Agency LLC," or such other name as the Managing Members may from time to time determine. Prompt Notice of any change in the name of the Company will be given to all Members.

1.3 *Principal Office*. The Company's principal office will be located at 601 West 26 Street, Suite 1737 New York, New York 10001, or such other place as the Managing Members may determine. Prompt Notice of any change in the location of the principal office will be given to all Members.

1.4 *Term*. The term of the Company will begin on the date the Articles are filed with the New York Secretary of State, and will be perpetual until the Company is dissolved and its affairs wound up in accordance with the Law or this Agreement.

1.5 *Registered Office and Registered Agent*. The Company will continuously maintain within the State of New York (i) a registered agent for service of process on the Company, which initially will be the person designated in the Articles, and (ii) a registered office which need not be a place of business, which initially will be at the location stated in the Articles.

1.6 *Business of the Company*. The Company has been organized to engage in the following business:

      1.6.1     Operating a modeling agency;

      1.6.2     Engaging in such other activities directly or indirectly related to the foregoing as may be necessary or advisable in the opinion of the Managing Members to further any aspect of the Company's business; and

      1.6.3     Engaging in any lawful business for which limited liability companies may be organized under the Law.

      1.7    *Partnership Classification.* It is the intention of the parties hereto that the Company be treated as a partnership for federal and state income tax purposes. The Company will not elect to be treated as a corporation under section 301.7701-3(c) (or any corresponding applicable provisions of foreign, state or local law).

## ARTICLE II
## CAPITAL CONTRIBUTIONS; UNITS; LOANS

      2.1    *Initial Contributions: Units.*

      2.1.1     *Units.* The Company will initially have 99 Units with ownership rights and economic rights as set forth herein.

      2.1.2     *Additional Members.* Additional members may be admitted to the Company upon unanimous action by the Members.

      2.1.3     *Additional Units.* The Managing Members may issue additional Units as determined by unanimous consent by the Members.

      2.2    *Capital Contributions.* The Initial Members have contributed the amounts set forth on **Schedule A,** to the Company's capital upon its formation ("*Initial Capital Contributions*") as they deem necessary to carry out the Company's business. Such Initial Capital Contributions will be used to fund working capital needs. No Initial Member will be required to make any additional contribution to the Company. If the Company needs additional funds for any reason, the Members may, but will not be required to, make additional Capital Contributions to the Company in such amounts and on such terms as may be deemed appropriate by the Members. Capital Contributions from Members shall be recorded in the Company's books and records. Capital Contributions will be made as follows:

      2.2.1     Fusion Model Management, Inc. ("*Fusion Inc.*") will contribute its assets to Fusion LLC and receive 99 ownership units. Fusion Inc. will sell 33 of its ownership units ("Units") to Hall, Chui, Ankney and Paragon ("*Investors*") for $130,000 such that Investors own one-third of the total outstanding Units of Fusion LLC and the remaining 66 Units will be evenly distributed by Fusion Inc., to Jodie Gordon and Kevin Pollack. Following the payments as set forth in Section 2.2.6, the business of Fusion Inc. will be wound up, and Fusion Inc. will be dissolved and terminated.

      2.2.2     Fusion Inc. will distribute a liquidating dividend of $130,000 to Kevin Pollack ("Pollack") and Jodie Gordon ("Gordon") as follows: $50,000 to Gordon and $80,000 to Pollack and such liquidating dividend will be paid out pursuant to Section 7 below.

      2.2.3     Gordon will receive the first $5,000 of profit of Fusion LLC for fiscal year 2006, such fiscal year ending on December 31, 2006, before any profit sharing takes place. Gordon will

receive the first $55,000 of profit for fiscal year 2007, ending on December 31, 2007, before any profit sharing takes place. Should Fusion LLC not have $5,000 of profit for fiscal year 2006 or $55,000 for fiscal year 2007, Investors will contribute an amount equivalent to the difference between the profit actually achieved and the caps of $5,000 and $55,000 for each respective year. One-half of the $55,000 for year 2007 will be paid semi-annually on June 30 and December 31 of each such fiscal year as set forth above. Should Gordon be entitled receive an amount from profit-sharing in excess of the $5,000 cap for 2006 or the $55,000 cap for 2007 due to the semi-annual payments, such amounts equivalent to Gordon's profit-sharing, up to a maximum of the cap, must be repaid to the Investors at the end of the applicable fiscal year. After fiscal year 2007, Gordon's salary will be determined by the Board of Managing Members.

        2.2.4     Pollack agrees to retire and terminate any and all debt owed to him by Fusion Inc. or its successor Fusion LLC, or anyone for whom he has invested in Fusion Inc., or represents with respect to debt owed by Fusion Inc., in return for the $80,000 liquidating dividend and the distribution of 33 Units of Fusion LLC.

        2.2.5     Investors will contribute $150,000 to Fusion LLC as working capital. The total dollar amount to be invested by Investors is $280,000 (the "Investment"). This amount of $280,000 includes the amount set forth in this **Section 2.2.5** and the amount set forth in **Section 2.2.2** above.

        2.2.6     Investors will make the Investment in four (4) quarterly installments. The first installment shall be paid in the amount of $77,500 of which $37,500 will be held by Fusion LLC as working capital and $40,000 will be paid to Fusion Inc., in partial satisfaction of **Sections 2.2.2, 2.2.3, and 2.2.4** and which will be paid out by Fusion Inc., as a liquidating dividend. The last three (3) of the four (4) quarterly installments shall be paid in the amount of $67,500 of which $37,500 will be held by Fusion LLC as working capital and $30,000 will be paid to Fusion Inc., in full satisfaction of **Sections 2.2.2, 2.2.3, and 2.2.4** and which will be paid out by Fusion Inc., as a liquidating dividend. Payments made by Investors shall be allocated as follows: $20,000 of the first installment to Gordon and $20,000 to Pollack, and thereafter, the next three (3) installments shall be paid as follows: $10,000 each quarter to Gordon and $20,000 each quarter to Pollack. The Investment's quarterly payments will be made at such times as follows: the first quarterly payment upon formation of Fusion LLC and the signing of the Operating Agreement for the LLC, January 1, 2007, April 1, 2007, and July 1, 2007. Upon the receipt of the final payment of the Investment on July 1, 2007, Fusion Inc.'s affairs will be wound up and Fusion Inc., will be dissolved.

        2.3    *Loans by Members*. No Member will be required to lend funds to the Company. However, upon the unanimous approval of the Members, Members may make such loans. Any such loan will not be considered a Capital Contribution but will be a debt due from the Company to the lending Member(s) and will be made upon such terms and conditions and bearing interest at such rates as may be approved by the Members.

## ARTICLE III
## CAPITAL ACCOUNTS, DISTRIBUTIONS AND ALLOCATIONS

        3.1    *Capital Accounts*.

        3.1.1    *General*. A Capital Account will be maintained for each Member in accordance with Treasury Regulations Sections 1.704-1(b) and 1.704-2. Each Member's Capital Account generally will equal that Member's Capital Contributions (net of any liabilities assumed by the Company or taken

subject to), increased by allocations of Net Income, and reduced by distributions and by allocations of Net Loss.

        3.1.2    *Transfers.* If any Units in the Company are transferred in accordance with the terms of **Article VII** of this Agreement, the transferee will succeed to the Capital Account of the transferor to the extent it relates to the transferred Units.

    3.2    *Distributions.*

        3.2.1    *General.* Distributions require the unanimous approval of the Members. Except as provided in this **Section 3.2** or **Section 8.2** (upon liquidation), the Company will make distributions only at such times and in such amounts as the Members may unanimously determine from time to time.

        3.2.2    *Distributions In Kind.* If any assets of the Company are distributed in kind, such assets will be distributed on the basis of the fair market value thereof, as reasonably determined by the Company's auditors. All such distributions will be in the same proportion as if such distribution had been made in cash.

        3.2.3    *No Violations.* Notwithstanding anything in this Agreement to the contrary, the Company will not be obligated to, and will not, make any distribution that would (i) result in a violation of any law, rule, or regulation of any regulatory authority that has jurisdiction over the Company or its activities or (ii) render the Company insolvent.

    3.3    *Allocations.*

        3.3.1    *Allocation of Net Income and Loss.* After giving effect to the special allocations set forth in **Section 3.3.3**, Net Income or Net Loss for any period will be allocated among the Members in accordance with the percentage of Units owned by the respective Members as of the beginning of such period as set forth on **Schedule A** or as agreed to, in writing, by all of the Members.

        3.3.2    *Source.* The Managing Members, in consultation with the Company's accountant, will determine the source of each item of income, gain, loss, deduction, or credit, and will separately compute Net Income and Net Loss directly or indirectly attributable to each Member's Units. The Managing Members' determination of the source of any items of income, gain, loss, deduction, or credit, will be final and binding on all Members.

        3.3.3    *Special Allocations.*

        (a)    Notwithstanding the foregoing, no allocation of Net Income or Net Loss under **Section 3.3.1** will be made unless it would be considered, under the Regulations promulgated under Code Section 704(b) (the "*704(b) Regulations*"), either to have substantial economic effect, or to be in accordance with the percentage of Units owned by each Member in the Company. To the extent necessary to comply with the foregoing, in lieu of the allocations set forth in **Section 3.3.1**, the Managing Members may cause the Company's Net Income or Net Loss, or any items thereof, to be reallocated among the Members in such manner as the Managing Members may determine to be fair, appropriate and consistent with the provisions of the 704(b) Regulations, including without limitation the provisions of Regulations Section 1.704-2(f) (minimum gain chargeback), Section 1.704-2(i)(4) (member nonrecourse debt minimum gain chargeback), and Section 1.704-1(b)(2)(ii)(d) (qualified income offset), each of which is incorporated herein by reference.

(b)     Special allocations of Net Income (or items thereof) will be made to any Member if the Managing Members determine that such Member's Capital Account would otherwise have a deficit capital account balance that (in absolute value) exceeds the maximum deficit balance that would be permitted under the 704(b) Regulations.

(c)     If any allocations of Net Loss (or items thereof) would result in a deficit balance in a Member's Capital Account that would (in absolute value) exceed the maximum deficit balance that would be permitted under the 704(b) Regulations, some or all of such Net Loss (or items thereof) may be reallocated to any other Members whose Capital Accounts would not have such excess deficit balances (in proportion to their respective Units).

(d)     If any special allocations are made under **Sections 3.3.3(a)** or **(b)** (the "*Regulatory Allocations*"), the Managing Members may take such Regulatory Allocations into account in making subsequent allocations of Net Income or Net Loss, and may make such further special allocations as may be necessary or appropriate so as to prevent the Regulatory Allocations from distorting the manner in which Company distributions will be divided among the Members pursuant to this Agreement.

3.3.4     *Tax Allocations.*  For purposes of reporting each Member's share of federal, state and any applicable local income taxes, items of income, gain, loss, deduction and credit will be allocated in accordance with the provisions of Code Section 704(c) and the Regulations promulgated thereunder, so as to properly take into account any variation between the adjusted tax basis and the book value of Company assets, using any method that complies with Section 1.704-3 of the Regulations, as the Managing Members deem appropriate.

3.4     *Book-Up of Company Assets.*  The book value of all Company assets will be adjusted to equal their respective gross fair market values, as determined by the Managing Members, in consultation with the Company's accountant immediately preceding the occurrence of any of the following events: (i) the acquisition of additional Units in the Company by any new or existing member if the Managing Members determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members of the Company; (ii) the distribution by the Company of more than a *de minimus* amount of property as consideration for Units in the Company if the Managing Members determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members of the Company; and (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g) (which for this purpose will include the termination of the Company for federal income tax purposes pursuant to Code Section 708(b)(1)(B)).  In addition, the book value of any asset distributed by the Company to any Member will be adjusted to equal its gross fair market value immediately prior to such distribution.

## ARTICLE IV
## MEMBERS

4.1     *Limited Liability and Indemnification.*

4.1.1     Except as required under the Law, or as expressly set forth in this Agreement, or as agreed in writing by and between the Company and a Member, no Member will be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise.

4.1.2     To the maximum extent permitted by law, each Member will be indemnified and held harmless by the Company, to the extent of the Company's assets, from and against any and all

losses, claims, damages, liabilities (joint and/or several), expenses, judgments, fines, settlements, and other amounts arising from any and all claims (including reasonable legal fees and expenses, as those fees and expenses are incurred), demands, actions, suits, or proceedings (civil, criminal, administrative, or investigative), in which such person may be involved, as a party or otherwise, by reason of his or its membership in the Company.

4.2     *Admission of Additional Members.*  Additional Members may be admitted to the Company from time to time in accordance with **Section 2.1.2**, with participation in the Company on such terms as may be unanimously approved by the Members.

4.3     *Voluntary Partial Withdrawals.*  No Member may make a partial withdrawal from his Capital Account without the unanimous approval of the Members.

4.4     *Removal and Buyout.*  Members may not be removed by Members at any time.  No Member will be permitted to sell or transfer his or her Units until **three (3) years** after this Agreement has been executed.  Units may then be sold only upon the consent of a unanimous vote of Units and each Member shall have the first right of refusal to purchase such Units on a pro rata basis and each Member has the right to participate in any arranged sale of Units on a pro rata basis.

4.5     *Competing Activities.*  Except as otherwise provided in this **Section 4.5, Section 5.3.1** or elsewhere in this Agreement (or in any written agreement that may be entered into by the Company with any Member), the Members and their Affiliates may engage or invest in any other business activity, except those that might be in direct or indirect competition with the Company.  Neither the Company nor any Member will have any right in such other activities or to the income or proceeds derived from such other business activities.  No Member will be obligated to present any investment or business opportunity to the Company, if the opportunity is of the character that, if presented to the Company, could not be taken by the Company.  Each Member will have the right to hold any other investment or business opportunity for his own account or to recommend such opportunity to persons other than the Company. *Except that*, Gordon agrees that she cannot compete with, solicit employees or clients of, or leave Fusion LLC for 5 years from the date of the signing of this Agreement and agrees to allow Fusion LLC to obtain a life insurance policy and a disability insurance policy in an amount of at least $500,000, to be paid to Fusion LLC .

4.6     *Confidentiality.*

4.6.1     *Confidential Information.*  In the course of each Member's activities on behalf of the Company, he or she will come into possession of and/or become aware of certain proprietary matters and affairs of the Company.  Each Member will be in a position of trust and confidence as to all trade secret information and other proprietary information relating to the Company's business that is not generally known to, or readily available to, the public and that is of a confidential, proprietary or secret nature and is or may be either applicable to, or related in any way to, the present or future business of the Company, or the business of any client of the Company (collectively, "*Confidential Information*").  Such Confidential Information includes, but is not limited to: investment decisions, investment opportunities, techniques and strategies; various financial and operating data consisting of, among other things, marketing data, documents, files, electronically recordable data or concepts, computer software and hardware, books, papers, compilations of information, records and specifications; names, of existing and potential clients; names, marketing methods, operating practices and related information regarding the Company's existing and potential clients, joint venture partners, licensees, licensors, and vendors; prices and fee structures the Company obtains or has obtained or at which it sells, has sold or intends to sell its services; information regarding the Company's financial condition; and fee structures applied to and compensation paid to the Company's consultants and employees.  Each Member agrees not to disclose

KY

any Confidential Information, directly or indirectly, or use Confidential Information in any way, either during such Member's membership in the Company or at any time thereafter, except as required in the course of such Member's pursuit of the Company's business on behalf of the Company. Upon termination of a Member's status as a Member, such Member will return all originals and copies of the Company's property in such Member's possession, including materials, memoranda, records, reports, client lists or other documents, and specifically including any documents containing Confidential Information.

       4.6.2     *Remedies Upon Breach.* The Members acknowledge that the goodwill, continued patronage and identity of the Company's clients and other confidential information constitute significant assets of the Company. The parties recognize that irreparable injury will result to the Company, its business, and property, in the event of a breach by any Member of the covenants contained under the heading "Confidential Information" in this Agreement. The parties further recognize that such injury could not be fully compensated by monetary damages and thus would render any award ineffectual without provisional relief. Accordingly, it is agreed that, as a provisional remedy prior to arbitration for a breach of those provisions by a Member, the Company will be entitled to temporary and preliminary injunctive relief to restrain each Member and all other persons, firms or entities acting for or with such Member from any violations of **Section 4.6.1**. If the Company is required by applicable law to furnish a bond or other surety as a condition to the entry of such an injunction or restraining order, the Member against whom such injunction is sought hereby agrees that such bond or other surety may be in the minimum amount allowable by law. The Members acknowledge and agree that if any Member were to breach any of his or its obligations under the heading "Confidential Information" in this Agreement, it would be difficult to ascertain the precise damages arising from or as a consequence of the breach. Accordingly, each Member agrees that the Company will be entitled to recover, as liquidated damages, an amount equal to either the gross profit or 50% of the revenues, whichever is greater, resulting from business generated by such Member, either directly or indirectly. The agreements in this paragraph and under the heading "Confidential Information" will survive any termination of this Agreement.

## ARTICLE V
## MANAGEMENT AND CONTROL OF THE COMPANY

       5.1     *General Authority and Power of Managing Members.* Except as otherwise provided in this Agreement, and subject to any written agreements entered into by and between the Managing Members and the Members, and subject to **Sections 5.2** and **5.3**, the Managing Members will have exclusive management and control of the day-to-day operations of the Company, will make all decisions affecting the Company and the Company's assets, and will have the rights, power and authority granted hereunder and by law, directly and through their duly appointed agents, to obligate and bind the Company and, on behalf of and in the name of the Company, to take any action of any kind and to do anything they deem necessary or advisable, including, without limitation, to:

       5.1.1     Enter into such other organizational documents or other agreements that the Managing Members may, from time to time, deem appropriate; and take all actions required or permitted thereunder as the Managing Members deem necessary or appropriate;

       5.1.2     Enter into agreements with clients of the Company and to take all actions required or permitted under such agreements as the Managing Members deem necessary or appropriate;

       5.1.3     Purchase, hold, sell or otherwise deal in property for the Company's account, and to exercise all rights, powers, privileges and other incidents of ownership;

5.1.4    Upon unanimous approval of the Members borrow funds and issue evidences of indebtedness on behalf of the Company on either a recourse or nonrecourse basis and to pledge and hypothecate assets of the Company for such loans; and to prepay in whole or in part, refinance, revise, increase, modify, or extend any liabilities affecting the Company assets and in connection therewith execute any extensions or renewals thereof;

5.1.5    Open, maintain, conduct, and close accounts with banks or other custodians for Company assets, each as selected by the Managing Members in their sole discretion, and to draw checks or other orders for the payment of money by the Company;

5.1.6    From time to time engage, at the expense of the Company, persons required for the Company's business, including accountants, attorneys, and others; to enter into and exercise on behalf of the Company, agreements and contracts with such persons on such terms and for such compensation as the Managing Members determine to be reasonable; and to give receipts, releases, indemnities, and discharges as to all of the foregoing and any matter incident thereto as the Managing Members may deem advisable or appropriate;

5.1.7    Act as an authorized agent of the Company for purposes of compliance with the rules and regulations of any regulatory agency or self-regulatory organization with jurisdiction over the Company or its activities, to the extent required by such rules or regulations;

5.1.8    Purchase, from or through others, contracts of liability, casualty and other insurance that the Managing Members deem advisable, appropriate or convenient for the protection of the assets or affairs of the Company or for any purpose convenient or beneficial to the Company, including policies of insurance insuring the Managing Members and/or the Company against liabilities that may arise out of the Managing Members' management of the Company;

5.1.9    Engage in any transaction with the Managing Members or any of their Affiliates, *provided that* in causing the Company to engage in such transactions, the Managing Members act in good faith and in the best interests of the Company;

5.1.10    Make all tax elections required or permitted to be made by the Company (including elections under Section 754 of the Code to the extent deemed appropriate by the Managing Members);

5.1.11    Make such applications for, and to obtain, such licenses, registrations, permits, and other authorizations from such governmental agencies, and associations, all in the name of and on behalf of the Company, as the Managing Members may from time to time determine;

5.1.12    File, conduct and defend legal proceedings of any type and to compromise and settle any such proceedings, or any claims against the Company on whatever terms deemed appropriate by the Managing Members after consultation with the Members; and

5.1.13    Engage in any kind of activity, and to perform and carry out contracts of any kind, necessary to, or in connection with, or incidental to the accomplishment of, the purposes of the Company.

5.2    *Limitations on Power of Managing Members.* Notwithstanding any other provision of this Agreement, the Managing Members will have no authority to cause the Company to engage in any transactions specified in this Agreement as requiring the approval, consent or vote of the Members without first obtaining the approval, consent or vote of the Members as set forth in this Agreement.

5.3    *Time and Services; Fees; Reimbursements.*

5.3.1    *Devotion of Time.* Except as to Gordon, or as may be provided in a separate writing by and between the Managing Members, the Managing Members will devote such time and services to the Company as they deem necessary for the efficient conduct of the Company's activities, but they will not be required to devote their full time to the performance of such duties. Gordon will be a full-time employee of the Company. Except as provided herein, nothing will prevent the Managing Members from engaging in other investment and/or activities for profit. Each Member acknowledges that such other activities on the part of the Managing Members gives rise to no obligation on the part of the Managing Members to account to any other Member or to the Company for any profits or other benefits derived therefrom, and that neither any Member nor the Company will have or will be entitled to any interest in any such activity.

5.3.2    *Compensation.* The Managing Members will not be entitled to any compensation for serving as such, although they may be compensated for services as employees or officers of the Company, on terms determined in good faith by the Managing Members to be reasonable. *Provided that,* as to Gordon, compensation for her services for years 2006 and 2007 will be as set forth in **Section 2.2.3**.

5.3.3    *Expenses and Reimbursements.* Except as may be provided in a separate writing by and between the Managing Members, all Company expenses will be borne by the Company or, if advanced by a Member, reimbursed to him (if prior approval by the Managing Members is obtained), including but not limited to: all costs and expenses (including legal fees) of forming and organizing the Company and offering Interests; legal and accounting fees incurred by or on behalf of the Company; rent for the Company's offices and salaries and benefits for its employees; expenses of Member meetings; and telephone and postage expense.

5.3.4    *Employees of the Company.* The Members acknowledge and agree that the Company may pay substantial amounts as salaries and bonuses to officers and employees of the Company who may also be Managing Members and/or Members of the Company, and that the amounts of such compensation will be within the sole discretion of the unanimous vote of the Members. The Members further acknowledge and agree that nothing in this Agreement will be construed as providing any Member who is also an employee of the Company any right to continued employment by the Company, nor will it be construed as limiting or otherwise affecting any of the Member's obligations or duties owed to the Company in his or her capacity as an employee of the Company, except as otherwise provided herein. The Members acknowledge that the Company has the right to terminate any Member's employment at any time for any reason, with or without cause, subject only to such Member's written employment contract, if any.

5.4    *Appointment of Managing Members.*

5.4.1    *Number; Designation.* Initially, Gordon, Pollack, and Hall will be the Managing Members. Hall, Chui, Ankney, and Paragon may elect another Member to serve as a Managing Member if Hall should resign or cease to be a managing member.

5.4.2    *No Removal; Cessation of Status.* The Members will have no right to remove the Managing Members for any reason.

5.5    *Officers.* The Managing Members may at any time appoint officers to whom they may delegate some or all of their duties, powers and responsibilities. The officers of the Company may include, without limitation, a chairperson, a president, a chief executive officer, one or more vice

presidents, a secretary (and one or more assistant secretaries), and a chief financial officer or treasurer (and one or more assistant treasurers). The officers will serve at the pleasure of the Managing Members. Any individual may hold any number of offices. The general areas of responsibility and specific powers and duties of each officer may be set forth in written delegations executed by the Managing Members, which may be revised from time to time.

     5.6    *Investment Committee.* The Managing Members may, in their discretion, establish one or more investment committees, comprised of Members and/or employees of the Company chosen by the Managing Members, in order to make business decisions. The terms under which such committees will function will be at the discretion of the Managing Members.

     5.7    *Meetings of Members; Approvals.* No annual or regular meetings of the Members are required to be held. However, if such meetings are held, such meetings will be noticed, held and conducted pursuant to the Law. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Law.

     5.8    *Members Have No Managerial Authority.* The Members, in their capacities as such, will have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Law. Unless expressly and duly authorized in writing to do so by the Managing Members, no Member will have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

     5.9    *Liability and Indemnification of Managing Members.*

     5.9.1    *Limitation on Liability.* The Managing Members will not be liable to the Company or to any Member for any act or omission based upon errors of judgment or other fault in connection with the business or affairs of the Company, except for any such liability for losses, claims, damages, liabilities or expenses that a court of competent jurisdiction determines resulted from gross negligence or a willful violation of law.

     5.9.2    *Indemnity.* The Company will indemnify and hold the Managing Members (the "*Indemnitees*") harmless, to the maximum extent permitted by law, from and against any and all losses, claims, damages, liabilities (joint or several), expenses, judgments, fines, settlements, and other amounts (including reasonable legal fees and expenses, as such fees and expenses are incurred) arising from any and all claims, demands, actions, suits, or proceedings (civil, criminal, administrative, or investigative) (i) in which the Indemnitees may be involved, as a party, a threatened party, or otherwise, by reason of their participation in the management of the Company's affairs or rendering of advice or consultation thereto, or being or having been, at the request of the Company, a general partner, member, director, officer, employee, or agent of any partnership, joint venture, limited liability company, corporation, trust, or other entity, or (ii) that relate to the Company, its business, or its affairs. Indemnification under this subsection will be permitted whether or not the Indemnitees continue to hold any of the aforementioned positions or continues to act in any of the aforementioned capacities at the time any such liability or expense is paid or incurred. Notwithstanding the foregoing, the Company will not be obligated to indemnify or hold harmless the Indemnitees to the extent the Indemnitees' liability for losses, claims, damages, liabilities or expenses is determined by a court of competent jurisdiction to have resulted from gross negligence or a willful violation of law by such Indemnitees.

     5.9.3    *Reliance on Agents.* The Managing Members may execute any power granted, or perform any duty imposed by this Agreement either directly or through agents, including any of their Affiliates. The Managing Members may consult with legal counsel, accountants, appraisers, management

consultants, investment bankers, and other consultants. An opinion by any such person on a matter that the Managing Member believes to be within such person's professional or expert competence will be full and complete protection for any action taken or omitted by the Managing Members in good faith based on the opinion. The Managing Members will not be responsible for the misconduct, negligence, acts, or omissions of any such person or of any agent or employee of the Company, except that they must use due care in selecting such persons.

## ARTICLE VI
## BOOKS AND RECORDS; ACCOUNTING; TAX ELECTIONS

6.1     *Books and Records*. Books and records of the Company will be maintained at the principal office of the Company. The Company will maintain the following books and records:

6.1.1     A current list of the name and last known business, residence or mailing address of each Member, together with the Capital Contributions and number of Units held by each Member;

6.1.2     A copy of the Articles and all amendments thereto, together with executed copies of any power of attorney pursuant to which the Articles or any amendments thereto have been executed;

6.1.3     A copy of this Agreement and all amendments hereto, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments hereto have been executed;

6.1.4     A copy of any agreements entered into by and between the Managing Members that modify the terms of this Agreement;

6.1.5     A copy of the Company's federal, state and local income tax or information returns and reports, if any, for each year;

6.1.6     Financial statements of the Company for the six most recent fiscal years; and

6.1.7     True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date each became a Member.

6.2     *Inspection of Records*. Each Member has the right, on reasonable request, subject to such Member's agreement to maintain the confidentiality thereof, to:

6.2.1     Inspect during normal business hours, for any purpose reasonably associated with such Member's Units, any of the Company records required to be maintained by **Section 6.1** and such other information regarding the affairs of the Company as is just and reasonable; and

6.2.2     Obtain from the Company, promptly after they are available, a copy of the Company's federal, state, and local income tax or information returns for each year.

6.3     *Reports*. The Managing Members will cause the following to be prepared and provided to each Member:

6.3.1     As soon as possible after the end of each fiscal year, the information necessary for each Member to complete such Member's federal and state income tax or information returns; and

6.3.2     As soon as possible after the end of each fiscal year, an annual financial report.

6.4     *Tax Returns and Elections.* The Company's tax or fiscal year will end on December 31 of each year. The Company's accountants will be instructed to prepare and file all required income tax returns for the Company. The Managing Members will make any tax election necessary for completion of the Company tax return. If a distribution of property is made in the manner provided in Code Section 734, or if a transfer of any Units are permitted by this Agreement are made in the manner provided in Code Section 743, the Company may file an election under Code Section 754 in accordance with the procedures set forth in the applicable Regulations promulgated thereunder.

6.5     *Tax Matters Partner.* Charles Hall is hereby appointed the initial "Tax Matters Partner" for purposes of Code Sections 6221 et seq., and will have all the authority granted by the Code to the Tax Matters Partner. The Managing Members may from time to time appoint any other Member to be the Tax Matters Partner on behalf of the Company.

6.6     *Withholding and Tax Advances.*

6.6.1     *Authority To Withhold.* To the extent the Company is required by law to withhold or to make tax payments on behalf of, or as to, any Member (e.g., (i) backup withholding, (ii) withholding as to Members that are neither citizens nor residents of the United States, or (iii) withholding under any applicable state income tax laws as to Members that are not residents of such state (to the extent the Company has income that is sourced from such state) ("*Tax Advances*"), the Company may withhold such amounts and make such tax payments as may be required.

6.6.2     *Repayment of Tax Advances.* All Tax Advances made on behalf of a Member will, at the option of the Company, either be (i) promptly paid to the Company by the Member on whose behalf such Tax Advances were made, or (ii) repaid by reducing the amount of the current or next succeeding distribution or distributions which would otherwise have been made to such Member (or, if such distributions are not sufficient for that purpose, by so reducing the proceeds of any liquidation otherwise payable to such Member). Whenever the Company selects option (ii) pursuant to the preceding sentence for repayment of a Tax Advance by a Member, for all other purposes of this Agreement such Member will be treated as having received such distributions (whether before or upon liquidation) unreduced by the amount of such Tax Advance.

6.6.3     *Indemnification.* Each Member hereby agrees to indemnify and hold harmless the Company from and against any liability as to Tax Advances made on behalf of or as to a Member.

6.6.4     *Certification.* Each Member will promptly give the Company any certification or affidavit that the Company may request in connection with this **Section 6.6.**

6.7     *Bank Accounts.* The Managing Members will maintain the funds of the Company in one or more separate accounts in the name of the Company with such financial institutions as the Managing Members may determine, and the Managing Members will not permit the funds of the Company to be commingled in any fashion with the funds of any other person. Withdrawals will be made only in the regular course of the Company's business on such signature or signatures as the Managing Members may from time to time determine.

## ARTICLE VII
### TRANSFERS OF INTERESTS; REPURCHASE OPTIONS

7.1 *Conditions to Transfer*. Except for involuntary transfers that are caused by Member Termination Events, no Member will be entitled to transfer, assign, convey, sell, pledge or encumber (collectively, "transfer") all or any of his Units unless the following conditions are satisfied:

7.1.1 The Members unanimously approve the transfer subject to **Section 4.4** of this Agreement;

7.1.2 The transferor and the transferee submit a duly executed and acknowledged written assignment to the Company in a form approved by the Managing Members specifying the Units being transferred, setting forth the transferor's intention that the transferee succeed to the transferor's standing as a Member, and stating that the transferee accepts and agrees to be bound by the provisions of this Agreement;

7.1.3 The transferor or transferee furnishes an opinion of counsel, satisfactory to the Managing Members that the transfer will not violate any federal or state securities laws, adversely affect either the tax status of the Company or the limited liability of any Member, or cause a termination of the Company under Code Section 708(b); and

7.1.4 The transferor or transferee pays a transfer fee to the Company sufficient to cover all reasonable expenses connected with the assignment, including legal fees.

7.1.5 Any of the foregoing conditions (other than in **Section 7.1.1** above) may be waived by the Managing Members, in their discretion.

7.2 *Rights of Transferee*. If a transfer complies with the provisions of **Section 7.1**, the transferee will be entitled to receive the assigning Member's share of distributions, Net Income, and Net Loss, but will not be a Member and will not be entitled to voting or other rights of a Member (other than the right to receive distributions and allocations), unless the transferee is admitted as a substitute Member in accordance with the provisions of **Section 7.3**.

7.3 *Substitute Member*. A transferee as to some or all of a Member's Units may become a Member if, in addition to satisfying the conditions in **Section 7.1**, the transferee signs and agrees to the terms of this Agreement, the Members unanimously Consent to such transferee being admitted as a substitute Member, which Consent may be given or withheld, conditioned or delayed, as the Members may determine in their absolute discretion. Furthermore, no transferee will be considered admitted as a substitute Member unless and until such transferee executes and delivers to the Company such number of counterpart signature pages to this Agreement as the Managing Members may require. A transferee of some or all of a Member's Units who has not been so admitted will be entitled only to the transferring Member's share of all allocations of Net Income and Net Loss (and any items in the nature thereof) pursuant to **Article III** and all distributions pursuant to **Article III** and **Article VIII**. The admission of a transferee as a substitute Member will not result in the release of the Member who assigned the Units from any liability that such Member may have to the Company, except as otherwise expressly provided in a writing executed by the Company.

7.4 *Effective Date of Transfer*. Unless otherwise provided in this Agreement or in the documentation delivered in connection with the transfer of a Member's Units, any transfer of a Member's Units made in compliance with this **Article VII** will be effective as of the close of business on the day on which all documentation required by this **Article VII** has been received and accepted by the Company.

7.5     *Effect of Violation.*   Any purported transfer other than as provided pursuant to this **Article VII** will be null and void and will not bind or be recognized by the Company.

7.6     *Valuation of Assets.*

7.6.1     *Purchase Price.*   The amount paid to be paid for Units (the *"Purchase Price"*) will equal the net present value of the Company's projected cash flows or a multiple of book value, whichever is greater.

7.6.2     *Valuation of Assets.*   For purposes of this **Section 7.6**, the net present value of the Company's Units as of a particular date (the *"Valuation Date"*) will be calculated as set forth above in **Section 7.6.1;**

7.6.3     *Terms.*   The Purchase Price to be paid upon the purchase of Units may be paid in such combination of cash and promissory notes (*"Purchase Notes"*) as the Members may decide, provided that any Purchase Notes will bear interest from the effective date of the purchase at the Company's borrowing rate as it may be from time to time, and such Purchase Price will provide for the payment of interest at least quarterly and the repayment of principal no later than the fifth anniversary of the effective date of the purchase, and will be prepayable in whole or in part, without penalty.

7.6.4     *Closing.*   The closing of any purchase will be held at the offices of the Company at a time specified by the Managing Members.

7.7     *Divorce.*   As to any Member who is also an employee of the Company, if such Member's spouse obtains or becomes entitled to an ownership interest in such Member's Units (or any portion thereof) as a result of or in connection with any decree, judgment, award, or settlement arising out of a divorce, separation, or decree of separate maintenance, the spouse's share of such Member's Units will become subject to the purchase and/or redemption options described in **Section 7.6**, except that such Member will have the first option to purchase the Units.


## ARTICLE VIII
### DISSOLUTION

8.1     *Dissolution.*   The Company will be dissolved and its affairs will be wound up upon the earliest to occur of the following:

8.1.1     The sale or other disposition of all or substantially all of the Company's assets and distribution of the proceeds of such sale or disposition;

8.1.2     Unanimous election of the Members to dissolve the Company;

8.1.3     The resignation of a Managing Member where either no other Managing Member exists or the remaining Members do not elect to continue the business of the Company as provided in **Section 8.4**; or

8.1.4     Any other event which is specified in this Agreement or the entry of a decree of judicial dissolution pursuant to the Law.

8.2     *Winding Up.*   Upon the occurrence of any event specified in **Section 8.1**, the Managing Members will take full account of the Company's liabilities and assets, and the Company's assets will be

liquidated as promptly as is consistent with obtaining the fair value thereof. The proceeds from the liquidation of the Company's assets will be applied and distributed in the following order:

        8.2.1     First, to the payment and discharge of all of the Company's debts and liabilities (including debts and liabilities to the Members, to the extent permitted by law), and the establishment of any necessary reserves;

        8.2.2     The balance, to the Members in accordance with the percentage of Units owned by each Member.

    8.3     *Timing of Liquidating Distributions.* Liquidating distributions will be made by the end of the taxable year in which the liquidation occurs or, if later, within **ninety (90) days** of the liquidating event and will otherwise comply with Regulations Section 1.704-1(b).

    8.4     *Continuation of Company.* Upon the resignation of a Managing Member, the Company will dissolve unless there is at least one remaining Managing Member who elects to continue the business of the Company within **thirty (30) days** of the Managing Members' resignation.

    8.5     *Return of Contribution Nonrecourse to Other Members.* Except as provided by law, upon dissolution, each Member will look solely to the assets of the Company for the return of the Member's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the contribution of any Members, such Member will have no recourse against any other Member.

## ARTICLE IX
### MISCELLANEOUS PROVISIONS

    9.1     *Representations.* Each Member represents and warrants to each other Member and the Company that such Member:

        9.1.1     Has a pre-existing personal or business relationship with the Company or one or more of its Members, or by reason of his or its business or financial experience, or by reason of the business or financial experience of his or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any Affiliate of the Company, he or it is capable of evaluating the risks and merits of an investment in the Company and of protecting his or its own interests in connection with this investment;

        9.1.2     Has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, article or any other form of advertising or general solicitation as to the sale of Units in the Company;

        9.1.3     Has acquired his Units in the Company for his own account, for investment, and not with a view to or for the resale, distribution, subdivision or fractionalization thereof and no other person will have any direct or indirect beneficial interest in or right to the Units;

        9.1.4     Has no contract, undertaking, understanding, agreement, or arrangement, formal or informal, with any person to sell, transfer, or pledge all or any portion of his or its Units in the Company; and has no current plans to enter into any such contract, undertaking, understanding, agreement, or arrangement;

9.1.5    Has sufficient financial strength to hold Units in the Company as an investment and bear the economic risks of that investment (including possible complete loss of such investment) for an indefinite period of time; and

9.1.6    Has been afforded full and complete access to the books, financial statements, records, contracts, documents and other information concerning the Company and its proposed activities, and has been afforded an opportunity to ask such questions of the Company's agents, accountants and other representatives concerning the Company's proposed business, operations, financial condition, assets, liabilities and other relevant matters as he has deemed necessary or desirable, and has been given all such information as has been requested, in order to evaluate the merits and risks of the investment contemplated herein.

9.2    *Arbitration.* Any controversy between the Members, or between the Managing Members and the Members, involving this Agreement will be submitted to arbitration on the request of any party to such controversy in the county and state in which the Company maintains its principal office at the time the request for such arbitration is made. The arbitration will comply with and be governed by the provisions of the commercial arbitration rules of the American Arbitration Association and no party to any such controversy will be entitled to any punitive damages. Judgment may be entered upon any award granted in any such arbitration in any court of competent jurisdiction in the county and state in which the Company maintains its principal office at the time the award is rendered. By signing this Agreement, each Member agrees to waive his or her or its right to seek remedies in court, including any right to a jury trial; *provided, however*, that nothing in this paragraph will constitute a waiver of any right a party to this Agreement may have to choose a judicial forum to the extent such a waiver would violate applicable law.

9.3    *Counterparts.* This Agreement may be executed in several counterparts, and as executed will constitute one agreement, binding on all of the parties hereto.

9.4    *Successors and Assigns.* Except as otherwise provided herein, the terms and provisions of this Agreement will be binding upon and will inure to the benefit of the successors, personal representatives and assigns of the parties hereto.

9.5    *Notices.* All Notices required or permitted under this Agreement will be given to the person entitled thereto by personal service, mail, overnight courier or telecopy to the address or telecopy number maintained by the Company for such person. All Notices will be effective upon actual receipt; provided, however, that any Notice sent by certified or registered mail to the address so maintained will be deemed received on the earlier of actual receipt or three days after mailing.

9.6    *Amendments.* This Agreement may be amended only upon the unanimous Consent of the Members.

9.7    *No Third Party Beneficiaries.* Except as expressly provided herein, this Agreement is entered into for the sole and exclusive benefit of the parties hereto and will not be interpreted in such a manner as to give rise to or create any rights or benefits of or for any person not a party hereto.

9.8    *Severability.* If any covenant, condition, term or provision of this Agreement or if the application of such provision to any person or circumstance is judicially determined to be invalid or unenforceable, then the remainder of this Agreement, or the application of such covenants, condition, term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, will not be affected thereby, and each covenant, term, condition and provision of this Agreement will be valid and enforceable to the fullest extent permitted by law.

9.9     *Complete Agreement.* This Agreement and the Articles constitute the complete agreement between the parties.

9.10    *Governing Law.* This Agreement will be governed by and interpreted under the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York.

9.11    *Legal Fees.* In the event that any dispute between the Managing Members, or between the Managing Member and the Members, or between the Company and the Members, or among the Members should result in litigation or arbitration, the prevailing party in such dispute will be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

9.12    *Gender, Number and Headings.* As used in this Agreement, the masculine gender will include the feminine and neuter, and vice versa, as the context so requires; and the singular number will include the plural, and vice versa, as the context so requires. As used in this Agreement, section headings are for the convenience of reference only and will not be used to modify, interpret, limit, expand or construe the terms of this Agreement.

9.13    *Cross-References.* All cross-references in this Agreement, unless specifically directed to another agreement or document or statute, refer to provisions within this Agreement.

9.14    *Covenant to Sign Documents.* Each Member will execute, with acknowledgement or affidavit if required, all documents and writings reasonably necessary or appropriate in the creation of the Company and the achievement of its purpose, including any certification required.

9.15    *Cumulative Remedies.* The remedies of the Members under this Agreement are cumulative and will not exclude any other remedies to which any Member may be lawfully entitled.

## ARTICLE X
## DEFINITIONS

The following terms used in this Agreement will have the meanings set forth below:

| | |
|---|---|
| "*Affiliate*" | as to a specified person, any other person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the person in question. |
| "*Agreement*" | this Operating Agreement, as it may be amended from time to time. |
| "*Articles of Organization*" | the Company's Articles of Organization as filed with the New York Secretary of State, as it may be amended from time to time. |
| "*Capital Account*" | an account maintained for each Member as provided in **Section 3.1.** |
| "*Capital Contribution*" | as to any Member the amount of money and the gross fair market value of any other property contributed by the Member to the Company. |
| "*Code*" | the Internal Revenue Code of 1986, as amended (or any corresponding provision of succeeding law), and, to the extent applicable, the Regulations. |
| "*Company*" | Fusion Modeling Agency LLC. |
| "*Consent*" | Either (a) the consent given by vote at a meeting called and held in accordance with **Section 5.7**; (b) a written consent required or permitted to be given pursuant to this Agreement or applicable law; or (c) the act of voting or granting any such written consent, as the context may require. As used in this Agreement, except where otherwise expressly provided, the "*Consent of the Managing Members*" and the "*Consent of the Members*" mean the Consent of a Majority in Interest of the Managing Members, and the Consent of a Majority in Interest of the Members, respectively. |
| "*Event of Bankruptcy*" | as to any person, (a) the entry of a decree or order for relief by a court having jurisdiction in respect of such person in an involuntary case under federal or state bankruptcy or insolvency law, or the appointment of a receiver, assignee, or trustee for such person or for any substantial part of his property, or the issuance of an order for the winding-up or liquidation of his affairs and the continuance of any such decree or order unstayed and in effect for a period of **ninety (90)** consecutive days, or (b) the commencement by such person of a voluntary proceeding seeking any decree, order or appointment referred to in clause (a) or the consent by such person to any such decree, order or appointment. |
| "*Majority in Interest*" | of the Members means Members collectively holding more than one-half of the Units entitled to consent on an issue. |
| "*Member*" | each person listed on **Schedule A** as a member, and any additional or |

KS

substitute Member admitted to the Company in accordance with the terms of this Agreement.

*"Managing Members"*     Jodie Gordon, Kevin Pollack, Charles Hall and any additional or substitute Managing Member admitted to the Company in accordance with the terms of this Agreement.

*"Net Income" and "Net Loss"*     the taxable income or taxable loss of the Company for each period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

(a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss will be added to such taxable income or will reduce such loss;

(b) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Loss, will be subtracted from such taxable income or will increase such loss;

(c) in lieu of any depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, the Company will compute such deductions based on the book value of the Company property, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3);

(d) gain or loss resulting from a taxable disposition of Company property will be computed by reference to the book value of the property disposed of (as adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3)), notwithstanding that the adjusted tax basis of such property differs from its book value; and

(e) if the book value of Company assets is adjusted to equal fair market value as provided in Section 3.5, then Net Income or Net Loss will include the amount of any increase or decrease in such book values attributable to such adjustment.

(f) any item which is specially allocated pursuant to **Sections 3.3.3** or **3.3.4** will not be taken into account in computing Net Income or Net Loss.

*"Notification" or "Notice"*     a writing containing the information required by this Agreement to be communicated to any person, sent or delivered in accordance with **Section 9.5**; provided, however, that any written communication containing such information sent to such person and actually received by such person will constitute Notification or Notice for all purposes of this Agreement.

*"Regulations"*     the income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of

## SCHEDULE A
## CAPITAL CONTRIBUTIONS
## AND
## NUMBER OF UNITS

|  | Capital Contribution | Number of Units |
|---|---|---|
| Jodie Gordon | $0 | 33 |
| Kevin Pollack | $0 | 33 |
| Charles Hall | $37,500 | 8.25 |
| Benjamin Chui | $37,500 | 8.25 |
| Nathan Ankney | $10,000 | 2.20 |
| Paragon Strategic Group, Inc. | $65,000 | 14.30 |
| Total | $150,000 | 99 Units |

## CONSENT OF SPOUSE AND AGREEMENT
## REGARDING MEMBERSHIP INTERESTS IN
## FUSION MODELING MANAGEMENT LLC

I am the spouse of a Member in Fusion Modeling Agency LLC (the "*Company*"). I understand that, in connection with my spouse's participation in the business of the Company and his acquisition of his Membership Interest in the Company, my spouse has entered into a Limited Liability Company Operating Agreement (the "*Agreement*") with all of the other Members in the Company.

I have read the Agreement and have discussed it with my spouse. I understand that in the Agreement my spouse has given certain other Members and/or the Company the right to buy all of his Units in the Company that he owns or may in the future own (the "*Units*") in certain events. I understand that the Agreement restricts my spouse's ability to sell or otherwise transfer all or any portion of the Units to anyone, including me.

I also understand that one of the main purposes of the restrictions in the Agreement is to ensure that equity ownership of the Units remains with my spouse and, to the extent described in the Agreement, other Members who are active in the Company's business. I understand that it is important to the Members of the Company that, if my spouse were to die or become incapacitated, I would not be able to exert any control over the operation of the Company and that, if my spouse and I were to become separated or divorced, I would not be the owner of any Units in the Company. I understand that these things are important to the value and viability of the Company's business. I understand that the other Members would not be willing to enter into the Agreement or to purchase Units if I did not consent to and approve the terms of the Agreement and if I did not make the other promises in this document.

Because of these factors, I consent to and approve of all of the terms of the Agreement. I also agree with my spouse, the Company, and the other Members of the Company that if my spouse and I ever get divorced or try to enter into any marital property settlement agreement, or if my spouse or I ever seek a decree of separate maintenance, I will not have an interest in or try to obtain any part of the Units; instead, to the extent my spouse has or can obtain assets other than the Units in amounts and of value sufficient to settle or satisfy any marital property claims I may have in the value of the Units, I will accept such other assets in settlement of those claims. If my spouse does not have sufficient other assets with which to satisfy any claims I may have as to the Units, or if for any other reason I obtain an interest in the Units in connection with any such divorce, separation, settlement, or decree, I agree to sell the Units to the Company and/or other Members at the price and in accordance with the applicable terms of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units. I agree that I will not do anything to try to prevent the operation of any part of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units.

Dated: _____          _____

                                          (Signature)


                                _____

                                          (Print Name)

                                _____
                                Spouse of [name of member]

-1-

succeeding regulations).

"Units"    the number of Units held by a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement.

**IN WITNESS WHEREOF,** Jodie Gordon, Kevin Pollack and Charles Hall, Benjamin P. Chui, Nathan Ankney, and Paragon Strategic Group, Inc., a Nevada corporation have executed this Agreement as of the date first above written.

By: _____        By: _____
    Jodie Gordon                        Kevin Pollack

By: _____        By: _____
    Charles Hall                        Benjamin P. Chui

By: _____        For: Paragon Strategic Group, Inc., a Nevada
    Nathan Ankney                       corporation

                                   By: _____
                                       Nathan Ankney
                                   Its:  Chief Executive Officer

CONSENT OF SPOUSE AND AGREEMENT
REGARDING MEMBERSHIP INTERESTS IN
FUSION MODELING MANAGEMENT LLC

I am the spouse of a Member in Fusion Modeling Agency LLC (the "*Company*"). I understand that, in connection with my spouse's participation in the business of the Company and his acquisition of his Membership Interest in the Company, my spouse has entered into a Limited Liability Company Operating Agreement (the "*Agreement*") with all of the other Members in the Company.

I have read the Agreement and have discussed it with my spouse. I understand that in the Agreement my spouse has given certain other Members and/or the Company the right to buy all of his Units in the Company that he owns or may in the future own (the "*Units*") in certain events. I understand that the Agreement restricts my spouse's ability to sell or otherwise transfer all or any portion of the Units to anyone, including me.

I also understand that one of the main purposes of the restrictions in the Agreement is to ensure that equity ownership of the Units remains with my spouse and, to the extent described in the Agreement, other Members who are active in the Company's business. I understand that it is important to the Members of the Company that, if my spouse were to die or become incapacitated, I would not be able to exert any control over the operation of the Company and that, if my spouse and I were to become separated or divorced, I would not be the owner of any Units in the Company. I understand that these things are important to the value and viability of the Company's business. I understand that the other Members would not be willing to enter into the Agreement or to purchase Units if I did not consent to and approve the terms of the Agreement and if I did not make the other promises in this document.

Because of these factors, I consent to and approve of all of the terms of the Agreement. I also agree with my spouse, the Company, and the other Members of the Company that if my spouse and I ever get divorced or try to enter into any marital property settlement agreement, or if my spouse or I ever seek a decree of separate maintenance, I will not have an interest in or try to obtain any part of the Units; instead, to the extent my spouse has or can obtain assets other than the Units in amounts and of value sufficient to settle or satisfy any marital property claims I may have in the value of the Units, I will accept such other assets in settlement of those claims. If my spouse does not have sufficient other assets with which to satisfy any claims I may have as to the Units, or if for any other reason I obtain an interest in the Units in connection with any such divorce, separation, settlement, or decree, I agree to sell the Units to the Company and/or other Members at the price and in accordance with the applicable terms of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units. I agree that I will not do anything to try to prevent the operation of any part of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units.

Dated:  12-18-06

_Amee Ankney_
(Signature)

_Amee Ankney_
(Print Name)

Spouse of (name of member)

_Nathan Ankney_

-1-

succeeding regulations).

"Units"        the number of Units held by a Member in the Company at any particular time,
               including the right of such Member to any and all benefits to which a Member
               may be entitled as provided in this Agreement.

**IN WITNESS WHEREOF**, Jodie Gordon, Kevin Pollack and Charles Hall, Benjamin P. Chui, Nathan Ankney, and Paragon Strategic Group, Inc., a Nevada corporation have executed this Agreement as of the date first above written.

By: _____          By: _____
    Jodie Gordon                            Kevin Pollack

By: _____          By: _____
    Charles Hall                            Benjamin P. Chui

By: _____          For: Paragon Strategic Group, Inc., a Nevada
    Nathan Ankney                            corporation

                                       By: _____
                                           Nathan Ankney
                                       Its:   Chief Executive Officer

succeeding regulations).

"Units"     the number of Units held by a Member in the Company at any particular time,
            including the right of such Member to any and all benefits to which a Member
            may be entitled as provided in this Agreement.

**IN WITNESS WHEREOF,** Jodie Gordon, Kevin Pollack and Charles Hall, Benjamin P.
Chui, Nathan Ankney, and Paragon Strategic Group, Inc., a Nevada corporation have executed this
Agreement as of the date first above written.

By: _____          By: _____
    Jodie Gordon                              Kevin Pollack

By: _____          By: _____
    Charles Hall                              Benjamin P. Chui

By: _____          For: Paragon Strategic Group, Inc., a Nevada
    Nathan Ankney                         corporation

                                      By: _____
                                          Nathan Ankney
                                      Its:   Chief Executive Officer

## CONSENT OF SPOUSE AND AGREEMENT
## REGARDING MEMBERSHIP INTERESTS IN
## FUSION MODELING MANAGEMENT LLC

I am the spouse of a Member in Fusion Modeling Agency LLC (the "*Company*"). I understand that, in connection with my spouse's participation in the business of the Company and his acquisition of his Membership Interest in the Company, my spouse has entered into a Limited Liability Company Operating Agreement (the "*Agreement*") with all of the other Members in the Company.

I have read the Agreement and have discussed it with my spouse. I understand that in the Agreement my spouse has given certain other Members and/or the Company the right to buy all of his Units in the Company that he owns or may in the future own (the "*Units*") in certain events. I understand that the Agreement restricts my spouse's ability to sell or otherwise transfer all or any portion of the Units to anyone, including me.

I also understand that one of the main purposes of the restrictions in the Agreement is to ensure that equity ownership of the Units remains with my spouse and, to the extent described in the Agreement, other Members who are active in the Company's business. I understand that it is important to the Members of the Company that, if my spouse were to die or become incapacitated, I would not be able to exert any control over the operation of the Company and that, if my spouse and I were to become separated or divorced, I would not be the owner of any Units in the Company. I understand that these things are important to the value and viability of the Company's business. I understand that the other Members would not be willing to enter into the Agreement or to purchase Units if I did not consent to and approve the terms of the Agreement and if I did not make the other promises in this document.

Because of these factors, I consent to and approve of all of the terms of the Agreement. I also agree with my spouse, the Company, and the other Members of the Company that if my spouse and I ever get divorced or try to enter into any marital property settlement agreement, or if my spouse or I ever seek a decree of separate maintenance, I will not have an interest in or try to obtain any part of the Units; instead, to the extent my spouse has or can obtain assets other than the Units in amounts and of value sufficient to settle or satisfy any marital property claims I may have in the value of the Units, I will accept such other assets in settlement of those claims. If my spouse does not have sufficient other assets with which to satisfy any claims I may have as to the Units, or if for any other reason I obtain an interest in the Units in connection with any such divorce, separation, settlement, or decree, I agree to sell the Units to the Company and/or other Members at the price and in accordance with the applicable terms of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units. I agree that I will not do anything to try to prevent the operation of any part of the Agreement regardless of whether or not alternative valuation techniques might suggest a different value for the Units.

Dated: _Jul 13ᵗʰ, 2006_          _____
                                    (Signature)

                                    Jenny Lui
                                    _____
                                    (Print Name)

                                    _____
                                    Spouse of Benjamin Chui

-1-

Exhibit "B"

Case 1:23-cv-02033-JGK-JBK Document 17 Filed 08/28/23 Page 33 of 42 PageID #: 51
Case 1:23-cv-02033-JGK-JBK Document 17 Filed 08/28/23 Page 210 of 211
PageID #: 947

**From:** pollackka@aol.com,

**To:** Pollackka@aol.com, jody@fusionmodelsnyc.com, Thomas@aperfectcalendar.com, ben@Chui.us.com,

**Subject:** Re: Timing of proposed $225K capital raise - Please confirm

**Date:** Tue, 8 Feb 2011 1:57

---

Below are the relevant terms that appear to have been agreed upon with respect to the proposed capital raise. I have culled through past emails where agreement was noted. If you believe there is a mistake, please point it out.

We agree and consent to a proposed capital raise with the following terms as follows:

1) $225,000 is amount of the proposed capital raise.

2) Investment in the proposed capital raise can be made on or before 8pm EST on Friday, February 11, 2011.

3) The pre-money valuation for this capital raise is $214,500.

4) The $25,000 money owed to Jody shall be paid out to her by Fusion up to $1,100 per month, until she is paid exactly a total of $27,500.

5) A maximum of $3,000 shall be paid towards the credit card debt upon completion of the proposed capital raise. Thereafter up to $1,000 may be paid per month towards any remaining balances due.

6) All future K-1s shall be delivered to Members no later than April 1 of each year. Any subsequent tax penalties or accountant costs suffered by any Member shall be reimbursed by Fusion.

7) All Members shall have reasonable access to Fusion's books and records.

8) Once Fusion shows any profit then Jody shall pay out profit sharing to all Members in pro rata fashion in an amount that will at least cover any tax liability of the Members for their share of profits.

9) Jody shall, within 30 days of the Friday, February 11, 2011, have completed and submitted a life insurance policy for at least $500K of coverage, with "Fusion Modeling Agency LLC" as the beneficiary. Every 30 days this is late, a fair and appropriate penalty shall be applied against Jody. Such penalty shall be determined by a vote, based on ownership percentage, of all of the Members other than Jody.

10) Jody's salary shall not increase above $110,000 unless both: a) Members have received profit sharing, and b) all Members agree to a raise.

11) Should Fusion need another capital raise beyond this raise process, it is Jody's responsibility to find a financing method that does not dilute other Members or require other Members to contribute capital.

12) Email confirmation of these terms by all Members (or failure to disagree with these terms via email by 9PM EST on Wednesday, February 9, 2011) shall make these terms binding going forward.

13) If there are changes to these terms in the future, they will require agreement among all of the Members.

-----Original Message-----
From: Pollackka@aol.com
To: pollackka@aol.com; jody@fusionmodelsnyc.com; Thomas@aperfectcalendar.com; ben@Chui.us.com
Sent: Mon, Feb 7, 2011 2:21 pm
Subject: Timing of proposed $225K capital raise - Please confirm

Jody wants to wrap up this proposed $225K capital raise this week as per the prior email.

Accordingly, she has proposed that: **investors may participate in this proposed $225K capital raise on or before Friday, February 11, 2011, by 8pm EST**. Note that any wires or checks must be received by Jody at her offices no later than Friday, February 11, 2011, at 8pm EST to participate in this proposed $225K capital raise.

I will plan to put together a summary of all the terms/conditions (i.e. #4 below, etc.) and distribute later this week.

Please confirm your assent to the timing of this proposed $225K capital raise. I hereby confirm my assent. Failure to affirmatively confirm your assent by Wednesday, February 9, 2011, at 9pm EST shall be interpreted to mean that you assent to the timing of this proposed $225K capital raise.

Regards,
Kevin


In a message dated 2/4/2011 8:33:22 P.M. Eastern Standard Time, pollackka@aol.com writes:

Thomas,

Ben, Jody and I were on the conference call. We were hoping you would be on so we could finalize everything.

We agree and consent to a proposed capital raise as follows:

1) $225,000 is the total capital raise
2) The pre-money valuation for this capital raise is $214,500
3) The $25K money owed to Jody shall be paid out to her by Fusion up to $1.1K per month, until she is paid exactly a total of $27.5K
4) There are other agreed upon conditions (the ones that I proposed that Jody already agreed to in an email previously - I don't have them in front of me and they can be delineated later, but for example, Jody agreed to the life insurance getting done in X time, K-1s in timely manner, etc.)

Although I think $225K is more than required (and Lyme Regis determined this, too) and although I have set certain conditions in the past and I think it is not good business sense to not incorporate some of my conditions, I also believe that it would be unwise to hold up the process and drive the company to close for lack of capital in a timely manner. Accordingly, I have been willing to consent to a full capital raise without those piror conditions.

What remains is receiving your consent to a proposed capital raise. Do you consent to 1), 2), 3) and 4) above? If so, we can set a date.

Thanks,
Kevin


-----Original Message-----
From: Jody Gordon <jody@fusionmodelsnyc.com>
To: 'Thomas Quinlin' <Thomas@aperfectcalendar.com>; pollackka@aol.com; ben@Chui.us.com