UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

KEVIN POLLACK,

     *Plaintiff*,

-against-

JODIE LOUISE GORDON (also known as JODY
GORDON) and FUSION MODELS BK LLC,

     *Defendants*.

---------------------------------------------------------------X

**FILED**
**CLERK**

11/12/2025 4:53 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

23 Civ. 02376 (SJB)

**MEMORANDUM OF LAW IN OPPOSITION TO
EXCLUDE PLAINTIFF'S EXPERT WITNESS UNDER
RULE 702 OF THE FEDERAL RULES OF EVIDENCE**

Brian Lehman, Esq.
KASELL LAW FIRM
1038 Jackson Avenue, Suite 4
Long Island City, NY 11101
Attorneys for Plaintiff Kevin Pollack

Plaintiff Kevin Pollack respectfully submits this memorandum of law in opposition to Defendants' motion to exclude the opinions and testimony of Plaintiff's expert, Quan Vu, pursuant to Federal Rule of Evidence 702. Accompanying this memorandum are the following exhibits, attached to the Declaration of Brian Lehman, Esq., counsel for Plaintiff: (1) the Expert Report of Quan Vu ("Ex. 1"); (2) Vu's resume and deal sheet ("Ex. 2"); and (3) excerpts from the transcript of Vu's deposition ("Ex. 3").

## I.    STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that expert testimony is admissible if the Court finds, by a preponderance of the evidence, that (1) the expert's specialized knowledge will help the trier of fact, (2) the opinion rests on sufficient facts or data, (3) the expert employed reliable principles and methods, and (4) those methods were reliably applied to the facts. *See* Fed. R. Evid. 702.

The district court acts as a "gatekeeper" to ensure that expert evidence is both relevant and reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016). This gatekeeping role does not make the court a replacement for the jury, but rather ensures that expert testimony is grounded in "scientific validity" and thus the evidentiary relevance and reliability.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594–95 (1993). The focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* If the Court has any concern about any discrete assumption, the appropriate remedy is targeted cross-examination and, if needed, a tailored instruction—not wholesale exclusion. See id. at 596 (adversary testing is the "traditional and appropriate means" of attacking shaky but admissible evidence); see also Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). The Second Circuit has consistently emphasized that the Rule 702 threshold is intentionally low. Exclusion of expert testimony is the exception, not the rule. So long as the expert employs a reliable methodology and the testimony will assist the trier of fact, challenges to the expert's conclusions go to weight, not admissibility. *See In re Pfizer*, 819 F.3d at 658. "Courts in the Second Circuit [also] liberally construe the expert qualifications requirement," meaning they generally do not exclude expert testimony provided that "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question." *I.M. v. United States*, 362 F. Supp. 3d 161, 192 (S.D.N.Y. 2019).

## II.    SUMMARY OF THE QUAN VU'S EXPERT REPORT

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), Plaintiff's expert, Quan Vu, submitted a written expert report setting forth his opinions, the basis and reasons for those opinions, and the materials he considered in reaching them. *See* Ex. 1. Consistent with this rule, Vu's report disclosed the analytical framework, data, and valuation methods he applied in assessing the fair value of Fusion Modeling Agency LLC ("Fusion") and Fusion's intangible assets at the time of dissolution.

Utilizing the Discounted Cash Flow ("DCF") methodology, Vu concluded that Fusion's enterprise value ranged between $3.4 million and $5.4 million, reflecting the company's intrinsic worth based on its capacity to generate future cash flows. *See* Ex. 1 at 1–2. He selected the DCF method as the most reliable approach, given the absence of publicly available precedent transactions and the limited availability of comparable publicly traded modeling agencies—apart

from Wilhelmina International, Inc. (Nasdaq: WHLM), which served as a benchmark for EBITDA multiples. *See* Ex. 1 at 2–3.

To prepare the valuation, Vu analyzed Fusion's profit and loss statements, tax filings, balance sheets, and bank and credit card statements produced in discovery, covering the period from 2013 through mid-2020. See Ex. 1 at 2–3. He reconstructed historical financials from several exhibits, adjusted for discrepancies between the documents, and derived a mean annual revenue growth rate of 6.73% and average EBITDA and EBIT margins of approximately 8%. These historical margins informed a five-year forecast (2022–2026), with a conservative 25% reduction in operating expenses to account for expected efficiencies. *See* Ex. 1 at 3–4.

Vu further explained that Fusion functioned as a "market maker" in the modeling industry by facilitating transactions between diverse models located across the world and clients seeking inclusive representation for projects, thereby ensuring liquidity in a niche market segment. *See* Ex. 1 at 4. He emphasized that Fusion's "primary asset" was its service mark, which embodied significant goodwill and brand equity developed over fifteen years. *See* Ex. 1 at 5. This intangible asset provided "a competitive advantage, creating barriers to entry for potential competitors and commanding a premium in contractual negotiations." Ex. 1 at 4.

Vu characterized Fusion as a "bolt-on" acquisition candidate that could produce substantial synergies for a larger firm, estimating that an acquirer could achieve an 85–95% reduction in operating expenses—raising the valuation range to approximately $11.4 million to $20.5 million. *See* Ex. 1 at 4. Using DCF analysis, Vu discounted Fusion's projected free cash flows to present value using a weighted average cost of capital ("WACC") between 13% and 17%. *See* Ex. 1 at 4–5. He calculated terminal value under two standard methods: a multiples method applying a 3–5x EBITDA exit multiple (based on Wilhelmina's 3.75x multiple) and a perpetuity growth method

assuming a 6–8% growth rate. *See* Ex. 1 at 4–5. These analyses yielded consistent valuation ranges, confirming the robustness of the model and producing an overall enterprise value between $3.4 million and $5.4 million. *See* Ex. 1 at 6.

## III.    ARGUMENT

Defendants' motion seeks the extraordinary remedy of excluding in its entirety the testimony of Plaintiff's valuation expert under Rule 702 of the Federal Rules for two reasons. Defendants contend that Vu used "(i) an incorrect standard, and therefore will not assist the trier of fact; and (ii) an overwhelming incomplete and incorrect review of the record, which results in an unreliable application of valuation methodologies." Def. Mem. at 1.

Vu, however, applied "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). His opinions rest on sufficient facts and data, and he employed reliable, well-accepted valuation methods that fit the damages issues the jury must decide. *See Daubert*, 509 U.S. at 593–95. Defendants' criticisms are really about labels, inputs, and professional preferences and these go to weight, not admissibility. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).

### A.    DCF is a well-accepted methodology

In this case, if liability is established, the jury will determine (i) Fusion's value as a going concern at dissolution; (ii) the value of, and harm from the misappropriation and continuing exploitation of, Fusion's monetizable intangible assets (trade name/marks, domain/website, social media handles, branded email, and telephone number); and (iii) the economic effect of Defendants' diversion of those assets into Fusion Models BK LLC ("Fusion BK") rather than liquidating and distributing them.

Vu's expert report directly addresses each of these issues using the Discounted Cash Flow ("DCF") method, universally recognized as the most rigorous and widely accepted valuation framework. *See* Ex. 1 at 1–6. His analysis ties every valuation input to documentary evidence in the record, using Fusion's own financial data, growth trajectory, and cost structure.  As the Federal Circuit has observed:

> The DCF [discounted cash flow] method is currently in wide use in the analysis of capital stock, acquisition candidates, capital projects, financial instruments, and contract rights. The DCF method measures the value of a business by forecasting its anticipated net cash flow. Such cash flows are then discounted to present value to account for both: (i) the time value of money; and (ii) business and financial risks.

*Energy Capital Corp. v. United States*, 302 F.3d 1314, 1331 (Fed. Cir. 2002).

Courts repeatedly reaffirm that the DCF method is not only accepted, but essential. *See Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186 (7th Cir. 1993) (describing DCF as "the methodology that experts in valuation find essential"). Defendants themselves concede the point, acknowledging that "the DCF methodology is widely used to assess the intrinsic value of a business or investment by considering both the future earnings potential and risk factors." Def. Mem. at 5. That concession, if anything, understates the matter: economists have traced the concept of discounted cash flow back to ancient Babylon. *See* Phillip R. Daves, Michael C. Ehrhardt & Ronald E. Shrieves, *Corporate Valuation: A Guide for Managers and Investors* 5 (Thomson South-Western 2004).

Courts in this Circuit have consistently approved the use of DCF as a valid and reliable means of determining a company's fair value. *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995) (endorsing extrapolation of going-concern value from historical earnings); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp.

913, 939–43 (S.D.N.Y. 1995) (recognizing DCF and comparable-transaction analysis as valid valuation approaches). Indeed, courts have criticized experts who fail to use DCF altogether. See Lippe, 288 B.R. at 689 (quoting Shannon P. Pratt et al., *Valuing a Business: The Analysis & Appraisal of Closely Held Companies* 154 (4th ed. 2000) as stating: "[R]egardless of what valuation approach is used, in order for it to make rational economic sense from a financial point of view, the results should be compatible with what would result if a well-supported discounted economic income analysis were carried out.").

In short, Defendants' attempt to rebrand Vu's work as measuring "intrinsic" rather than "fair market" value is nothing more than a semantic diversion. Rule 702 requires reliability, not nomenclature. What matters is that Vu applied an established, transparent, and replicable methodology anchored in the record. The DCF model—long regarded as the gold standard for valuing businesses—easily satisfies that test.

Defendants' argument that Vu's analysis is unreliable because he did not interview Ms. Gordon borders on frivolous. Expert valuation analysis does not—and should not—depend on subjective recollections or self-serving narratives from a party whose conduct is the very subject of the litigation. *See* Def. Mem. at 10–11. Valuation experts rely on objective financial evidence, not storytelling. Vu grounded his analysis in Fusion's own contemporaneous financial statements, tax returns, balance sheets, and bank records—precisely the type of primary data that valuation standards require. See Ex. 1 at 2–6. Ms. Gordon's personal opinions about how she ran the company or what she believes Fusion was "worth" would have introduced bias, not reliability, into a financial model.

Moreover, interviewing Ms. Gordon would have been methodologically meaningless. The DCF method measures economic value by projecting future cash flows based on verified historical

performance, not by soliciting speculative commentary from an adverse litigant. *See* Def. Mem. at 10 (claiming that "it was important to interview Gordon who was running the day to day operations of Fusion"). A defendant's narrative about her own conduct is not a recognized input in any professional valuation framework—whether under AICPA, ASA, NACVA, or any other accepted standard. The notion that expert financial analysis must defer to the testimony of the very party accused of wrongdoing makes no sense and confuses advocacy with accounting.

Defendants' insistence that Vu's failure to "speak with Gordon" renders his work incomplete only underscores their misunderstanding of the expert's role. The purpose of expert testimony is to help the trier of fact understand technical and financial data—not to parrot a litigant's personal version of events. No credible valuation expert would contaminate an objective financial model with unverified anecdotes from a party whose incentives are aligned with devaluing the company she took over.

Finally, Defendants' argument is self-defeating. Ms. Gordon's day-to-day operations after dissolution are the very conduct Plaintiff alleges was wrongful—diverting Fusion's assets and goodwill into Fusion BK. Her testimony about those actions is not a valuation input; it is evidence of liability. Vu's independence from Ms. Gordon's self-serving narrative is a strength, not a flaw.

## B.    Vu's Valuation is Rigorous, Data-Driven Expert Analysis

Defendants' assertion that Vu's valuation is "overwhelmingly incomplete and incorrect" mischaracterizes both the record and the expert's methodology. Def. Mem. at 1. Vu reviewed and synthesized Fusion's profit-and-loss statements, balance sheets, and tax returns from 2013 through 2020. *See* Ex. 1 at 2–6. Where overlapping figures differed slightly, he calculated mean, minimum, and maximum values and applied the average historical growth rate of 6.73 percent and average margins of 8.29 percent (EBITDA) and 8.05 percent (EBIT) to forecast future cash flows. His step-

by-step approach—computing averages, projecting revenues over five years, discounting those free cash flows at a 13–17 percent WACC, and performing cross-checks using both terminal-multiple and perpetuity-growth models—reflects precisely the kind of rigor that satisfies Rule 702 and *Daubert*.

During his deposition, Vu explained that his 25 percent operating-expense reduction was a conservative adjustment reflecting ordinary efficiency gains observable in acquisitions or scaling scenarios. *See* Ex. 3 at 37–38. Defendants' counsel pressed this point repeatedly, and Vu emphasized that while larger firms might achieve up to 85–95 percent savings, his model purposefully adopted a far smaller assumption, anchoring the analysis in realism, not optimism. *See* Ex. 3 at 46–48. He also subjected his valuation to sensitivity testing on both discount and growth rates, confirming that both DCF models (terminal multiple and perpetuity) yielded consistent ranges. *See* Ex. 3 at 65–66. Because Fusion operated in a privately held industry with no comparable transactions and only one publicly traded peer (Wilhelmina International Inc.), Vu reasonably used Wilhelmina's 3.75× EBITDA multiple as a benchmark and applied a conservative 3–5× range. *See* Ex. 1 at 5; Ex. 3 at 53–55.

In sum, Vu's report reflects a disciplined and transparent application of the DCF method, grounded in Fusion's historical financials and consistent with accepted valuation practice under Rule 702.

### C.    Vu is Qualified as an Expert

Finally, because Defendants make some disparaging remarks about Vu's professional experience, it bears emphasizing that he is qualified. Vu has over twenty years of experience in valuation, finance, and strategic transactions across the biopharma, healthcare, and technology sectors. *See* Ex. 2 at 1. He has served as Chief Financial Officer, Chief Business Officer, and

Managing Director in corporate finance and M&A advisory roles for both public and private companies, including Ocugen, Inc. (NASDAQ: OCGN), 180 Life Sciences Corp. (NASDAQ: ATNF), Opiant Pharmaceuticals, Inc. (acquired by Indivior PLC), and Impax Laboratories, Inc. (acquired by Amneal Pharmaceuticals). *See* Ex. 2 at 1–2.

Over the course of his career, Vu has structured, negotiated, and closed transactions valued in the billions of dollars, including mergers, acquisitions, licensing agreements, and capital raises. *See* Ex. 2 at 1–3. His deal sheet lists dozens of successful transactions with global firms such as Amgen, Celgene, AstraZeneca, UnitedHealth, and Valeant Pharmaceuticals, demonstrating deep familiarity with valuation methodologies used in both private and public markets. *See* Ex. 2 at 3–4.

Vu holds a Master of Science in Legal Studies from Cornell Law School and a Bachelor of Arts in Economics from UCLA, where he graduated summa cum laude and in the top five percent of his class. See Ex. 2 at 2. His education and hands-on valuation experience in corporate finance and M&A plainly qualify him under Rule 702.

### D.    Responses to the Rebuttal Report

Defendants' rebuttal report does not undermine the reliability or relevance of Vu's opinions. The rebuttal largely reasserts the same criticisms in Defendants' motion—namely, that Vu's valuation was "incomplete," that he applied an "incorrect standard," and that his use of the DCF model was "unreliable." These claims fail for the same reasons discussed above. The rebuttal offers no alternative valuation model grounded in Fusion's actual financial data, and it identifies no computational error or factual omission that meaningfully affects the valuation range set forth in Vu's report. To the contrary, Defendants' own rebuttal confirms that Vu reviewed the same

universe of financial documents that Defendants themselves produced in discovery and relied on those documents as the basis for his quantitative analysis. *See* Ex. 1 at 2–6; Ex. 3 at 37–38.

Second, the rebuttal mischaracterizes Vu's discussion of "intrinsic value" as if it reflected a departure from fair market value. It does not. As Vu explained in deposition, his analysis calculated Fusion's intrinsic or economic worth based on its future cash-generating potential—a method consistent with the DCF framework and fully compatible with fair market valuation principles. *See* Ex. 3 at 29–34. As courts have recognized, DCF inherently measures the fair market value of an enterprise by discounting expected future cash flows to their present value. *See Frymire-Brinati*, 2 F.3d at 186. The rebuttal's semantic critique ignores that both "intrinsic" and "fair market" value rest on the same underlying principle: the economic worth of future cash flows adjusted for risk and time.

Third, Defendants' rebuttal attacks individual assumptions—such as Vu's 25 percent expense reduction and 6–8 percent growth rate—without offering any competing empirical support. Those adjustments are well within normal valuation parameters and were transparently disclosed so that the jury can make its adjudgments as it sees fit based on its own experience and determination. *See* Ex. 1 at 3–4; Ex. 3 at 46–48, 65–66. Defendants' rebuttal does not identify any documentary evidence contradicting those assumptions, nor does it propose alternative inputs or models that would yield materially different results. Disagreements over these assumptions go to weight, not admissibility, and are for the jury to decide. *See McCullock*, 61 F.3d at 1044.

Finally, the rebuttal's attempt to challenge Vu's professional background adds nothing to the reliability analysis. As shown in Ex. 2, Vu's twenty-plus years of experience in corporate finance and valuation easily exceed Rule 702's qualification threshold. He has performed valuations and structured transactions worth billions of dollars, applying the same DCF

methodology at the core of his analysis here. See Ex. 2 at 1–3. Defendants' rebuttal substitutes rhetoric for substance; it does not identify a single methodological flaw, factual error, or professional standard that Vu violated. The Court should therefore reject the rebuttal's arguments as immaterial and reiterate that the weight of Vu's opinions is a question for the jury.

## IV.    CONCLUSION

Even on Defendants' own account, their disputes with Mr. Vu's analysis raise quintessential jury questions, not admissibility issues. It is for the jury to decide whether a strategic buyer would value the assets based on the expectation of achieving expense efficiencies; whether the DCF or capitalization-of-earnings model better captures Fusion's cash-generating capacity; whether Wilhelmina International is a reasonable industry benchmark; whether long-term growth should be 6–8% or some lower figure; and whether Fusion's brand and digital infrastructure—the website, Instagram account, email system, and telephone number—constituted its core intangible assets, are all matters for cross-examination and competing evidence, not exclusion. These are precisely the kinds of factual and economic issues for which expert testimony assists the trier of fact.

If the Court harbors any concern about a particular assumption or data input, the proper remedy is adversarial testing, not disqualification. *See Daubert*, 509 U.S. at 596 (cross-examination and contrary evidence are the "traditional and appropriate means" of challenging admissible but disputed expert opinions). Rule 702 entrusts such debates to the crucible of trial, where the jury weighs credibility and persuasiveness—not to pretrial exclusion based on methodological quibbles.

At its core, the jury must determine whether Fusion's greatest value resided in its brand and digital channels—the very assets Defendants continued to exploit. Modeling agencies operate as two-sided marketplaces: models seek agencies with strong client networks, and clients gravitate

toward agencies with desirable talent. The "matchmaking" function that drives this marketplace depends on brand identity and digital reach. Fusion's domain, Instagram presence, branded email, and telephone number created network effects that amplified the agency's value and market position. Measuring those channels and associated goodwill is not speculative—it is standard intangible-asset valuation.

Mr. Vu's testimony gives the jury the analytical tools to translate those economic realities into monetary terms, fulfilling exactly the purpose of Rule 702. Defendants' disagreement with his weighting of intangible assets or selection of comparables does not render his methodology unreliable; it merely defines the scope of cross-examination. Such differences go to the weight of the evidence, not its admissibility.

The motion to exclude should therefore be denied in its entirety.

Dated: October 27, 2025
Brooklyn, New York

Respectfully submitted,
By: /s/ Brian Lehman
Brian Lehman, Esq.
KASELL LAW FIRM
1038 Jackson Avenue, Suite 4
Long Island City, NY 11101
Attorneys for Plaintiff Kevin Pollack