UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

KEVIN POLLACK,                                           23 Civ. 02376 (SJB)

        *Plaintiff*,

    -against-

JODIE LOUISE GORDON (also known as JODY
GORDON) and FUSION MODELS BK LLC,

        *Defendants*.

---------------------------------------------------------------X

## DECLARATION OF BRIAN LEHMAN, ESQ.
## IN OPPOSITION TO MOTION TO EXCLUDE PLAINTIFF'S EXPERT
(28 U.S.C. § 1746)

I, Brian Lehman, Esq., pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am counsel of record for Plaintiff Kevin Pollack in the above-captioned action. I am admitted to practice in this matter *pro hac vice* and submit this declaration in support of Plaintiff's opposition to Defendants' motion to exclude the opinions and testimony of Plaintiff's expert, Quan Vu, under Federal Rule of Evidence 702, and to authenticate the accompanying materials under Federal Rule of Civil Procedure 56(c)(4) and Local Civil Rule 56.1(d).

2.      The documents identified below were produced or obtained in discovery in this case, have been maintained by me in the ordinary course of my practice, and are true and correct copies of the documents they purport to be. To the best of my knowledge, information, and belief, they are authentic and unaltered in any material respect. This declaration is made to satisfy the evidentiary foundation required by the Federal Rules of Evidence, including Rules 901 and 1002.

3.      Attached hereto are the following exhibits:

**Exhibit 1 —** Expert Report of Quan Vu ("Vu Report");

**Exhibit 2 —** Resume and Deal Sheet of Quan Vu;

**Exhibit 3 —** Excerpts from the Deposition Transcript of Quan Vu, dated June 4, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 27, 2025,
Brooklyn, New York.

/s/ *Brian Lehman*
Brian Lehman, Esq.
*Counsel for Plaintiff Kevin Pollack*

Exhibit 1

Expert Report of Quan Vu

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

 KEVIN POLLACK,

                        Plaintiff,

                                                      23 Civ. 2376 (KAM) (SJB)

         -against-

JODIE LOUISE GORDON (also known as
JODY GORDON) and FUSION MODELS
BK LLC,

                        Defendants.

-------------------------------------------------------------------------X

**Expert Report on**
**Valuation of Fusion Modeling Agency LLC as**
**<u>of Judicial Dissolution (April 30, 2021)</u>**

This report summarizes my expert testimony in valuing Fusion Modeling Agency LLC ("Fusion" or "the Company"), a limited liability company formed under the laws of New York that was judicially dissolved on April 30, 2021, in *Jodie Gordon v. Fusion Modeling Agency, LLC*, Index No. 500709/2021 (Kings County Supreme Court) (Martin, J.).

Utilizing the Discounted Cash Flow ("DCF") methodology, I estimate Fusion's value to be between $3.4 million and $5.4 million. The DCF methodology is a financial valuation method used to estimate the value of a company based on its expected future cash flows. The DCF approach projects the future cash flows the entity is expected to generate and then discounts them back to their present value using a discount rate, typically the weighted average cost of capital (WACC).

The main idea behind the DCF method is that the value of an investment today is equal to the sum of all its future cash flows, adjusted for cash flow risks and the time value of money, which reflects the idea that money available today is worth more than the same amount in the future due to its potential earning capacity. The DCF methodology is widely used to assess the intrinsic value of a business or investment by considering both future earnings potential and risk factors.

This valuation is based on several sources of information including Profit & Loss ("P&L") statements from for 2013 through Q2 2020 provided by Fusion; Fusion's tax filings, balance sheets, bank statements and credit card statements turned over in discovery in this litigation (D0001-02139); and publicly available data for a publicly traded comparable company, Wilhelmina International, Inc. ("Wilhelmina"; Nasdaq-CM ticker: WHLM) including the information and financial data available in Wilhelmina's Annual Reports (Form 10-K) and Quarterly Reports (Form 10-Q).

## **Background on Valuation**

There are three widely accepted valuation methodologies for businesses:

**(1) Discounted Cash Flow (DCF)**: The DCF method estimates a company's intrinsic value based on its expected future cash flows. The process starts by forecasting the company's free cash flows over a set period, typically five to ten years. This forecast uses assumptions about revenue growth, operating margins, capital expenditures, and working capital needs. The projected cash flows are then discounted to their present value using a discount rate, usually the company's Weighted Average Cost of Capital (WACC), which reflects the time value of money and the risks associated with future cash flows.

After the forecast period, a terminal value is calculated to estimate the company's worth beyond that horizon. Terminal value represents the estimated value of a business or asset at the end of a specific forecast period when future cash flows can be projected more reliably. It accounts

for all future cash flows beyond the forecast period, essentially capturing the company's value into perpetuity.

Two primary methods exist for calculating the terminal value: (1) Multiples Method: This involves applying a valuation multiple, such as EBITDA, revenue, or net income, to the company's financials at the end of the forecast period. This method is based on comparable companies within the same industry and provides a market-based valuation, and (2) Perpetuity Growth Method: This assumes the company will continue to generate cash flows at a constant growth rate indefinitely. It is ideal for mature, stable companies expected to grow steadily over time. Both methods are often used as checks against each other to ensure consistency in the valuation results.

**(2) Comparable Companies Analysis (Comps)**: Comps estimates a company's value by comparing it to similar companies within the same industry or sector. This approach is based on the idea that similar companies should have similar market valuation metrics. The process starts by selecting a group of peer companies that match the target company in industry, size, growth potential, and financial characteristics.

Once the peer group is chosen, key financial metrics, such as Enterprise Value to EBITDA (EV/EBITDA) and Price-to-Earnings (P/E) ratios, are calculated for each comparable company. These multiples are obtained by dividing each company's market or enterprise value by its respective financial metric. This standardizes comparisons across companies. The mean and median of these multiples are often used as they provide a reliable benchmark, mitigating the impact of outliers and presenting a balanced view of market valuations.

These multiples are then applied to the target company's financial metrics to estimate its value. Adjustments may be needed to account for differences in growth rates, profitability, or capital structure to improve accuracy. The outcome is a valuation range that reflects how the market values similar companies.

**(3) Precedent Transaction Analysis (Transaction Comps)**: Transaction Comps estimates a company's value by examining prices paid in past transactions involving similar companies. The idea is that comparable companies in similar situations are valued similarly in mergers, acquisitions, or buyouts. The process starts by identifying relevant past transactions in the same industry or involving similar companies.

Key valuation multiples, such as EV/EBITDA and P/E ratios, are derived based on the transaction price and the financial metrics of the acquired company at the time of the deal. The mean and median of these multiples create a benchmark that is applied to the target company's financial metrics. Adjustments may be made for differences such as size, market conditions, or growth potential.

2

Transaction Comps is valuable because it reflects the premiums paid in acquisitions, including synergies, strategic value, or control premiums. However, this method relies on the availability of recent and relevant transaction data, and unique deal circumstances can sometimes make direct comparisons challenging.

**Valuation of Fusion**

The Discounted Cash Flow or DCF method is the most suitable and reliable valuation methodology because there are no publicly available precedent transactions and limited public traded comps (*i.e.*, Wilhelmina). As explained above, the DCF method emphasizes Fusion's ability to generate future cash flows, providing an intrinsic valuation based on the company's specific financial performance and growth prospects.

To forecast Fusion's P&L statements for the DCF valuation, historical data from Exhibits O, P, Q, and R, covering the period from 2013 through the second quarter of 2020, was used. The first step involved constructing historical P&Ls from all four exhibits, despite discrepancies in overlapping figures. To address these inconsistencies and assess their magnitude, the mean, maximum, and minimum values were calculated for overlapping data points. The mean historical annual revenue growth rate (6.73%) was then applied to project Fusion's revenues for the 2022-2026 period (a five-year forecast). For the other P&L line items, the mean of the historical margins was calculated and applied to derive the forecasted values (8.29% for EBITDA and 8.05% for EBIT), ensuring consistency and accuracy in the projections. This structured approach enabled a robust, data-driven forecast for Fusion's P&L statements, forming the basis for the DCF valuation.

With the forecasted P&L complete, the valuation process moved to calculating free cash flows for the five-year forecast period based on revenue projections, incorporating a 25% reduction in operating expenses to reflect reasonable, expected efficiency improvements. It bears emphasizing that may be viewed as a very conservative reduction given that Fusion's primary asset is its service mark, which is associated with Fusion Models being a pioneer in promoting diversity and inclusion in the modeling industry particularly for high-end fashion.

From an economic perspective, Fusion Models operates as a market maker within the modeling industry by facilitating transactions between diverse models and clients seeking inclusive representation for high-end projects, thereby ensuring liquidity in a niche market segment. Fusion has positioned itself itself as an intermediary that provides reliable access to a diverse talent pool, Fusion enhances market efficiency, and it is able to capture the surplus. Fusion has a gross profit margin of approximately 30% ((gross profits – costs of good and services)/(gross profits)).

Fusion's established, strategic positioning allows the company to capture value through a robust network effect, driving demand from both sides of the market. Fusion's commitment to diversity serves as a differentiator that attracts premium models and clientele, thereby augmenting its pricing power and reinforcing its status as an industry leader.

The primary asset of Fusion Models is its service mark, which functions as intellectual property embodying significant goodwill and brand equity that was established over 15 years. The service mark "Fusion" is a powerful intangible asset. This brand equity provides a competitive advantage, creating barriers to entry for potential competitors and commanding a premium in contractual negotiations. The service mark acts as an economic moat, protecting the firm's market share and ensuring long-term profitability.

From an economic perspective, Fusion is a "bolt-on" company -- that is, Fusion is a smaller business that could be acquired by a larger company, typically a strategic acquirer or a private equity firm, to complement and enhance the operations of an existing platform company. The bolt-on is integrated into the parent company's existing business structure to create value through synergies, such as expanding market share, enhancing product offerings, or increasing operational efficiencies.

The goal of acquiring a bolt-on company is to achieve strategic growth by leveraging the existing infrastructure, distribution channels, or expertise of the larger company, thereby maximizing economies of scale and reducing costs. This type of acquisition strategy allows the larger entity to quickly diversify its portfolio, enter new markets, or strengthen its competitive position without having to develop those capabilities organically.

A larger company that acquires Fusion could reasonably expect to achieve an 85-95% reduction in operating expenses, which is significantly higher than the 25% reduction I have included in this valuation. An 85% reduction in expenses produces a valuation range of $11.4 million to $18.4 million and a 95% reduction in expenses produces a valuation range of $12.7 million to $20.5 million.  For example, a larger company would benefit from economies of scale on expenses such as accounting, legal, and professional services, and meals, which total $178,283 according to Fusion's 2021 Federal Partnership Tax Return (D0495).

In simple terms, a larger company would already have in-house counsel and accounting, allowing it to eliminate these expenses immediately.  That is, redundancies would be eliminated. Similarly, a modeling agent's budget for meals would already be accounted for and could be eliminated.  Finally, a review of the bank and credit card statements for Fusion shows that many of the expenses are of a more personal benefit to one of the managing members (such as SoulCyle memberships, frequent Uber rides, and spa treatments) that a larger company would expect to eliminate.

The efficiency of collections and returns would also improve, as larger companies are more effective in these areas; clients who fail to pay would not receive repeated services. This enhanced efficiency not only streamlines cash flow but also reduces the administrative burden associated

with follow-up on outstanding payments. Additionally, the established reputation and resources of a larger company can lead to higher client compliance and quicker resolution of payment issues.

After calculating free cash flows for the five-year forecast period based on revenue projections, Fusion's free cash flows were discounted to their present value using a WACC (Weighted Average Cost of Capital) range of 13-17%, accounting for the risk and time value of Fusion's future cash flows. To estimate the terminal value, two methods were employed. The first was the multiples method, which applied an exit multiple of 3-5x EBITDA, referencing Wilhelmina's EBITDA multiple of 3.75x as of December 12, 2022, to provide a market-based estimate for Fusion's value beyond the forecast period. The second method, the perpetuity growth approach, assumed a perpetual growth rate of 6-8% to estimate the ongoing value of Fusion's cash flows. Terminal values from both methods were discounted to their present value using the same WACC range. The multiples method produced a valuation range of $2.8-$3.4 million at a 15% WACC with a 3-5x EBITDA exit multiple, while the perpetuity method yielded a valuation range of $5.4-$6.5 million with a 6-8% annual growth rate. The combined present value of the forecasted cash flows and terminal value provided a comprehensive valuation of Fusion, covering both near-term projections and long-term growth potential. This approach offered a balanced valuation, even with limited comparable market and transaction data.

DCF is a robust valuation method with several advantages in valuing Fusion. Primarily, it provides an intrinsic valuation by focusing on the company's ability to generate future cash flows, making it less influenced by short-term market fluctuations and investor sentiment. As a result, the DCF often leads to more conservative valuations compared to market-based methods like Comps and Transaction Comps. This conservatism makes it ideal for producing a cautious and fundamental estimate of a company's value. Additionally, the DCF's forward-looking nature allows for consideration of potential growth and strategic initiatives, making it especially useful for companies with strong future prospects. Its flexibility enables practitioners to adapt it to different industries, business models, and economic conditions, incorporating various scenarios and assumptions. This adaptability, combined with its comprehensive focus on cash generation, ensures a thorough and detailed assessment of a company's intrinsic value.

The DCF method's ability to change assumptions serves as a strength, requiring rigorous evaluation and justification of each projection. This ensures that every assumption is grounded in careful analysis and realistic expectations. This sensitivity highlights the importance of thorough research, enabling more accurate and nuanced valuations. DCF's complexity is also beneficial because it ensures that all aspects of a company's operations, from revenue to capital expenditures, are examined. This level of detail provides a more comprehensive and accurate reflection of the company's value than simpler models can. Although estimating the terminal value involves judgment, using both the multiples method and the perpetuity growth method can yield a range of outcomes for a balanced valuation. By applying sensitivity analysis to different scenarios, one can

test the strength of their valuations, making the DCF not only reliable but also adaptable to changing conditions. Thus, DCF remains one of the most insightful tools for assessing a company's intrinsic value, far outweighing its potential challenges.

In this case, DCF is the most appropriate methodology for valuation, offering a conservative, intrinsic valuation grounded in projected future cash flows. Fusion's enterprise value is estimated to range between $3.4 million and $5.4 million.

Quan A Vu
November 4, 2024

**Fusion Modeling Agency LLC: Raw Income Statements**

**Profit & Loss**
**Jan 2015 - Jun 2020 (Exhibit R)**
**Date: 7/24/20**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1Q 2020 | 2Q 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income** | | | | | | | | | |
| Advance Fees | | | | | | | | | |
| Agency Fee | | | | | | | | | |
| Agency Fee (Models) | | | | | | | | | |
| CC Fees | | | | | | | | | |
| Expenses Recovered | | | | | | | | | |
| MA Fee's | | | | | | | | | |
| Model Fees | | | | | | | | | |
| Uncategorized Income | | | | | | | | | |
| Usage | | | | | | | | | |
| Write-Offs Collected | | | | | | | | | |
| Other (Consolidated) | | | 3,774,700.00 | 4,563,064.00 | 4,893,369.33 | 5,751,701.67 | 5,619,379.64 | 1,280,860.93 | 305,344.01 |
| **Total Income** | | | **3,774,700.00** | **4,563,064.00** | **4,893,369.33** | **5,751,701.67** | **5,619,379.64** | **1,280,860.93** | **305,344.01** |
| **COGS** | | | | | | | | | |
| Model Expenses | | | 2,515,876.00 | 3,157,295.00 | 3,286,615.67 | 4,060,624.33 | 3,927,157.78 | 836,215.49 | 190,704.67 |
| Model Payments | | | | | | | | | |
| **Total COGS** | | | **2,515,876.00** | **3,157,295.00** | **3,286,615.67** | **4,060,624.33** | **3,927,157.78** | **836,215.49** | **190,704.67** |
| **Gross Profit** | | | **1,258,824.00** | **1,405,769.00** | **1,606,753.66** | **1,691,077.34** | **1,692,221.86** | **444,645.44** | **114,639.34** |
| **Expense** | | | | | | | | | |
| Advertising | | | | | | 598.00 | 225.00 | | |
| Depreciation | | | | | 30,538.56 | 30,538.56 | 30,538.56 | 7,634.64 | 7,634.64 |
| Insurance | | | 29,189.04 | 53,206.40 | 47,339.90 | 64,659.90 | 43,878.09 | 11,539.38 | 11,725.28 |
| Interest | | | 1,433.17 | 25,417.67 | 53,906.18 | 36,042.21 | 31,996.53 | 80.72 | |
| Licenses and Permits | | | 3,578.00 | 150.00 | 150.00 | 1,630.00 | | | |
| Marketing | | | 102,500.00 | 248,500.00 | 107,000.00 | 620.59 | 3,200.00 | | |
| Meals & Entertainment | | | 61,991.23 | 66,145.82 | 66,532.20 | 45,596.37 | 32,117.63 | 18,419.54 | |
| Merchant Deposit Fees | | | | | | | | | |
| Mother Agency | | | 72,903.13 | 97,870.64 | 173,777.18 | 172,793.93 | 177,084.66 | 39,331.67 | 830.00 |
| Office Expenses | | | 81,595.22 | 125,047.28 | 103,357.42 | 111,164.63 | 125,613.66 | 16,133.09 | 4,249.16 |
| Payroll | | | 504,866.91 | 616,906.22 | 669,639.52 | 661,067.83 | 723,463.68 | 182,016.56 | 143,635.64 |
| Professional Fees | | | 57,043.95 | 38,992.47 | 31,943.90 | 67,749.87 | 80,629.03 | 16,613.46 | 19,630.32 |
| Reconciliation Discrepancies | | | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Reimbursement | | | | | | | |
| Rent | 83,976.52 | 64,024.31 | 72,278.28 | 168,204.28 | 189,920.26 | 21,403.23 | 27,717.00 |
| Taxes | 7,327.81 | 5,580.45 | 1,500.00 | | 8,268.34 | 1,500.00 | |
| Telephone | | | | | | | |
| Travel | 225,118.06 | 264,723.24 | 196,908.64 | 298,009.44 | 228,707.67 | 65,534.76 | 6,477.90 |
| Utilities | 27,384.96 | 32,742.58 | 24,305.46 | 37,629.33 | 42,211.79 | 14,265.98 | 5,286.59 |
| Other (QuickBooks) | | 1,040.92 | 1,115.73 | 2,117.06 | 2,335.10 | 4,489.35 | 943.93 |
| **Total Expense** | **1,258,908.00** | **1,640,348.00** | **1,580,293.00** | **1,698,422.00** | **1,720,190.00** | **398,962.38** | **228,130.46** |
| | | | | | | | |
| **Net Ordinary Income** | **(84.00)** | **(234,579.00)** | **26,460.66** | **(7,344.66)** | **(27,968.14)** | **45,683.06** | **(113,491.12)** |
| Other Income | | | | | | | |
| Other Expense | | | | | | | |
| **Net Other Income** | **--** | **--** | **--** | **--** | **--** | **--** | **--** |
| **Net Income** | **(84.00)** | **(234,579.00)** | **26,460.66** | **(7,344.66)** | **(27,968.14)** | **45,683.06** | **(113,491.12)** |

**Profit & Loss**
**Jan 2015 - 1Q 2020 (Exhibit Q)**
**Date: 5/28/20**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1Q 2020 | 2Q 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income** | | | | | | | | | |
| Advance Fees | | | | | | | | | |
| Agency Fee | | | 527,808.78 | 626,949.19 | 668,595.71 | 798,266.78 | 757,928.76 | 173,403.96 | |
| Agency Fee (Models) | | | 534,735.54 | 686,833.02 | 661,515.16 | 794,283.11 | 742,512.78 | 162,741.19 | |
| CC Fees | | | | | | | | | |
| Expenses Recovered | | | 181,346.76 | 86,264.81 | 72,149.02 | 144,252.13 | 88,880.08 | 2,564.71 | |
| MA Fee's | | | | | | | | | |
| Model Fees | | | 2,472,233.36 | 3,024,436.19 | 3,357,213.51 | 3,990,966.78 | 3,984,898.37 | 922,924.03 | |
| Uncategorized Income | | | | | | | | | |
| Usage | | | | | | | | | |
| Write-Offs Collected | | | | | | | | | |
| Other | | | 58,575.56 | 138,580.79 | 134,312.60 | 23,516.20 | 40,625.01 | 19,312.98 | |
| **Total Income** | | | **3,774,700.00** | **4,563,064.00** | **4,893,786.00** | **5,751,285.00** | **5,614,845.00** | **1,280,946.87** | |
| | | | | | | | | | |
| **COGS** | | | | | | | | | |
| Model Expenses | | | 39,924.12 | 37,578.05 | 409,287.34 | 179,814.75 | 554,620.22 | (22,166.85) | |
| Model Payments | | | 2,475,951.88 | 3,119,716.95 | 2,879,411.66 | 3,878,226.25 | 3,352,113.78 | 857,639.20 | |
| **Total COGS** | | | **2,515,876.00** | **3,157,295.00** | **3,288,699.00** | **4,058,041.00** | **3,906,734.00** | **835,472.35** | |
| | | | | | | | | | |
| **Gross Profit** | | | **1,258,824.00** | **1,405,769.00** | **1,605,087.00** | **1,693,244.00** | **1,708,111.00** | **445,474.52** | |

**Expense**

| | | | | | | |
|---|---|---|---|---|---|---|
| Advertising | | | | | | |
| Depreciation | | | | | | |
| Insurance | | | | | | |
| Interest | | | | | | |
| Licenses and Permits | | | | | | |
| Marketing | | | | | | |
| Meals & Entertainment | | | | | | |
| Merchant Deposit Fees | | | | | | |
| Mother Agency | | | | | | |
| Office Expenses | | | | | | |
| Payroll | 504,866.91 | 616,906.22 | 669,639.52 | 661,067.83 | 723,463.68 | 182,016.56 |
| Professional Fees | | | | | | |
| Reconciliation Discrepancies | | | | | | |
| Reimbursement | | | | | | |
| Rent | 83,976.52 | 64,024.31 | 72,278.28 | 168,204.28 | 189,920.26 | 7,000.00 |
| Taxes | 7,327.81 | 5,580.45 | 1,500.00 | -- | 8,268.34 | 1,500.00 |
| Telephone | | | | | | |
| Travel | 225,118.06 | 264,723.24 | 196,908.64 | 298,009.44 | 228,128.67 | 72,269.51 |
| Utilities | 27,384.96 | 32,742.58 | 24,305.46 | 37,629.33 | 42,211.79 | 14,265.98 |
| Other | 410,233.74 | 656,371.20 | 615,661.10 | 533,511.12 | 527,682.26 | 210,796.74 |
| **Total Expense** | **1,258,908.00** | **1,640,348.00** | **1,580,293.00** | **1,698,422.00** | **1,719,675.00** | **487,848.79** |
| | | | | | | |
| **Net Ordinary Income** | **(84.00)** | **(234,579.00)** | **24,794.00** | **(5,178.00)** | **(11,564.00)** | **(42,374.27)** |
| Other Income | | | | | | |
| Other Expense | | | | | | |
| **Net Other Income** | **--** | **--** | **--** | **--** | **--** | **--** |
| **Net Income** | **(84.00)** | **(234,579.00)** | **24,794.00** | **(5,178.00)** | **(11,564.00)** | **(42,374.27)** |

**Profit & Loss**
**Jan 2013 - Dec 2017 (Exhibit P)**
**Date: 1/9/18**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1Q 2020 | 2Q 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income** | | | | | | | | | |
| Advance Fees | 1,390.00 | 4,420.00 | 2,080.00 | 800.00 | 690.00 | | | | |
| Agency Fee | 535,847.33 | 560,916.43 | 528,405.45 | 628,370.85 | 668,870.91 | | | | |
| Agency Fee (Models) | 523,174.72 | 558,687.84 | 536,055.54 | 687,366.35 | 655,387.03 | | | | |
| CC Fees | -- | 15.00 | 525.60 | 741.42 | 847.20 | | | | |
| Expenses Recovered | 43,541.05 | 64,358.25 | 167,249.40 | 87,077.22 | 66,757.04 | | | | |

| | | | | | |
|---|---|---|---|---|---|
| MA Fee's | 17,551.61 | 74,798.54 | 47,818.71 | 91,976.56 | 70,127.51 |
| Model Fees | 2,563,744.05 | 2,562,928.13 | 2,475,216.69 | 3,031,844.53 | 3,356,269.58 |
| Uncategorized Income | -- | | -- | | |
| Usage | -- | 17,500.00 | -- | 17,530.47 | 50,896.04 |
| Write-Offs Collected | 204,523.81 | -- | | 20,670.43 | 8,331.90 |
| Other | -- | -- | -- | -- | -- |
| **Total Income** | **3,889,772.57** | **3,843,624.19** | **3,757,351.39** | **4,566,377.83** | **4,878,177.21** |
| | | | | | |
| **COGS** | | | | | |
| Model Expenses | 161,018.48 | 74,471.68 | 10,451.42 | 58,113.73 | (68,662.37) |
| Model Payments | 2,547,089.19 | 2,547,214.85 | 2,482,551.88 | 3,114,783.62 | 3,277,997.76 |
| **Total COGS** | **2,708,107.67** | **2,621,686.53** | **2,493,003.30** | **3,172,897.35** | **3,209,335.39** |
| | | | | | |
| **Gross Profit** | **1,181,664.90** | **1,221,937.66** | **1,264,348.09** | **1,393,480.48** | **1,668,841.82** |
| | | | | | |
| **Expense** | | | | | |
| Advertising | -- | -- | -- | -- | 10,000.00 |
| Depreciation | | | | | 30,538.56 |
| Insurance | 26,423.30 | 36,063.53 | 32,386.23 | 56,904.77 | 50,827.89 |
| Interest | 5,153.41 | 1,519.67 | 1,433.17 | 994.94 | 53,906.18 |
| Licenses and Permits | -- | | 3,578.00 | 150.00 | 150.00 |
| Marketing | 73,607.92 | 129,677.50 | 102,500.00 | 248,500.00 | 97,000.00 |
| Meals & Entertainment | 71,751.60 | 67,248.59 | 61,991.23 | 66,145.82 | 66,532.20 |
| Merchant Deposit Fees | | | | 1,040.92 | 1,115.73 |
| Mother Agency | 87,815.72 | 81,614.58 | 72,903.13 | 101,200.28 | 214,016.70 |
| Office Expenses | 63,613.46 | 63,622.56 | 93,746.08 | 85,373.55 | 111,531.99 |
| Payroll | 445,917.78 | 474,704.05 | 504,866.91 | 616,906.22 | 669,639.52 |
| Professional Fees | 33,925.36 | 49,540.20 | 57,043.95 | 38,992.47 | 31,943.93 |
| Reconciliation Discrep | 0.26 | -- | -- | (794.88) | -- |
| Reimbursement | 140.00 | -- | 1,050.00 | 95.41 | -- |
| Rent | 103,905.43 | 88,667.46 | 102,442.66 | 80,994.68 | 86,326.75 |
| Taxes | 23.26 | 4,214.31 | 7,327.81 | 5,580.45 | 1,500.00 |
| Telephone | 9,444.55 | 7,099.71 | 6,655.96 | 14,154.42 | 13,468.76 |
| Travel | 145,135.68 | 189,849.62 | 232,911.90 | 244,054.50 | 179,275.72 |
| Utilities | 18,112.08 | 21,034.96 | 20,729.00 | 18,588.16 | 10,836.70 |
| Other | -- | -- | -- | -- | -- |
| **Total Expense** | **1,084,969.81** | **1,214,856.74** | **1,301,566.03** | **1,578,881.71** | **1,628,610.63** |
| | | | | | |
| **Net Ordinary Income** | **96,695.09** | **7,080.92** | **(37,217.94)** | **(185,401.23)** | **40,231.19** |
| Other Income | 6.20 | 12.06 | 0.10 | -- | -- |
| Other Expense | 29,215.11 | 19,424.17 | 7,266.69 | 74,572.83 | 52,324.75 |
| **Net Other Income** | **(29,208.91)** | **(19,412.11)** | **(7,266.59)** | **(74,572.83)** | **(52,324.75)** |

**Net Income**          **67,486.18**      **(12,331.19)**      **(44,484.53)**      **(259,974.06)**      **(12,093.56)**


**Profit & Loss**
**Jan 2015 - Oct 2017 (Exhibit O)**
**Date: 11/14/18**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1Q 2020 | 2Q 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income** | | | | | | | | | |
| Advance Fees | | | 2,080.00 | 800.00 | 690.00 | | | | |
| Agency Fee | | | 528,355.45 | 628,237.52 | 671,629.04 | | | | |
| Agency Fee (Models) | | | 534,735.54 | 687,233.02 | 664,238.49 | | | | |
| CC Fees | | | 525.60 | 741.42 | 847.20 | | | | |
| Expenses Recovered | | | 167,249.40 | 87,077.22 | 72,149.02 | | | | |
| MA Fee's | | | 45,914.71 | 88,694.56 | 70,276.34 | | | | |
| Model Fees | | | 2,474,966.69 | 3,031,177.86 | 3,372,380.18 | | | | |
| Uncategorized Income | | | -- | -- | | | | | |
| Usage | | | -- | 17,530.47 | 50,896.04 | | | | |
| Write-Offs Collected | | | -- | 20,670.43 | 8,331.90 | | | | |
| Other | | | -- | -- | | | | | |
| **Total Income** | | | **3,753,827.39** | **4,562,162.50** | **4,911,438.21** | | | | |
| **COGS** | | | | | | | | | |
| Model Expenses | | | (9,669.81) | 18,821.03 | (57,125.80) | | | | |
| Model Payments | | | 2,496,073.11 | 3,153,409.65 | 3,316,792.57 | | | | |
| **Total COGS** | | | **2,486,403.30** | **3,172,230.68** | **3,259,666.77** | | | | |
| **Gross Profit** | | | **1,267,424.09** | **1,389,931.82** | **1,651,771.44** | | | | |
| **Expense** | | | | | | | | | |
| Advertising | | | | | | | | | |
| Depreciation | | | -- | -- | 30,538.56 | | | | |
| Insurance | | | 32,386.23 | 56,904.77 | 50,827.89 | | | | |
| Interest | | | 1,433.17 | 994.94 | 53,906.18 | | | | |
| Licenses and Permits | | | 3,578.00 | 150.00 | 150.00 | | | | |
| Marketing | | | 102,500.00 | 248,500.00 | 107,000.00 | | | | |
| Meals & Entertainment | | | 61,991.23 | 66,145.82 | 66,532.20 | | | | |
| Merchant Deposit Fees | | | -- | 1,040.92 | 1,115.73 | | | | |
| Mother Agency | | | 72,903.13 | 101,200.28 | 214,016.70 | | | | |
| Office Expenses | | | 93,746.08 | 85,373.55 | 111,576.99 | | | | |
| Payroll | | | 504,866.91 | 616,906.22 | 669,639.52 | | | | |

| | | | |
|---|--:|--:|--:|
| Professional Fees | 57,043.95 | 38,992.47 | 31,943.93 |
| Reconciliation Discrepancies | -- | (794.88) | 183.37 |
| Reimbursement | 1,050.00 | 95.41 | -- |
| Rent | 102,442.66 | 80,994.68 | 86,326.75 |
| Taxes | 7,327.81 | 5,580.45 | 1,500.00 |
| Telephone | 6,655.96 | 14,154.42 | 13,468.76 |
| Travel | 232,911.90 | 244,054.50 | 179,372.18 |
| Utilities | 20,729.00 | 18,588.16 | 10,836.70 |
| Other (Admin, Ins & Other Expenses) | -- | -- | -- |
| **Total Expense** | **1,301,566.03** | **1,578,881.71** | **1,628,935.46** |
| | | | |
| **Net Ordinary Income** | **(34,141.94)** | **(188,949.89)** | **22,835.98** |
| Other Income | 0.10 | -- | -- |
| Other Expense | 7,266.69 | 74,572.83 | 51,274.75 |
| **Net Other Income** | **(7,266.59)** | **(74,572.83)** | **(51,274.75)** |
| **Net Income** | **(41,408.53)** | **(263,522.72)** | **(28,438.77)** |

# Fusion Modeling Agency LLC: Raw Balance Sheet Statements

Balance Sheet
2015 - 2019 (Exhibit Q); 2020 - 2021 (Exhibits from Defendant's Objections)
Date: 7/24/20

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | |
| **Current Assets** | | | | | | | | | |
| **Bank Accounts** | | | | | | | | | |
| Payroll Account | | | 291.34 | 1,454.85 | 768.62 | (4,833.86) | (18.00) | 106,948.80 | 5,918.76 |
| Money Market Account | | | 195.47 | (69,413.56) | 0.65 | 26.01 | 500.94 | 58,406.27 | |
| Chase Checking | | | 145.19 | 351.12 | 211.23 | -- | -- | 1,000.00 | 1,000.00 |
| Chase Checking (Main) | | | 30,782.00 | 135,374.59 | (4,951.63) | (24,093.96) | (20,592.70) | 53,954.23 | (4,070.00) |
| **Total Bank Accounts** | | | **31,414.00** | **67,767.00** | **(3,971.13)** | **(28,901.81)** | **(20,109.76)** | **162,663.66** | **61,255.03** |
| **Accounts Receivable** | | | 841,904.89 | 718,365.35 | 754,422.11 | 973,992.96 | 1,305,797.34 | 666,124.16 | 813,511.68 |
| **Other Current Assets** | | | | | | | | | |
| Model Advances Receivable | | | 128,662.86 | 178,851.07 | 212,246.68 | 264,818.68 | 305,149.15 | 170,239.60 | 169,223.82 |
| Pre-Paid Commissions (deleted) | | | 120,000.00 | 111,500.00 | | | | -- | -- |
| For Deposit | | | | | | | | 19,200.00 | 19,200.00 |
| Security Deposits | | | | 37,950.00 | 34,813.00 | 34,813.00 | 34,813.00 | 34,813.00 | 40,663.00 |
| **Total Other Current Assets** | | | **248,662.86** | **328,301.07** | **247,059.68** | **299,631.68** | **339,962.15** | **224,252.60** | **229,086.82** |
| **Total Current Assets** | | | **1,121,981.75** | **1,114,433.42** | **997,510.66** | **1,244,722.83** | **1,625,649.73** | **##########** | **1,103,853.53** |
| **Fixed Assets** | | | | | | | | | |
| **Net - Brooklyn Office Build Out** | | | | | | | | | |
| Accum Dep - Brooklyn Office | | | | | (12,440.16) | (24,880.32) | (37,320.48) | (49,760.64) | (66,593.64) |
| Cost - Brooklyn Office | | | | 181,817.25 | 250,060.93 | 250,060.93 | 250,060.93 | 250,060.93 | 250,060.93 |
| **Total Net - Brooklyn Office Build Out** | | | **--** | **181,817.25** | **237,620.77** | **225,180.61** | **212,740.45** | **200,300.29** | **183,467.29** |
| **Net - Computers** | | | | | | | | | |
| Accum Dep - Computers | | | (17,205.42) | (17,205.42) | (18,074.34) | (18,943.26) | (19,812.18) | (20,681.10) | (21,443.10) |
| Cost - Brooklyn Computers | | | | 2,902.59 | 6,082.36 | 6,082.36 | 6,082.36 | 6,082.36 | 6,082.36 |
| Cost - Computers | | | 17,205.42 | 17,205.42 | 17,205.42 | 17,205.42 | 17,205.42 | 17,205.42 | 18,433.53 |
| **Total Net - Computers** | | | **--** | **2,902.59** | **5,213.44** | **4,344.52** | **3,475.60** | **2,606.68** | **3,072.79** |
| **Net - Office Furniture** | | | | | | | | | |
| Accum Dep - Office Furniture | | | (6,130.48) | (6,130.48) | (23,359.96) | (40,589.44) | (57,818.92) | (75,048.40) | (85,642.40) |
| Cost - Brooklyn Office | | | | 67,773.30 | 120,606.46 | 120,606.46 | 120,606.46 | 120,606.46 | 120,606.46 |
| Cost - Office Furniture | | | 6,130.48 | 6,130.48 | 6,654.05 | 6,654.05 | 6,654.05 | 6,654.05 | 6,654.05 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Total Net - Office Furniture** | -- | 67,773.30 | 103,900.55 | 86,671.07 | 69,441.59 | 52,212.11 | 41,618.11 |
| **Total Fixed Assets** | -- | 252,493.14 | 346,734.76 | 316,196.20 | 285,657.64 | 255,119.08 | 228,158.19 |
| **TOTAL ASSETS** | **1,121,981.75** | **1,366,926.56** | **1,344,245.42** | **1,560,919.03** | **1,911,307.37** | **###########** | **1,332,011.72** |
| **LIABILITIES AND EQUITY** | | | | | | | |
| **Liabilities** | | | | | | | |
| **Current Liabilities** | | | | | | | |
| Accounts Payable | 1,087,620.77 | 1,363,253.23 | 1,489,022.15 | 1,774,447.97 | 2,036,270.49 | ########### | 1,572,215.89 |
| Credit Cards | 47,066.84 | 56,285.94 | 31,584.87 | 38,879.73 | 54,217.74 | 27,876.28 | 49,234.28 |
| Other Current Liabilities | 1,402.58 | 17,557.57 | 2,100.00 | -- | 435.00 | 25,900.00 | 30,376.00 |
| **Total Current Liabilities** | **1,136,090.19** | **1,437,096.74** | **1,522,707.02** | **1,813,327.70** | **2,090,923.23** | **###########** | **1,651,826.17** |
| **Long-Term Liabilities** | | | | | | | |
| Business Loan | 96,877.56 | 555,478.82 | 184,786.40 | 171,743.33 | 282,143.14 | 353,597.76 | 318,463.49 |
| **Total Long-Term Liabilities** | **96,877.56** | **555,478.82** | **184,786.40** | **171,743.33** | **282,143.14** | **353,597.76** | **318,463.49** |
| **Total Liabilities** | **1,232,967.75** | **1,992,575.56** | **1,707,493.42** | **1,985,071.03** | **2,373,066.37** | **###########** | **1,970,289.66** |
| **Equity** | | | | | | | |
| **Managing Members Equity** | | | | | | | |
| **Gordon Equity - Net** | | | | | | | |
| Contributions - Gordon | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 |
| Current Yr R/E Added - Gordon | (194,051.52) | (374,219.52) | (372,258.52) | (392,295.52) | (412,521.52) | (412,521.52) | (412,521.52) |
| Distributions - Gordon | 62,266.57 | 60,229.57 | 60,229.57 | 60,229.57 | 60,229.57 | 60,229.57 | 60,229.57 |
| **Total Gordon Equity - Net** | **22,199.00** | **(160,006.00)** | **(158,045.00)** | **(178,082.00)** | **(198,308.00)** | **(198,308.00)** | **(198,308.00)** |
| **Pollack Equity - Net** | | | | | | | |
| Contributions - Pollack | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 |
| Current Yr R/E Added - Pollack | (207,898.89) | (305,861.89) | (304,794.89) | (315,689.89) | (326,686.89) | (326,686.89) | (326,686.89) |
| Distributions - Pollack | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 |
| **Total Gordon Equity - Net** | **(133,101.00)** | **(231,064.00)** | **(229,997.00)** | **(240,892.00)** | **(251,889.00)** | **(251,889.00)** | **(251,889.00)** |
| **Total Managing Members Equity** | **(110,902.00)** | **(391,070.00)** | **(388,042.00)** | **(418,974.00)** | **(450,197.00)** | **(450,197.00)** | **(450,197.00)** |
| **Retained Earnings** | -- | -- | -- | -- | -- | (34,489.94) | (271,444.55) |
| **Net Income** | (84.00) | (234,579.00) | 24,794.00 | (5,178.00) | (11,564.00) | (236,954.61) | 83,363.61 |
| **Total Equity** | **(110,986.00)** | **(625,649.00)** | **(363,248.00)** | **(424,152.00)** | **(461,761.00)** | **(721,641.55)** | **(638,277.94)** |
| **TOTAL LIABILITIES AND EQUITY** | **1,121,981.75** | **1,366,926.56** | **1,344,245.42** | **1,560,919.03** | **1,911,305.37** | **###########** | **1,332,011.72** |

**Fusion Modeling Agency LLC: Summary Income Statements**

**Profit & Loss**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1Q 2020 | 2Q 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 3,774,700 | 4,563,064 | 4,893,369 | 5,751,702 | 5,619,380 | 1,280,861 | 305,344 |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 3,774,700 | 4,563,064 | 4,893,786 | 5,751,285 | 5,614,845 | 1,280,947 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 3,753,827 | 4,562,163 | 4,911,438 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 3,889,773 | 3,843,624 | 3,757,351 | 4,566,378 | 4,878,177 | | | | |
| Ordinary Income | | | | | | | | | |
| Mean | 3,889,773 | 3,843,624 | 3,765,145 | 4,563,667 | 4,894,193 | 5,751,493 | 5,617,112 | 1,280,904 | 305,344 |
| Max | 3,889,773 | 3,843,624 | 3,774,700 | 4,566,378 | 4,911,438 | 5,751,702 | 5,619,380 | 1,280,947 | 305,344 |
| Min | 3,889,773 | 3,843,624 | 3,753,827 | 4,562,163 | 4,878,177 | 5,751,285 | 5,614,845 | 1,280,861 | 305,344 |
| *Max-Min Variance* | *--* | *--* | *20,873* | *4,215* | *33,261* | *417* | *4,535* | *86* | *--* |
| *% Variance from Mean* | *--* | *--* | *0.55%* | *0.09%* | *0.68%* | *0.01%* | *0.08%* | *0.01%* | *--* |
| | | | | | | | | | |
| **COGS** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 2,515,876 | 3,157,295 | 3,286,616 | 4,060,624 | 3,927,158 | 836,215 | 190,705 |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 2,515,876 | 3,157,295 | 3,288,699 | 4,058,041 | 3,906,734 | 835,472 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 2,486,403 | 3,172,231 | 3,259,667 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 2,708,108 | 2,621,687 | 2,493,003 | 3,172,897 | 3,209,335 | | | | |
| COGS | | | | | | | | | |
| Mean | 2,708,108 | 2,621,687 | 2,502,790 | 3,164,930 | 3,261,079 | 4,059,333 | 3,916,946 | 835,844 | 190,705 |
| Max | 2,708,108 | 2,621,687 | 2,515,876 | 3,172,897 | 3,288,699 | 4,060,624 | 3,927,158 | 836,215 | 190,705 |
| Min | 2,708,108 | 2,621,687 | 2,486,403 | 3,157,295 | 3,209,335 | 4,058,041 | 3,906,734 | 835,472 | 190,705 |
| *Max-Min Variance* | *--* | *--* | *29,473* | *15,602* | *79,364* | *2,583* | *20,424* | *743* | *--* |
| *% Variance from Mean* | *--* | *--* | *1.18%* | *0.49%* | *2.43%* | *0.06%* | *0.52%* | *0.09%* | *--* |
| | | | | | | | | | |
| **Gross Profit** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 1,258,824 | 1,405,769 | 1,606,754 | 1,691,077 | 1,692,222 | 444,645 | 114,639 |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 1,258,824 | 1,405,769 | 1,605,087 | 1,693,244 | 1,708,111 | 445,475 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 1,267,424 | 1,389,932 | 1,651,771 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 1,181,665 | 1,221,938 | 1,264,348 | 1,393,480 | 1,668,842 | | | | |
| Gross Profit | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Mean | 1,181,665 | 1,221,938 | 1,262,355 | 1,398,738 | 1,633,113 | 1,692,161 | 1,700,166 | 445,060 | 114,639 |
| Max | 1,181,665 | 1,221,938 | 1,267,424 | 1,405,769 | 1,668,842 | 1,693,244 | 1,708,111 | 445,475 | 114,639 |
| Min | 1,181,665 | 1,221,938 | 1,258,824 | 1,389,932 | 1,605,087 | 1,691,077 | 1,692,222 | 444,645 | 114,639 |
| *Max-Min Variance* | *--* | *--* | *8,600* | *15,837* | *63,755* | *2,167* | *15,889* | *829* | *--* |
| *% Variance from Mean* | *--* | *--* | *0.68%* | *1.13%* | *3.90%* | *0.13%* | *0.93%* | *0.19%* | *--* |
| **Expenses** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 944,181 | 1,230,261 | 1,185,220 | 1,273,817 | 1,290,143 | 299,222 | 171,098 |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 944,181 | 1,230,261 | 1,185,220 | 1,273,817 | 1,289,756 | 365,887 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 976,175 | 1,184,161 | 1,221,702 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 813,727 | 911,143 | 976,175 | 1,184,161 | 1,221,458 | | | | |
| Expenses | | | | | | | | | |
| Mean | 813,727 | 911,143 | 960,178 | 1,207,211 | 1,203,400 | 1,273,817 | 1,289,949 | 332,554 | 171,098 |
| Max | 813,727 | 911,143 | 976,175 | 1,230,261 | 1,221,702 | 1,273,817 | 1,290,143 | 365,887 | 171,098 |
| Min | 813,727 | 911,143 | 944,181 | 1,184,161 | 1,185,220 | 1,273,817 | 1,289,756 | 299,222 | 171,098 |
| *Max-Min Variance* | | | *31,994* | *46,100* | *36,482* | *--* | *386* | *66,665* | *--* |
| *% Variance from Mean* | *--* | *--* | *3.33%* | *3.82%* | *3.03%* | *--* | *0.03%* | *20.05%* | *--* |
| **Net Ordinary Income** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 314,643 | 175,508 | 421,534 | 417,261 | 402,079 | 145,424 | (56,459) |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 314,643 | 175,508 | 419,867 | 419,428 | 418,355 | 79,588 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 291,250 | 205,771 | 430,070 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 367,938 | 310,795 | 288,174 | 209,319 | 447,384 | | | | |
| Net Ordinary Income | | | | | | | | | |
| Mean | 367,938 | 310,795 | 302,177 | 191,526 | 429,714 | 418,344 | 410,217 | 112,506 | (56,459) |
| Max | 367,938 | 310,795 | 314,643 | 209,319 | 447,384 | 419,428 | 418,355 | 145,424 | (56,459) |
| Min | 367,938 | 310,795 | 288,174 | 175,508 | 419,867 | 417,261 | 402,079 | 79,588 | (56,459) |
| *Max-Min Variance* | *--* | *--* | *26,469* | *33,811* | *27,517* | *2,167* | *16,275* | *65,836* | *--* |
| *% Variance from Mean* | *--* | *--* | *8.76%* | *17.65%* | *6.40%* | *0.52%* | *3.97%* | *58.52%* | *--* |
| **Net Other Income** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | | | | | | | |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | | | | | | | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | (7,267) | (74,573) | (51,275) | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | (29,209) | (19,412) | (7,267) | (74,573) | (52,325) | | | | |
| Net Other Income | | | | | | | | | |
| Mean | (29,209) | (19,412) | (7,267) | (74,573) | (51,800) | | | | |
| Max | (29,209) | (19,412) | (7,267) | (74,573) | (51,275) | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Min | (29,209) | (19,412) | (7,267) | (74,573) | (52,325) | | | |
| *Max-Min Variance* | *--* | *--* | *--* | *--* | *1,050* | | | |
| *% Variance from Mean* | *--* | *--* | *--* | *--* | *(2.03%)* | | | |
| **Net Income** | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 314,643 | 175,508 | 421,534 | 417,261 | 402,079 | 145,424 | (56,459) |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 314,643 | 175,508 | 419,867 | 419,428 | 418,355 | 79,588 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 283,983 | 131,198 | 378,795 | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 338,729 | 291,383 | 280,907 | 134,746 | 395,059 | | | |
| Net Income | | | | | | | | |
| Mean | 338,729 | 291,383 | 298,544 | 154,240 | 403,814 | 418,344 | 410,217 | 112,506 | (56,459) |
| Max | 338,729 | 291,383 | 314,643 | 175,508 | 421,534 | 419,428 | 418,355 | 145,424 | (56,459) |
| Min | 338,729 | 291,383 | 280,907 | 131,198 | 378,795 | 417,261 | 402,079 | 79,588 | (56,459) |
| *Max-Min Variance* | *--* | *--* | *33,736* | *44,310* | *42,739* | *2,167* | *16,275* | *65,836* | *--* |
| *% Variance from Mean* | *--* | *--* | *11.30%* | *28.73%* | *10.58%* | *0.52%* | *3.97%* | *58.52%* | *--* |
| **Checks** | | | | | | | | |
| ***Net Ordinary Income*** | | | | | | | | |
| *Jan 2015 - Jun 2020 (Exhibit R)* | *--* | *--* | *314,727* | *410,087* | *395,073* | *424,606* | *430,048* | *99,741* | *57,033* |
| *Jan 2015 - 1Q 2020 (Exhibit Q)* | *--* | *--* | *314,727* | *410,087* | *395,073* | *424,606* | *429,919* | *121,962* | *--* |
| *Jan 2015 - Oct 2017 (Exhibit O)* | *--* | *--* | *325,392* | *394,720* | *407,234* | *--* | *--* | *--* | *--* |
| *Jan 2013 - Dec 2017 (Exhibit P)* | *271,242* | *303,714* | *325,392* | *394,720* | *407,153* | *--* | *--* | *--* | *--* |
| ***Net Income*** | | | | | | | | |
| *Jan 2015 - Jun 2020 (Exhibit R)* | *--* | *--* | *314,727* | *410,087* | *395,073* | *424,606* | *430,048* | *99,741* | *57,033* |
| *Jan 2015 - 1Q 2020 (Exhibit Q)* | *--* | *--* | *314,727* | *410,087* | *395,073* | *424,606* | *429,919* | *121,962* | *--* |
| *Jan 2015 - Oct 2017 (Exhibit O)* | *--* | *--* | *325,392* | *394,720* | *407,234* | *--* | *--* | *--* | *--* |
| *Jan 2013 - Dec 2017 (Exhibit P)* | *271,242* | *303,714* | *325,392* | *394,720* | *407,153* | *--* | *--* | *--* | *--* |
| | | | | | | | | |
| **Depreciation** | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | | | 30,539 | 30,539 | 30,539 | 7,635 | 7,635 |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | | | | | | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | | | 30,539 | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | | | | | 30,539 | | | |
| Depreciation | | | | | | | | |
| Mean | | | | | 30,539 | 30,539 | 30,539 | 7,635 | 7,635 |
| Max | -- | -- | -- | -- | 30,539 | 30,539 | 30,539 | 7,635 | 7,635 |
| Min | -- | -- | -- | -- | 30,539 | 30,539 | 30,539 | 7,635 | 7,635 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *Max-Min Variance* | | | | | -- | -- | -- | -- | -- |
| *% Variance from Mean* | | | | | -- | -- | -- | -- | -- |
| **Interest** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 1,433 | 25,418 | 53,906 | 36,042 | 31,997 | 81 | |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | | | | | | | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 1,433 | 995 | 53,906 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 5,153 | 1,520 | 1,433 | 995 | 53,906 | | | | |
| Interest | | | | | | | | | |
| Mean | 5,153 | 1,520 | 1,433 | 9,136 | 53,906 | 36,042 | 31,997 | 81 | |
| Max | 5,153 | 1,520 | 1,433 | 25,418 | 53,906 | 36,042 | 31,997 | 81 | -- |
| Min | 5,153 | 1,520 | 1,433 | 995 | 53,906 | 36,042 | 31,997 | 81 | -- |
| *Max-Min Variance* | -- | -- | -- | 24,423 | -- | -- | -- | -- | |
| *% Variance from Mean* | -- | -- | -- | 267.33% | -- | -- | -- | -- | |
| **Taxes** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 7,328 | 5,580 | 1,500 | -- | 8,268 | 1,500 | |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 7,328 | 5,580 | 1,500 | | 8,268 | 1,500 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 7,328 | 5,580 | 1,500 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 23 | 4,214 | 7,328 | 5,580 | 1,500 | | | | |
| Taxes | | | | | | | | | |
| Mean | 23 | 4,214 | 7,328 | 5,580 | 1,500 | -- | 8,268 | 1,500 | |
| Max | 23 | 4,214 | 7,328 | 5,580 | 1,500 | -- | 8,268 | 1,500 | -- |
| Min | 23 | 4,214 | 7,328 | 5,580 | 1,500 | -- | 8,268 | 1,500 | -- |
| *Min* | -- | -- | -- | -- | -- | | | | |
| *Max-Min Variance* | -- | -- | -- | -- | -- | | | | |
| **EBITDA** | | | | | | | | | |
| Jan 2015 - Jun 2020 (Exhibit R) | | | 323,404 | 206,506 | 507,479 | 483,842 | 472,883 | 154,639 | (48,824) |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 321,971 | 181,088 | 421,367 | 419,428 | 426,623 | 81,088 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 300,011 | 212,346 | 516,015 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 373,114 | 316,529 | 296,935 | 215,895 | 533,329 | | | | |
| EBITDA | | | | | | | | | |
| Mean | 373,114 | 316,529 | 306,783 | 211,582 | 518,941 | 483,842 | 472,883 | 154,639 | (48,824) |
| Max | 373,114 | 316,529 | 323,404 | 215,895 | 533,329 | 483,842 | 472,883 | 154,639 | (48,824) |
| Min | 373,114 | 316,529 | 296,935 | 206,506 | 507,479 | 483,842 | 472,883 | 154,639 | (48,824) |
| *Max-Min Variance* | -- | -- | 26,469 | 9,388 | 25,850 | | | | |
| *% Variance from Mean* | -- | -- | 8.63% | 4.44% | 4.98% | -- | -- | -- | -- |

**EBIT**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Jan 2015 - Jun 2020 (Exhibit R) | | | 323,404 | 206,506 | 476,940 | 453,303 | 442,344 | 147,004 | (56,459) |
| Jan 2015 - 1Q 2020 (Exhibit Q) | | | 321,971 | 181,088 | 421,367 | 419,428 | 426,623 | 81,088 | |
| Jan 2015 - Oct 2017 (Exhibit O) | | | 300,011 | 212,346 | 485,476 | | | | |
| Jan 2013 - Dec 2017 (Exhibit P) | 373,114 | 316,529 | 296,935 | 215,895 | 502,790 | | | | |
| EBIT | | | | | | | | | |
| Mean | 373,114 | 316,529 | 306,783 | 211,582 | 488,402 | 453,303 | 442,344 | 147,004 | (56,459) |
| Max | 373,114 | 316,529 | 323,404 | 215,895 | 502,790 | 453,303 | 442,344 | 147,004 | (56,459) |
| Min | 373,114 | 316,529 | 296,935 | 206,506 | 476,940 | 453,303 | 442,344 | 147,004 | (56,459) |
| *Max-Min Variance* | *--* | *--* | *26,469* | *9,388* | *25,850* | *--* | *--* | *--* | *--* |
| *% Variance from Mean* | *--* | *--* | *8.63%* | *4.44%* | *5.29%* | *--* | *--* | *--* | *--* |

# Fusion Modeling Agency LLC: Forecasted Income Statement

**Profit & Loss**

| | | | | Actuals | | |
|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** |
| **Ordinary Income** | | | | | | |
| Mean | 3,889,773 | 3,843,624 | 3,765,145 | 4,563,667 | 4,894,193 | 5,751,493 |
| Max | 3,889,773 | 3,843,624 | 3,774,700 | 4,566,378 | 4,911,438 | 5,751,702 |
| Min | 3,889,773 | 3,843,624 | 3,753,827 | 4,562,163 | 4,878,177 | 5,751,285 |
| *Ordinary Income Y-o-Y Growth* | | | | | | |
| *Mean* | | *(1.19%)* | *(2.04%)* | *21.21%* | *7.24%* | *17.52%* |
| *Max* | | *(1.19%)* | *(1.79%)* | *20.97%* | *7.56%* | *17.11%* |
| *Min* | | *(1.19%)* | *(2.34%)* | *21.53%* | *6.93%* | *17.90%* |
| **EBITDA** | | | | | | |
| Mean | 373,114 | 316,529 | 306,783 | 211,582 | 518,941 | 483,842 |
| Max | 373,114 | 316,529 | 323,404 | 215,895 | 533,329 | 483,842 |
| Min | 373,114 | 316,529 | 296,935 | 206,506 | 507,479 | 483,842 |
| *EBITDA Margins* | | | | | | |
| *Mean* | *9.59%* | *8.24%* | *8.15%* | *4.64%* | *10.60%* | *8.41%* |
| *Max* | *9.59%* | *8.24%* | *8.57%* | *4.73%* | *10.86%* | *8.41%* |
| *Min* | *9.59%* | *8.24%* | *7.91%* | *4.53%* | *10.40%* | *8.41%* |
| **EBIT** | | | | | | |
| Mean | 373,114 | 316,529 | 306,783 | 211,582 | 488,402 | 453,303 |
| Max | 373,114 | 316,529 | 323,404 | 215,895 | 502,790 | 453,303 |
| Min | 373,114 | 316,529 | 296,935 | 206,506 | 476,940 | 453,303 |
| *EBIT Margins* | | | | | | |
| *Mean* | *9.59%* | *8.24%* | *8.15%* | *4.64%* | *9.98%* | *7.88%* |
| *Max* | *9.59%* | *8.24%* | *8.57%* | *4.73%* | *10.24%* | *7.88%* |
| *Min* | *9.59%* | *8.24%* | *7.91%* | *4.53%* | *9.78%* | *7.88%* |
| **Taxes** | | | | | | |
| Mean | 23 | 4,214 | 7,328 | 5,580 | 1,500 | -- |
| Max | 23 | 4,214 | 7,328 | 5,580 | 1,500 | -- |
| Min | 23 | 4,214 | 7,328 | 5,580 | 1,500 | -- |
| *Taxes as % of EBIT* | | | | | | |
| *Mean* | *0.01%* | *1.33%* | *2.39%* | *2.64%* | *0.31%* | *--* |
| *Max* | *0.01%* | *1.33%* | *2.27%* | *2.58%* | *0.30%* | *--* |
| *Min* | *0.01%* | *1.33%* | *2.47%* | *2.70%* | *0.31%* | *--* |

**S**

| | 2019 | Mean | | Forecasts | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | 2022 | 2023 | 2024 | 2025 | 2026 |
| | 5,617,112 | | | 5,995,358 | 6,399,074 | 6,829,975 | 7,289,893 | 7,780,780 |
| | 5,619,380 | | | 5,997,778 | 6,401,657 | 6,832,732 | 7,292,835 | 7,783,921 |
| | 5,614,845 | | | 5,992,938 | 6,396,491 | 6,827,218 | 7,286,950 | 7,777,639 |
| | | | | | | | | |
| | *(2.34%)* | *6.73%* | | *6.73%* | *6.73%* | *6.73%* | *6.73%* | *6.73%* |
| | *(2.30%)* | *6.73%* | | *6.73%* | *6.73%* | *6.73%* | *6.73%* | *6.73%* |
| | *(2.37%)* | *6.74%* | | *6.73%* | *6.73%* | *6.73%* | *6.73%* | *6.73%* |
| | | | | | | | | |
| | 472,883 | | | 497,151 | 530,628 | 566,359 | 604,497 | 645,202 |
| | 472,883 | | | 497,351 | 530,842 | 566,588 | 604,741 | 645,463 |
| | 472,883 | | | 496,950 | 530,414 | 566,131 | 604,253 | 644,942 |
| | | | | | | | | |
| | *8.42%* | *8.29%* | | *8.29%* | *8.29%* | *8.29%* | *8.29%* | *8.29%* |
| | *8.42%* | *8.40%* | | *8.29%* | *8.29%* | *8.29%* | *8.29%* | *8.29%* |
| | *8.42%* | *8.21%* | | *8.29%* | *8.29%* | *8.29%* | *8.29%* | *8.29%* |
| | | | | | | | | |
| | 442,344 | | | 482,602 | 515,100 | 549,786 | 586,807 | 626,322 |
| | 442,344 | | | 482,797 | 515,308 | 550,008 | 587,044 | 626,575 |
| | 442,344 | | | 482,408 | 514,892 | 549,564 | 586,570 | 626,069 |
| | | | | | | | | |
| | *7.87%* | *8.05%* | | *8.05%* | *8.05%* | *8.05%* | *8.05%* | *8.05%* |
| | *7.87%* | *8.16%* | | *8.05%* | *8.05%* | *8.05%* | *8.05%* | *8.05%* |
| | *7.88%* | *7.97%* | | *8.05%* | *8.05%* | *8.05%* | *8.05%* | *8.05%* |
| | | | | | | | | |
| | 8,268 | | | 5,888 | 6,284 | 6,707 | 7,159 | 7,641 |
| | 8,268 | | | 5,890 | 6,287 | 6,710 | 7,162 | 7,644 |
| | 8,268 | | | 5,885 | 6,282 | 6,705 | 7,156 | 7,638 |
| | | | | | | | | |
| | *1.87%* | *1.22%* | | *1.22%* | *1.22%* | *1.22%* | *1.22%* | *1.22%* |
| | *1.87%* | *1.19%* | | *1.22%* | *1.22%* | *1.22%* | *1.22%* | *1.22%* |
| | *1.87%* | *1.24%* | | *1.22%* | *1.22%* | *1.22%* | *1.22%* | *1.22%* |

# Discounted Cash Flow Analysis - EBITDA Methodology

| | | Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2022E** | **2023E** | **2024E** | **2025E** | **2026E** |
| Revenues | | $5,995,358 | $6,399,074 | $6,829,975 | $7,289,893 | $7,780,780 |
| EBITDA | | 497,151 | 530,628 | 566,359 | 604,497 | 645,202 |
| EBIT | | 482,602 | 515,100 | 549,786 | 586,807 | 626,322 |
| Tax Provision | | (5,888) | (6,284) | (6,707) | (7,159) | (7,641) |
| **Unlevered Net Income** | | **$476,715** | **$508,816** | **$543,078** | **$579,648** | **$618,681** |
| | | | | | | |
| Plus: | Depreciation and Amortization | $14,548 | $15,528 | $16,574 | $17,690 | $18,881 |
| Less: | Capital Expenditures | (14,548) | (15,528) | (16,574) | (17,690) | (18,881) |
| | Change in Working Capital (high variability --> not reliable) | | | | | |
| **Unlevered Free Cash Flow** | | **$476,715** | **$508,816** | **$543,078** | **$579,648** | **$618,681** |
| | | | | | | |
| Revenue % Growth Rate | | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% |
| % EBIT Margin | | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% |
| Depreciation (% of Revenues) | | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Capital Expenditures (% of Revenues) | | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Tax Rate | | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% |

**Present Value Calculation Based on Terminal EBITDA Multiple**

| | A | | B | | | A + B | | |
|---|---|---|---|---|---|---|---|---|
| **Discount Rate** | **Discounted Unlevered FCF** | | **Present Value of Terminal Value Based on a Multiple of LTM EBITDA** | | | | **Present Value of Enterprise Value** | |
| | | | **3.0x** | **4.0x** | **5.0x** | **3.0x** | **4.0x** | **5.0x** |
| **13.0%** | $1,888,033 | | $1,050,570 | $1,400,760 | $1,750,950 | $2,938,603 | $3,288,793 | $3,638,983 |
| 14.0% | 1,840,772 | | 1,005,294 | 1,340,392 | 1,675,490 | 2,846,066 | 3,181,163 | 3,516,261 |
| 15.0% | 1,795,364 | | 962,339 | 1,283,119 | 1,603,898 | 2,757,703 | 3,078,483 | 3,399,263 |
| 16.0% | 1,751,717 | | 921,568 | 1,228,757 | 1,535,946 | 2,673,285 | 2,980,475 | 3,287,664 |
| 17.0% | 1,709,744 | | 882,852 | 1,177,136 | 1,471,420 | 2,592,596 | 2,886,880 | 3,181,164 |

## Discounted Cash Flow Analysis - Perpetuity Methodology

| | Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|
| | **2022E** | **2023E** | **2024E** | **2025E** | **2026E** |
| Revenues | $5,995,358 | $6,399,074 | $6,829,975 | $7,289,893 | $7,780,780 |
| EBITDA | 497,151 | 530,628 | 566,359 | 604,497 | 645,202 |
| EBIT | 482,602 | 515,100 | 549,786 | 586,807 | 626,322 |
| Tax Provision | (5,888) | (6,284) | (6,707) | (7,159) | (7,641) |
| **Unlevered Net Income** | **$476,715** | **$508,816** | **$543,078** | **$579,648** | **$618,681** |
| | | | | | |
| Plus:    Depreciation and Amortization | $14,548 | $15,528 | $16,574 | $17,690 | $18,881 |
| Less:    Capital Expenditures | (14,548) | (15,528) | (16,574) | (17,690) | (18,881) |
|    Change in Working Capital | -- | -- | -- | -- | -- |
| **Unlevered Free Cash Flow** | **$476,715** | **$508,816** | **$543,078** | **$579,648** | **$618,681** |
| | | | | | |
| Revenue % Growth Rate | 6.7% | 6.7% | 6.7% | 6.7% | 6.7% |
| % EBIT Margin | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% |
| Depreciation (% of Revenues) | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Capital Expenditures (% of Revenues) | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |

### Present Value Calculation Based on Unlevered Free Cash Flow in Perpetuity

| Discount Rate | A — Discounted Unlevered FCF | B — Present Value of Terminal Unlevered Free Cash Flow in Perpetuity Growing at | | | A + B — Present Value of Enterprise Value | | |
|---|---|---|---|---|---|---|---|
| | | **6.0%** | **7.0%** | **8.0%** | **6.0%** | **7.0%** | **8.0%** |
| 13.0% | $1,888,033 | $5,084,896 | $5,988,344 | $7,253,172 | $6,972,929 | $7,876,377 | $9,141,205 |
| 14.0% | 1,840,772 | 4,257,533 | 4,911,656 | 5,783,819 | 6,098,305 | 6,752,428 | 7,624,591 |
| 15.0% | 1,795,364 | 3,622,769 | 4,114,064 | 4,745,729 | 5,418,133 | 5,909,428 | 6,541,094 |
| 16.0% | 1,751,717 | 3,122,356 | 3,502,013 | 3,976,585 | 4,874,073 | 5,253,731 | 5,728,302 |
| 17.0% | 1,709,744 | 2,719,257 | 3,019,402 | 3,386,245 | 4,429,001 | 4,729,145 | 5,095,989 |

Exhibit "O"

**Fusion Modeling Agency LLC**
**Profit & Loss**
January 2015 through October 2018

| | 2015 | 2016 | 2017 | 2018 to Oct |
|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | |
| **Income** | | | | |
| Advance Fees | 2,080.00 | 800.00 | 690.00 | 1,465.00 |
| Agency Fee | 528,355.45 | 628,237.52 | 671,629.04 | 668,421.62 |
| Agency Fee (Models) | 534,735.54 | 687,233.02 | 664,238.49 | 667,006.68 |
| CC Fees | 525.60 | 741.42 | 847.20 | 307.80 |
| Expenses Recovered | 167,249.40 | 87,077.22 | 72,149.02 | 111,036.42 |
| MA Fee's | 45,914.71 | 88,694.56 | 70,276.34 | 20,292.25 |
| Model Fees | 2,474,966.69 | 3,031,177.86 | 3,372,380.18 | 3,349,990.94 |
| Uncategorized Income | 0.00 | 0.00 | 0.00 | 0.00 |
| Usage | 0.00 | 17,530.47 | 50,896.04 | 7,820.00 |
| Write-Offs Collected | 0.00 | 20,670.43 | 8,331.90 | 68,724.00 |
| **Total Income** | 3,753,827.39 | 4,562,162.50 | 4,911,438.21 | 4,895,064.71 |
| **Cost of Goods Sold** | | | | |
| Model Expenses | (9,669.81) | 18,821.03 | (57,125.80) | (84,445.97) |
| Model Payments | 2,496,073.11 | 3,153,409.65 | 3,316,792.57 | 3,350,157.59 |
| **Total COGS** | 2,486,403.30 | 3,172,230.68 | 3,259,666.77 | 3,265,711.62 |
| **Gross Profit** | 1,267,424.09 | 1,389,931.82 | 1,651,771.44 | 1,629,353.09 |
| **Expense** | | | | |
| Depreciation | 0.00 | 0.00 | 30,538.56 | 25,448.80 |
| Insurance | 32,386.23 | 56,904.77 | 50,827.89 | 53,665.25 |
| Interest | 1,433.17 | 994.94 | 53,906.18 | 64,448.30 |
| Licenses and Permits | 3,578.00 | 150.00 | 150.00 | 1,500.00 |
| Marketing | 102,500.00 | 248,500.00 | 107,000.00 | (5,499.41) |
| Meals & Entertainment | 61,991.23 | 66,145.82 | 66,532.20 | 41,005.35 |
| Merchant deposit fees | 0.00 | 1,040.92 | 1,115.73 | 1,856.06 |
| Mother Agency | 72,903.13 | 101,200.28 | 214,016.70 | 141,253.84 |
| Office Expenses | 93,746.08 | 85,373.55 | 111,576.99 | 84,308.43 |
| Payroll | 504,866.91 | 616,906.22 | 669,639.52 | 538,052.24 |
| Professional Fees | 57,043.95 | 38,992.47 | 31,943.93 | 54,482.95 |
| Reconciliation Discrepancies | 0.00 | (794.88) | 183.37 | (200.00) |
| Reimbursement | 1,050.00 | 95.41 | 0.00 | 0.00 |
| Rent | 102,442.66 | 80,994.68 | 86,326.75 | 147,957.84 |
| Taxes | 7,327.81 | 5,580.45 | 1,500.00 | 0.00 |
| Telephone | 6,655.96 | 14,154.42 | 13,468.76 | 8,796.06 |
| Travel | 232,911.90 | 244,054.50 | 179,372.18 | 224,434.03 |
| Utilities | 20,729.00 | 18,588.16 | 10,836.70 | 22,507.03 |
| **Total Expense** | 1,301,566.03 | 1,578,881.71 | 1,628,935.46 | 1,404,016.77 |
| **Net Ordinary Income** | (34,141.94) | (188,949.89) | 22,835.98 | 225,336.32 |
| **Other Income/Expense** | | | | |
| **Other Income** | | | | |
| Interest Income | 0.10 | 0.00 | 0.00 | 0.24 |
| **Total Other Income** | 0.10 | 0.00 | 0.00 | 0.24 |
| **Other Expense** | | | | |
| Exchange Gain or Loss | 62.70 | (281.78) | (2,940.63) | (2,015.22) |
| Write Off Model Account | 7,203.99 | 74,854.61 | 54,215.38 | (4,665.49) |
| **Total Other Expense** | 7,266.69 | 74,572.83 | 51,274.75 | (6,680.71) |

10:35 AM
11/4/18
Accrual Basis

# Fusion Modeling Agency LLC
## Profit & Loss
### January 2015 through October 2018

|  | 2015 | 2016 | 2017 | 2018 to Oct |
|---|---|---|---|---|
| Net Other Income | (7,266.59) | (74,572.83) | (51,274.75) | 6,680.95 |
| Net Income | (41,408.53) | (263,522.72) | (28,438.77) | 232,017.27 |

# Fusion Modeling Agency LLC
# Profit & Loss
## January 2015 through October 2018

|  | TOTAL |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Advance Fees | 5,035.00 |
| Agency Fee | 2,496,643.63 |
| Agency Fee (Models) | 2,553,213.73 |
| CC Fees | 2,422.02 |
| Expenses Recovered | 437,512.06 |
| MA Fee's | 225,177.86 |
| Model Fees | 12,228,515.67 |
| Uncategorized Income | 0.00 |
| Usage | 76,246.51 |
| Write-Offs Collected | 97,726.33 |
| **Total Income** | 18,122,492.81 |
| **Cost of Goods Sold** | |
| Model Expenses | (132,420.55) |
| Model Payments | 12,316,432.92 |
| **Total COGS** | 12,184,012.37 |
| **Gross Profit** | 5,938,480.44 |
| **Expense** | |
| Depreciation | 55,987.36 |
| Insurance | 193,784.14 |
| Interest | 120,782.59 |
| Licenses and Permits | 5,378.00 |
| Marketing | 452,500.59 |
| Meals & Entertainment | 235,674.60 |
| Merchant deposit fees | 4,012.71 |
| Mother Agency | 529,373.95 |
| Office Expenses | 375,005.05 |
| Payroll | 2,329,464.89 |
| Professional Fees | 182,463.30 |
| Reconciliation Discrepancies | (811.51) |
| Reimbursement | 1,145.41 |
| Rent | 417,721.93 |
| Taxes | 14,408.26 |
| Telephone | 43,075.20 |
| Travel | 880,772.61 |
| Utilities | 72,660.89 |
| **Total Expense** | 5,913,399.97 |
| **Net Ordinary Income** | 25,080.47 |
| **Other Income/Expense** | |
| **Other Income** | |
| Interest Income | 0.34 |
| **Total Other Income** | 0.34 |
| **Other Expense** | |
| Exchange Gain or Loss | (5,174.93) |
| Write Off Model Account | 131,608.49 |
| **Total Other Expense** | 126,433.56 |

Case 1:23-cv-02376-SJB-LKE   Document 74-1   Filed 11/12/25   Page 32 of 112 PageID #: 993

# Fusion Modeling Agency LLC
# Profit & Loss
January 2015 through October 2018

| | TOTAL |
|---|---|
| Net Other Income | (126,433.22) |
| Net Income | (101,352.75) |

Exhibit "P"

10:23 AM
01/09/18
Accrual Basis

# Fusion Modeling Agency LLC
## Profit & Loss
### January 2013 through December 2017

| | Jan - Dec 13 | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | TOTAL |
|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | |
| **Income** | | | | | | |
| Advance Fees | 1,390.00 | 4,420.00 | 2,080.00 | 800.00 | 690.00 | 9,380.00 |
| Agency Fee | 535,847.33 | 560,916.43 | 528,405.45 | 628,370.85 | 668,870.91 | 2,922,410.97 |
| Agency Fee (Models) | 523,174.72 | 558,687.84 | 536,055.54 | 687,366.35 | 655,387.03 | 2,960,671.48 |
| CC Fees | 0.00 | 15.00 | 525.60 | 741.42 | 847.20 | 2,129.22 |
| Expenses Recovered | 43,541.05 | 64,358.25 | 167,249.40 | 87,077.22 | 66,757.04 | 428,982.96 |
| MA Fee's | 17,551.61 | 74,798.54 | 47,818.71 | 91,976.56 | 70,127.51 | 302,272.93 |
| Model Fees | 2,563,744.05 | 2,562,928.13 | 2,475,216.69 | 3,031,844.53 | 3,356,269.58 | 13,990,002.98 |
| Uncategorized Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Usage | 0.00 | 17,500.00 | 0.00 | 17,530.47 | 50,896.04 | 85,926.51 |
| Write-Offs Collected | 204,523.81 | 0.00 | 0.00 | 20,670.43 | 8,331.90 | 233,526.14 |
| **Total Income** | 3,889,772.57 | 3,843,624.19 | 3,757,351.39 | 4,566,377.83 | 4,878,177.21 | 20,935,303.19 |
| **Cost of Goods Sold** | | | | | | |
| Model Expenses | 161,018.48 | 74,471.68 | 10,451.42 | 58,113.73 | -68,662.37 | 235,392.94 |
| Model Payments | 2,547,089.19 | 2,547,214.85 | 2,482,551.88 | 3,114,783.62 | 3,277,997.76 | 13,969,637.30 |
| **Total COGS** | 2,708,107.67 | 2,621,686.53 | 2,493,003.30 | 3,172,897.35 | 3,209,335.39 | 14,205,030.24 |
| **Gross Profit** | 1,181,664.90 | 1,221,937.66 | 1,264,348.09 | 1,393,480.48 | 1,668,841.82 | 6,730,272.95 |
| **Expense** | | | | | | |
| Advertising | 0.00 | 0.00 | 0.00 | 0.00 | 10,000.00 | 10,000.00 |
| Depreciation | 0.00 | 0.00 | 0.00 | 0.00 | 30,538.56 | 30,538.56 |
| Insurance | 26,423.30 | 36,063.53 | 32,386.23 | 56,904.77 | 50,827.89 | 202,605.72 |
| Interest | 5,153.41 | 1,519.67 | 1,433.17 | 994.94 | 53,906.18 | 63,007.37 |
| Licenses and Permits | 0.00 | 0.00 | 3,578.00 | 150.00 | 150.00 | 3,878.00 |
| Marketing | 73,607.92 | 129,677.50 | 102,500.00 | 248,500.00 | 97,000.00 | 651,285.42 |
| Meals & Entertainment | 71,751.60 | 67,248.59 | 61,991.23 | 66,145.82 | 66,532.20 | 333,669.44 |
| Merchant deposit fees | 0.00 | 0.00 | 0.00 | 1,040.92 | 1,115.73 | 2,156.65 |
| Mother Agency | 87,815.72 | 81,614.58 | 72,903.13 | 101,200.28 | 214,016.70 | 557,550.41 |
| Office Expenses | 63,613.46 | 63,622.56 | 93,746.08 | 85,373.55 | 111,531.99 | 417,887.64 |
| Payroll | 445,917.78 | 474,704.05 | 504,866.91 | 616,906.22 | 669,639.52 | 2,712,034.48 |
| Professional Fees | 33,925.36 | 49,540.20 | 57,043.95 | 38,992.47 | 31,943.93 | 211,445.91 |
| Reconciliation Discrepancies | 0.26 | 0.00 | 0.00 | -794.88 | 0.00 | -794.62 |
| Reimbursement | 140.00 | 0.00 | 1,050.00 | 95.41 | 0.00 | 1,285.41 |
| Rent | 103,905.43 | 88,667.46 | 102,442.66 | 80,994.68 | 86,326.75 | 462,336.98 |
| Taxes | 23.26 | 4,214.31 | 7,327.81 | 5,580.45 | 1,500.00 | 18,645.83 |
| Telephone | 9,444.55 | 7,099.71 | 6,655.96 | 14,154.42 | 13,468.76 | 50,823.40 |
| Travel | 145,135.68 | 189,849.62 | 232,911.90 | 244,054.50 | 179,275.72 | 991,227.42 |
| Utilities | 18,112.08 | 21,034.96 | 20,729.00 | 18,588.16 | 10,836.70 | 89,300.90 |
| **Total Expense** | 1,084,969.81 | 1,214,856.74 | 1,301,566.03 | 1,578,881.71 | 1,628,610.63 | 6,808,884.92 |
| **Net Ordinary Income** | 96,695.09 | 7,080.92 | -37,217.94 | -185,401.23 | 40,231.19 | -78,611.97 |
| **Other Income/Expense** | | | | | | |
| Other Income | 6.20 | 12.06 | 0.10 | 0.00 | 0.00 | 18.36 |
| Other Expense | 29,215.11 | 19,424.17 | 7,266.69 | 74,572.83 | 52,324.75 | 182,803.55 |
| **Net Other Income** | -29,208.91 | -19,412.11 | -7,266.59 | -74,572.83 | -52,324.75 | -182,785.19 |
| **Net Income** | 67,486.18 | -12,331.19 | -44,484.53 | -259,974.06 | -12,093.56 | -261,397.16 |

Exhibit "Q"



# Fusion Modeling Agency, LLC
## Profit and Loss
### 2015 through Q1 2020

| | 2015 | 2016 | 2017 | 2018 | 2019 | Q1 2020 | Total |
|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | |
| Agency Fee | 527,808.78 | 626,949.19 | 668,595.71 | 798,266.78 | 757,928.76 | 173,403.96 | 3,552,953.18 |
| Agency Fee (Models) | 534,735.54 | 686,833.02 | 661,515.16 | 794,283.11 | 742,512.78 | 162,741.19 | 3,582,620.80 |
| Model Fees | 2,472,233.36 | 3,024,436.19 | 3,357,213.51 | 3,990,966.78 | 3,984,898.37 | 922,924.03 | 17,752,672.24 |
| Expenses Recovered | 181,346.76 | 86,264.81 | 72,149.02 | 144,252.13 | 88,880.08 | 2,564.71 | 575,457.51 |
| All Other Income | 58,575.56 | 138,580.79 | 134,312.60 | 23,516.20 | 40,625.01 | 19,312.98 | 414,923.14 |
| **Total Income** | $ 3,774,700.00 | $ 4,563,064.00 | $ 4,893,786.00 | $ 5,751,285.00 | $ 5,614,845.00 | $ 1,280,946.87 | $ 25,878,626.87 |
| **Cost of Goods Sold** | | | | | | | |
| Model Payments | 2,475,951.88 | 3,119,716.95 | 2,879,411.66 | 3,878,226.25 | 3,352,113.78 | 857,639.20 | 16,563,059.72 |
| Model Expenses | 39,924.12 | 37,578.05 | 409,287.34 | 179,814.75 | 554,620.22 | (22,166.85) | 1,199,057.63 |
| **Total Cost of Goods Sold** | $ 2,515,876.00 | $ 3,157,295.00 | $ 3,288,699.00 | $ 4,058,041.00 | $ 3,906,734.00 | $ 835,472.35 | $ 17,762,117.35 |
| **Gross Profit** | $ 1,258,824.00 | $ 1,405,769.00 | $ 1,605,087.00 | $ 1,693,244.00 | $ 1,708,111.00 | $ 445,474.52 | $ 8,116,509.52 |
| **Expenses** | | | | | | | |
| Admin, Ins & Office Expenses | 410,233.74 | 656,371.20 | 615,661.10 | 533,511.12 | 527,682.26 | 210,796.74 | 2,954,256.16 |
| Payroll | 504,866.91 | 616,906.22 | 669,639.52 | 661,067.83 | 723,463.68 | 182,016.56 | 3,357,960.72 |
| Rent | 83,976.52 | 64,024.31 | 72,278.28 | 168,204.28 | 189,920.26 | 7,000.00 | 585,403.65 |
| Taxes | 7,327.81 | 5,580.45 | 1,500.00 | 0.00 | 8,268.34 | 1,500.00 | 24,176.60 |
| Travel | 225,118.06 | 264,723.24 | 196,908.64 | 298,009.44 | 228,128.67 | 72,269.51 | 1,285,157.56 |
| Utilities | 27,384.96 | 32,742.58 | 24,305.46 | 37,629.33 | 42,211.79 | 14,265.98 | 178,540.10 |
| **Total Expenses** | $ 1,258,908.00 | $ 1,640,348.00 | $ 1,580,293.00 | $ 1,698,422.00 | $ 1,719,675.00 | $ 487,848.79 | $ 8,385,494.79 |
| **Net Income** | $ (84.00) | $ (234,579.00) | $ 24,794.00 | $ (5,178.00) | $ (11,564.00) | $ (42,374.27) | $ (266,985.27) |

Thursday, May 28, 2020 08:44:19 AM GMT-7 - Accrual Basis



# Fusion Modeling Agency, LLC
## Balance Sheet
### 2015 through 2019

| | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| **Bank Accounts** | | | | | |
| 0736 - Payroll Account | 291.34 | 1,454.85 | 768.62 | (4,833.86) | (18.00) |
| 3457 - Money Market Account | 195.47 | (69,413.56) | 0.65 | 26.01 | 500.94 |
| 6565 - Chase Chcking | 145.19 | 351.12 | 211.23 | 0.00 | 0.00 |
| 9646 - Chase Chcking (Main) | 30,782.00 | 135,374.59 | (4,951.63) | (24,093.96) | (20,592.70) |
| **Total Bank Accounts** | $ 31,414.00 | $ 67,767.00 $ | (3,971.13) $ | (28,901.81) $ | (20,109.76) |
| **Accounts Receivable** | $ 841,904.89 | $ 718,365.35 | $ 754,422.11 | $ 973,992.96 | $ 1,305,795.34 |
| **Other Current Assets** | | | | | |
| Model Advances Receivable | 128,662.86 | 178,851.07 | 212,246.68 | 264,818.68 | 305,149.15 |
| Pre-Paid Commissions (deleted) | 120,000.00 | 111,500.00 | 0.00 | 0.00 | 0.00 |
| Security Deposits | | 37,950.00 | 34,813.00 | 34,813.00 | 34,813.00 |
| **Total Other Current Assets** | $ 248,662.86 | $ 328,301.07 | $ 247,059.68 | $ 299,631.68 | $ 339,962.15 |
| **Total Current Assets** | $ 1,121,981.75 | $ 1,114,433.42 | $ 997,510.66 | $ 1,244,722.83 | $ 1,625,647.73 |
| **Fixed Assets** | | | | | |
| **Net - Brooklyn Office Build Out** | | | | | |
| Accum Dep - Brooklyn Office | | | (12,440.16) | (24,880.32) | (37,320.48) |
| Cost - Brooklyn Office | | 181,817.25 | 250,060.93 | 250,060.93 | 250,060.93 |
| **Total Net - Brooklyn Office Build Out** | $ - | $ 181,817.25 | $ 237,620.77 | $ 225,180.61 | $ 212,740.45 |
| **Net - Computers** | | | | | |
| Accum Dep - Computers | (17,205.42) | (17,205.42) | (18,074.34) | (18,943.26) | (19,812.18) |
| Cost - Brooklyn Computers | | 2,902.59 | 6,082.36 | 6,082.36 | 6,082.36 |
| Cost - Computers | 17,205.42 | 17,205.42 | 17,205.42 | 17,205.42 | 17,205.42 |
| **Total Net - Computers** | $ - | $ 2,902.59 | $ 5,213.44 | $ 4,344.52 | $ 3,475.60 |
| **Net - Office Furniture** | | | | | |
| Accu Dep - Office Furniture | (6,130.48) | (6,130.48) | (23,359.96) | (40,589.44) | (57,818.92) |
| Cost - Brooklyn Office | | 67,773.30 | 120,606.46 | 120,606.46 | 120,606.46 |
| Cost - Office Furniture | 6,130.48 | 6,130.48 | 6,654.05 | 6,654.05 | 6,654.05 |
| **Total Net - Office Furniture** | $ - | $ 67,773.30 | $ 103,900.55 | $ 86,671.07 | $ 69,441.59 |
| **Total Fixed Assets** | $ - | $ 252,493.14 | $ 346,734.76 | $ 316,196.20 | $ 285,657.64 |
| **TOTAL ASSETS** | $ 1,121,981.75 | $ 1,366,926.56 | $ 1,344,245.42 | $ 1,560,919.03 | $ 1,911,305.37 |
| **LIABILITIES AND EQUITY** | | | | | |
| **Liabilities** | | | | | |
| **Current Liabilities** | | | | | |
| **Accounts Payable** | 1,087,620.77 | 1,363,253.23 | 1,489,022.15 | 1,774,447.97 | 2,036,270.49 |
| **Credit Cards** | 47,066.84 | 56,285.94 | 31,584.87 | 38,879.73 | 54,217.74 |
| **Other Current Liabilities** | 1,402.58 | 17,557.57 | 2,100.00 | 0.00 | 435.00 |
| **Total Current Liabilities** | $ 1,136,090.19 | $ 1,437,096.74 | $ 1,522,707.02 | $ 1,813,327.70 | $ 2,090,923.23 |
| **Long-Term Liabilities** | | | | | |
| **Business Loan** | 96,877.56 | 555,478.82 | 184,786.40 | 171,743.33 | 282,143.14 |
| **Total Long-Term Liabilities** | $ 96,877.56 | $ 555,478.82 | $ 184,786.40 | $ 171,743.33 | $ 282,143.14 |
| **Total Liabilities** | $ 1,232,967.75 | $ 1,992,575.56 | $ 1,707,493.42 | $ 1,985,071.03 | $ 2,373,066.37 |



# Fusion Modeling Agency, LLC
## Balance Sheet
### 2015 through 2019

|  | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **Equity** |  |  |  |  |  |
| **Managing Members Equity** |  |  |  |  |  |
| Gordon Equity - Net |  |  |  |  |  |
| Contribtuions - Gordon | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 | 153,983.95 |
| Current yr R/E Added - Gordon | (194,051.52) | (374,219.52) | (372,258.52) | (392,295.52) | (412,521.52) |
| Distributions - Gordon | 62,266.57 | 60,229.57 | 60,229.57 | 60,229.57 | 60,229.57 |
| **Total Gordon Equity - Net** | $ 22,199.00 | $ (160,006.00) | $ (158,045.00) | $ (178,082.00) | $ (198,308.00) |
| Pollack Equity - Net |  |  |  |  |  |
| Contributions - Pollack | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 | 33,500.00 |
| Current Yr R/E Added - Pollack | (207,898.89) | (305,861.89) | (304,794.89) | (315,689.89) | (326,686.89) |
| Distributions - Pollack | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 | 41,297.89 |
| **Total Pollack Equity - Net** | $ (133,101.00) | $ (231,064.00) | $ (229,997.00) | $ (240,892.00) | $ (251,889.00) |
| **Total Managing Members Equity** | $ (110,902.00) | $ (391,070.00) | $ (388,042.00) | $ (418,974.00) | $ (450,197.00) |
| **Retained Earnings** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Net Income** | (84.00) | (234,579.00) | 24,794.00 | (5,178.00) | (11,564.00) |
| **Total Equity** | $ (110,986.00) | $ (625,649.00) | $ (363,248.00) | $ (424,152.00) | $ (461,761.00) |
| **TOTAL LIABILITIES AND EQUITY** | $ 1,121,981.75 | $ 1,366,926.56 | $ 1,344,245.42 | $ 1,560,919.03 | $ 1,911,305.37 |

Thursday, May 28, 2020 09:04:22 AM GMT-7 - Accrual Basis

Exhibit "R"

# Fusion Modeling Agency, LLC

PROFIT AND LOSS

January 2015 - December 2019



| | JAN - DEC 2015 | JAN - DEC 2016 | JAN - DEC 2017 | JAN - DEC 2018 | JAN - DEC 2019 | TOTAL |
|---|---|---|---|---|---|---|
| Income | $3,774,700.00 | $4,563,064.00 | $4,893,369.33 | $5,751,701.67 | $5,619,379.64 | $24,602,214.64 |
| Cost of Goods Sold | | | | | | $823.00 |
| Model Expenses | 2,515,876.00 | 3,157,295.00 | 3,286,615.67 | 4,060,624.33 | 3,927,157.78 | $16,947,568.78 |
| **Total Cost of Goods Sold** | **2,515,876.00** | **3,157,295.00** | **3,286,615.67** | **4,060,624.33** | **3,927,157.78** | **$16,947,568.78** |
| **GROSS PROFIT** | **$1,258,824.00** | **$1,405,769.00** | **$1,606,753.66** | **$1,691,077.34** | **$1,692,221.86** | **$7,654,645.86** |
| Expenses | | | | | | |
| Advertising | | | | 598.00 | 225.00 | $823.00 |
| Depreciation | | | 30,538.56 | 30,538.56 | 30,538.56 | $91,615.68 |
| Insurance | 29,189.04 | 53,206.40 | 47,339.90 | 64,659.90 | 43,878.09 | $238,273.33 |
| Interest Expense | 1,433.17 | 25,417.67 | 53,906.18 | 36,042.21 | 31,996.53 | $148,795.76 |
| Licenses and Permits | 3,578.00 | 150.00 | 150.00 | 1,630.00 | | $5,508.00 |
| Marketing | 102,500.00 | 248,500.00 | 107,000.00 | 620.59 | 3,200.00 | $461,820.59 |
| Meals & Entertainment | 61,991.23 | 66,145.82 | 66,532.20 | 45,596.37 | 32,117.63 | $272,383.25 |
| Mother Agency | 72,903.13 | 97,870.64 | 173,777.18 | 172,793.93 | 177,084.66 | $694,429.54 |
| Office Expenses | 81,595.22 | 125,047.28 | 103,357.42 | 111,164.63 | 125,613.66 | $546,778.21 |
| Payroll | 504,866.91 | 616,906.22 | 669,639.52 | 681,067.83 | 723,463.68 | $3,175,944.16 |
| Professional Fees | 57,043.95 | 38,992.47 | 31,943.83 | 67,749.87 | 80,629.03 | $276,359.25 |
| QuickBooks Payments Fees | | 1,040.92 | 1,115.73 | 2,117.06 | 2,335.10 | $6,608.81 |
| Rent | 83,976.52 | 64,024.31 | 72,278.28 | 168,204.28 | 189,920.26 | $578,403.65 |
| Taxes | 7,327.81 | 5,580.45 | 1,500.00 | | 8,268.34 | $22,676.60 |
| Travel | 225,118.06 | 264,723.24 | 196,908.64 | 298,009.44 | 228,707.67 | $1,213,467.05 |
| Utilities | 27,384.96 | 32,742.58 | 24,305.46 | 37,629.33 | 42,211.79 | $164,274.12 |
| **Total Expenses** | **$1,258,908.00** | **$1,640,348.00** | **$1,580,293.00** | **$1,698,422.00** | **$1,720,190.00** | **$7,898,161.00** |
| NET OPERATING INCOME | $ (84.00) | $ (234,579.00) | $26,460.66 | $ (7,344.66) | $ (27,968.14) | $ (243,515.14) |
| NET INCOME | $ (84.00) | $ (234,579.00) | $26,460.66 | $ (7,344.66) | $ (27,968.14) | $ (243,515.14) |

Accrual Basis Friday, July 24, 2020 11:46 AM GMT-04:00

# Fusion Modeling Agency, LLC

## PROFIT AND LOSS

January - June, 2020

| | JAN - MAR, 2020 | APR - JUN, 2020 | TOTAL |
|---|---|---|---|
| Income | $1,280,860.93 | $305,344.01 | $1,586,204.94 |
| Cost of Goods Sold | | | |
| Model Expenses | 836,215.49 | 190,704.67 | $1,026,920.16 |
| **Total Cost of Goods Sold** | **$836,215.49** | **$190,704.67** | **$1,026,920.16** |
| GROSS PROFIT | $444,645.44 | $114,639.34 | $559,284.78 |
| Expenses | | | |
| Depreciation | 7,634.64 | 7,634.64 | $15,269.28 |
| Insurance | 11,539.38 | 11,725.28 | $23,264.66 |
| Interest Expense | 80.72 | | $80.72 |
| Meals & Entertainment | 18,419.54 | | $18,419.54 |
| Mother Agency | 39,331.67 | 830.00 | $40,161.67 |
| Office Expenses | 16,133.09 | 4,249.16 | $20,382.25 |
| Payroll | 182,016.56 | 143,635.64 | $325,652.20 |
| Professional Fees | 16,613.46 | 19,630.32 | $36,243.78 |
| QuickBooks Payments Fees | 4,489.35 | 943.93 | $5,433.28 |
| Rent | 21,403.23 | 27,717.00 | $49,120.23 |
| Taxes | 1,500.00 | | $1,500.00 |
| Travel | 65,534.76 | 6,477.90 | $72,012.66 |
| Utilities | 14,265.98 | 5,286.59 | $19,552.57 |
| **Total Expenses** | **$398,962.38** | **$228,130.46** | **$627,092.84** |
| NET OPERATING INCOME | $45,683.06 | $ (113,491.12) | $ (67,808.06) |
| NET INCOME | $45,683.06 | $ (113,491.12) | $ (67,808.06) |

# Exhibit 2

Resume and Deal Sheet of Quan Vu

# Quan A. Vu

(310) 498-6602 ▪ quan.a.vu@gmail.com

---

## EXECUTIVE SUMMARY

---

### Strategically-Minded, Entrepreneurial-Spirited, Mission-Driven Biopharma Executive

Strategy, corporate & business development, finance, and operations professional with 20$^+$ years of "hands-on" experience.

- Developed corporate strategies that spanned pipeline development through commercial launches
- Prospected, evaluated, structured, and closed transactions that augmented organizational and shareholder value
- Consummated billions of dollars in capital raises and M&A deals for public and private companies
- Optimized operational performance by identifying improvement opportunities and instituting efficiency initiatives

---

## PROFESSIONAL HIGHLIGHTS

---

**Melius BioPharma Consulting LLC**                                              Los Angeles, CA
*Founder/CEO*                                                                    Sept 2019 – Present
Provide support services, including interim C-suite leadership, sell-side and buy-side M&A, corporate finance, IR/PR communications, business development, product forecasting, financial operations.

Key Clients and Engagements:
LS Associates, member company of LifeSci Partners                               New York, NY
*CFO/CBO Consultant – On-Demand C-Suite Leadership*                             2020 – Present

Solganick & Co.                                                                  San Francisco & Los Angeles, CA
*Managing Director – Healthcare IT Strategic, Corporate Finance and M&A Advisory*    2019 – 2021; Aug 2024 – Present

Lombard Global, Inc.                                                             Dallas, TX
*Managing Director – Healthcare IT Investment Banking*                          Sept 2023 – Present

**Ocugen, Inc. (NASDAQ – OCGN)**                                                 Malvern, PA
*Chief Financial Officer/Chief Business Officer*                                 2023
Led a team of 8 FTEs to oversee FP&A, financial reporting, PR/IR, risk & capital structure management, treasury, tax, corporate finance, cost control & efficiency, internal controls & compliance, audit, strategy, business operations, business development.

Key Accomplishments:
- Ensured timely filing of proxy statement and 10-Q filing despite void left by key accounting departures
- Secured $16.5M via an underwritten bought deal with a middle-market investment bank
- Executed an operational efficiency initiative to save ~$20M and extend cash runway an additional quarter
- Instituted a new, $40M corporate investment program to generate income and eliminate SVB exposure

**180 Life Sciences Corp. (NASDAQ – ATNF)**                                      Palo Alto, CA
*Chief Operating Officer/Chief Business Officer*                                 2021 – 2023
Oversaw operations, strategy, business & product development, finance, cost control & efficiency, corporate finance, stakeholder relations, regulatory compliance, market analysis & intelligence, risk management, IR/PR.

Key Accomplishments:
- Designed and executed an operational efficiency initiative to reduce cash expenditures by 35-40%
- Improved the deal terms for a related-party, out-licensing transaction of a preclinical asset by ~25%
- Saved over 50% of initial proposed approval milestones and sales royalties for in-licensing of SCAs
- Reviewed and negotiated an MSA with a CRO for discovery and development services for SCA programs
- Oversaw the company's $12.5M registered direct offering to a single US healthcare institutional investor

**Opiant Pharmaceuticals, Inc. (acquired by Indivior PLC; NASDAQ – INDV)**       Santa Monica, CA
*Vice President – Head of Strategy & Corporate/Business Development*             2016 – 2019
Reported to the CEO/CFO. Drove strategic planning, market analysis, business development, M&A, cross-functional collaboration. Supported FP&A, corporate finance, SEC reporting, HR, IT activities.

Key Accomplishments:
- Accelerated the company's growth from 3 to 16 FTEs and from $10M to $60M market cap
- Expedited the company's listing on NASDAQ and first research analyst coverage by Cantor Fitzgerald

- Facilitated discussions with BARDA and NIDA to obtain $11M funding for nasal nalmefene development
- Renegotiated the licensing agreement with Aegis Therapeutics for Intravail, saving 25% in value
- Oversaw the US market and commercial strategy assessment of the company's entire clinical pipeline
- In-licensed a cannabinoid receptor antagonist from Sanofi for a favorable 80/20 economic split
- Saved 15% on development and capital investment agreements with Bespak/Aesica for nasal device

## Elevance Health, Inc. (formerly Anthem, Inc.; NYSE – ELV)                    Thousand Oaks, CA
*Staff Vice President, Chief of Staff – Strategy, Planning & Administration*                    2014 – 2015
Supervised 27 FTEs and 24 external contractors. Directed strategy, operational planning, project management, performance tracking, FP&A, resource allocation, cost control & efficiency.

Key Accomplishments:
- Directed and modified monthly financial strategies to achieve the 2014 IT budget of $2.2B
- Piloted an enterprise-wide process improvement model, One Path, to save ~240K hours annually
- Reduced current root applications portfolio by 30%, improving operational efficiency and saving ~$25M
- Renegotiated major vendor contracts, ensuring optimal service with 5-10% cost savings

## Impax Laboratories, Inc. (acquired by Amneal; NYSE – AMRX)                    Hayward, CA
*Consultant (full-time) – Strategy & Corporate/Business Development*                    2015 – 2016
*Associate Director / Director – Strategy, Corporate/Business Development & Finance*                    2012 – 2014
Reported to the CFO and supervised two senior managers. Supported strategic planning, market analysis, business development, M&A, cross-functional collaboration, corporate finance, tax strategies.

Key Accomplishments:
- Recognized with "Above and Beyond Award" for inversion efforts to lower corporate tax rate to 12.5%
- Led the company's first credit rating and subsequent $435M term loan financing initiative
- In-licensed the worldwide rights to Eladur, indicated for PHN pain, from DURECT
- Purchased Ursodiol for cirrhosis and Lamotrigine for bipolar disorder and epilepsy from Actavis
- Campaigned for organizational improvements with potential yearly operating expense savings of 35%

## Amgen Inc. (NASDAQ – AMGN)                    Thousand Oaks, CA
*Manager / Senior Manager – Strategy & Corporate/Business Development*                    2009 – 2012
Supported strategic planning, market analysis, business development, M&A, cross-functional collaboration.

Key Accomplishments:
- Commended with four consecutive years of Bravo Points for top performance
- Acquired Bergamo, a Brazilian company with $80M in sales, to establish an emerging market footprint
- Out-licensed a myostatin portfolio of six assets to form Atara Bio, a $1B market cap company
- In-licensed a Type 2 diabetes asset from Array BioPharma in a deal valued at over $700M
- Executed a $400M collaboration agreement with Watson to develop and commercialize biosimilars
- Championed for the pre-launch acquisition of Krypolis before the ultimate $10.4B Onyx purchase

## Other Experience – Investment Banking (e.g., Goldman Sachs, Morgan Stanley)    San Francisco & Los Angeles, CA
*Analyst / Senior Analyst / Associate – Healthcare M&A/Corporate Finance*                    2003 – 2008
Engaged in all aspects of M&A and corporate finance pitches and deal execution.

## EDUCATION, CERTIFICATIONS, AND ACTIVITIES

## Cornell University Law School – Master of Science in Legal Studies
- GPA: 4.3/4.3
- Relevant Courses: Contracts, Corporate Governance, Regulatory Policy, Antitrust Law, Compliance Systems, Intellectual Property, Business Transactions, Effective Communications, Criminal Liability

## University of California, Los Angeles (UCLA) – Bachelor of Arts in Economics
- GPA: 3.9/4.0 *Summa Cum Laude; Top 5%*
- Other Honors: College Honors (Highest UCLA Honors), Economics Departmental Honors, Dean's List

**Certifications**    Certified Treasury Professional – Inactive

**Activities**    UCLA Alumni Mentor, Investor, Sailing & Sports Car Enthusiast, Foodie, Karate Practitioner

2

## QUAN VU – TRANSACTION EXPERIENCE (S=Successful, NS=Not Successful, IP=In Progress)

### *IN-LICENSING*

**Synthetic CBDs (180LS; S):** if sublicense, 8% of approval milestones & sales royalties received from partner; if self-develop, tiered royalties on net sales from 5-10%; saved over 50% of initial proposed terms

**Aegis Therapeutics, Acquired by Neurelis (Opiant; S):** renegotiated the in-licensing agreement for Intravail, an excipient with absorption enhancement properties, for use with Opiant's clinical pipeline products; saved 25% in value

**Sanofi (Opiant; S):** in-licensed a cannabinoid receptor antagonist with P2 data and IP portfolio for a favorable 80/20 economic split

**DURECT (Impax; S):** $2M upfront with $61M in potential milestones for WW rights to Eladur, indicated for post-herpetic neuralgia

**Merck (Impax; S):** $160M upfront with $90M in potential milestones for US marketing rights to anti-psychotic Saphris; lost final round bid to Forest Labs

**Array BioPharma (Amgen; S):** $60M upfront with $660M of additional milestones and royalties for ARRY-403, a P1 small-molecule glucokinase activator program for Type 2 diabetes

**Onyx (Amgen; S):** $2.9B potential pre-launch licensing/acquisition of Krypolis, a P3 multiple myeloma drug (blood cancer), before Amgen's ultimate $10.4B purchase of the entire company

### *OUT-LICENSING*

**Liver Repair/Regeneration Asset (180LS; S):** lead the out-licensing efforts to optimize deal terms in a related-party transaction

**Adalimumab (180LS; IP):** lead the US/UK/EU partnering efforts for a repurposed, clinical asset in Dupuytren's and frozen shoulder

**Project NP (Consulting Client; S):** market two Chinese clinical-stage oncology assets (BRAF inhibitors) to potential pharma partners

**Project BB (Consulting Client; NS):** facilitate the US partnering efforts of IN1001, a 505(b)(2) oncology asset from China

**Two Clinical Programs in Addiction and Overdose (Opiant; NS):** initiated discussions with over 15 Japanese companies, in conjunction with PwC Consulting, to out-license rights to Asia Pacific region

**Rytary for Parkinson's (Impax; NS):** endeavored to out-license ex-US Rytary/Numient rights to international partners with established commercial footprints; focused on North America, Latin America, Europe and Asia

**Myostatin Portfolio in Oncology and Nephrology (Amgen; S):** $250M of potential milestones and royalties for out-licensing of 6 myostatin assets to form Atara Biotherapeutics, a $1B+ market cap company

### *SUPPLY / DISTRIBUTION / CO-DEVELOPMENT*

**Bespak/Aesica (Opiant; S):** development and capital investment agreements for unit-dose nasal device

**Undisclosed Suppliers (Opiant; S):** supplier contracts for continuous access to nalmefene API, an opioid antagonist

**Finnish Institute (Opiant; S):** clinical trial agreement for an addiction asset

**Nektar Therapeutics (Amgen; S):** $50M PEG supply extension agreement for Neulasta

**Genesis Pharma (Amgen; S):** re-negotiation of distribution agreement and debt forgiveness in light of Greece's financial crisis

**Watson Pharmaceuticals (Amgen; S):** $400M contribution in co-development costs for collaboration to develop oncology biosimilars

### *STRATEGIC ADVISORY*

**Paradigm Immunotheraputics (Consulting Client; S):** assist with crafting the "business story" and raising capital; ultimately shifted gear and sought $7M in NIH grants for COVID testing development (also listed under Capital Raises)

**Therapix Biosciences (Consulting Client; S):** explore strategic options, including a reverse merger and spin-off of certain assets

**MAXONA Pharmaceuticals (Consulting Client; S):** build and iterate a robust forecast and valuation model for MAX-001

### *MERGERS & ACQUISITIONS*

**Project Lab (Consulting Client; NS):** dual-track process for a diagnostic company providing at-home test kits (also listed under Capital Raises)

**AstraZeneca (Impax; NS):** undisclosed value proposition for the purchase of Zomig's royalty stream; did not move forward

**Actavis (Impax; S):** undisclosed value for the acquisition of Ursodiol for cirrhosis and Lamotrigine for bipolar disorder and epilepsy

**Novartis (Impax; NS):** $50-$70M acquisition of Novartis CNS assets Fanapt and Clozaril; withdrew from final negotiations

**Vidara (Impax; NS):** $550M Irish company strategic acquisition with pro forma tax advantage; lost final round bid

**Corium International (Impax; NS):** $100M closely negotiated acquisition with key CNS products; negotiations failed in final stages

**Crealta Pharmaceuticals (Impax; NS):** $500M bid for a pharmaceutical company with Krystexxa; lost final round bid to Horizon

**Akorn (Impax; NS):** $1.5B closely negotiated strategic acquisition of company with both generic and branded prescription drugs; could not come to mutually agreed terms

3

**Hi-Tech (Impax; NS):** $500M bid for generic and branded prescription as well as OTC drugs; lost final round bid to Akorn

**VersaPharm (Impax; NS):** $400M bid for diversified generics company; lost final round bid to Akorn

**Bergamo (Amgen; S):** $215M privately-held, Brazilian acquisition to establish an emerging market footprint

**Novo Nordisk (Amgen; NS):** $60B potential acquisition/merger of equals; devoted over one year of work, which resulted in Amgen getting more traction with this foundation owned company than anyone else

**Celgene (Amgen; S):** $40B re-examination of the viability of an acquisition that Amgen passed on several years prior; sum-of-the-parts valuation of product portfolio did not warrant market valuation + market premium; averted a potential $5B loss

**Kyowa Hakko Kirin (Amgen; NS):** explored the potential acquisition to re-establish a Japan footprint; provided deal support to facilitate initial meeting of CEOs in Japan; parent company of KHK not supportive of deal

**UCB (Amgen; NS):** undisclosed value proposition for acquisition of complete rights to Cimzia (UCB opted for continued collaboration)

**Valeant Pharmaceuticals (Banking Client; NS):** $1.7B buy-side; the company develops pharmaceutical products in the areas of neurology, dermatology and infectious diseases; our task was to work with a private equity firm and determine the viability of a buyout, possibly with a consortium of other private equity players

**Estech (Banking Client; NS):** $900M buy-side; the company develops minimal access instruments for cardiothoracic surgeons; our task was to help the company, in conjunction with its private equity backer, to buy the cardiovascular/surgical instruments business of Boston Scientific

**Apria Healthcare (Banking Client; NS):** $3.3B buy-side; the company offers home respiratory, infusion and medical equipment services; our task was to work with the new CFO and his team to develop a projections model and then explore acquisition opportunities with minimal Medicare reimbursement risks

**Adiana (Banking Client; S):** $215M sell-side to Cytyc; the company offers surgical and diagnostic products targeting women's health and cancer diagnostics; our task was to value the company, draft a detailed descriptive memo and find a strategic buyer

**Sierra Health (Banking Client; S):** $2.6B sell-side to UnitedHealth; the company offers healthcare coverage through its commercial and Medicare products; our task was to search for possible financial and strategic buyers

### *CAPITAL RAISES*

**Ocugen (S):** led the underwritten public offering of 30M shares of common stock for gross proceeds of $16.5M

**180 Life Sciences (S):** oversee the $12.5M registered direct offering to a single healthcare-focused US institutional investor

**Baleena Bioscience (Consulting Client; IP):** serve as CEO of the consolidator company in its preparation for a $100M SPAC

**Project Precision (Consulting Client; S):** act as an interim CFO to aid a surgical visualization company with its $10M Series A financing

**Project AI (Consulting Client; IP):** support an AI/ML platform life science company with its $20M Series A financing

**Project Lab (Consulting Client; NS):** dual-track process for a diagnostic company providing at-home test kits; Series A goal of $10M (also listed under Mergers & Acquisitions)

**Paradigm Immunotherapeutics (Consulting Client; S):** assist with crafting the "business story" and raising capital; ultimately shifted gear and sought $7M in NIH grants for COVID testing development (also listed under Strategic Advisory)

**Opiant Pharmaceuticals (S):** $11M in non-dilutive funding from BARDA and NIDA for nasal nalmefene development

**Impax Laboratories (S):** $435M term loan financing for the acquisition of Tower Holdings and its operating subsidiaries

**Replidyne (Banking Client; S):** $50M IPO (joint-bookrunner); the company develops antibiotics to treat infections caused by drug-resistant bacteria; our task was to participate in due diligence, document preparation, filing, marketing and issuance

**Affymax (Banking Client; S):** $106M IPO (sole bookrunner); the company develops novel peptide-based drugs to improve the treatment of serious and often life-threatening conditions; our task was to partake in due diligence, document preparation, filing, marketing and issuance

**LabCorp (Banking Client; S):** $250M leveraged recapitalization (co-manager); the company provides laboratory tests and services through a national network of primary and clinical laboratories; our task was to examine the ideal amount of debt to be raised, the ability to pay down debt and the EPS impact

**Genentech (Banking Client; S):** $2.0B unsecured notes offering (co-manager); the company develops a wide range of pharmaceutical products; our task was to draft a descriptive memo for internal commitment committee review

**CV Therapeutics (Banking Client; S):** $158M follow-on/$150M convertible (joint bookrunner); the company develops drugs for the treatment of cardiovascular diseases; our task was to prepare the sales memo, edit the descriptive memo for review by the internal commitment committee and arrange logistics for a road show

**Telik (Banking Client; S):** $173M equity offering (co-manager); the company develops drugs for the treatment of cancer and inflammatory diseases; our task was to participate in the due diligence sessions and prepare a descriptive memo for internal review

Exhibit 3

Excerpts from the Deposition Transcript of Quan Vu, dated June 4, 2025

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------X

KEVIN POLLACK,

                         PLAINTIFF,

   -against-             Case No.:
                 23 Civ. 2376 (SJB) (LKE)


JODIE LOUISE GORDON (also known as JODY
GORDON) and FUSION MODELS BK LLC,

                         DEFENDANTS.

----------------------------------------X

              DATE: June 4, 2025
              TIME: 11:23 A.M.


        DEPOSITION of the Non-Party
Witness, QUAN VU, taken by the Defendants,
pursuant to a Notice and to the Federal
Rules of Civil Procedure, held VIA ZOOM
VIDEOCONFERENCE, before Jamie Newman, a
Notary Public of the State of New York.

```
(1)
(2)      A P P E A R A N C E S:
(3)
(4)      KASELL LAW FIRM
            Attorneys for the Plaintiff
(5)         KEVIN POLLACK
            1038 Jackson Avenue, Ste #4
(6)      Long Island City, New York 11101
            BY: BRIAN LEHMAN, ESQ.
(7)         Brianlehman97@gmail.com
(8)
         MARIA PATELIS & ASSOCIATES, PLLC
(9)         Attorneys for the Defendants
            JODIE LOUISE GORDON (also known as JODY
(10)     GORDON) and FUSION MODELS BK LLC
            7024 18th Avenue
(11)     Brooklyn, New York 11204
            BY: MARIA PATELIS, ESQ.
(12)        File #: 23CIV2376
            m.patelis@aol.com
(13)
(14)
(15)                 *          *          *
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

(1)                    QUAN VU

(2)          **A.     No.**

(3)          Q.     Are you accredited by any

(4)    professional valuation body such as NACVA,

(5)    ACA or AICPA?

(6)          **A.     No.**

(7)          Q.     Have you ever taken or passed

(8)    any valuation course work through these

(9)    organizations?

(10)         **A.     No.**

(11)         Q.     Would you agree, other than

(12)   your new profession, that most of your

(13)   background involves Biopharma operations

(14)   and strategic finance rather than valuation

(15)   consulting?

(16)         **A.     No, the -- not necessarily.**

(17)   **The reason for that is our business is in**

(18)   **the business of valuation because in the**

(19)   **mergers and acquisition context, even**

(20)   **outside of Biopharma, for example, in which**

(21)   **I consulted for technology companies,**

(22)   **valuation is the fundamental core in any**

(23)   **kinds of mergers and acquisition context or**

(24)   **licensing context.**

(25)         Q.     Right, but here is -- this case

(1)                    QUAN VU

(2)   is not a merger and acquisition case, it's

(3)   a --

(4)        **A.    Yeah, but the valuation is the**

(5)   **same irrespective.**

(6)        Q.    Okay.

(7)             How many shareholder dispute

(8)   valuation cases have you personally

(9)   performed a DCF for?

(10)       **A.    Shareholders disputes**

(11)  **specifically?**

(12)       Q.    Yes.

(13)       **A.    I don't think I have done any.**

(14)       Q.    Okay.

(15)             Have you ever prepared a

(16)  valuation report for modeling agency or any

(17)  similar service based business?

(18)       **A.    Service based business, yes.**

(19)  **So, if you look at, for example, healthcare**

(20)  **insurance companies those are service based**

(21)  **businesses.  You look at different types of**

(22)  **consulting firms that are service based**

(23)  **business.**

(24)            **If you look at technology**

(25)  **companies which I've done plenty of**

(1)                    QUAN VU

(2)   valuation those are service based business

(3)   in terms of the software that they provide.

(4)        Q.    Were they publicly traded

(5)   companies?

(6)        A.    Yes.

(7)        Q.    Were any of them private

(8)   companies?

(9)        A.    Yes.

(10)       Q.    Is your firm registered as a

(11)  valuation service provider with any

(12)  professional body?

(13)       A.    My firm -- which one in

(14)  particular are we talking about?

(15)       Q.    The one you work for?

(16)       A.    The one right now?

(17)       Q.    Yes.

(18)       A.    No, the one right now is

(19)  Biopharma company.

(20)       Q.    How many times have you been

(21)  retained as an expert in litigation?

(22)       A.    How many times have I been

(23)  retained as an expert, probably be this is

(24)  the second.

(25)       Q.    This is the second?

(1)                    QUAN VU

(2)        **A.    Uh-hmm.**

(3)        Q.    And the first one?

(4)        **A.    The one I've alluded to earlier**

(5)  **in the deposition context with respect to**

(6)  **potential financial improprieties.**

(7)        Q.    But that was within your

(8)  business; correct?

(9)        **A.    Within the business, correct.**

(10)       Q.    So, it wasn't you were --

(11)       **A.    No.  No.  Not contacted by**

(12) **anyone, yes, that's correct.**

(13)       Q.    So, you were never contracted

(14) by anyone to perform an evaluation, other

(15) than the one that was disputed in your

(16) firm; correct?

(17)       **A.    Correct.**

(18)       Q.    And --

(19)       **A.    You know, the -- it depends on**

(20) **how you classify or define that, but, you**

(21) **know, specifically with context the answer**

(22) **is no.  With respect to doing valuation**

(23) **work on behalf of companies who engage us,**

(24) **that's quite a bit.**

(25)       Q.    Right, but how many times have

(1)                          QUAN VU
(2)          bring that up to the Judge, but I'm
(3)          going to wait to see how many times
(4)          you interrupt me before I do so
(5)          because I'm not spending the next
(6)          hour arguing with you, Brian, as much
(7)          as I like you.
(8)          Q.    Can you, Mr. Vu, can you
(9)     identify any peer-reviewed valuation
(10)    publications that support your growth rates
(11)    and multiples without reconciliation?
(12)         A.     I'm sorry, can you rephrase
(13)    that?
(14)             MR. LEHMAN:  Are you saying can
(15)         he?
(16)         Q.    Yeah.  Can you identify any
(17)    peer-reviewed valuation publication that
(18)    support your growth rate and multiples
(19)    without reconciliation?
(20)         A.     Yeah, the premise of the growth
(21)    rates are pretty much based upon the
(22)    historical valuation of the P&L statements
(23)    that are provided to you us.  The -- when
(24)    you look at the multiples of how that
(25)    works, that's based on a peer comp that's

(1)                    QUAN VU

(2)   publicly traded.

(3)             I believe the company is called

(4)   the Wilhelmina and that's the emphasis of

(5)   how this actually grows.  The industry

(6)   growth in and of itself is never that

(7)   specific and so, you don't take an industry

(8)   growth and go, okay, I'm going to take that

(9)   and apply it to this company, no.

(10)             It's based on the individual

(11)   projection of the company which is the

(12)   imbedded assumption behind the -- the

(13)   assumptions are based upon DCF, discounted

(14)   cash flow analysis.

(15)        Q.    But, are these -- but, did you

(16)   identify any peer-reviewed valuations

(17)   that's --

(18)        A.    I'm not sure I understand what

(19)   you mean by peer-reviewed valuation.

(20)        Q.    Well, these are your

(21)   assumptions, independent assumptions, is

(22)   that what you're saying?

(23)        A.    No, these are not independent

(24)   assumptions.  The independent assumptions

(25)   in which the data has been provided to me,

(1)                    QUAN VU

(2)    yes.  Based upon the financial statements

(3)    that have been provided, you know, you look

(4)    at the historical trends, for example, see

(5)    where its grown hence, you know, the DCF is

(6)    an intrinsic value of the company so it's

(7)    based upon all the information, financial

(8)    information, as provided to me.

(9)            The one that is applied as one

(10)   of the exit multiple terminal value is

(11)   essentially a fair market of multiple and

(12)   the peer comp here which is basically the

(13)   only one that's publicly traded is

(14)   Wilhelmina.

(15)       Q.     Right.

(16)            Do you have a written

(17)   methodology or check list that you follow

(18)   in preparing the DCF valuation?

(19)       A.     Once again, I'm not entirely

(20)   sure I understand the question.

(21)       Q.     Well, do you have a form, a

(22)   format if your -- have you done DCF

(23)   valuation before?

(24)       A.     Yes, many times.

(25)       Q.     And do you have a check list of

(1)                    QUAN VU

(2)    what you follow when you prepare one?

(3)        A.    You don't need a check list to

(4)    follow because if you've done it that many

(5)    times it becomes kind of like imbedded

(6)    muscle memory.

(7)        Q.    Right.

(8)            But, is your valuation of

(9)    fusion replicable by any other credential

(10)   valuation professional using standard

(11)   inputs?

(12)       A.    Absolutely.

(13)       Q.    And can you identify them?

(14)       A.    Yeah, it's the DCF methodology.

(15)   You follow the standard procedures, you

(16)   look at the historical numbers.  You run

(17)   the averages and the means.  Then you

(18)   calculate the growth rates and you grow

(19)   that out five years and you take the

(20)   historical margins, you apply to everything

(21)   below, including cause, expenses and then

(22)   you derive at all the following multiples

(23)   in the valuation.

(24)           It's very standard.  Anyone can

(25)   do it with historical numbers.  The method

```
(1)                    QUAN VU
(2)    is pretty much consistent and standardized.
(3)         Q.     Can you identify the objective
(4)    bench marks used in selecting your -- you
(5)    said five percent, but in your report you
(6)    did a six to eight perpetual growth rate?
(7)              MR. LEHMAN:  Objection, I don't
(8)         think he said five percent.
(9)              MS. PATELIS:  He did say it.
(10)        A.     Yeah, so the growth rate takes
(11)   historical growth rates and you kind of
(12)   just look at a range of potential growth
(13)   rates that you can grow the company into
(14)   perpetuity and that's where I was using the
(15)   numbers.
(16)             There's no technical bench mark
(17)   per se because as I have alluded to before,
(18)   each company is unique in its own growth
(19)   rate and it just depends on where they are.
(20)        Q.     So, is it fair to say that you
(21)   used the DCF standard in your valuation of
(22)   fusion modeling agency?
(23)        A.     Yes.
(24)        Q.     And I'm going to ask you, did
(25)   you cite any valuation authority or
```

```
(1)                  QUAN VU
(2)  standard that supports your choice?
(3)       A.    There is no standard per se.
(4)  You look at the various methodologies
(5)  available to you and you --
(6)       Q.    What are those?
(7)       A.    -- and you evaluate what is the
(8)  most appropriate.
(9)       Q.    So what are those that are
(10) available to you?
(11)      A.    They are a number of
(12) available --
(13)           MR. LEHMAN:  Quan, wait.
(14)       Ms. Patelis, please don't interrupt
(15)       him while he's in the middle of
(16)       answering you did it on the last
(17)       question.  Thank you.
(18)      A.    Yeah, so there are a number of
(19) different methodologies.  Generally
(20) speaking depending on the circumstances
(21) it's hard to encompass all of them.  For
(22) example, in the liquidation context it's
(23) something else.  In a real estate context
(24) it's something else, but at a high level
(25) for general businesses, they're basically
```

(1)                    QUAN VU

(2)     -- they're variant thereof, but essentially

(3)     there is something called public comps

(4)     which are publicly traded companies that

(5)     are trading and then you look at the

(6)     different variables.

(7)                    There are precedent

(8)     transactions, they call them traction comps

(9)     in which companies have already been

(10)    acquired and you look at what is the

(11)    premium above market they are being traded

(12)    for and the DCF.

(13)                   Obviously as I have alluded to

(14)    before, sometimes they are different names,

(15)    sometimes they are variants thereof or

(16)    subcategories thereof, but at a high level

(17)    that's what it is.  I mean certain context

(18)    require certain things, for example, like a

(19)    leverage buyout is very different.

(20)                   Real estate or let's say very

(21)    asset heavy companies, tangible asset

(22)    companies are also very different.  They

(23)    don't necessarily apply and so it requires

(24)    an evaluation of the factors intrinsic to

(25)    the company in terms of valuation being

(1)                    **QUAN VU**

(2)    **applied.**

(3)         Q.     But my question is, what

(4)    valuation did you apply?

(5)         **A.     The DCF.**

(6)         Q.     The DCF.

(7)              And what is your authority that

(8)    supports your choice?

(9)              **MR. LEHMAN:  Objection.**

(10)         **Assumes evidence that's not in the**

(11)         **record.  Assumes there's an**

(12)         **authority.**

(13)              **MS. PATELIS:  I'm asking him a**

(14)         **question and it's a standard question**

(15)         **to an expert, so Brian, can you just**

(16)         **back off in interrupting.**

(17)         **A.     So, there's no authority per se**

(18)    **because the DCF is intrinsic and it's a**

(19)    **methodology used by people who do valuation**

(20)    **as part of their daily lives.  There's --**

(21)    **you don't need to cite anything per se**

(22)    **because it's all -- that's why it's called**

(23)    **an intrinsic valuation because it is**

(24)    **intrinsic in and of itself.  It doesn't**

(25)    **rely on many market factors.**

```
(1)                    QUAN VU
(2)    with the IRS?
(3)            MR. LEHMAN:  Maria, you just
(4)         interrupted him again, do not do
(5)         that.  He's in the middle of a
(6)         question.  He's trying to answer your
(7)         questions.
(8)            MS. PATELIS:  Okay, he's not.
(9)            MR. LEHMAN:  Stop interrupting.
(10)        Just give it a pause.  I understand
(11)        that Zoom's difficult, but give it a
(12)        pause.
(13)        A.    Yeah, no, so to answer your
(14)   question, Maria, it depends because you
(15)   don't just apply fair value according to
(16)   the IRS standards.
(17)            The key to valuation here is
(18)   what is the market willing to pay for.
(19)   It's not contingent upon what the IRS or
(20)   what anybody else talks about.  I mean, at
(21)   the end of the day when you look at
(22)   valuation between one business versus
(23)   another it's who is willing to buy what at
(24)   what price.
(25)            And so, the intrinsic valuation
```

```
(1)                    QUAN VU
(2)  is irrespective of, you know, anything else
(3)  that's transpiring around, it's just
(4)  looking at the methodology, how it's done
(5)  and you value the company intrinsically,
(6)  not market driven, not any rule related in
(7)  the sense, but accepted methodology that
(8)  everyone uses.
(9)       Q.   I understand that, but you know
(10) that the company was dissolved; correct?
(11)      A.   Right, so that's in a
(12) liquidation.  See, if you're assuming a
(13) liquidation context, yes, but from my
(14) understanding we are operating from a
(15) context of a but-for analysis.
(16)           But-for the liquidation aspect
(17) of it, we are looking at a company from a
(18) potential efficiency before it even gets to
(19) that liquidation.
(20)      Q.   But that was not the facts of
(21) the case.  The facts were that the company
(22) was dissolved judicially?
(23)      A.   Right.
(24)      Q.   So --
(25)           MR. LEHMAN:  Objection, is
```

(1)                        QUAN VU

(2)              MS. PATELIS:  He finished.

(3)              MR. LEHMAN:  -- you literally

(4)          just did that.

(5)              MS. PATELIS:  He finished.

(6)              MR. LEHMAN:  No, he didn't.

(7)          Can we please remove the resumé off

(8)          the screen, I don't think you could

(9)          see him.  There we go, thank you.

(10)         Q.    But Mr. Vu, you were aware that

(11)    the company was dissolved?

(12)         A.    Yes, I am.

(13)         Q.    Do you agree that intrinsic

(14)    value is not the same as fair market value

(15)    used in litigation settings?

(16)         A.    The intrinsic value is not the

(17)    same -- once again, it comes back to what

(18)    do you mean by intrinsic and what do you

(19)    mean by fair value?  We don't need -- you

(20)    know, the definition of fair value in and

(21)    of itself doesn't require anything market

(22)    related sometimes.

(23)              If you take, for example, even

(24)    the approaches of, like, an asset value

(25)    model where you take the assets minus

(1)                    QUAN VU

(2)    liability that has nothing to do with

(3)    technically fair value.  I mean, fair value

(4)    by definition is what do you believe is the

(5)    value of the business, like, fairly and I

(6)    suppose but whatever that means --

(7)         Q.    I know, I'm --

(8)         A.    -- but that approach --

(9)              MR. LEHMAN:  Stop interrupting

(10)         him.

(11)         A.    -- accepted approach is

(12)    essentially assets minus liability and so,

(13)    but that's not how companies look at in

(14)    terms of the value of how they're being

(15)    sold, for example.  You know --

(16)         Q.    I --

(17)         A.    -- when you look at a company

(18)    it's not just what's going on out there.

(19)              THE COURT REPORTER:  I cannot

(20)         get everyone talking at the same

(21)         time.

(22)              MR. LEHMAN:  Ms. Patelis, you

(23)         have to stop interrupting him.  I

(24)         agree.  If you want to get the Judge

(25)         involved get the Judge involved, but

(1)                    QUAN VU

(2)        **A.    Yes.**

(3)            **(Whereupon, the aforementioned**

(4)        **38-page valuation expert report was**

(5)        **marked as Defendant(s)' Exhibit 2 for**

(6)        **identification as of this date by the**

(7)        **Reporter.)**

(8)        Q.    Showing you what's been marked

(9)   as Defendant's Exhibit 2, are you familiar

(10)  with this document, please review it?

(11)       **A.    I am.**

(12)       Q.    And is the same report that you

(13)  provided to your Counsel?

(14)       **A.    It is.**

(15)       Q.    Do you need time to answer the

(16)  question or?

(17)       **A.    Oh, are you still on that**

(18)  **question, okay?**

(19)       Q.    Yes.

(20)       **A.    Yeah, no, absolutely.  So what**

(21)  **I did was I look at the historical ordinary**

(22)  **income provided the various P&Ls and I ran**

(23)  **a mean, a max and minimum number on them**

(24)  **and then using the year to year growth of**

(25)  **the revenues from 2013 all the way to 2019,**

(1)                    **QUAN VU**
(2)    **I get a mean growth of 6.73 percent.**
(3)          Q.    So was that an industry data?
(4)          **A.    No.  Once again, there's no**
(5)    **industry data here it's intrinsic to the**
(6)    **company itself.**
(7)          Q.    So, you used fusion numbers?
(8)          **A.    Correct.**
(9)          Q.    Okay.
(10)          And you applied a 25 percent
(11)    reduction in operating expenses?
(12)          **A.    Correct.**
(13)          Q.    What documentation supports
(14)    that assumption?
(15)          **A.    The ordinary business when run**
(16)    **with efficiency it's just that, I mean,**
(17)    **there is no technical documents per se --**
(18)          Q.    Do you --
(19)          **A.    -- if you look at any kind of**
(20)    **acquisition context those are usually the**
(21)    **synergies assumed, for example, in any kind**
(22)    **of acquisition context because the**
(23)    **potential efficiencies.  The argument here**
(24)    **is based on efficiency of the company, how**
(25)    **it's run before it goes down.**

(1)                    QUAN VU

(2)          MR. LEHMAN:  Stop interrupting

(3)      the witness.  Stop interrupting the

(4)      witness.

(5)      Q.    So, this number, again, was

(6)  just derived from nowhere; correct?

(7)      A.    No.  No.  It's not --

(8)          MR. LEHMAN:  Objection.

(9)      Q.    Can you explain?

(10)          MR. LEHMAN:  Objection.  Can

(11)      you repeat the question, please?

(12)      Q.    Can you explain how you came up

(13)  with the 25 percent reduction?

(14)      A.    Absolutely.  The 25 percent

(15)  reduction assumes pretty much industry, you

(16)  know, general industry operational

(17)  efficiency -- inefficiency companies that

(18)  you can say.

(19)      Q.    And were the efficiency

(20)  assumption bench marked against comparable

(21)  modeling agencies?

(22)      A.    There are -- unfortunately,

(23)  there's only one out there that's publicly

(24)  traded which the data has revealed.

(25)      Q.    Okay, we'll get to that soon.

```
(1)                    QUAN VU

(2)   acquisition.  So when they have a bolt-on

(3)   acquisition the expenses almost become

(4)   irrelevant because there will be

(5)   redundancies.

(6)              So, a company would buy it for

(7)   -- just to achieve the top line sales that

(8)   they'll add to their on top line sales and

(9)   eliminate all the operating expenses

(10)  associated with the fusion.

(11)      Q.    Right, but this company was

(12)  being dissolved?

(13)      A.    I understand that.

(14)      Q.    So it doesn't align with your

(15)  valuation?

(16)      A.    The valuation is contingent

(17)  upon the assumption that it operates

(18)  efficiently before liquidation context.

(19)  That's like almost -- to argue from a

(20)  liquidation context and its value kind of

(21)  defeats the whole purpose.

(22)      Q.    Right, but this is a legal

(23)  matter so --

(24)      A.    I'm not here to evaluate legal

(25)  matters, I'm here to evaluate the company
```

```
(1)                    QUAN VU

(2)    itself.

(3)         Q.    And what financial documents

(4)    did you reply upon?

(5)         A.    Once again, it's an intrinsic

(6)    value.  The documents I rely upon are given

(7)    to me by the company or by my -- our

(8)    Counsel that has received all these

(9)    documents from the company.

(10)        Q.    So, can you specify what

(11)   documents you?

(12)        A.    Yeah, Exhibits O, P, Q and R.

(13)        Q.    That's it?

(14)        A.    Those are specific to the

(15)   valuation model, yes.

(16)        Q.    And did you accept managements

(17)   projections without independent

(18)   verification?

(19)        A.    Management didn't give me any

(20)   rejections.

(21)        Q.    Did you consider the industry

(22)   competitive landscape or macroeconomic

(23)   conditions?

(24)        A.    Absolutely, that's why there's

(25)   only -- that's how I found Wilhelmina
```

(1)                         **QUAN VU**

(2)     **International.  That's the only one that's**

(3)     **publicly traded.**

(4)          Q.     And what -- wait, the fusion is

(5)     not publicly traded --

(6)          **A.     I know.**

(7)          Q.     -- correct?

(8)          **A.     I know.**

(9)          Q.     Okay.

(10)              And what risk factors did you

(11)    account in your analysis, if any?

(12)         **A.     Hard to define what you mean by**

(13)    **risk factors.  What specific risk factors**

(14)    **are we talking about?**

(15)         Q.     So, the valuation methodology

(16)    you used, right?

(17)         **A.     Uh-hmm.**

(18)         Q.     Is that approach recognized by

(19)    professional valuation standards such as

(20)    ASA, NAC, VA, etc.?

(21)         **A.     Absolutely.**

(22)         Q.     And did you apply adjustments

(23)    that would not be made in a fair market

(24)    transition?

(25)         **A.     Absolutely.**

(1)                    **QUAN VU**

(2)        Q.    And have you testified in other

(3)    matters using a non-fair market value

(4)    standards?

(5)        **A.    No, I've not testified, this**

(6)    **goes back to the question you've asked**

(7)    **before.**

(8)        Q.    Right.

(9)              And is there any authoritative

(10)    source that supports your deviation from

(11)    fair market value?

(12)        **A.    No, not that I'm aware.**

(13)        Q.    You reference a bolt-on

(14)    acquisition scenario with up to 95 expense

(15)    reductions; correct?

(16)        **A.    Uh-hmm.**

(17)        Q.    Was this based on your offer or

(18)    actual acquire interest on any --

(19)              **MR. LEHMAN:  Maria, I have a**

(20)           **question.  You said 95 reductions, I**

(21)           **just don't know what that means.  95**

(22)           **-- maybe it's muffled because of**

(23)           **Zoom.  95 what?**

(24)        Q.    Mr. Vu understands my

(25)    questions?

```
(1)                    QUAN VU
(2)        A.     It's on Page 4, fourth
(3)    paragraph.
(4)            MR. LEHMAN:  I -- okay.
(5)        Q.     So, you reference on a bolt-on
(6)    requisition scenario with up to 95 percent
(7)    expense reduction?
(8)        A.     Correct.
(9)        Q.     Was this based on any offer or
(10)   actual acquire interest?
(11)       A.     With respect to the company?
(12)       Q.     Yes, of course.
(13)       A.     Like, somebody -- no.  I mean,
(14)   I'm not aware that anybody came and offered
(15)   this company a price, no.
(16)       Q.     Okay.
(17)            So, then how did you come up
(18)   with bolt-on acquisition scenario of up to
(19)   95 percent expense reduction?
(20)       A.     It's the same answer in which
(21)   I've alluded to and specifically answered
(22)   before, is that in an acquisition context
(23)   there will be redundancies across the
(24)   board.
(25)            You can almost eliminate almost
```

(1)                          QUAN VU

(2)    specifically for a very small company being

(3)    acquired by a large company that almost all

(4)    the operating expenses can be eliminated.

(5)         Q.    Right, but why would you apply

(6)    this analysis when the company is getting

(7)    dissolved and not acquired, that's what I'm

(8)    trying to understand?

(9)         A.    Right, this is when we go back

(10)   to the but-for analysis.  The analysis is

(11)   based upon but before the liquidation

(12)   scenario as an operating entity operating

(13)   efficiently.  It should not happen, it

(14)   should not even go there, but --

(15)        Q.    I understand, but --

(16)        A.    Please let me finish.  If you

(17)   look at the operational listed you can

(18)   achieve up to 85 to 95 percent, but that's

(19)   why I'm only assuming 25 percent.

(20)        Q.    But at the time the litigation

(21)   was filed, the company was dissolved?

(22)        A.    I understand that which is what

(23)   you keep on going back to, but that's not

(24)   the argument I am making.  The argument and

(25)   the valuation I'm basing on is before the

```
(1)                    QUAN VU

(2)   liquidation.  How should the company be run

(3)   and that's how the value is based off of.

(4)            It should be, like, you know,

(5)   assuming a 25 percent operational

(6)   efficiency you should have a really -- a

(7)   decent, you know, justifiable valuation of

(8)   the company.

(9)        Q.    Okay.  So, the facts of the

(10)  matter weren't really correctly applied in

(11)  your valuation?

(12)           MR. LEHMAN:  Objection, you're

(13)      testifying.

(14)       Q.    And were these bolt-on benefits

(15)  modeled in actual financial terms or left

(16)  conceptually?

(17)       A.    Once again, it depends on

(18)  context.

(19)       Q.    You used a 1317 percent

(20)  discount rate.  Can you walk me through how

(21)  you derived that WACC?

(22)           MR. LEHMAN:  Maria, you said

(23)      1317.  Are you saying 13 to 17?

(24)           MS. PATELIS:  13-17 percent

(25)      discount rate.
```

(1)                    QUAN VU

(2)              MR. LEHMAN:  The dash means to,

(3)         right?  I think you're just reading

(4)         something, but it's coming across as

(5)         confusing.  Is it 13 to 17?

(6)    Q.    Mr. Vu, are you looking at the

(7)    same thing that I'm looking at?

(8)    A.    Yes.

(9)              MR. LEHMAN:  Where are you

(10)        looking?

(11)   A.    The 13 to 17 discount percent

(12)   rate, that is correct.

(13)   Q.    Okay.  And can you walk me

(14)   through how you derived that WACC?

(15)   A.    Yes.  If you look at -- if you

(16)   look at how companies, particularly

(17)   companies that are, you know, either

(18)   private or in the market and what's the

(19)   risk factor.

(20)            So, there are a number of

(21)   things that could go into there.  You can

(22)   look at the variety of different things;

(23)   what's the industry, what's the interest

(24)   rate because essentially what the discount

(25)   rate is, what do I expect to get in return

(1)                    QUAN VU

(2)  for the investment I'm making.

(3)               And so it takes into account

(4)  that very risk to be fair, you have to

(5)  always take a range and so I'm assuming a

(6)  discount rate of 15 percent because of the

(7)  risk factors associated with an investment

(8)  in a private company.  It's not -- you

(9)  know, it's not like you're putting money

(10) into treasury notes or something where

(11) you're guaranteed like four percent.

(12)               And so those risk factors are

(13) accounted for as well as, you know, other

(14) factors.  I gave it a range between 13 and

(15) 17 taking the midpoint of 15.

(16)      Q.    And did you use CAPM or any

(17) other model for that?

(18)      A.    Yeah, the cap -- yeah, the

(19) capital asset pricing model.  There are not

(20) enough variables here to do that, but you

(21) -- that's why there's a range provided.

(22)      Q.    Did you consult Duff & Phelps

(23) or any other standards for private company

(24) discount rates?

(25)      A.    Once again, it depends upon

```
(1)                    QUAN VU

(2)   industry.  They're not that reliable in the

(3)   sense that you only have one, for example,

(4)   publicly traded company.  I mean, it's not

(5)   possible.

(6)        Q.    But I'm saying for a private

(7)   company discount rate?

(8)        A.    Once again, it's very specific

(9)   to very different industries to different

(10)  companies and to different capital

(11)  structure and whatnot, it's not apples to

(12)  apples.

(13)       Q.    Right.  Well, why did you use

(14)  six to eight percent perpetual growth rate?

(15)       A.    Based upon the historical

(16)  numbers provided by the top line sales of

(17)  the company.

(18)       Q.    Do you have data supporting the

(19)  level of sustained growth?

(20)       A.    I'm looking at that as a

(21)  sustained growth.  Depends on the different

(22)  companies, different -- sustained industry.

(23)  If you look at, for example, let's say you

(24)  want to grow a company six percent into

(25)  perpetuity and the inflation rate is four
```

```
(1)                      QUAN VU

(2)    percent.  Then you have to make the

(3)    appropriate adjustments.

(4)              Normally speaking you're

(5)    looking anywhere between two to four

(6)    percent growth into perpetuity is the

(7)    standard.  That's an accepted standard.

(8)              But that assumes that you

(9)    adjust for potential inflationary

(10)   environments where the real growth rate is

(11)   actually only several percentages which is

(12)   the difference between the nominal versus

(13)   the inflation rate.

(14)        Q.    Well, how about if I ask you is

(15)   a six to eight percent growth rate

(16)   reasonable for a company declining in a

(17)   niche industry?

(18)        A.    That's one -- yeah, if you're

(19)   looking at the industry, right, it's one

(20)   thing.  Once again, this valuation is very

(21)   specific to the company and intrinsic to

(22)   the company's performance on the top line.

(23)        Q.    Right, but -- okay.

(24)              But, you were aware that the

(25)   company was dissolved; correct?
```

                        QUAN VU

(1)

(2)        **A.     Yes, you've asked me that**

(3)   **several times.**

(4)        Q.     Okay, I just want to make sure

(5)   because I don't know why you would do it

(6)   this way.

(7)             Why did you choose 3-5 times

(8)   EBITDA multiples?

(9)        **A.     Yes.**

(10)       Q.     And how does that compare to

(11)  Wilhelmina or other industry comps?

(12)       **A.     So Wilhelmina International as**

(13)  **of 12 -- December 2nd, 2022 it's enterprise**

(14)  **value 3.75.  Using that as kind of like the**

(15)  **midpoint range.  I put between three and**

(16)  **five times EBITDA multiples taking the 4.**

(17)  **-- four times EBITDA multiples as kind of**

(18)  **like the midpoint.**

(19)       Q.     Well, you know, that Wilhelmina

(20)  offers more in different services than what

(21)  Fusion offers; correct?

(22)       **A.     I understand that, but that's**

(23)  **the closest publicly available comp, and**

(24)  **the only publicly available comp available.**

(25)       Q.     But how did they compare to

(1)                    QUAN VU

(2)    Fusion?

(3)         **A.     They are a model agency that**

(4)    **does similar things and that is the closest**

(5)    **thing that's available.**

(6)         Q.    So, a company that has been in

(7)    business since 2007, correct, that's when

(8)    Fusion came into business, how did you

(9)    determine that it was still in the growth

(10)   stage and not a mature company?

(11)        **A.     Because you look at the**

(12)   **historical numbers, again, the top line**

(13)   **sales will tell you that.  So, if you look**

(14)   **at the growth rate of Fusion, you know, if**

(15)   **you look at -- if you just look at in the**

(16)   **first couple of years from 2013 to 2014,**

(17)   **right, the mean growth rate is, you know,**

(18)   **1.9 percent -- 1.2 percent in the negative.**

(19)             **From 2014 to 2015 it's 2**

(20)   **percent in the negative and then in 2016 it**

(21)   **goes to 21 percent in the positive and then**

(22)   **to 7.24 in the positive in the following**

(23)   **year and then up again in 2018 to**

(24)   **17.52 percent and in 2019 to negative**

(25)   **2.34 percent.**

(1)                    QUAN VU

(2)            If you take the average of all

(3)    those growth rates you get 6.73 which is

(4)    the number that is provided in the analysis

(5)    document that is before you.

(6)        Q.    And how sensitive is your

(7)    valuation to changes in the exit multiple

(8)    then?

(9)        A.    How sensitive it is.  You have

(10)    one company so it can be potentially

(11)    sensitive, but there no other publicly

(12)    traded comps and so given the date of the

(13)    valuation and pretty much the date of when

(14)    this case was taking place as December 2nd,

(15)    the closet one that I got, December 2,

(16)    2022, I'm using that multiple.

(17)            But remember that there are two

(18)    multiples.  One multiple is being applied

(19)    for the terminal value.  The other is to

(20)    check it, right.  So, you have basically

(21)    two DCF valuation methodologies.  You have

(22)    the multiple exit method and you have the

(23)    the growth into perpetuity.

(24)        Q.    You also determined that Fusion

(25)    was a pioneer in promoting diversity, can

(1)                    QUAN VU

(2) you cite your sources?

(3)        **A.    That is from the information**

(4) **provided from the company description.**

(5)        Q.    Where did you obtain that?

(6)        **A.    I think I read it on the -- in**

(7) **one of the documents.  I can't remember.**

(8)        Q.    And how did you determine the

(9) Fusion attracts premium models and

(10) clientele?

(11)        **A.    Once again, I believe that is**

(12) **also from one of the marketing documents.**

(13)        Q.    Okay, but how does that defer

(14) then the public companies that you are

(15) comparing Fusion to?

(16)        **MR. LEHMAN:  Defer?  Differ?**

(17)        Q.    Yeah, how does that differ from

(18) the public companies you compared Fusion

(19) to?

(20)        **A.    Yeah, so that is what**

(21) **distinguishes in the sense of the**

(22) **diversity.  The different types of clients,**

(23) **the different models they attract.**

(24)        **But once again it goes back to**

(25) **the models.  Fusion -- once Fusion becomes**

(1)                    QUAN VU

(2)     somewhat of a, for lack of a better word, a

(3)     household name, right, similar to, you

(4)     know, kind of like the top modeling agency,

(5)     then that's where the value comes in.

(6)          Q.    Did you present a waited

(7)     conclusion blending DCF and market based

(8)     results?

(9)          A.    No, negative because of the

(10)    limited -- that's why I eliminated the

(11)    other two analysis based upon the public

(12)    comps because there's only one, right, and

(13)    so you want to try to eliminate as much as

(14)    the potential market distortion because

(15)    there's only one company.

(16)              So, the publicly traded comps

(17)    only one is available which is not very

(18)    good for valuation purposes.  The second is

(19)    the present transaction which, you know,

(20)    you simply don't have any because these are

(21)    private companies and even they acquire

(22)    other companies often times, you know, if

(23)    not most of the time they're not required

(24)    to publicly reveal what they are being

(25)    bought for.

(1)                    QUAN VU

(2)            And so because of that you try

(3)    to eliminate all kinds of market influences

(4)    and hence the conclusion to do the

(5)    intrinsic value of the company, right.  And

(6)    so, the only variable that is affected

(7)    perhaps by the market is the discount rate

(8)    if you really want to take it, but to

(9)    minimize that variability you do the range.

(10)   You always do a range.

(11)        Q.    Right, but the problem is that

(12)   this company was dissolved?

(13)            MR. LEHMAN:  Objection, please

(14)        stop testifying.

(15)            MS. PATELIS:  I'm not, but

(16)        there's no objection based.  I'm just

(17)        trying to understand why he would do

(18)        a totally different approach on

(19)        something that is dissolved already.

(20)            MR. LEHMAN:  You've made this

(21)        point, like, six times already, can

(22)        we move on.  Just ask questions.  If

(23)        you have questions, ask them.  If not

(24)        can, can just end the deposition this

(25)        is tedious.

(1)                    QUAN VU

(2)  financials to correct any personal expenses

(3)  run through the business?

(4)       **A.       Negative.  I took a abroad**

(5)  **25 percent discount.**

(6)       Q.    Were your projections

(7)  independently verified or supported by

(8)  management's actual plans?

(9)       **A.       I only used what's available to**

(10) **me.**

(11)      Q.    And what was available to you?

(12)      **A.       The P&Ls that I already cited**

(13) **to you and in the report.**

(14)      Q.    And did you consider Covid-19's

(15) impact on cash flow reliability post-2020?

(16)      **A.       I don't need to consider these**

(17) **factors because when you look at it, once**

(18) **again, it's an intrinsic valuation**

(19) **irrespective of what the market and the**

(20) **outside factors are.**

(21)           **Just looking at the intrinsic**

(22) **value of the company based upon the**

(23) **historical financials forecasted forward.**

(24)      Q.    Okay.  So would a hypothetical

(25) buyer in a private market apply a discount

(1)                    **QUAN VU**

(2)    **you value the company.  If you're hired by**

(3)    **a valuation expert to look at your company**

(4)    **and what it can potentially sell for in the**

(5)    **market, that is a vary clear and objective**

(6)    **evaluation methodology that, oh, okay, this**

(7)    **is what a potential buyer could buy it for.**

(8)    **This is what you could sell it for.**

(9)         Q.    But would a willing buyer in an

(10)   arm's length transaction realistically pay

(11)   the value you concluded in the --

(12)        A.    **Absolutely.**

(13)        Q.    And what due diligence would a

(14)   hypothetical buyer need to believe this

(15)   valuation is fair?

(16)        A.    **Almost everything -- everything**

(17)   **that I've done provide in that report.**

(18)   **They would do exactly the same.**

(19)        Q.    So another valuation

(20)   professional would replicate your work

(21)   based solely on your report?

(22)        A.    **Yes, they could easily**

(23)   **replicate that and they would publicly come**

(24)   **to the same conclusion based upon the**

(25)   **information that was given to me.**

```
(1)                    QUAN VU
(2)        Q.    Do you have an understanding of
(3)   where Fusion gets its business from?
(4)        A.    I do not know the business
(5)   model.
(6)        Q.    And is there any concentration
(7)   of risk with most sales coming from one or
(8)   two clients?
(9)        A.    That is a risk that any company
(10)  would face, yes.
(11)       Q.    Why did you use past operations
(12)  of Fusion for the future?
(13)       A.    That is a standard methodology
(14)  for the discounted cash flow.
(15)       Q.    And Fusion has been around for
(16)  many years, what made you assume that those
(17)  years of operation were not suitable to be
(18)  used for value?
(19)       A.    Those are the numbers that I
(20)  got from 2013 to 2019 and I believe a part
(21)  of 2020.  So I am using all the information
(22)  at my disposal.
(23)       Q.    And how did you determine the
(24)  Fusion was running efficiently?
(25)       A.    You look at some of these
```

```
(1)                    QUAN VU
(2)   operating expenses and then you start to
(3)   question wait, these are not typical of
(4)   companies that are run efficiently.  Having
(5)   that many valuation exercises you can
(6)   pretty much assume that a lot of businesses
(7)   or all businesses are run around, roughly,
(8)   25 to 30 percent.
(9)              If you look at all the
(10)  potential market data which I've done all
(11)  my life is that you can efficiently
(12)  eliminate in almost all acquisition there's
(13)  an acquisition context where inefficiencies
(14)  show a company can run in the same manner
(15)  with cost cutting of, roughly, around 30
(16)  percent every single time.
(17)       Q.    Yes, but unfortunately this is
(18)  not an acquisition matter.
(19)       A.    I know that.
(20)       Q.    And under case law the standard
(21)  value is fair market value.
(22)            MR. LEHMAN:  Maria, are you
(23)       really testifying now under case law.
(24)       What case law are you referring --
(25)            MS. PATELIS:  No, I'm asking
```

(1)                    QUAN VU
(2)          and just telling him as an expert --
(3)                MR. LEHMAN:  You're telling
(4)          him?  I asked you before, please do
(5)          not educate the expert.  That's not
(6)          what's supposed to happen here.
(7)          You're literally saying under case
(8)          law to a witness who is testifying.
(9)          Q.    Have you ever published a
(10)    peer-reviewed work on DCF analysis?
(11)          A.    No.
(12)          Q.    Is the method you ever
(13)    recognized by professional valuation
(14)    standards ACA, NA, CVA?
(15)          A.    Yes.
(16)          Q.    Did you test the sensitivity of
(17)    your DCF to key assumptions?
(18)          A.    Yes.
(19)          Q.    So, you tested growth rate and
(20)    discount rate?
(21)          A.    Yes, that's why you have two
(22)    methods of the DCF right there.  You have
(23)    the DCF using the terminal value of EBITDA
(24)    multiples.  You have the DCF running into
(25)    perpetuity with the terminal value and you

(1)                          QUAN VU

(2)    double checked against those two as long as

(3)    they're within range, they're reasonable

(4)    checks against one another.

(5)         Q.    Now, who directed you to use

(6)    the DCF model in this case?

(7)         A.    No one.

(8)         Q.    Did you assess what -- again,

(9)    I'm just asking a question that you already

(10)   answered that -- in your calculations, did

(11)   you include market based inputs?

(12)        A.    Only Wilhelmina.

(13)        Q.    That's it?

(14)        A.    That's it.

(15)        Q.    Did you apply marketability or

(16)   minority interest discounts?

(17)        A.    No.

(18)        Q.    Would a hypothetical buyer

(19)   consider the risk factors you omitted?

(20)        A.    Yes.

(21)        Q.    Were your cash flow projections

(22)   provided by the party that retains you?

(23)        A.    No.

(24)        Q.    Where did you -- how did you

(25)   receive them?

```
(1)                    QUAN VU

(2)        A.    I don't have a cash flow

(3)    projection.   I created the cash flow

(4)    protection based upon the historical

(5)    numbers that I got from the company.

(6)        Q.    Did you conduct any independent

(7)    verification on those projections?

(8)        A.    I don't have access to the

(9)    company's complete financials to do

(10)   verification.   I just take what the P&Ls

(11)   that were sent over and the other financial

(12)   statements that companied that.

(13)       Q.    If you did not speak to anyone

(14)   managing Fusion's operations, how did you

(15)   determine that the past income was

(16)   unreliable?

(17)       A.    You look at the discrepancies.

(18)   Why are the numbers different from year to

(19)   year, right, and then overlap.   So when you

(20)   look at some of those things, you can see

(21)   there are differences that's why there are

(22)   discrepancies and there's no way for me

(23)   personally to evaluate why there are

(24)   discrepancies.

(25)       Q.    And on what basis did you
```

(1)                QUAN VU

(2)    conclude the company was liquid?

(3)        A.    **Based upon the historic and its**

(4)    **growth rate, right, this is a but-for**

(5)    **analysis.  But-for the liquidation itself**

(6)    **if the company was run efficiently it would**

(7)    **be fine.**

(8)        Q.    And did you review Fusion's

(9)    2019 and 2020 balance sheets, before

(10)    reaching that conclusion?

(11)        A.    **Yes.**

(12)        Q.    And are you aware that Fusion

(13)    incurs high model related overhead

(14)    including rent, travel and meals?

(15)        A.    **Yes.**

(16)        Q.    Would you agree that gross

(17)    profit, not net, is the more useful metric

(18)    for service business like model agencies?

(19)        A.    **Depends on how you define**

(20)    **growth and net.**

(21)        Q.    Would you agree that the value

(22)    of the service mark depends on the success

(23)    of the associated business?

(24)        A.    **Yes.**

(25)        Q.    Isn't the value of the service

(1)                    QUAN VU

(2)  mark determined by income?

(3)      **A.     Yes and no, right.  Depending**

(4)  **on the circumstances.  Depending upon the**

(5)  **year.  Depending upon many different**

(6)  **factors, but generally speaking the market**

(7)  **in and of itself have value and how does it**

(8)  **have value it's obviously going to be very**

(9)  **tied to the contract of the models that**

(10) **come on, right.**

(11)            **And what attracts it, I mean,**

(12) **it's almost like Pepsi and Coke, so to**

(13) **speak.**

(14)     Q.     Right, but we're talking about

(15) Fusion, not Pepsi.

(16)     **A.     I'm just giving you an example.**

(17)     Q.     So, if there's -- if you don't

(18) know what contract they had, you wouldn't

(19) be able to determine the income of the

(20) service mark?

(21)     **A.     Well, I wouldn't be able to do**

(22) **that, so the only measure that I have is**

(23) **essentially, once again, just the P&Ls that**

(24) **Fusion has provided to me.**

(25)     Q.     And what evidence do you have

(1)                    QUAN VU

(2)    that a larger company would buy them?

(3)        **A.    I don't have the evidence.  I**

(4)    **mean, that calls for speculation.**

(5)        Q.    Well, it's in your report

(6)    that's why I'm referencing it.

(7)        **A.    Yes, I mean, that is in the**

(8)    **potential of any smaller company being**

(9)    **acquired by a big one what is the value**

(10)   **going to be.**

(11)       Q.    And what basis do you have that

(12)   a larger company that will acquire Fusion,

(13)   would expect to achieve in 85, 95 percent

(14)   reduction in operating expenses?

(15)       **A.    Those are assumptions based**

(16)   **upon the size of a company.  So like I said**

(17)   **before, if a company is big enough and it**

(18)   **has redundancies that's what you could**

(19)   **eliminate, but that's not what I'm assuming**

(20)   **in my model and valuation.  My model and**

(21)   **valuation assumes 25 percent.**

(22)       Q.    Right, but we're talking about

(23)   Fusion not in general, I just want to --

(24)       **A.    Yes, 25 to 30 percent is in**

(25)   **general as well.  If you look at any kind**

(1)                          QUAN VU

(2)    of acquisition context by a strategic

(3)    buyer, not a finance buyer, if it's

(4)    acquired by a private equity or you know,

(5)    but they, too, can eliminate.

(6)            But most strategic buyers, not

(7)    all of them, find synergy associated with

(8)    operating expenses and eliminating

(9)    redundancies.  You don't need accounting,

(10)   you don't need HR.  You don't need a lot of

(11)   other functions because it's already

(12)   embedded within the acquiring entity.

(13)       Q.    I mean, what qualifies you to

(14)   assume which cost should be reduced?

(15)       A.    Because I've done this my

(16)   entire 25 years of valuation.

(17)       Q.    I understand that, but what did

(18)   you do for Fusion though?

(19)       A.    I'm applying the same

(20)   methodology.  I'm applying the same

(21)   assumptions that I've used in selling

(22)   multi-billion dollars business, right, at

(23)   the investment bank.  These are accepted

(24)   standards in all fair valuation investment

(25)   banks employ.

(1)                          **QUAN VU**

(2)          Q.    Did you interview the owner or

(3)    gain an understanding of the operation to

(4)    assume what costs should -- you think

(5)    should be reduced?

(6)          **A.    I do not have access to such**

(7)    **individuals.**

(8)          Q.    Okay.

(9)               Under what assumption -- how do

(10)   you know what the larger company has in

(11)   terms of infrastructure or not as it is

(12)   again just based upon your expectations and

(13)   your assumptions?

(14)         **A.    Based upon --**

(15)         **MR. LEHMAN:  Objection, asked**

(16)      **-- Quan, wait a second.  It has been**

(17)      **asked and answered and we know this**

(18)      **because in your question you said**

(19)      **again.  So can we just please stop**

(20)      **berating this.**

(21)         **MS. PATELIS:  Can you just**

(22)      **repeat my last question, Jamie, and**

(23)      **have him answer it.**

(24)         **(Whereupon, the referred to**

(25)      **question was read back by the**

```
                        QUAN VU

(1)                     QUAN VU

(2)          Reporter.)

(3)          A.     I do not know exactly what a

(4)     large company would have, but in general,

(5)     you know, if you assume a strategic acquire

(6)     that's usually the average of what they

(7)     will get in terms of synergy.

(8)                Obvious that's dependent.  You

(9)     can argue the bigger they are, the more

(10)    likely that's the case.  The smaller they

(11)    are, the less likely --

(12)         Q.     But we're focusing on a model

(13)    of Fusion, right?

(14)         A.     I know, I get it.

(15)         Q.     If the business is acquired by

(16)    a larger --

(17)               MR. LEHMAN:  Ms. Patelis, you

(18)          just interrupted him, so please let

(19)          him finish.

(20)         A.     So yeah, if you're in the

(21)    modeling agency.  If let's say, for

(22)    example, this is acquired by the elite

(23)    modeling agency or for modeling agency all

(24)    these things will be redundant and yes,

(25)    they could achieve significant, significant
```

                          **QUAN VU**

(1)

(2)   **operational expense savings.**

(3)        Q.    I understand that, but again,

(4)   this company is dissolved so we're trying

(5)   --

(6)        **A.    You're just kind of, again,**

(7)   **Maria, you're kind of beating a dead horse.**

(8)        Q.    Right.

(9)        **A.    You know, this is not an**

(10)  **analysis based upon liquidation, it's based**

(11)  **upon the but-for liquidation.**

(12)       Q.    But if you did a liquidation

(13)  analysis, what would the valuation be?

(14)       **A.    I don't know, I didn't do that**

(15)  **that's a hypothetical question.  I would**

(16)  **need to look at the capital structure, what**

(17)  **its debts are, what are the various things**

(18)  **and so on and so forth in order to**

(19)  **determine that and I don't have that.**

(20)       Q.    And how did you determine a

(21)  Fusion pays expenses for the personal

(22)  benefit of the member if you didn't

(23)  interview her?

(24)       **A.    I looked at what's in the the**

(25)  **financials.**

(1)                      **QUAN VU**

(2)        Q.    And what did you determine the

(3)   expenses were for?

(4)        **A.    I do not recall from the top of**

(5)   **my head.**

(6)        Q.    Well, the report's right there.

(7)   I mean, it's listed --

(8)        **A.    Which section of the report are**

(9)   **we referring to?**

(10)       Q.    Well, with the section you said

(11)  the expenses that pay for the models that

(12)  they have, what were the expenses, what did

(13)  you ask?

(14)       **A.    I didn't ask anybody, right.    I**

(15)  **don't have access to any particular**

(16)  **individuals to ask which is what I said**

(17)  **before.**

(18)       Q.    Okay, moving on.

(19)             How did you know that a larger

(20)  company will lead to higher client

(21)  compliance and quicker payment resolution?

(22)       **A.    Because when you look at larger**

(23)  **companies they have various accounting**

(24)  **systems with respect to accounts**

(25)  **receivables, accounts payable and so they**

(1)                    QUAN VU

(2)  can have -- they have the infrastructure in

(3)  place to pretty enforce all of that.  Much

(4)  easier and much faster than a typical

(5)  smaller company.

(6)       Q.    But what are these assumptions

(7)  based upon?

(8)       A.    They're based upon just any

(9)  established company.  I mean, that's what

(10)  -- an established company with a build up

(11)  of an infrastructure would have as the

(12)  company grows you have much more mature

(13)  departments with individuals that

(14)  specialize in these various areas.

(15)       Q.    Right.  But I'm asking you to

(16)  testify with respect to a report that you

(17)  prepared.  So I'm just asking, like, are

(18)  you aware that the model agency doesn't

(19)  offer services to their models, that they

(20)  will sign --

(21)            MR. LEHMAN:  Objection, you're

(22)        testifying now that makes you a

(23)        witness.  You're literally telling

(24)        the expert what other people will do

(25)        that makes you a witness.

```
(1)                    QUAN VU

(2)        report though.

(3)              MS. PATELIS:  Brian --

(4)              MR. LEHMAN:  Please, as an

(5)        attorney -- no, I can't do what I'm

(6)        supposed to do if you're not showing

(7)        me in the report where you're

(8)        referring to.  Where are you

(9)        referring to?

(10)             MS. PATELIS:  He just testified

(11)       that Wilhelmina was the only comp

(12)       that he used or are you not

(13)       listening?

(14)             MR. LEHMAN:  Can you please

(15)       tell me where in the report?

(16)             MS. PATELIS:  No.

(17)       Q.    Mr. Vu, can you tell me how

(18)   Wilhelmina was comparable?

(19)       A.    Yes, I --

(20)             MR. LEHMAN:  Asked and

(21)        answered.

(22)       Q.    So, go on?

(23)       A.    As I said before they are in

(24)   the modeling business.  They have models,

(25)   they do very similar lines of business.
```

(1)                    QUAN VU

(2)      A.    That is essentially what's

(3)  discounted anywhere between 13 and

(4)  17 percent taking the 15 percent discount,

(5)  yes.

(6)      Q.    And what projection did you use

(7)  for future cash flows?

(8)      A.    I don't have projections.  Once

(9)  again, this has already been answer.  It is

(10)  using the historical numbers to forecast

(11)  going forward.

(12)           I do not have access for

(13)  anything from the company with regard to --

(14)  with respect to any forecast, any kind of

(15)  assumptions that go into those forecasts so

(16)  on and so forth.

(17)      Q.    And how did you calculate the

(18)  terminal value?

(19)      A.    I covered it on two levels.

(20)  The terminal value is calculated on an

(21)  EBITDA multiple based upon the Wilhelmina

(22)  multiple.  The other one is based upon the

(23)  growth rate of the company and the mean

(24)  average -- the average which is the growth

(25)  into perpetuity of 6.73 percent.

(1)                    **QUAN VU**

(2)        Q.    So it wasn't the Gordon growth

(3)   model then?

(4)        **A.    I don't know what the Gordon**

(5)   **growth model is.**

(6)        Q.    You don't know, okay.

(7)             **MR. LEHMAN:  Maria, what is the**

(8)        **Gordon growth model?  Maria, what is**

(9)        **the Gordon growth model?**

(10)            **MS. PATELIS:  When you put me**

(11)       **on for a deposition and you pay for**

(12)       **it, you can ask me.**

(13)       Q.    Did you reconcile your DCF

(14)   results with other valuation methods?

(15)       **A.    There's -- you cannot value.**

(16)   **This is the best method that's available to**

(17)   **me based upon the information I've got.  I**

(18)   **have assessed it against two other**

(19)   **multiples, right.**

(20)            **The publicly traded comps which**

(21)   **there is one and the present transaction**

(22)   **which there's no information available for**

(23)   **any kind of modeling, it's acquiring others**

(24)   **and they're usually private and so, of the**

(25)   **three methodologies, the DCF is the best**

(1)                    **QUAN VU**

(2)    **one available.**

(3)        Q.    Right, but wouldn't you agree

(4)    that the DCF's model reliability depends

(5)    heavily on the validity of its input?

(6)        A.    **Of course, as with any model.**

(7)        Q.    Right.  So, if your cash flows

(8)    or discount rate are inconsistent, doesn't

(9)    that skew the result?

(10)        A.    **Of course, but my discount**

(11)    **rates a very justified based upon what the**

(12)    **market is, what the inflationary rate is**

(13)    **and what is generally speaking the risks**

(14)    **associates with small companies.**

(15)        Q.    Right, but I'm talking

(16)    specifically about this report, not in

(17)    general?

(18)        A.    **Right.  So you take it with**

(19)    **it's level of specificity, but no one knows**

(20)    **with any level of specificity exactly what**

(21)    **the discount rate will be.  Even if you ask**

(22)    **somebody sitting at the company, for**

(23)    **example, how would he or she know what is**

(24)    **the true absolute discount rate because**

(25)    **there's not enough publicly available**

```
(1)                    QUAN VU
(2)   information out there to come to that level
(3)   of precision hence the range.
(4)        Q.    Right, but do you agree that
(5)   buyers in an open market will perform due
(6)   diligence on these projections?
(7)        A.    Of course they would, but I
(8)   don't have access to do the due diligence
(9)   beyond what is given to me.
(10)       Q.    So, if this business was listed
(11)  for sale would a buyer pay your value?
(12)       A.    Absolutely.  If they run the
(13)  analysis, if they run the discounted cash
(14)  flow and they forecast appropriately, yes,
(15)  they would come to the same conclusion.
(16)       Q.    Did you consult with legal
(17)  counsel before selecting your valuation
(18)  standard?
(19)       A.    Once again, you have asked me
(20)  that before.  The answer is no.
(21)       Q.    Would you agree that using a
(22)  fair market value provides an objective
(23)  arm's length basis for valuation?
(24)       A.    Once again, you've asked me
(25)  that before.
```

[Page 88]
June 4, 2025

```
(1)                    QUAN VU

(2)      Q.     It's a yes or no?

(3)      A.     Yes, and the discounted cash

(4)  flow as well as all the other methodologies

(5)  here are assessments of fair market value.

(6)          The question is really upon at

(7)  what stage are we doing this kind of

(8)  analysis and what's appropriate for the

(9)  company and the type of company that's

(10) being run.

(11)          This particular instance with

(12) Fusion and given it's historical data the

(13) obvious method for valuation here is the

(14) discounted cash flow.

(15)     Q.     Now, can you explain the legal

(16) authority that permits you to use intrinsic

(17) value --

(18)              MR. LEHMAN:  No. No.

(19)              MS. PATELIS:  No?

(20)              MR. LEHMAN:  Yes, absolutely.

(21)       The expert witness is not going to

(22)       give the legal authority for

(23)       anything.

(24)              MS. PATELIS:  Well, if the

(25)       attorney doesn't, then the expert
```

(1)                    QUAN VU

(2)    only pretty much selected.  It is basically

(3)    party of my daily job for the last

(4)    25 years.

(5)        Q.    So, just to clarify, doing

(6)    valuations is part of your daily job for

(7)    the last 25 years?

(8)        A.    Yes, both from the service's

(9)    side of the business investment banking

(10)   providing advisory work and valuation for

(11)   various companies of the investment banking

(12)   and from a corporate side in-house

(13)   valuation of potential acquisitions,

(14)   licensing, collaborations, joint ventures,

(15)   you name it, all based upon the varies

(16)   methodologies that I have with a heavy

(17)   reliance upon the DCF because of its

(18)   intrinsic value and you know, how a company

(19)   would look at it for the most part, but one

(20)   of three methodologies.

(21)       Q.    I'm going to skip around a

(22)   little bit.

(23)            I believe at one point you

(24)   testified you didn't know the business

(25)   models, does it matter from a valuation

```
(1)                    QUAN VU
(2)  perspective if you know the business model?
(3)       A.    If you understand the business
(4)  model, yeah, it can provide some input, but
(5)  for the most part from this particular
(6)  context because there's no publicly --
(7)  let's say, for example I look at a business
(8)  model and I look at the performance of the
(9)  business model, well, to what extent and
(10) how well I know it's being run is also the
(11) way in which I would compare it against
(12) peers.
(13)            But there are no peer's
(14) information, there's only Wilhelmina so I
(15) have to rely on the intrinsic information
(16) that is given to me.
(17)      Q.    Do you only value public
(18) companies or do you valuate private
(19) companies?
(20)      A.    I valuated private companies
(21) plenty.
(22)      Q.    How do you valuate private
(23) companies if they're --
(24)            (Cross-talk.)
(25)            MR. LEHMAN:  I'm asking him --
```

```
(1)                   QUAN VU
(2)        if you want to put down your
(3)        objection you can say outside the
(4)        scope and you can raise it with the
(5)        Judge, I'm going to ask the question.
(6)        You want to put down your objection
(7)        or are you done talking.
(8)            MS. PATELIS:  I finished my
(9)        deposition.  So I am instructing the
(10)       Reporter since it's my deposition --
(11)           MR. LEHMAN:  Maria, let me ask
(12)       the question.
(13)       Q.   Quan, how do you value private
(14) companies if there's not publicly traded
(15) companies available?
(16)           MS. PATELIS:  Objection.
(17)       A.   The intrinsic valuation of the
(18) company based upon the DCF.
(19)       Q.   Why does that work?
(20)       A.   It works because it has numbers
(21) and that's the only thing we can work from.
(22) It has historical numbers and the
(23) historical numbers allow the DCF to
(24) actually because it's the cash flow forward
(25) looking, it allows us to project forward,
```

```
(1)                      QUAN VU
(2)    discount backward to get the value that the
(3)    company is worth.
(4)             Those are the only numbers and
(5)    the only information available to us to run
(6)    valuations.
(7)        Q.    Would you agree that it's basic
(8)    economics that any company would buy
(9)    another company if they could get more
(10)   value for less money?
(11)            MS. PATELIS:  Objection,
(12)        relevance.  Fusion was dissolved at
(13)        the time this lawsuit began.
(14)       Q.    Quan, you can answer the
(15)   question?
(16)       A.    Absolutely.
(17)            MR. LEHMAN:  I don't have any
(18)        other questions.  All right, Maria,
(19)        are you going to send me the
(20)        transcript from the other -- Jamie,
(21)        can you just note that she logged
(22)        off.  Counsel for Defendant's logged
(23)        off.
(24)
(25)
```

```
(1)                    (Whereupon, at 12:58 P.M., the

(2)          Examination of this witness was concluded.)

(3)                    QUAN VU

(4)

(5)

(6)            °         °         °         °

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)
```