UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
KEVIN POLLACK,

Plaintiff,

No. 23-CV-2376 (SJB)(LKE)

-against-

JODIE LOUISE GORDON (also known as JODY GORDON) and FUSION MODELS BK LLC,

Defendants.
------------------------------------------------------------ X

**DEFENDANTS' MEMORANDUM OF LAW**

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT....1

BACKGROUND AND FACTS....2

I. GORDON DID NOT BREACH THE OPERATING AGREEMENT....5

A. Section 8.2 Requires a Sale at Fair Value and Payment of Debts First, Not a Sale by a Date....5

B. No Liquidating Distribution Was Owed Because No Balance Remained After Fusion's Debts....6

C. Fusion's Name and Accounts Do Not Change the Result....7

D. The Claim Against Fusion BK Fails With the Breach Claim....8

II. ANY DAMAGES ARE THE NET BALANCE SECTION 8.2 WOULD HAVE PAID, AND PLAINTIFF HAS NOT PROVED ONE....8

A. Section 8.2 Fixes the Measure: a Share of What Is Left After Debts....8

B. Plaintiff's Table and Vu's Valuation Do Not Measure the Net Balance....10

C. Plaintiff Bears the Burden of Proving the Net Amount....12

D. The Same Measure Applies to the Claim Against Fusion BK....15

CONCLUSION....15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489 (2d Cir. 1985)....................14

*Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683 (1978)....................12

*Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918 (2d Cir. 1977)........8, 9, 12, 13

*Cornell v. T.V. Dev. Corp.*, 17 N.Y.2d 69 (1966)....................14

*G & A Moving & Storage Co. v. Computer Assocs. Int'l*, 233 A.D.2d 479 (2d Dep't 1996)....................14

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562 (2002)....................5

*Matter of Seagroatt Floral Co.*, 78 N.Y.2d 439 (1991)....................10

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614 (1996)....................8

*Perma Research & Dev. v. Singer Co.*, 542 F.2d 111 (2d Cir. 1976)....................8

*Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000)....................10, 13, 14

*Switzerland Cheese Ass'n v. E. Horne's Market, Inc.*, 385 U.S. 23 (1966)....................13

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89 (2d Cir. 2007).............12, 13

*United States v. Cartwright*, 411 U.S. 546 (1973)....................10

*Wai Ming Ng v. Tow*, 260 A.D.2d 574 (2d Dep't 1999)....................8, 9, 11

*Wilbur v. Wilbur*, 116 A.D.2d 953 (3d Dep't 1986)....................11

**Statutes**

N.Y. Ltd. Liab. Co. Law § 702....................4

N.Y. Ltd. Liab. Co. Law § 704(a)....................8

**Other Authorities**

Financial Accounting Standards Board, FASB Accounting Standards Codification, *About the Codification* (v 5.11) (Feb. 2023)....................9

Raj Gnanarajah, Cong. Rsch. Serv., R43811, *Cash Versus Accrual Basis of Accounting: An Introduction* (Dec. 12, 2014)....................9

## PRELIMINARY STATEMENT

This case comes down to one provision of the Operating Agreement. When Fusion Modeling Agency LLC ("Fusion") was dissolved, Section 8.2 required that the proceeds of its assets go first to "the payment and discharge of all of the Company's debts and liabilities" and "any necessary reserves," and only then "[t]he balance, to the Members."[1] Plaintiff Kevin Pollack owned 35.222% of Fusion.[2] He claims in the Joint Pretrial Order ("JPTO") that Defendant Jodie Gordon breached Section 8.2 by not selling Fusion's assets and paying him his share.[3] But Section 8.2 does not give a Member a share of Fusion's assets. It gives him a share of what is left after Fusion's debts are paid. Fusion's own balance sheets, prepared on the accrual basis, show that it owed more than it owned in every year from 2016 through 2021.[4]

Defendants set forth two points for the court to consider in this memorandum of law.[5]

The first is that Gordon did not breach the Operating Agreement. Section 8.2 sets no date for a sale. It requires that Fusion's assets be liquidated "as promptly as is consistent with obtaining the fair value thereof."[6] Gordon wound up Fusion by waiting for clients to pay what they owed so that the models Fusion owed could be paid.[7] As of December 31, 2020, Fusion's liabilities exceeded its assets by $721,642.[8] Without a balance left after debts, there was no liquidating distribution to make. Plaintiff answers that Fusion's name and goodwill had "substantial market value" and should have been sold.[9] But his expert, Quan Vu, valued Fusion

---

[1] Operating Agreement, Plaintiff's Exhibit ("PX") 1, §§ 8.2.1, 8.2.2.
[2] Stipulations of Fact annexed to the Joint Pretrial Order ("Stip.") ¶ 3.
[3] JPTO at 3.
[4] Report of Quan Vu dated Nov. 4, 2024 ("Vu Report"), Raw Balance Sheet Statements; DX-6 at 4.
[5] The two points set forth in this memorandum do not constitute the entirety of the arguments that the defendants seek to present at trial
[6] PX-1 § 8.2.
[7] Deposition of Jodie Gordon, Oct. 8, 2024 ("Gordon Dep.") 51:13-20.
[8] Report of Heidi Muckler dated Nov. 4, 2024, Defendants' Exhibit ("DX") 6, at 4.
[9] JPTO at 3.

as a continuing business, not on a liquidation basis, and testified that he would need to look at "what its debts are" to do a liquidation analysis.[10] Vu also agreed that the value of Fusion's service mark depends on the success of the business. Fusion lost money in 2018 and 2019, and Defendants' expert, Heidi Muckler, valued a 100% interest in Fusion at zero as of December 31, 2020.[11]

The second point is that, if the jury finds a breach, Section 8.2 also fixes the damages. Pollack lost only what Section 8.2 would have paid him, which is 35.222% of the balance left after Fusion's debts, liabilities, and necessary reserves. Plaintiff's damages table does not measure that. It multiplies five gross figures, from $3.4 million to $20.5 million, by 35.222% and subtracts nothing.[12] The burden of proving the net amount is Plaintiff's, and neither his table nor his expert supplies one. Plaintiff's claim against Defendant Fusion Models BK LLC for tortious interference depends on the same breach and seeks the same damages, so both arguments apply to it.[13] Defendants therefore will ask the Court to hold that any damages are limited to Pollack's 35.222% share of what remained after Fusion's debts, liabilities, and necessary reserves were paid, and to instruct the jury that Plaintiff must prove that amount.

## BACKGROUND AND FACTS

Fusion was a New York modeling agency.[14] Its Operating Agreement is dated December 7, 2006.[15] By December 2020, Gordon and Pollack were its only remaining members, and Pollack owned 35.222% of the membership interests.[16] Under the Operating Agreement, both Gordon and Pollack were Managing Members. Pollack testified that he was a Managing Member

[10] Deposition of Quan Vu, June 4, 2025 ("Vu Dep.") 74:9-19.
[11] DX-6 at 10.
[12] JPTO at 29.
[13] JPTO at 3, 29.
[14] JPTO at 9.
[15] Stip. ¶ 1.
[16] Stip. ¶ 3.

from the signing of the Operating Agreement until Fusion was dissolved in 2021 and that he never removed himself from the LLC.[17] The parties stipulate that the Operating Agreement is a valid and binding contract that governs "the dissolution, winding up, and distribution of the Company's assets."[18]

Article VIII of the Operating Agreement governs dissolution. The entry of a decree of judicial dissolution is one of the events that dissolves the Company.[19] Two provisions then control the winding up:

> 8.2 Winding Up. Upon the occurrence of any event specified in Section 8.1, the Managing Members will take full account of the Company's liabilities and assets, and the Company's assets will be liquidated as promptly as is consistent with obtaining the fair value thereof. The proceeds from the liquidation of the Company's assets will be applied and distributed in the following order:
>
> 8.2.1 First, to the payment and discharge of all of the Company's debts and liabilities (including debts and liabilities to the Members, to the extent permitted by law), and the establishment of any necessary reserves;
>
> 8.2.2 The balance, to the Members in accordance with the percentage of Units owned by each Member.
>
> 8.3 Timing of Liquidating Distributions. Liquidating distributions will be made by the end of the taxable year in which the liquidation occurs or, if later, within ninety (90) days of the liquidating event and will otherwise comply with Regulations Section 1.704-1(b).[20]

---

[17] PX-1 § 5.4.1; Deposition of Kevin Pollack, Apr. 23, 2025 ("Pollack Dep.") 86:4-9, 96:8-22.
[18] Stip. ¶ 8.
[19] PX-1 § 8.1.4.
[20] PX-1 §§ 8.2, 8.2.1, 8.2.2, 8.3.

On January 11, 2021, Gordon petitioned the Kings County Supreme Court for judicial dissolution of Fusion under Limited Liability Company Law § 702.[21] By Decision and Order of Justice Reginald A. Boddie dated April 30, 2021, and entered May 3, 2021, the petition was granted and Fusion was dissolved.[22]

The parties stipulate that Fusion's tax returns, profit and loss statements, balance sheets, and general ledger are authentic business records.[23] The balance sheets attached to the report of Plaintiff's own expert show that Fusion's liabilities exceeded its assets, and that its total equity was negative, in every year from 2016 through 2021.[24] For 2019, they show total assets of $1,911,307.37 and total liabilities of $2,373,066.37.[25] As of December 31, 2020, the closest year end to the dissolution, Fusion's assets were $1,308,160, mostly accounts receivable, and its liabilities were $2,029,801, mostly accounts payable and a business loan.[26] Its book value on that date was negative $721,642.[27] For 2021, the balance sheets show total assets of $1,332,011.72 and total liabilities of $1,970,289.66.[28] Fusion lost money in 2018 and 2019.[29] Pollack himself testified that a document covering 2016 to 2022 showed about $35 million of gross income but "almost zero, no profit. Nominal, maybe $50,000 one way or the other."[30]

Gordon testified that winding up Fusion meant waiting for clients who owed Fusion money to pay, so that the models Fusion owed could be paid, and that some of those clients never

---

[21] Stip. ¶ 4.
[22] Stip. ¶ 5.
[23] Stip. ¶ 7.
[24] Vu Report, Raw Balance Sheet Statements.
[25] *Id.* Fusion's accrual basis balance sheet shows total assets of $1,852,429.85 and total liabilities of $2,348,680.79 at December 31, 2019. Ex. A, Part A.2. The two sources also differ for 2017 and 2018. Both show liabilities above assets in every year from 2016 through 2020.
[26] DX-6 at 4, 10.
[27] DX-6 at 4.
[28] Vu Report, Raw Balance Sheet Statements.
[29] DX-6 at 10.
[30] Pollack Dep. 125:22-126:4.

paid.[31] She testified, "I don't think there's anything left owed," and that "[w]e had to wait to close things out until things had been paid."[32] Fusion Models BK LLC ("Fusion BK") was formed on November 5, 2021, after the dissolution order, and Gordon is its sole member and manager.[33] Plaintiff contends that Gordon and Fusion BK continued to use Fusion's name, marks, website, and other intangible assets instead of selling them, and that those assets had "substantial market value."[34] Defendants contend that they had "little or no market value."[35] Each side has a valuation expert. Plaintiff's expert, Quan Vu, values Fusion at $3.4 million to $5.4 million as of its judicial dissolution, and opines that an acquirer able to eliminate duplicative expenses would value it at $11.4 million to $20.5 million.[36] Defendants' expert, Heidi Muckler, concludes that the value of a 100% interest in Fusion as of December 31, 2020 was zero.[37] Two claims will be tried to the jury: breach of the Operating Agreement against Gordon, and tortious interference with that agreement against Fusion BK.[38]

## I. GORDON DID NOT BREACH THE OPERATING AGREEMENT

### A. Section 8.2 Requires a Sale at Fair Value and Payment of Debts First, Not a Sale by a Date

Under New York law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). Section 8.2 is that kind of agreement, and it says two things. First, it sets a standard for the sale, not a deadline. The assets "will be liquidated as

---

[31] Gordon Dep. 51:13-52:2.
[32] *Id.* at 52:8-11.
[33] Stip. ¶ 6.
[34] JPTO at 3.
[35] JPTO at 9.
[36] JPTO at 11.
[37] DX-6 at 10.
[38] JPTO at 2, 9.

promptly as is consistent with obtaining the fair value thereof."[39] Speed is required only so far as it is consistent with fair value. A Managing Member who does not sell at once because a quick sale would not bring fair value does what Section 8.2 asks. Second, it sets the order of payment. Proceeds go "[f]irst" to Fusion's debts, liabilities, and necessary reserves, and the Members receive only "[t]he balance."[40] Section 8.2 therefore gives a Member no right to a sale by a particular date, and no right to any of the proceeds until the debts are paid. Plaintiff cannot prove a breach by showing only that time passed after the dissolution order, or only that he was not paid.

**B. No Liquidating Distribution Was Owed Because No Balance Remained After Fusion's Debts**

Plaintiff's first complaint is that he received no liquidating distribution.[41] Section 8.2 owed him one only if a balance remained after Fusion's debts, and the record shows none. On Fusion's accrual basis balance sheets, its liabilities exceeded its assets in every year from 2016 through 2021.[42] At the year end closest to the dissolution, the gap was $721,642.[43] Gordon wound up the company in the order Section 8.2 prescribes. She waited for clients to pay what they owed so that the models Fusion owed could be paid, and some clients never paid.[44] Section 8.3 does not change the result. It sets the time for "[l]iquidating distributions," and under Section 8.2.2 a liquidating distribution is a payment of "[t]he balance."[45] Where there is no balance, there is no liquidating distribution to make by December 31, 2021 or by any other date. For the same reason, the timing of the wind up cost Pollack nothing. A faster liquidation of a company that

---

[39] PX-1 § 8.2.
[40] *Id.* §§ 8.2.1, 8.2.2.
[41] JPTO at 3.
[42] Vu Report, Raw Balance Sheet Statements; DX-6 at 4.
[43] DX-6 at 4, 10.
[44] Gordon Dep. 51:13-52:2.
[45] PX-1 §§ 8.2.2, 8.3.

owed more than it owned would have paid its creditors sooner. It would not have paid him. That leaves Plaintiff's contention that Fusion's name and accounts would have sold for enough to change this.

**C. Fusion's Name and Accounts Do Not Change the Result**

Plaintiff's second complaint is that Gordon did not sell Fusion's name, marks, website, and social media accounts and instead used them in Fusion BK.[46] Section 8.2 required a sale of those assets only at fair value, which is what a willing buyer would pay a willing seller. And because Section 8.2 pays debts first, a sale would have reached Pollack only if it brought more than Fusion owed. Defendants' evidence is that it would not have. Ms. Muckler concluded that a 100% interest in Fusion was worth zero.[47] That is a value for the whole company, not for its receivables alone. Responding to Vu's statement that Fusion's service mark embodies "significant goodwill," she explains that whether that is correct "would depend upon if the business made money and someone would be willing to buy just the 'service mark' and close the operation of the business."[48] Vu agreed that the value of the service mark depends on the success of the associated business.[49] The business lost money in 2018 and 2019.[50] A buyer would also have had to replace Gordon, and "would want to know what it would actually cost them to pay an employee to do Ms. Gordon's job."[51] Plaintiff's own expert does not value the name and accounts for sale. Vu valued Fusion as a continuing business and did no liquidation analysis.[52] A Managing Member does not breach Section 8.2 by not selling what a buyer would not pay a fair price for, and Pollack lost nothing from a sale whose proceeds would not have reached him.

---

[46] JPTO at 3.
[47] DX-6 at 10.
[48] Rebuttal Report of Heidi Muckler dated Nov. 18, 2024, DX-7, at 3.
[49] Vu Dep. 68:21-24.
[50] DX-6 at 10.
[51] DX-7 at 4.
[52] Vu Dep. 74:9-19.

### D. The Claim Against Fusion BK Fails With the Breach Claim

Plaintiff's second claim is that Fusion BK tortiously interfered with the Operating Agreement by procuring Gordon's breach of it.[53] In New York, breach of the contract is an essential element of that tort. *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621 (1996) ("breach of contract has repeatedly been listed among the elements"). If Gordon did not breach Section 8.2, for the reasons above, the claim against Fusion BK fails as well.

## II. ANY DAMAGES ARE THE NET BALANCE SECTION 8.2 WOULD HAVE PAID, AND PLAINTIFF HAS NOT PROVED ONE

### A. Section 8.2 Fixes the Measure: a Share of What Is Left After Debts

If the jury finds a breach, the measure of damages is "the amount necessary to put the injured party in exact position as he would have been if the contract had not been breached." *Perma Research & Dev. v. Singer Co.*, 542 F.2d 111, 116 (2d Cir. 1976); *accord Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977). For an owner's share of a business, an award "should place the plaintiff in the same position as he or she would have been in if the contract had not been breached." *Wai Ming Ng v. Tow*, 260 A.D.2d 574, 575 (2d Dep't 1999). The contract says what Pollack would have received. Section 8.2 pays the Members only "[t]he balance" after "all of the Company's debts and liabilities" and "any necessary reserves."[54] The Limited Liability Company Law sets the same order for a winding up, with creditors first "whether by payment or by establishment of adequate reserves." N.Y. Ltd. Liab. Co. Law § 704(a). Pollack's damages, if any, are therefore 35.222% of the balance left after Fusion's debts, liabilities, and necessary reserves were paid from the proceeds of a sale at fair value.[55] A figure that is not net of those items would put him in a better position than Section 8.2

[53] JPTO at 3.
[54] PX-1 §§ 8.2.1, 8.2.2.
[55] Stip. ¶ 3.

would have, which the measure of damages does not allow. *Contemporary Mission*, 557 F.2d at 926; *Wai Ming Ng*, 260 A.D.2d at 575.

Exhibit A applies this formula to Fusion's year end balance sheets for 2016 through 2020. It begins with the accrual basis, the basis on which Fusion prepared its balance sheet, DX-6 at 4, because Section 8.2.1 requires payment of "all of the Company's debts and liabilities," including amounts Fusion owed but had not yet paid. On that basis liabilities exceeded assets in every year, and the formula yields no balance. Exhibit A then applies the same formula to the cash basis, which records far fewer unpaid debts and uncollected receivables, and states those results.

The accrual basis is the right one for this calculation. Accrual accounting records a debt when it is incurred and a receivable when it is earned, even if no cash has changed hands, and the cash basis records them only when cash is paid or received. The accrual basis is the one that conforms to generally accepted accounting principles. The Financial Accounting Standards Board describes its Codification as "the source of authoritative generally accepted accounting principles" and states that the Codification "does not include guidance for non-GAAP matters," including the "Cash Basis."[56] The Congressional Research Service reports the same and adds that the cash method does not accurately reflect a company's assets and liabilities.[57] The difference is large here. At December 31, 2020, Fusion's accounts payable were $1,622,427.01 on the accrual basis and $182,457.56 on the cash basis. Ex. A, Parts A and B. Section 8.2.1 requires payment of "all of the Company's debts and liabilities," and a debt Fusion owed to a model was a debt

---

[56] FASB, Accounting Standards Codification, *About the Codification* (v 5.11) at 4, 8 (Feb. 2023), Ex. C.

[57] Raj Gnanarajah, Cong. Rsch. Serv., R43811, *Cash Versus Accrual Basis of Accounting: An Introduction* 5, 7 (Dec. 12, 2014), Ex. B ("Accrual basis of accounting is in accordance with GAAP"; cash basis "[d]oes not meet GAAP requirements"; "[t]he cash method does not, however, accurately reflect a company's assets, liabilities, revenues, or expenses").

whether or not Fusion had paid it. Exhibit A shows both bases so the Court can see each, but the accrual basis is the one that records the debts Fusion owed and had not yet paid.

Section 8.2 also requires a sale at "fair value."[58] For unique or intangible assets, New York courts apply the hypothetical market standard: the price "at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) (quoting *United States v. Cartwright*, 411 U.S. 546, 551 (1973)). In a statutory fair value proceeding, the Court of Appeals describes the objective the same way: "what a willing purchaser in an arm's length transaction would offer." *Matter of Seagroatt Floral Co.*, 78 N.Y.2d 439, 445 (1991).

**B. Plaintiff's Table and Vu's Valuation Do Not Measure the Net Balance**

Plaintiff's damages table leaves out the first step of Section 8.2. It lists five figures for the "Value of Fusion's assets," from $3.4 million to $20.5 million, and multiplies each by 35.222%.[59] He asks the jury "to determine the fair value of Fusion's assets and to award him 35.222% of that value."[60] That is a share of gross value, not of the balance the contract awards.

Vu's report supplies no net figure. He values Fusion as a business and calls his figure of $3.4 million to $5.4 million its "enterprise value."[61] By his own account, his is "not an analysis based upon liquidation, it's based upon the but-for liquidation."[62] He did not consider what a hypothetical willing buyer and seller would agree upon, which is the standard Section 8.2 sets.[63] Asked whether his valuation reflects what someone in the open market would pay, he said yes,

[58] PX-1 § 8.2.
[59] JPTO at 29.
[60] *Id.*
[61] Vu Report at 6.
[62] Vu Dep. 74:9-11.
[63] *Id.* at 41:8-13.

because it is "an intrinsic valuation" and a company that acquires Fusion "would consider this a bolt-on acquisition" in which "the expenses almost become irrelevant."[64] He added that his valuation is "contingent upon the assumption that it operates efficiently before liquidation context."[65] Vu agreed that the "accepted approach" is "essentially assets minus liability,"[66] although he said buyers do not value a company that way.[67] Asked what his valuation would be in a liquidation, he answered that he would need to look at "what its debts are" and "I don't have that."[68] He had reviewed the 2019 and 2020 balance sheets,[69] but his figure does not subtract the liabilities they show. Those balance sheets, attached to his own report, show liabilities above assets in every year from 2016 through 2021.[70]

The table's $16 million figure does not come from Vu. The JPTO says Plaintiff will prove it through his own testimony and Gordon's statements, including what she told him an accountant thought Fusion was worth.[71] It is also a gross figure, with nothing subtracted for debts.

New York courts have seen this mistake before. In *Wai Ming Ng v. Tow*, a 25% shareholder won a judgment that rested on his expert's valuation of the company. The Second Department reversed the damages award and called the flaws in that valuation "obvious." The expert based it "solely on earnings" and ignored, among other things, "the corporation's expenses and outstanding debts." 260 A.D.2d at 575. Vu's valuation has the same flaw. It values earnings and ignores debt. *Wilbur v. Wilbur* shows what that omission can cost. There the

---

[64] *Id.* at 41:17-42:5.
[65] *Id.* at 42:16-18.
[66] *Id.* at 34:11-12.
[67] *Id.* at 34:12-15.
[68] *Id.* at 74:12-19.
[69] *Id.* at 68:8-11.
[70] Vu Report, Raw Balance Sheet Statements.
[71] JPTO at 29.

plaintiff's expert capitalized a closely held company's earnings and put the value of its stock at $650,806. The defendant's expert subtracted the company's liabilities from its assets and found that the liabilities exceeded the assets by $6,000. The trial court chose the second figure, which was zero, and the Third Department left that choice undisturbed. 116 A.D.2d 953, 953 to 54 (3d Dep't 1986).

**C. Plaintiff Bears the Burden of Proving the Net Amount**

Plaintiff will answer that the amount of damages need not be exact. That is true, but only after a prior question is answered. New York is lenient on the amount of damage and strict on the fact of damage. Damages must be "reasonably certain," and for general damages that certainty "refers to the fact of damage, not the amount." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007). Only "once the fact of damage is established" does the plaintiff need to supply no more than "a stable foundation for a reasonable estimate" of the amount. *Id.* at 111; *see Contemporary Mission*, 557 F.2d at 926 (relaxed proof of amount applies "when the existence of damage is certain, and the only uncertainty is as to its amount"). Until that first showing is made, the plaintiff carries "the burden of proving the extent of the harm suffered," and "[s]peculation or conjecture will not suffice." *Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 686 to 87 (1978).

Here the first question remains open. Section 8.2 pays Pollack only from what is left after debts, and Plaintiff's table and Vu's valuation offer no figure for what was left. Without one, the jury would have no basis to find that any balance remained for the Members. As shown in Part I.B, Defendants' evidence is that none did. Plaintiff cannot ask the jury to estimate an amount until he has proved that there was something to estimate.

The Court's summary judgment decision does not answer that question. The Court observed that, on that motion, Defendants had "set forth no facts evidencing a lack of damages." DE 80 at 25 to 26. But the denial of summary judgment "does not settle or even tentatively decide anything about the merits of the claim." *Switzerland Cheese Ass'n v. E. Horne's Market, Inc.*, 385 U.S. 23, 25 (1966). The trial record will include Fusion's balance sheets, which the parties stipulate are authentic business records, Stip. ¶ 7, and Ms. Muckler's testimony. The Court's decision itself quotes the order of payment that Section 8.2 prescribes. DE 80 at 15.

Plaintiff's two rules do not change this. He says that certainty "applies to the fact of damage, not its amount," and that a claim for "the market value of a lost asset" is not held to the standard for the projected earnings of a new business.[72] The first rule has a starting point: the fact of damage must already be established. In *Tractebel*, it was. The district court had impliedly found that the non-breaching party "suffered at least some damage" from the breach, and the only dispute was how much. 487 F.3d at 111 n.24. In *Contemporary Mission*, the court first held that "it is certain that Contemporary suffered some damage in the form of lost royalties," and only then turned to the amount. 557 F.2d at 927. *Schonfeld* itself refused to apply the rule where the fact of damage was not shown. The wrongdoer rule, it said, "is not that broad." It applies "when the existence of damage is certain," and it did not apply to lost profits whose existence could not be established "with the requisite certainty." 218 F.3d at 174 to 75.

The second rule tells a court how to value an asset. It does not change what Section 8.2 owes Pollack. *Schonfeld* describes the purpose of damages as making sure the breach "does not leave the plaintiff with assets or net worth less than that to which she is entitled." *Id.* at 177 (citation omitted). Section 8.2 fixes what Pollack was entitled to: a share of "the balance" after Fusion's debts, liabilities, and reserves. Valuing the assets is where the calculation begins, not

[72] JPTO at 4 (citing *Tractebel*, 487 F.3d at 110 to 11, and *Schonfeld*, 218 F.3d at 175 to 77).

where it ends. *Schonfeld* also does not say the amount needs no proof. For a lost asset, "the asset's value should be proven with reasonable certainty," and the plaintiff must "establish both their existence and their amount with reasonable certainty." *Id.* at 177. A buyer's price is evidence of market value only if it is "also the price at which a reasonably informed seller is willing to sell the asset." *Id.* at 181. In *Schonfeld* that test was met because the company had signed a contract agreeing to sell at the buyer's price. *Id.* at 179 to 81. Vu's figures of $11.4 million to $20.5 million have nothing like that. They are what he says a larger company "could reasonably expect to achieve" by cutting 85 to 95 percent of Fusion's operating expenses.[73] Plaintiff identifies no buyer who offered those numbers or seller who accepted them, and Vu did not consider what a willing buyer and a willing seller would agree on.[74] The $16 million figure rests on testimony and Gordon's statements about value, not on a price a seller accepted.[75]

Nor can Plaintiff leave the debts to Defendants. Mitigation asks what a plaintiff could have done after a breach to reduce a loss he has already proved, and the defendant carries that burden. *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985); *Cornell v. T.V. Dev. Corp.*, 17 N.Y.2d 69, 74 (1966). Fusion's debts are not a step Pollack could have taken to reduce his loss. They are the first term in the formula that fixes what Section 8.2 owed him.[76] *G & A Moving & Storage Co. v. Computer Assocs. Int'l* shows how courts apply the burden. The plaintiff there sued for lost profits but offered no proof of its own costs. It won at trial, and the Second Department reversed and dismissed the complaint. The trial court had "erroneously shifted the burden of proving damages to the defendant," because without evidence of the plaintiff's costs there was "insufficient evidence to compute the plaintiff's net loss of profits."

---

[73] Vu Report at 4.
[74] Vu Dep. 41:8-13.
[75] JPTO at 29.
[76] PX-1 § 8.2.1.

233 A.D.2d 479, 479 to 80 (2d Dep't 1996). Section 8.2 pays Pollack a share of a balance, which is the assets less the debts. He must prove the balance.

**D. The Same Measure Applies to the Claim Against Fusion BK**

Plaintiff seeks the same 35.222% "against Gordon and Fusion BK."[77] Everything in this Section applies equally to the claim against Fusion BK.

Defendants therefore ask the Court to hold that any damages are limited to Pollack's 35.222% share of what remained after Fusion's debts, liabilities, and necessary reserves were paid from the proceeds of a sale at fair value, and to instruct the jury that Plaintiff must prove that amount.

## CONCLUSION

Section 8.2 of the Operating Agreement pays Fusion's debts, liabilities, and necessary reserves first, distributes only "[t]he balance" to the Members, and sets no date by which Fusion had to be sold.[78] The balance sheets attached to Plaintiff's own expert's report show liabilities above assets in every year from 2016 through 2021, and Vu's valuation does not subtract them.[79] If no balance remained, Gordon owed Pollack no liquidating distribution, and the claim against Fusion BK, which depends on the same breach, fails with it. If the jury reaches damages, Pollack must prove 35.222% of the net balance Section 8.2 would have paid, and neither his table of gross asset values nor Vu's valuation does that.[80]

Defendants therefore respectfully will ask the Court to instruct the jury that Section 8.2 requires payment of Fusion's debts, liabilities, and necessary reserves before any distribution to Members and sets no deadline for a sale; that Plaintiff must prove a breach; and that any

---

[77] JPTO at 29.
[78] PX-1 §§ 8.2, 8.2.1, 8.2.2.
[79] Vu Report, Raw Balance Sheet Statements; Vu Dep. 74:12-19.
[80] JPTO at 29.

damages are limited to 35.222% of the net balance Section 8.2 would have paid, which Plaintiff must prove.

Dated: Brooklyn, New York
November 12, 2026

Respectfully submitted,

Maria Patelis, Esq.
Maria Patelis & Associates, PLLC
Attorneys for Defendants Jodie Gordon and Fusion Models BK LLC
9732 3rd Avenue
Brooklyn, New York 11209
917-653-7214
m.patelis@aol.com

I certify that this memorandum of law contains 4,882 words, including headings and footnotes and excluding the caption, table of contents, table of authorities, signature block, and this certificate, as counted by the word-processing program used to prepare it. This memorandum therefore complies with the 8,750 word limit.

Dated: Brooklyn, New York
November 12, 2026

Respectfully submitted,

/s/ Maria Patelis
Maria Patelis, Esq.
MARIA PATELIS & ASSOCIATES, PLLC
9732 3rd Avenue
Brooklyn, New York 11209
Tel: (917) 653-7214
m.patelis@aol.com
Counsel for Defendants Jodie Gordon and
Fusion Models BK LLC