# EXHIBIT E

Excerpts from the Transcript of the Deposition of
Quan Vu
June 4, 2025

**Contents**

Transcript cover page
Page 33
Page 34
Page 41
Page 42
Page 68
Page 74
Reporter's certificate (page 101)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------X
KEVIN POLLACK,

PLAINTIFF,

-against- Case No.:
23 Civ. 2376 (SJB) (LKE)

JODIE LOUISE GORDON (also known as JODY GORDON) and FUSION MODELS BK LLC,

DEFENDANTS.
------------------------------------------X

DATE: June 4, 2025
TIME: 11:23 A.M.

DEPOSITION of the Non-Party Witness, QUAN VU, taken by the Defendants, pursuant to a Notice and to the Federal Rules of Civil Procedure, held VIA ZOOM VIDEOCONFERENCE, before Jamie Newman, a Notary Public of the State of New York.

QUAN VU

MS. PATELIS: He finished.

MR. LEHMAN: -- you literally just did that.

MS. PATELIS: He finished.

MR. LEHMAN: No, he didn't. Can we please remove the resumé off the screen, I don't think you could see him. There we go, thank you.

Q. But Mr. Vu, you were aware that the company was dissolved?

A. Yes, I am.

Q. Do you agree that intrinsic value is not the same as fair market value used in litigation settings?

A. The intrinsic value is not the same -- once again, it comes back to what do you mean by intrinsic and what do you mean by fair value? We don't need -- you know, the definition of fair value in and of itself doesn't require anything market related sometimes.

If you take, for example, even the approaches of, like, an asset value model where you take the assets minus

QUAN VU

liability that has nothing to do with technically fair value. I mean, fair value by definition is what do you believe is the value of the business, like, fairly and I suppose but whatever that means --

Q. I know, I'm --

A. -- but that approach --

MR. LEHMAN: Stop interrupting him.

A. -- accepted approach is essentially assets minus liability and so, but that's not how companies look at in terms of the value of how they're being sold, for example. You know --

Q. I --

A. -- when you look at a company it's not just what's going on out there.

THE COURT REPORTER: I cannot get everyone talking at the same time.

MR. LEHMAN: Ms. Patelis, you have to stop interrupting him. I agree. If you want to get the Judge involved get the Judge involved, but

QUAN VU

**A. Absolutely.**

Q. Did you consider what a hypothetical willing and able buyer would agree upon a valuation for this company?

**A. I'm sorry, can you rephrase that question, please?**

Q. Did you consider what a hypothetical willing buyer and seller would agree upon?

**A. When I was doing the analysis?**

Q. Yes.

**A. No.**

Q. Did you apply any marketability or minority discounts?

**A. No.**

Q. In your review, is your valuation a reflection of what someone in the open market would pay?

**A. Yes.**

Q. How?

**A. Because it is an intrinsic valuation of the company. So any company that acquires it, which is part of the report, would consider this a bolt-on**

**QUAN VU**

**acquisition. So when they have a bolt-on acquisition the expenses almost become irrelevant because there will be redundancies.**

**So, a company would buy it for -- just to achieve the top line sales that they'll add to their on top line sales and eliminate all the operating expenses associated with the fusion.**

Q. Right, but this company was being dissolved?

**A. I understand that.**

Q. So it doesn't align with your valuation?

**A. The valuation is contingent upon the assumption that it operates efficiently before liquidation context. That's like almost -- to argue from a liquidation context and its value kind of defeats the whole purpose.**

Q. Right, but this is a legal matter so --

**A. I'm not here to evaluate legal matters, I'm here to evaluate the company**

QUAN VU

conclude the company was liquid?

**A. Based upon the historic and its growth rate, right, this is a but-for analysis. But-for the liquidation itself if the company was run efficiently it would be fine.**

Q. And did you review Fusion's 2019 and 2020 balance sheets, before reaching that conclusion?

**A. Yes.**

Q. And are you aware that Fusion incurs high model related overhead including rent, travel and meals?

**A. Yes.**

Q. Would you agree that gross profit, not net, is the more useful metric for service business like model agencies?

**A. Depends on how you define growth and net.**

Q. Would you agree that the value of the service mark depends on the success of the associated business?

**A. Yes.**

Q. Isn't the value of the service

**QUAN VU**

**operational expense savings.**

Q. I understand that, but again, this company is dissolved so we're trying --

**A. You're just kind of, again, Maria, you're kind of beating a dead horse.**

Q. Right.

**A. You know, this is not an analysis based upon liquidation, it's based upon the but-for liquidation.**

Q. But if you did a liquidation analysis, what would the valuation be?

**A. I don't know, I didn't do that that's a hypothetical question. I would need to look at the capital structure, what its debts are, what are the various things and so on and so forth in order to determine that and I don't have that.**

Q. And how did you determine a Fusion pays expenses for the personal benefit of the member if you didn't interview her?

**A. I looked at what's in the the financials.**

QUAN VU

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF KINGS )

I, JAMIE NEWMAN, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of June 2025.

______________________________
JAMIE NEWMAN